ORIGINAL

1  Steven A. Marenberg (101033) (smarenberg@irell.com)
2  Melissa R. McCormick (180384) (mmcormick@irell.com)
   Douglas J. Dixon (275389) (ddixon@irell.com)
3  IRELL & MANELLA LLP
   1800 Avenue of the Stars, Suite 900
4  Los Angeles, California 90067-4276
   Telephone:  (310) 277-1010
5  Facsimile:   (310) 203-7199

6  Attorneys for Plaintiffs

7

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12  BAGDASARIAN PRODUCTIONS,           )  Case No. CV-10-02991 MWF
    LLC, a California limited liability    )
13  company, and JANICE KARMAN, an     )  Referred under Cal. Code Civ. Proc.
    individual,                        )  Section 638 to:
14                                     )
15              Plaintiffs,            )  Hon. Carl J. West (Ret.)
                                       )
16                                     )  JAMS Reference No. 1220044628
    v.                                 )
17                                     )  **FIRST AMENDED COMPLAINT**
                                       )  **FOR DECLARATION OF CO-**
18  TWENTIETH CENTURY FOX FILM         )  **OWNERSHIP OF COPYRIGHT**
    CORPORATION, a Delaware            )  **AND ACCOUNTING FOR PROFITS,**
19  corporation,                       )  **COPYRIGHT INFRINGEMENT,**
                                       )  **UNJUST ENRICHMENT, BREACH**
20                                     )  **OF IMPLIED CONTRACT, AND**
              Defendant.               )  **BREACH OF CONTRACT**
21                                     )
                                       )  **DEMAND FOR JURY TRIAL**
22

23

24

25

26

27

28

1        Plaintiffs Bagdasarian Productions, LLC ("Bagdasarian Productions") and

2   Janice Karman ("Karman") allege against defendant Twentieth Century Fox Film

3   Corporation ("Fox") as follows:

4        1.    This is an action to force Fox to account to Karman for her critical

5   creative contributions to the motion picture *Alvin and the Chipmunks: The*

6   *Squeakquel* ("*The Squeakquel*"), and to remedy Fox's repeated breaches of a

7   producer agreement between the parties, pursuant to which Fox derives its rights to

8   make motion pictures, including *Alvin and the Chipmunks*, *The Squeakquel*, and

9   *Alvin and the Chipmunks: Chipwrecked* ("*Chipwrecked*"), based on the iconic and

10  beloved pop culture characters *Alvin and the Chipmunks*.

11       2.    Bagdasarian Productions, a company owned and run by Ross

12  Bagdasarian, Jr. and his wife Janice Karman, is the owner and licensor of the

13  properties known as *Alvin and the Chipmunks*.  In 2004, Fox and Bagdasarian

14  Productions entered into a Purchase/Producer Agreement (the "Producer

15  Agreement"), pursuant to which Bagdasarian Productions granted Fox an option for

16  the right to develop, produce and distribute motion pictures based on the underlying

17  *Alvin and the Chipmunks* properties.  In addition, under the Producer Agreement,

18  Fox engaged Bagdasarian, Jr. and Karman to render services in connection with the

19  motion pictures but solely in the capacity of producers.  The Producer Agreement

20  does not require that Bagdasarian, Jr. or Karman perform writing services and

21  makes clear that Fox would write the screenplays for the motion pictures.  The first

22  film produced under the Producer Agreement, *Alvin and the Chipmunks*, was

23  released in 2007 and achieved significant box office success.

24       3.    Following the success of the first film, Fox and Bagdasarian

25  Productions began work on *The Squeakquel*, a title Karman came up with, in early

26  2008.  In March 2008, Karman wrote the 33-page treatment — containing full

27  scenes and dialogue — for *The Squeakquel* screenplay.  In connection with the

28  development of the *Squeakquel* screenplay, over the course of almost one year,

- 1 -

Karman — at Fox's specific request and in the absence of any agreement between Karman and Fox with respect to Karman's writing services or writings — created numerous original treatments, draft screenplays, scenes, and dialogue for *The Squeakquel*. Karman and, upon information and belief, Fox intended to merge and did merge Karman's screenplay writings with Fox's writings to create a unitary whole: *The Squeakquel*'s final screenplay. Indeed, Karman's screenplay writings constitute a substantial portion of *The Squeakquel*'s final screenplay and the film's audience appeal.

4. To date, Fox has refused to account to Karman as co-owner of *The Squeakquel* screenplay, or, in the alternative, as the owner of her substantial copyrighted contributions used by Fox, without authorization, in *The Squeakquel* screenplay. Nor has Fox compensated Karman for the graphic design services that she provided in connection with certain key characters. Further, as detailed below, Fox has separately and repeatedly breached the Producer Agreement between Fox and Bagdasarian Productions. For these reasons, Karman and Bagdasarian Productions seek relief in this action.

## JURISDICTION AND VENUE

5. This action arises under the Copyright Act, 17 U.S.C. §§ 101, et seq., and the common laws of the State of California. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

6. This Court has personal jurisdiction over Fox pursuant to Cal. Code Civ. Proc. § 410.10 because Fox resides in and/or is doing business in the State of California and in this District. In addition, upon information and belief, many of the acts complained of herein resulted from Fox's actions in the State of California and in this District. Upon information and belief, Fox has purposefully engaged in acts targeted at this District that have caused harm in this District; it has entered into

1  agreements with residents of this State and District; and it has availed itself of the

2  privilege of conducting activities in this State and District.

3       7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)

4  because Fox resides in this District (as that term is defined in 28 U.S.C. § 1391(c))

5  and/or pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or

6  omissions giving rise to this action have occurred and/or will occur in this District.

7                              **THE PARTIES**

8       8.    Bagdasarian Productions is a limited liability corporation organized and

9  existing under the laws of the State of California, with its principal place of business

10  at 1192 East Mountain Drive, Montecito, California 93108.

11      9.    Karman is an individual residing in the County of Santa Barbara, State

12  of California.

13      10.   Upon information and belief, Fox is a private corporation duly

14  organized and existing under the laws of Delaware, with its principal place of

15  business at 10201 West Pico Boulevard, Los Angeles, California 90035.

16                              **BACKGROUND**

17      11.   *Alvin and the Chipmunks* is an animated music group, consisting of

18  three singing chipmunks:  Alvin, the enthusiastic, charming troublemaker and star of

19  the group; Simon, the witty, bespectacled intellectual; and Theodore, the chubby,

20  innocent, gullible one.  The trio is managed by their human father, David Seville.

21      12.   Ross Bagdasarian, Sr., also known as David Seville, created *Alvin and*

22  *the Chipmunks* in 1958.  Soon after, Bagdasarian recorded the Chipmunks' first

23  single, *The Chipmunk Song (Christmas Don't Be Late)*.  The song was an instant

24  classic, quickly rising to Number 1 on the Billboard Hot 100, earning three Grammy

25  Awards, and spawning three generations of Chipmunk songs, motion pictures,

26  television shows, books, and toys — to the delight of fans of all ages.  Beyond

27  creating *Alvin and the Chipmunks*, Ross Bagdasarian, Sr. wrote the music and some

28  of the dialogue for all of the shows, acted as the voice of David Seville and all three

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1  chipmunks, and essentially single-handedly ran the *Alvin and the Chipmunks*

2  business, from licensing and administration to the extensive creation of original

3  *Alvin and the Chipmunks* properties.

4      13.  After Ross Bagdasarian, Sr. died in 1972, his son, Ross Bagdasarian,

5  Jr., succeeded as head of the family business. Subsequently, Bagdasarian, Jr. and

6  Karman founded Bagdasarian Productions, a company dedicated to developing,

7  licensing, and producing *Alvin and the Chipmunks*-related properties. Under

8  Bagdasarian, Jr. and Karman, the Chipmunks franchise rose to new heights, starting

9  in 1980 with an album, *Chipmunk Punk*, which sold over a million copies. This was

10  followed by two more highly successful albums, a primetime special — *A*

11  *Chipmunk Christmas* — seen by tens of millions of people, and the Number 1,

12  Emmy-nominated animated television series, which ran on NBC for eight

13  production seasons from 1983 through 1991. The television show featured Alvin,

14  Simon, and Theodore and introduced Karman's creation, the female "Chipettes" —

15  Brittany, Jeanette, and Eleanor — who paralleled the personalities of their

16  Chipmunk counterparts. Bagdasarian, Jr. performed the voices of Alvin, Simon, and

17  Dave Seville, while Karman performed the voices of Theodore and the Chipettes.

18  In 1987, Bagdasarian, Jr. and Karman wrote and Karman directed the Chipmunks'

19  first animated feature film, *The Chipmunk Adventure*, which was released to theaters

20  by the Samuel Goldwyn Company. Since then, *Alvin and the Chipmunks* have

21  continued to entertain generations of fans with their million-selling albums, live

22  touring shows, merchandise, television shows, home videos, and feature films.

23  **The Producer Agreement**

24      14.  On March 26, 2004, Bagdasarian Productions and Fox entered into the

25  Producer Agreement. (A copy of the Producer Agreement is attached as Exhibit A.)

26      15.  The Producer Agreement grants Fox an option for the right to use the

27  *Alvin and the Chipmunks* "property" in connection with the development,

28  production, and distribution of motion pictures. (Producer Agreement, ¶¶ 1(a), 5.)

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

The Producer Agreement defines "property" to include: the "pre-existing property generally known as 'Alvin and the Chipmunks' . . . and any and all associated characters . . . now or hereafter created and to the extent owned and/or controlled by [Bagdasarian Productions], and any and all other plots, themes, titles, story lines, names related thereto, and any and all other elements relating to any of the foregoing, now existing or created hereafter." (Producer Agreement, ¶ 1(a).) The Grant of Rights and the Property definition under the Producer Agreement do not include the right to use treatments or screenplays created by Bagdasarian Productions, Bagdasarian, Jr., or Karman. (Producer Agreement, ¶¶ 1(a), 5.)

16.    The Producer Agreement requires that Bagdasarian Productions cause Bagdasarian, Jr. and Karman to render producer-related services in connection with motion pictures produced pursuant to the Producer Agreement. (Producer Agreement, ¶ 5.) The Producer Agreement does not require Bagdasarian Productions, Bagdasarian, Jr., or Karman to create treatments or screenplays for Fox or to provide screenwriting services to Fox. To the contrary, the Producer Agreement provides that Fox and screenwriters employed by Fox would draft the treatments and screenplays for motion pictures produced under the Producer Agreement. (Producer Agreement, ¶¶ 5, 11, 13, 15; Standard Terms and Conditions, ¶¶ 2, 6(b).)

17.    Regarding "sequels," in consideration of the Grant of Rights and producer services and in contrast to the compensation Fox agreed to pay on the first film, Fox agreed to compensate Bagdasarian Productions in "an amount equal to (i) the Purchase Price, *and* (ii) a percentage of the Defined Gross Proceeds of such sequel equal to the rate of percentage participation in the Defined Gross Proceeds from '1st dollar' of the Picture payable pursuant to Paragraph 7." (Producer Agreement, ¶ 12(a) (emphasis added).)  "Purchase Price" is defined in the Producer Agreement as $3,000,000. (Producer Agreement, ¶ 6.)  The "rate of percentage of participation of the Defined Gross Proceeds from '1st dollar'" is defined as 2.5%.

(Producer Agreement, ¶ 7.) Thus, Bagdasarian Productions is entitled to payment of $3,000,000 in addition to 2.5% of 1st dollar Defined Gross Proceeds from both *The Squeakquel* and *Chipwrecked*.

18. The Producer Agreement further grants Fox the exclusive right to use, exploit, and license "Picture-Related Merchandising Rights" in connection with the *Alvin and the Chipmunks* properties, and provides that Bagdasarian Productions will receive a royalty of 50% of the Merchandising Net Receipts derived from the Picture-Related Merchandising Rights. (Producer Agreement, ¶ 9.)

19. Bagdasarian Productions is also entitled to certain Soundtrack Royalties based upon net sales of any top-line soundtrack album derived from motion pictures produced pursuant to the Producer Agreement. (Producer Agreement, ¶ 10.) For sales in the U.S. and Canada, Fox agreed to pay Bagdasarian Productions 1% of the suggested retail list price ("SRLP") for soundtrack album sales and up to an additional 13% of SRLP of sales pro-rated by the number of tracks on which Bagdasarian, Jr. or Karman renders services and the total number of tracks on the soundtrack album. (Producer Agreement, ¶ 10(a)(i)(B).)

20. Further, the Producer Agreement grants Bagdasarian Productions approval rights with respect to any motion picture produced under the Agreement, and provides that Bagdasarian, Jr. and Karman shall have "access and open invitation" to all meetings conducted by Fox in connection with the "development, production, and post-production" of motion pictures produced under the Agreement. (Producer Agreement, ¶¶ 16, 16(a), 16(c).)

21. *Alvin and the Chipmunks*, the first film produced under the Producer Agreement, was released in 2007 and enjoyed significant financial success. Eager to capitalize on the booming *Alvin and the Chipmunks* franchise, Fox immediately began work on a second film, *The Squeakquel*.

- 6 -

**The Creation of *The Squeakquel* Screenplay**

22.    In March 2008, Fox informed Bagdasarian, Jr. and Karman that it was searching for a story for *The Squeakquel*. Karman, of her own accord, prepared much more: a 33-page detailed, extensive treatment, which Karman pitched to Fox on March 31, 2008. On the cover page of Karman's treatment were the words: "Property of: Bagdasarian Productions."

23.    Karman's March 31, 2008 treatment contained specific scenes, dialogue, and other original written expression that were incorporated in whole or in part into *The Squeakquel*'s final screenplay.

24.    Pleased with Karman's treatment, Fox adopted it as the working draft for *The Squeakquel* screenplay. Over the next several months, Karman and Fox screenwriters worked on revising the treatment, exchanging multiple drafts. Upon information and belief, in August 2008, Fox asked a Fox screenwriter to draft a screenplay based on the treatment.

25.    In October 2008, the Fox screenwriter submitted his first draft of the screenplay. Terming the draft a "train wreck" and anxious to get the film into production, Fox formally asked Karman to re-write the screenplay.

26.    Thereafter, in consideration of the screenplay writings and substantial screenwriting services to be rendered by Karman, Fox offered Karman additional compensation beyond that which was payable to Bagdasarian Productions under the Producer Agreement. After Karman rejected Fox's initial offer as insufficient, Fox raised its offer multiple times, which offers Karman also rejected. The parties never reached an agreement on the terms of Karman's writings services or the writings that were the proceeds of such services. Neither Bagdasarian Productions nor Karman has ever received any consideration for Karman's screenplay writings or her screenwriting services.

27.    Throughout October and the beginning of November 2008, Karman drafted a new screenplay, which she delivered to Fox on or about November 10,

2008. Approximately a month later, Fox hired two additional screenwriters to revise Karman's November 10, 2008 draft. The Fox writers submitted their revised draft to Fox at the end of December. Fox, again, was not happy with the result, particularly with respect to the failure of the screenplay to draw upon and develop the Chipmunk's beloved personalities, so Fox, again, asked Karman to revise the screenplay. Karman therefore worked over the holidays and completed her revised draft by early January 2009. Thereafter, both Karman and the Fox screenwriters — two new writers hired to polish Karman's screenplay — continued to revise the working draft of the screenplay.

28. Throughout the nearly twelve-month period during which Karman and the Fox writers drafted *The Squeakquel* screenplay, Karman created and revised numerous screenplay drafts, exercised control over *The Squeakquel* screenplay, and gave expression to the ideas, storylines, plots, and characters in *The Squeakquel* screenplay.

29. The final version of the shooting screenplay for *The Squeakquel* was completed on April 17, 2009.

30. By way of example, but without limitation, Karman contributed the following scenes, dialogue, and other original expression to *The Squeakquel* screenplay:

- the opening scene, in which the Chipmunks perform a huge European charity concert seen by people around the world;

- the dialogue and scene from the Chipmunks' first day at school where a student in an eagle costume races down the hallway on a skateboard and runs over Theodore's tail, sending the eagle down the stairs and Theodore lying on the floor, injured, and lamenting, "That isn't very fun…ish";

- the dialogue and scene in which one of the bullies says to his friend, "Let's knock them down to size!" to which the friend responds, "Knock them down to what? They're only eight inches tall";

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

- the dialogue and scene in which the bullies attacked one of Alvin's brothers and just as Alvin is about to spring, Simon steps on Alvin's tail and says, "I appreciate the gesture, but we won't solve anything with violence";

- the dialogue and scene in which the bullies poke fun at Theodore's chubbiness, after which Alvin and Simon "set on the [bullies] with the fury of two jungle cats" and rip their clothes to shreds;

- the dialogue and scene in which Theodore asks Simon, "If I pull my hoodie down, does it make me look thinner?" to which Simon responds, "You look good, Theodore. Those guys are just jerks";

- the dialogue and scene in which antagonist Ian Hawke first meets the Chipettes and asks them if they can sing;

- the dialogue and scene in which, prior to the second day at school, Alvin tells Toby, "Don't worry about picking us up at three today, we'll be dead by noon";

- the scene in which the Chipmunks are pummeled by dozens of balls during a game of "killerball" in gym class;

- the dialogue and scene in which Alvin forsakes his brothers to be with the popular crowd;

- the dialogue and scene in which Alvin and Simon fight in a garbage can but temporarily reconcile for the sake of Theodore, who is traumatized by the brothers' split;

- the dialogue and scene after the Chipettes win the talent contest by default, and in which Brittany confronts Alvin over his callousness towards his brothers' feelings and says, "Oh and by the way, this wasn't the way I wanted to win"; and

- the dialogue and scene in which Alvin returns home after the talent contest and calls out to his brothers, but Simon and Theodore pretend to be asleep because they are too upset to talk to Alvin.

31.    Karman's original creative contributions to *The Squeakquel* screenplay — deriving from her March 31, 2008 treatment, numerous draft screenplays, and

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1 other original expression — account for critical and significant portions of *The*
2 *Squeakquel* screenplay's content, and account, in substantial part, for *The*
3 *Squeakquel* screenplay's audience appeal. Indeed, in recognition of Karman's
4 significant contributions, Fox submitted Karman's name to the Writer's Guild of
5 America ("WGA") as one of the participating writers whom Fox believed should
6 receive screenwriting credit for *The Squeakquel* screenplay.

7    32.   Based on the foregoing, Karman and, upon information and belief, Fox
8 both intended that they each would make substantial, original copyrighted
9 contributions in connection with the development of the screenplay for *The*
10 *Squeakquel*, and that their separate contributions would be merged inseparably into
11 a unitary whole — namely, *The Squeakquel* final screenplay.

12    33.   Accordingly, pursuant to 17 U.S.C. §§ 101 and 201(a), *The Squeakquel*
13 screenplay constitutes a joint work of which Karman and Fox are co-owners. As a
14 co-owner of *The Squeakquel*'s screenplay, Karman possesses an equal, undivided
15 interest in the entire screenplay, thereby entitling her to half of all profits attributable
16 to *The Squeakquel*'s screenplay.

17    34.   Karman's screenplay writings are in and of themselves copyrightable
18 works, and have been duly registered at the U.S. Copyright Office as Registration
19 Nos. PAu003447896, PAu003447916, PAu003447910, PAu003437843,
20 PAu003437842, PAu003447931, PAu003437838, PAu003437832, PAu003447913,
21 PAu003447935, PAu003447912, PAu003437823, PAu003447941, PAu003447938,
22 PAu003447919 and PAu003447923, respectively. (Copies of Karman's
23 Registrations are attached as Exhibits B.) In addition, Fox registered the copyright
24 in *The Squeakquel* screenplay, which includes Karman's writings, on March 26,
25 2009, Registration No. PAu003412055.

26    35.   At no time did Karman assign, transfer, or license the copyrights in her
27 screenplay writings to Fox, or otherwise enter into any agreement with Fox,
28

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1  including any "work for hire" agreement, with respect to her copyrighted screenplay

2  writings. Nor was Karman ever an employee of Fox.

3      36.    Karman's provision of her screenplay writings to Fox was conditioned

4  upon the payment of adequate compensation for those writings and her attendant

5  services, which Karman never received.

6      **Karman's Graphic Design Services**

7      37.    The Producer Agreement does not obligate Karman, Bagdasarian, Jr.,

8  or Bagdasarian Productions to provide graphic design services for the motion

9  pictures produced thereunder. Indeed, in connection with the first film, Fox

10 separately engaged and paid an artist to re-design the pre-existing animated

11 Chipmunks for a live action/computer-generated imagery ("CGI") motion

12 picture format.

13     38.    In mid-2008, Karman performed substantial graphic design services in

14 connection with the re-design of the pre-existing animated "Chipettes" for CGI

15 motion picture format.

16     39.    Fox obtained the benefit of Karman's graphic design services in

17 connection with *The Squeakquel* but has not provided Karman with any

18 compensation for such services.

19     **Fox's Breaches of the Producer Agreement**

20     40.    Fox also has breached numerous obligations under the

21 Producer Agreement concerning *Alvin and the Chipmunks, The Squeakquel*,

22 and *Chipwrecked*.

23          Contingent Compensation

24     41.    Pursuant to Paragraph 5 of the Producer Agreement, Fox agreed to pay

25 Bagdasarian Productions, *inter alia*, 2.5% of 100% of the Defined Gross Proceeds

26 of motion pictures produced under the Agreement.

27     42.    Pursuant to Paragraph 10 of the Producer Agreement, Fox also agreed

28 to pay Bagdasarian Productions certain Soundtrack Royalties based upon the sales

1 of any soundtrack album derived from motion pictures produced under

2 the Agreement.

3      43.    Fox breached its obligations under Paragraphs 5 and 10 in several

4 respects, including, without limitation, by failing to report the correct amount of

5 pay-television, cable-television, and soundtrack royalties to Bagdasarian

6 Productions in connection with *Alvin and the Chipmunks*. As an example, and

7 without limitation, Fox has underreported the number of units sold of the soundtrack

8 for *Alvin and the Chipmunks* and taken deductions that are not provided for in the

9 Producer Agreement, depriving Bagdasarian Production of substantial royalties.

10                 <u>Picture-Related Merchandising Rights</u>

11      44.    Paragraph 9 of the Producer Agreement grants Fox the exclusive right

12 to use, exploit, and license "Picture-Related Merchandising Rights" in connection

13 with the *Alvin and the Chipmunks* properties. The Producer Agreement further

14 provides that Bagdasarian Productions will receive a royalty of 50% of the

15 Merchandising Net Receipts derived from the Picture-Related

16 Merchandising Rights.

17      45.    Fox had an obligation to exploit its Picture-Related Merchandising

18 Rights, and to act in good faith and deal fairly with Bagdasarian Productions in

19 exploiting those rights, so as not to deprive Bagdasarian Productions of its right to

20 merchandising royalties.

21      46.    Fox breached this obligation in several respects, including, without

22 limitation, by failing adequately to exercise its Picture-Related Merchandising

23 Rights and by unreasonably delaying its merchandising efforts. As an example, and

24 without limitation, Fox failed to issue a "style book" (an essential marketing tool in

25 soliciting interest from prospective merchandise licensees) for Picture-Related

26 Merchandise in connection with the first film until approximately three months after

27 its release, an undue delay that crippled merchandising opportunities for the film.

28

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1      47.    By withholding the style book and by unreasonably delaying its

2 merchandising efforts, Fox frustrated the performance of the Producer Agreement

3 and deprived Bagdasarian Productions of the benefit of its bargain, including

4 substantial revenues from merchandising royalties to which Bagdasarian

5 Productions was entitled.

6             Amounts for Sequels: *The Squeakquel* and *Chipwrecked*

7      48.    Paragraph 12(a) of the Producer Agreement provides that payment for

8 "sequels" shall be "*an amount equal to* (i) the Purchase Price, *and* (ii) a percentage

9 of the Defined Gross Proceeds of such sequel equal to the rate of percentage

10 participation in the Defined Gross Proceeds from '1st dollar' of the Picture payable

11 pursuant to Paragraph 7" (emphasis added).

12      49.    "Purchase Price" is defined in the Producer Agreement as "the sum of

13 $3,000,000". (Producer Agreement, ¶ 6.) The "rate of percentage participation in

14 the Defined Gross Proceeds from '1st dollar'" is defined as 2.5%. (Producer

15 Agreement, ¶ 7.) Therefore, Bagdasarian Productions is entitled for each sequel to

16 payment of $3,000,000 *and* 2.5% of 1st dollar Defined Gross Proceeds from

17 each sequel.

18             Approval Rights

19      50.    The Producer Agreement grants Bagdasarian Productions rights of

20 "approval, access, and meaningful consultation" in connection with any motion

21 picture developed under the Producer Agreement, including but not limited to "the

22 right to approve the designs, attributes . . . and characterization of . . . new

23 characters introduced in" motion pictures produced under the Agreement (the

24 "Approval Rights"). (Producer Agreement, ¶¶ 15, 16.)

25      51.    Fox has repeatedly and wantonly disregarded Bagdasarian Productions'

26 Approval Rights. By way of example, but without limitation, Fox: (a) failed to

27 provide Bagdasarian Productions with the proposed domestic promotional

28 specimens for the commercial tie-in with McDonald's Corporation in connection

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1 with *The Squeakquel* until after Fox had already finalized those specimens; and
2 (b) failed to obtain prior approval of Bagdasarian Productions with respect to the
3 introduction of the character "Digger" in *The Squeakquel*.

4      52.      Upon information and belief, *Alvin and the Chipmunks, The*
5 *Squeakquel*, and *Chipwrecked* have garnered over a billion dollars in box office
6 receipts worldwide.  Upon information and belief, Fox, in addition, has sold tens of
7 millions of copies of DVDs from the three films domestically and internationally.
8 Notwithstanding the astounding success of *Alvin and the Chipmunks, The*
9 *Squeakquel*, and *Chipwrecked*, Fox continues to cause substantial harm to
10 Bagdasarian Productions and Karman.

11      53.      Among other harms, Karman is being deprived of her share of *The*
12 *Squeakquel*'s profits owed to her as co-owner of *The Squeakquel* screenplay.
13 Pleading in the alternative, and without prejudice to other allegations in the
14 Complaint, if and to the extent that Karman is not a co-owner of *The Squeakquel*
15 screenplay, Karman will have been substantially and irreparably harmed by Fox's
16 infringement of Karman's copyrights in the screenplay writings.

17      54.      Further, Fox has been unjustly enriched by reaping the benefits of
18 Karman's screenwriting and graphic design services without providing any
19 compensation to Karman or Bagdasarian Productions.

20      55.      In addition, Bagdasarian Productions has been harmed by Fox's
21 breaches of the Producer Agreement, which have deprived Bagdasarian Productions
22 of the benefit of its bargains under the Producer Agreement with respect to
23 contingent compensation and other amounts due Bagdasarian Productions for *Alvin*
24 *and the Chipmunks, The Squeakquel,* and *Chipwrecked*.

25                          <u>**COUNT I**</u>
26 <u>**DECLARATION OF CO-OWNERSHIP AND ACCOUNTING OF PROFITS**</u>
27      56.      Karman repeats and realleges paragraphs 1 through 55.
28

- 14 -

57.    Karman and, upon information and belief, Fox intended that their respective contributions to *The Squeakquel* screenplay would be merged inseparably into a unitary whole.  Accordingly, *The Squeakquel* screenplay constitutes a "joint work" within the meaning of 17 U.S.C. § 101, and, pursuant to 17 U.S.C. § 201(a), Karman and Fox are co-owners of the copyright in *The Squeakquel* screenplay.

58.    Upon information and belief, Fox has derived, and will continue to derive, substantial revenues from the use of *The Squeakquel* screenplay.

59.    As a co-owner of *The Squeakquel* screenplay, Karman is entitled, under 17 U.S.C. § 201(a), to a full and proper accounting with respect to those revenues, and to half of all profits attributable to *The Squeakquel* screenplay.

60.    Fox has failed and refused to account to Karman with respect to the matters asserted herein.

61.    As a direct and proximate result of Fox's conduct, Karman has suffered and will continue to suffer irreparable harm, for which she has no adequate remedy at law.

## COUNT II
## COPYRIGHT INFRINGEMENT

62.    Karman repeats and realleges paragraphs 1 through 61.

63.    The copyrights in Karman's screenplay writings are valid and owned by Karman.

64.    Karman's screenplay writings have been duly registered at the United States Copyright Office.

65.    Pleading in the alternative, and without prejudice to other allegations pleaded herein, if and to the extent that Karman is not a co-owner of *The Squeakquel* screenplay, Fox has infringed Karman's exclusive rights in her copyrights in the screenplay writings, in violation of 17 U.S.C. § 106, including without limitation 17 U.S.C. § 106(1), by using Karman's copyrighted screenplay writings or using

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1 writings substantially similar to Karman's screenplay writings without authorization

2 from Karman in *The Squeakquel* screenplay.

3     66.     Fox's infringement of Karman's copyrights in the screenplay writings

4 has been and continues to be intentional, willful, and with full knowledge of

5 Karman's copyrights.

6     67.     As a direct and proximate result of Fox's conduct, Karman has suffered

7 and will continue to suffer irreparable harm, for which she has no adequate remedy

8 at law.

9     68.     As a direct and proximate result of Fox's conduct, Karman is entitled to

10 actual damages and Fox's profits pursuant to 17 U.S.C. § 504(b) attributable to

11 Fox's infringement.

12     69.     Alternatively, Karman is entitled to the maximum statutory damages,

13 pursuant to 17 U.S.C. § 504(c), and such other amounts as may be proper under 17

14 U.S.C. § 504(c).

15     70.     Karman is further entitled to her attorneys' fees and full costs pursuant

16 to 17 U.S.C. § 505.

17 **COUNT III**

18 **UNJUST ENRICHMENT**

19     71.     Plaintiffs repeat and reallege paragraphs 1 through 70.

20     72.     By virtue of its exploitation of Karman's screenwriting services, Fox

21 has been unjustly enriched at the expense of Plaintiffs. Fox has been unjustly

22 enriched in an amount to be determined at trial and to which Karman and

23 Bagdasarian Productions are rightfully entitled.

24 **COUNT IV**

25 **UNJUST ENRICHMENT**

26     73.     Plaintiffs repeat and reallege paragraphs 1 through 72.

27     74.     By virtue of its exploitation of Karman's graphic design services, Fox

28 has been unjustly enriched at the expense of Plaintiffs. Fox has been unjustly

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

enriched in an amount to be determined at trial and to which Karman and Bagdasarian Productions are rightfully entitled.

## COUNT V

### BREACH OF IMPLIED CONTRACT

75.  Plaintiffs repeat and reallege paragraphs 1 through 74.

76.  At Fox's request, Karman agreed to provide, and did in fact provide, screenwriting services to Fox.  Karman provided those screenwriting services to Fox with the understanding and expectation, fully and fairly understood by Fox, that Karman would be compensated for her services by Fox.  After requesting and obtaining the benefit of Karman's screenwriting services, however, Fox has refused to compensate Karman for those services, and Karman has been damaged as a result of Fox's breaches.

## COUNT VI

### BREACH OF IMPLIED CONTRACT

77.  Plaintiffs repeat and reallege paragraphs 1 through 76.

78.  At Fox's request, Karman agreed to provide, and did in fact provide, graphic design services to Fox.  Karman provided those graphic design services to Fox with the understanding and expectation, fully and fairly understood by Fox, that Karman would be compensated for her services by Fox.  After requesting and obtaining the benefit of Karman's graphic design services, however, Fox has refused to compensate Karman for those services, and Karman has been damaged as a result of Fox's breaches.

## COUNT VII

### BREACH OF CONTRACT

79.  Bagdasarian Productions repeats and realleges paragraphs 1 through 78.

80.  By virtue of the foregoing, Fox has breached its contractual obligations under paragraphs 6, 7, 9, 10, 12, 15, 16, 16(a), and 16(c) of the Producer Agreement and the implied covenant of good faith and fair dealing.

- 17 -

1      81.    Upon information and belief, these actions by Fox were deliberate,

2  willful, and in conscious disregard of Bagdasarian Productions' rights.

3      82.    Bagdasarian Productions has fully performed under the terms of the

4  Producer Agreement with Fox, except insofar as its performance has been excused

5  in any respect.

6      83.    Each violation of the Producer Agreement enumerated above by Fox

7  constitutes, individually and collectively, a material breach of the Producer

8  Agreement.

9      84.    Bagdasarian Productions has been damaged as a result of

10  Fox's breaches.

11              **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs demand judgment against Fox as follows:

13      1.    A declaration that Karman is a co-owner of all rights, title, and interest

14  in the copyright in *The Squeakquel* screenplay;

15      2.    An order directing Fox to account to Karman for all profits obtained by

16  it as a result of *The Squeakquel* screenplay, and awarding to Karman restitution in

17  an amount to be determined at trial;

18      3.    In the alternative to (1) and (2), an order, pursuant to 17 U.S.C. § 504,

19  awarding to Karman actual damages and Fox's profits resulting from Fox's

20  unlawful conduct, or maximum statutory damages with respect to each of Karman's

21  screenplay writings, plus full costs and attorneys' fees as provided for by 17 U.S.C.

22  § 505;

23      4.    An order awarding damages in favor of Bagdasarian Productions and

24  Karman against Fox for all damages sustained as a result of Fox's wrongdoing,

25  including the amount by which Fox was unjustly enriched, in an amount to be

26  proven at trial;

27

28

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1    5.    An order awarding compensatory damages in favor of Bagdasarian

2 Productions for all damages sustained as a result of Fox's breaches of contract, in an

3 amount to be proven at trial;

4    6.    An order requiring Fox to pay Plaintiffs' costs, expenses, and

5 reasonable attorneys' fees; and

6    7.    An order granting Plaintiffs such other and further relief as the Court

7 deems just and proper.

8

9 Dated:  August 10, 2012                    Respectfully submitted,

10                                           IRELL & MANELLA LLP
                                             Steven A. Marenberg
11                                           Melissa R. McCormick
                                             Douglas J. Dixon
12

13                                           By:/s/ Steven A. Marenberg
                                                 Steven A. Marenberg
14
                                             Attorneys for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATION
OF CO-OWNERSHIP OF COPYRIGHT, COPYRIGHT
INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF
IMPLIED CONTRACT, AND BREACH OF CONTRACT

1    **<u>DEMAND FOR JURY TRIAL</u>**

2        Plaintiffs hereby request a trial by jury on all issues triable by jury.

3    Dated:  August 10, 2012                  Respectfully submitted,

4                                             IRELL & MANELLA LLP
5                                             Steven A. Marenberg
                                             Melissa R. McCormick
6                                             Douglas J. Dixon

7
                                             By: */s/ Steven A. Marenberg*
8                                                 Steven A. Marenberg

9                                             Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 20 -

1  **PROOF OF SERVICE**

2       I am employed in the County of Orange, State of California.  I am over the age of 18 and
3  not a party to the within action.  My business address is 840 Newport Center Dr., Ste. 400,
   Newport Beach, CA 92660.

4       On August 10, 2012, I served the foregoing document described as **FIRST AMENDED**
5  **COMPLAINT FOR DECLARATION OF CO-OWNERSHIP OF COPYRIGHT,**
   **COPYRIGHT INFRINGEMENT, UNJUST ENRICHMENT, BREACH OF IMPLIED**
6  **CONTRACT AND BREACH OF CONTRACT** on each interested party, as follows:

7       Louis A. Karasik (lou.karasik@alston.com)
8       Rachel M. Capoccia (rachel.capoccia@alston.com)
        Casondra K. Ruga (casondra.ruga@alston.com)
9       **ALSTON + BIRD LLP**
        333 South Hope Street
10      Sixteenth Floor
        Los Angeles, California  90071
11      Telephone: (213) 576-1000
        Facsimile: (213) 576-1100
12

13      Attorneys for Defendant

14      Via the JAMS electronic filing system and by email.

15      Executed on August 10, 2012, at Los Angeles, California.

16      I declare under penalty of perjury under the laws of the United States of America that the
17 foregoing is true and correct.

18      Douglas J. Dixon                              /s/ Douglas J. Dixon
19           (Type or print name)                        (Signature)

20

21

22

23

24

25

26

27

28

- 21 -

# EXHIBIT A

## PURCHASE/PRODUCER AGREEMENT – LITERARY MATERIAL

## "ALVIN AND THE CHIPMUNKS"

Purchase/Producer Agreement ("**Agreement**") dated as of March 26, 2004, between BAGDASARIAN PRODUCTIONS, LLC ("**Owner**"), a _____ corporation, Federal I.D. #77-0431244, and TWENTIETH CENTURY FOX FILM CORPORATION ("**Fox**"), a Delaware corporation.

1.    DEFINITIONS:

(a)    "**Property**":  That certain pre-existing property generally known as "Alvin and the Chipmunks" a.k.a. "Chipmunks" a.k.a. "Chipmunks Go to the Movies," "Alvin and the Chipmunks Series," "The Alvin Show," including various television series produced commencing in 1961, 1983 through 1987, and 1988 through 1991, created and/or controlled by Ross-Bagdasarian, Sr., Ross Bagdasarian, Jr., Janice Karman, Bagdasarian Productions, LLC, and any and all associated characters (including Simon, Theodore, Alvin, and David Seville) now or hereafter created and to the extent owned and/or controlled by Owner, and any and all other plots, themes, titles, story lines, names related thereto, and any and all other elements relating to any of the foregoing, now existing or created hereafter.

(b)    "**Picture(s)**":  The development and possible production of motion pictures based on the Property, it being understood and agreed that such Picture(s) may be live action and/or animated and/or any combination thereof.

(c)    "**business days**":  Any day(s) Fox's principal business offices in Los Angeles are open.

(d)    "**including**":  Whenever examples are used with the word including (or any derivation thereof), such examples are intended to be illustrative only and shall not limit the generality of the words accompanying the word including (or any derivation thereof).

2.    CONDITIONS PRECEDENT: Fox's obligations hereunder are subject in all respects to: (a) Fox's receipt of this Agreement (and the Short Form Option and undated Short Form Assignment) signed by Owner (with Owner's signature of the Short Form Option and Short Form Assignment acknowledged by a Notary); (b) the clearance in form and substance, to the reasonable satisfaction of Fox's Legal Department, of the chain-of-title to the Property; (c) Fox's receipt of all releases, and assignments, supporting agreements and documentation required by Fox's Legal Department in connection with the chain-of-title to the Property; and (d) Fox's receipt of the fully-signed Producer Agreement between Fox and Steve Waterman, dated as of March 26, 2004.

3.    GRANT OF OPTION: Owner hereby grants to Fox the exclusive and irrevocable right and option ("Option"), for the Option Period and consideration specified in Paragraph 4, to purchase from Owner the Granted Rights (as defined in Paragraph 5), upon the terms and conditions set forth in this Agreement.

4.    OPTION PERIOD AND CONSIDERATION: As consideration for the Option and for all the representations, warranties and agreements made by Owner hereunder, Fox shall pay to Owner the following amounts and the Option shall be effective during the following period ("Option Period"):

(a)    Initial Option Period: Subject to extension as set forth below, the Option shall be effective during the period commencing on the date hereof and ending 18 months after the date on which the Conditions Precedent are satisfied ("Initial Option Period"). Owner shall be paid $250,000 for the Initial Option Period, payable upon satisfaction of the Conditions Precedent. Said sum of $250,000 shall be deemed an advance against the Purchase Price.

(b)    Extended Option Period: The Initial Option Period may be extended for an additional period of 18 months ("Extended Option Period"), subject to further extension as set forth below, by serving upon Owner written notice of extension ("Extension Notice") on or before the expiration of the Initial Option Period. Owner shall be paid $250,000 for the Extended Option Period, within 10 business days after the date of service of the Extension Notice. Said sum of $250,000 shall not be considered an advance against the Purchase Price.

(c)    Claims/Work Stoppage Extension: If there is any claim (other than a claim of a frivolous or meritless nature as determined by Fox in its sole discretion), whether or not such claim shall result in or be followed by litigation, which would constitute a breach of any of Owner's warranties, representations or agreements, or any Force Majeure event (including labor strikes, acts of God, and natural disasters), which materially affects the development and/or production of the Property, then the Option Period shall be extended for a period equal to the time such claim is outstanding or unresolved (but in no event shall such extension exceed 6 months unless said claim results in litigation) or the duration of such Force Majeure event, as applicable (but in no event shall such extension exceed 6 months), plus such additional time as Fox reasonably requires to recommence its performance hereof.

5.    GRANT OF RIGHTS: Subject only to the exercise of the Option, Owner hereby irrevocably grants and assigns to Fox, its successors, assigns and licensees, in perpetuity throughout the universe the following rights in and to the Property ("Granted Rights"): the right to develop, produce, distribute, exhibit, exploit, advertise, promote and publicize, throughout the universe, in and by any and all manner, media, devices, processes and technology now known or hereafter devised, exclusively and in perpetuity, Theatrical Motion Pictures and Home Video Motion Pictures based on the Property, Merchandising Rights and Commercial Tie-In Rights as set forth in Paragraphs 9(a), (b), (c), and (d), and the motion picture and analogous and allied rights related thereto (collectively, "Motion Picture and Allied Rights") in and to the Property, as more particularly described in the Standard Terms and Conditions for Purchase of Literary Material ("Standard Terms and Conditions"), attached by this reference and made a part hereto and subject to good-faith negotiation within Fox's usual parameters taking into account the A+ level status and nature of the Property. To the maximum extent allowed, Owner hereby expressly waives, in perpetuity, without limitation, any and all rights which Owner may have or claim to have with respect to the Property under any law relating to the "moral rights of authors" or any similar law throughout the universe or as a result of any alleged violation of said rights and Owner agrees not to institute or authorize any action on the grounds that any changes, deletions, additions, or other use of the Property violates such rights or constitutes a defamation or mutilation of any part thereof. Owner shall furnish Fox the services of Ross Bagdasarian ("RB"), Social Security # ▮▮▮▮▮, and Janice Karman ("JK"), Social Security # ▮▮▮▮ ▮▮▮ (together, "Artist"), as producers in connection with the development and possible

production of the theatrical motion picture project(s) currently entitled "ALVIN AND THE CHIPMUNKS." Owner shall cause Artist to render all services (subject to Artist's consultation and approval rights in Paragraph 16 and Artist's fundamental elements approval rights in Paragraph 15, during development, pre-production, production, and post-production of the Picture(s)) customarily rendered by producers in the motion picture industry, including supervision of the screenplay materials required by Fox. Artist's services shall be non-exclusive, but rendered on a first-priority, regular in-person basis.

6.    PURCHASE PRICE: As consideration in full for the Granted Rights and for the representations, warranties and agreements made by Owner, Fox shall pay to Owner within 10 business days after exercise of the Option the sum of $3,000,000 (which shall also be deemed to include payment for all of Owner's and Artists' producing services) ("**Purchase Price**") less the amount paid to Owner for the Initial Option Period. The Purchase Price shall be deemed an advance against the Contingent Compensation (defined below).

7.    ADDITIONAL PAYMENTS: For each Picture that Fox produces and releases, Owner shall be paid:

(a)    Contingent Compensation: Subject to the last sentence of Paragraph 6, Lender shall be paid **"Contingent Compensation"** equal to 2½% of 100% of the "Defined Gross Proceeds" (as defined in the Participation Definition) from "1st dollar" of the Picture.

(b)    Participation Definition: The Contingent Compensation shall be computed, determined and paid in accordance with Fox's "A+-Level" Pre-Negotiated Definition of Defined Gross Proceeds – Exhibit "A," with the Glossary – Schedule "1" thereof ("**Participation Definition**"), which is attached hereto and by this reference made a part hereof.

8.    REVERSION / RIGHTS EXTENSION PAYMENT: If Fox elects, in its sole discretion, to exercise the Option but does not commence principal photography on the Picture by the date which is 5 years after such exercise (**"Reversion Date"**), then the Granted Rights (defined above) shall revert to Owner, subject to a first-priority lien in favor of Fox for the costs which Fox paid to Owner, consistent with Fox's customary terms (any other costs shall be reimbursed by the acquiring studio if such studio determines that it needs Fox's screenplay materials);

provided, however, that Fox may further extend the Reversion Date by up to an additional 2 years by paying Owner $500,000 for each additional 1-year extension. The foregoing reversion/extension concept shall apply and "roll" with each subsequent remake and/or sequel of the Picture, i.e., principal photography of either a remake and/or sequel of an immediately preceding Picture must commence prior to the date which is 5 years after the initial general U.S. theatrical release of the immediately preceding Picture (which 5 years may be extended up to an additional 2 years in the same manner as set forth above), failing which the Granted Rights will revert to Owner. All time periods set forth in this Paragraph 8 shall be subject to extension for the reasons set forth in Paragraph 4(c) above with respect to extension of the Option Period.

9.     PICTURE-RELATED MERCHANDISING:

(a)     Picture-Related Merchandising Rights:  Subject to Owner's approval rights as set forth in Paragraph 15 (but only if such element is inconsistent with the element previously approved pursuant to Paragraph 15) and subject to Owner's rights in the Reserved Classic Chipmunk Merchandise (as defined in Paragraph 11(a) below), Fox shall exclusively own and control all Picture-Related Merchandising Rights (including theme parks, live shows, music publishing and book publishing) and Commercial Tie-In Rights during the Merchandising Window (**"Picture-Related Merchandising Rights"**), including the right in connection with the Granted Rights to exclusively use and exploit and to license others to utilize and exploit all Merchandising Rights and Commercial Tie-In Rights of any sort and nature arising out of or connected with any or all of the following: (i) any Motion Picture based on the Property; (ii) the title or any titles of the Property or any Motion Picture versions thereof; (iii) the characters and characterization contained in any Motion Pictures based on the Property; (iv) the names, likenesses or characteristics of said characters; and (v) physical properties or other materials appearing or used in or in connection with all or any part of any Motion Pictures based on the Property. Owner shall have a right of approval (which approval shall not be unreasonably withheld or delayed) over the "style book" or the art-reference materials used in conjunction with Picture-Related Merchandising Rights, and of Purchaser's merchandising licenses with respect to the Picture; provided that Fox's decision shall be controlling and provided that all decisions relating to the financial and other terms of Fox's licensing agreements shall be in Fox's sole discretion. If mutual approval is not reached in a timely manner, then

Fox's decision shall be final with respect to matters related to the Picture-Related Merchandising Rights.

(b) <u>Owner's Royalty</u>: Owner shall receive a royalty equal to 50% of the Merchandising Net Receipts derived from the Picture-Related Merchandising Rights. **"Merchandising Net Receipts"** shall mean all monies received by Fox or by Fox's agent from the exercise of Picture-Related Merchandising Rights, less (in the following order): (i) Fox's administration fee of 20% (which has been reduced from its standard 40% fee) of such monies if Fox does not use an agent (which fee shall be further reduced to 10% if Fox uses an unrelated agent to administer the licenses outside of the United States); (ii) all costs, expenses and charges incurred in connection therewith, including costs of proprietary protection (which costs shall be capped at 5%, unless otherwise agreed to between Fox and Owner); and (iii) fees negotiated on an "arms-length" basis which are payable to or retained by Fox's unrelated agent. The aggregate of fees in (i) and (iii) shall not exceed 40%.

(c) <u>Separate Accounting</u>: Accountings for the Merchandising Royalty shall constitute a separate accounting unit and Merchandising Receipts shall not be included within the Defined Gross Receipts of the Picture.

(d) <u>Merchandising Window</u>: The time-period "window" **("Merchandising Window")** for Fox's Picture-Related Merchandising Rights shall commence 9 months prior to each theatrical release of a Picture and expire 48 months after each such release; provided, that, if Fox has not released the applicable Picture within 18 months of completion of principal photography of such Picture, then Fox's Picture-Related Merchandising Rights for such Picture shall lapse.

10. <u>SOUNDTRACK ROYALTY</u>: Owner shall be entitled to the following record royalties (collectively, **"Soundtrack Royalty"**), as applicable:

(a) <u>US & Canada Soundtrack Album Sales</u>:

(i) <u>Rights Royalty</u>: For net sales of any top-line album derived from the Picture (each a **"Soundtrack Album"**) sold in any and all distribution channels, or channels now known or hereafter created, in the United States and Canada:

(A)  Rights Royalty:  a base phonorecord royalty equal to 1% of the suggested retail list price ("SRLP") thereof for such Soundtrack Album sales (or the penny-equivalent thereto if the Record Company calculates royalties on a wholesale basis), and

(B)  Artist/Producer Royalty:  a base phonorecord royalty equal to 13% of SRLP - "all in" (i.e., including the royalty payable to the record producer) as an artist/producer in connection with the Soundtrack Album.  Said royalty shall be pro rated by the number of "tracks" on which Artist renders services and the total number of "tracks" on the Soundtrack Album, but in no event shall Owner receive a royalty less than 6½% of the SRLP under this Paragraph 10(a)(i)(B).

(b)  Other Royalty-Bearing Sales:  Soundtrack Royalties shall be reduced, computed, paid, and defined (including for all other phonorecords, including singles, and all international Soundtrack Album Sales) in accordance with the distribution agreement between Fox and the Soundtrack Album distributor ("Record Company").  By way of example only, if the Fox/Record Company agreement provides that the royalty for the sale of the Soundtrack Album in Japan is 75% of the US Soundtrack Album Sales rate, then the Soundtrack Royalty for sales in Japan shall be 75% of the Soundtrack Royalty for such US Soundtrack Album Sales.  If Fox does not have a royalty rate for US Soundtrack Album Sales, then the denominator shall be 20% of SRLP.

(c)  Computation:  The Soundtrack Royalty shall be subject to the same Record Company policies and practices as are applicable to Fox.  Owner shall not be entitled to any part of any advance or guarantee received by Fox, unless, if and to the extent Fox receives a non-returnable advance for a Soundtrack Album and a portion of such advance remains unspent after all music costs (that are not otherwise included in the budget of the Picture) of such Picture and/or Soundtrack Album have been paid (an "Advance Surplus"), then a proportionate share of such Advance Surplus shall be paid to Owner as Soundtrack Royalty.

(d)  Recoupment/Separate Accounting Unit:  With the exception of any Advance Surplus, if any, payable pursuant to Paragraph 10(c) above, the Soundtrack Royalty shall

be paid prospectively once Fox's account with the Record Company is in an **"earned"** position and for as long as Fox's account stays in an earned position (i.e., on all units sold after such recoupment). Accountings for the Soundtrack Royalty shall constitute a separate accounting unit, and Music Recording Receipts shall not be included within the Defined Gross Receipts of the Picture.

(e)    Accountings: Fox agrees to use its reasonable efforts to cause the Record Company to account for and pay the Soundtrack Royalty directly to Owner hereunder (unless such Record Company does not ordinarily render direct third party accountings), and if Record Company agrees in writing to Owner to so account, Fox shall be relieved of such obligations and Owner shall look solely to Record Company for such record royalties. Should Record Company not agree to directly account, Fox shall render accountings and accompanying royalty payments to Owner not later than 60 days following Fox's receipt of Record Company's accounting statement regarding the Soundtrack Album. Owner acknowledges that the relationship between Owner and Fox with respect to the payment of the Soundtrack Royalty hereunder is that of creditor and debtor, and nothing contained herein shall be construed to create a trust or specific fund as to record royalties in connection with the Soundtrack Album or Owner's share of such record royalties or prevent commingling of such record royalties with other monies or give Owner a lien with respect thereto or an assignment of any portion thereof. Owner shall receive its payments and statements with the same frequency that Fox receives its corresponding payments and statements from the Record Company.

(f)    Audit: Fox shall maintain books of account concerning the Soundtrack Royalty. Owner or a certified public accountant in Owner's behalf may, at Owner's sole expense, examine Fox's said books of account that have not become uncontestable only for purpose of verifying the accuracy of accounting statements rendered hereunder. Such examination shall take place where such books of account are maintained in Los Angeles County, only during the Fox's normal business hours and upon not less than 30 days advance written notice and not more often than once each calendar year, and such examination shall be conducted in such manner as not to interfere with Fox's normal business activities. Fox's books of account relating to any particular accounting statement may be examined as aforesaid only within 2½ years after the date rendered

(provided that such period shall not exceed the period of time so specified in the Fox/ Record Company agreement), and Fox shall have no obligation to permit Owner to so examine Fox's said books of account relating to any particular accounting statement more than once. Under no circumstances shall Owner or Owner's representative have the right to examine books of account or any other books, records, statements, reports or information relating to Fox's business generally or with respect to any phonorecord other than the phonorecords for which the applicable accounting statement has been rendered or any books of account or any other books, records, statements, reports or information of any Record Company hereunder. The rights hereinabove granted to Owner shall constitute Owner's sole and exclusive rights to examine Fox's books of account.

(g)    Audit of Record Company:  If Fox elects to audit Record Company's books of account concerning phonorecord royalties (including the Soundtrack Royalty) for the purpose of verifying the accuracy of statements rendered by Record Company, then Owner shall be entitled to a pro rata share of any net recovery (which pro rata share shall be determined, in consultation with Owner but with Fox's decision controlling, by multiplying such net recovery by the fraction the numerator of which is 1 and the denominator of which is the all-in royalty (i.e., the royalty for Fox and all other royalty participants) for top-line US Soundtrack Album Sales). As used in this Paragraph, **"net recovery"** shall mean additional phonorecord royalties from the Soundtrack Album and phonorecords derived therefrom which are paid by the Record Company (or credited to Fox's phonorecord royalty account) as a result of such audit, less (i) royalty amounts specifically allocable to a third party royalty participant; and (ii) a pro rata share of all costs and expenses incurred by Fox in connection with such audit and the collection of such additional monies (or such additional credit).  However, in no event shall Owner's pro rata share be less than 7.5% of the recovered amount (less the pro rata share of reasonable legal and audit expenses) solely applicable to the motion picture Soundtrack Album.

11.    RESERVED RIGHTS:  All rights not specifically granted to Fox herein are reserved to Owner, including the following rights (**"Reserved Rights"**), subject to the terms and conditions set forth below.

(a)   <u>Merchandising Rights</u>: Merchandising Rights in the "classic" "Alvin and the Chipmunks" and "Baby Alvin" *characters* (i.e., based on the pre-existing animated characters), and all existing derivations of the "classic" animated characters (including theme parks, live shows, music publishing and book publishing), are reserved to Owner (**"Reserved Classic Chipmunk Merchandising Rights"**). Notwithstanding the foregoing, Fox shall own and control all Picture-Related Merchandising Rights pursuant to Paragraphs 9(a), (b), (c), and (d).

(b)   <u>Television Rights</u>:

(i)   <u>Existing Programming</u>: Owner reserves the right to continue to exploit the existing animated and/or the existing puppet-based "Alvin and the Chipmunks" television series, and the existing animated television specials and/or the existing puppet-based specials in their current form (i.e., the existing animated television series and specials, including any puppet-based television series and specials, may continue to be exhibited throughout the universe, in any and all manner, media, devices, processes, and technology, how known or hereafter devised, excluding theatrical motion picture distribution and/or exhibition.

(ii)   <u>New Animated Television Series</u>:

(A)   <u>Saturday Morning Cartoons</u>:  Owners shall retain the right to produce new animated or puppet-based (i.e., no live component) shows for Television Exhibition for the "Saturday morning cartoon" timeslot.

(B)   <u>Non-Saturday Morning Cartoons</u>:  Owner shall retain the right to produce an animated television or puppet-based (i.e., no live component) series for Television Exhibition outside of the "Saturday morning cartoon" timeslot (e.g., in prime-time), however, such right shall be subject to Fox's "Right of First Negotiation" and "Right of Last Refusal" (as set forth in the Standard Terms and Conditions).

(iii)   <u>Frozen Live-Action Television</u>: All live-action television rights shall be frozen with the exception of "Baby Alvin," which is a predominantly puppet-based series with animation and live-action cameos currently featuring Ross Bagdasarian

and Janice Karman are the only "live" components (i.e., neither Owner nor Fox shall produce live action television projects without the express written consent and agreement of the other party) for as long as Fox has the right to produce Picture(s) hereunder.

(c) "Baby Alvin": Owner shall retain the right to continue to exploit the existing animated and puppet-based "Baby Alvin" infant education series throughout the universe, in any and all manner, media, devices, processes, and technology, now known or hereafter devised, excluding theatrical motion picture distribution and/or exhibition.

(d) Songs and Records: Owner shall retain the right to continue to exploit existing "Alvin and the Chipmunks" songs and records. Owner shall also retain the right to exploit new "Alvin and the Chipmunks" songs and records. In addition to the $3,000,000 Purchase Price and in consideration thereof, Fox shall be entitled to license from Owner, for a reasonable fee to be negotiated in good faith, any songs, music, or lyrics controlled by Owner. To the extent that Owner does not control any songs, music, or lyrics which Fox seeks to license, Owner agrees to use reasonable efforts as producers to assist Fox in obtaining a license for the use of said songs, music, or lyrics at a reasonable cost.

(e) Publication Rights: Subject to the Granted Rights and Paragraph 6 of the Standard Terms and Conditions, the right to publish books based on the Property, in any and all languages, in any and all territories in the universe, in all forms of publication, including hard-cover or soft-cover book or magazine form, or electronic book form (provided, however, that so-called "electronic" books must contain the entire text of such book as such book is published in hard-cover or soft-cover book form, as applicable {including all graphic [non-moving] depictions}, and be in a text-only form that is capable of being utilized only by the end consumer of such "electronic" book physically reading such retrieved text) ("Publication Rights"). Owner's reservation of Publication Rights shall in no way limit Fox's rights as set forth in Paragraph 6(f) of the Standard Terms and Conditions. The only other exceptions to Owner's Publication Rights are that Fox has the right to publish the screenplay materials and customary illustrated "making of" books and the right to include up to 7,500 words from any such book based on the Property in such materials. It is further understood and agreed that Owner shall have no right to license

motion picture rights in any of the Publication Rights to a third party until such time, if ever, that Fox no longer has the right to produce Picture(s) hereunder.

12.    STUDIO SEQUELS AND REMAKES:  Within 10 business days after the commencement of principal photography of the applicable studio sequel or remake, Owner shall receive:

(a)    Sequels:  an amount equal to (i) the Purchase Price, and (ii) a percentage of the Defined Gross Proceeds of such sequel equal to the rate of percentage participation in the Defined Gross Proceeds from "1st dollar" of the Picture payable pursuant to Paragraph 7.

(b)    Remakes:  an amount equal to (i) the Purchase Price, and (ii) a percentage of the Defined Gross Proceeds of such remake equal to the rate of percentage participation in the Defined Gross Proceeds from "1st dollar" of the Picture payable to Owner pursuant to Paragraph 7.

13.    CREDIT:  Provided that the applicable Picture is completed and subject to any restrictions and requirements of the WGA Agreement, Owner shall be accorded credit as follows:

(a)    Based on Credit:

(i)    On Prints:  On positive prints of the Picture, in the main titles (if main title credits are utilized), on a separate card from that used to display the credit accorded the screenplay writer(s), in an average size of type which is not less than the average size of type used to display the credit accorded the screenplay writer(s) of the Picture, Owner's credit shall read substantially as follows:

"Based upon Alvin and the Chipmunks, created by Ross Bagdasarian."

(ii)    Paid Advertising:  In the billing block portion of all paid advertising of the Picture issued by Fox or under Fox's control in which the screenplay writer(s) receive "Written by" or "Screenplay by" credit (other than Excepted Ads as defined in the Standard Terms and Conditions attached hereto).  Such credit shall be displayed in substantially the same form specified above in Paragraph 13(a)(i) in

an average size of type which is not less than the average size of type used to display the "Written By" or "Screenplay By" credit accorded the screenplay writer(s).

(iii)    Excepted Ads:  If the "Written By" or "Screenplay By" credit is displayed in the billing block portion of an Excepted Ad issued by or under the control of Fox (other than an advertisement related to awards, nominations, congratulations and the like or in the audio portion of an Excepted Ad), then Owner shall receive credit in the billing block portion of such Excepted Ad.

(b)    Production Credit:  Provided further that the Picture is completed with Artist as a producer thereof and there is no breach by Owner and/or Artist hereunder, Owner shall be accorded a production credit in substantially the form "A Bagdasarian Company Production," on positive prints of the Picture and in the billing block portion of all paid advertising of the Picture issued by Fox or under Fox's control (other than "Excepted Ads") as follows:

(i)    On Prints:  Above or before the regular title of the Picture, on a card to be shared only with other recipients of a production credit (but with Owner's production credit in first position and on a single card if any other producer's "production credit" is on a single card), in the main titles (if main title credits are utilized), in an average size of type which is not less than 50% of the average size of type used to display the regular title of the Picture.

(ii)    Paid Ads:  Above or before the regular title of the Picture, at Fox's discretion, in first position among any production credits, in an average size of type which is not less than 35% of the average size of type used to display the regular title of the Picture and not less than 15% of the average size of type used to display the artwork title if no regular title is used.

(c)    Additional "Production" Credit Terms:  In no event shall Owner's production credit under Paragraph 13(b) be in a size of type smaller than the average size of type used to display any "Film By" credit accorded the director or any individual's production credit accorded any other producer, on screen or in the billing block, as applicable, or any other

production or presentation credit in the billing block accorded to (i) the name of any individual rendering services in connection with the Picture; or (ii) the entity furnishing the services of such individual in connection with the Picture (except that accorded to Fox or any third party involved in the financing of the Picture or any entity which receives credit in the form of a logo or trade name). If the "Film By" credit or any other individual's production credit is displayed in the billing block portion of an Excepted Ad issued by or under the control of Fox (other than an advertisement related to awards, nominations, congratulations and the like or in the audio portion of any Excepted Ad), then Artist shall receive Artist's production credit in the billing block portion of such Excepted Ad.

(d)   Individual Producer Credit: Provided further that the Picture is completed with Artist as a producer thereof and there is no breach by Owner and/or Artist hereunder, Owner shall be accorded a "Produced By" credit in substantially the form "Produced By Ross Bagdasarian and Janice Karman," on positive prints of the Picture and in the billing block portion of all paid advertising of the Picture issued by Fox or under Fox's control (other than "Excepted Ads") as follows:

   (i)   On Prints: On a card to be shared only with other producer(s) (on a single card if any other "Produced By" credit is on a single card), in the main titles (if main title credits are utilized), in an average size of type which is not less than 50% of the average size of type used to display the regular title of the Picture.

   (ii)   Paid Ads: After the regular title of the Picture, in an average size of type which is not less than 35% of the average size of type used to display the regular title of the Picture and not less than 15% of the average size of type used to display the artwork title if no regular title is used.

(e)   Additional "Produced By" Credit Terms: In no event shall Artist's credit under Paragraph 13(d) be in a size of type smaller than the average size of type used to display the "Directed By" credit or any other individual's producer credit. If the "Directed By" credit or any other individual's producer credit is displayed in the billing block portion of an Excepted Ad issued by or under the control of Fox (other than an advertisement related to awards, nominations, congratulations and the like or in the audio portion of any

Excepted Ad), then Artist shall receive Artist's "Produced By" credit in the billing block portion of such Excepted Ad.

Except as expressly provided herein, all aspects of such credit shall be determined by Fox in its sole discretion.

14.   TRANSPORTATION AND EXPENSES:  If Fox requires Artist to perform services at a location more than 100 miles away from Artist's principal residence, which is Montecito, California, then:

(a)   Transportation:  Fox shall furnish Artist with first-class (if available and if used) transportation (by air if appropriate) to and from such location.  When required on such a location, Artist shall be furnished with transportation to and from airports and between Artist's local residence and the work site(s) in connection with Artist's services hereunder.

(b)   Living Expenses:  If such location is an overnight location, then Fox shall pay Lender $1,000 per week in a low-cost area, $1,500 per week in a medium-cost area, $2,000 per week in a major urban area or $2,500 per week in a high-cost major urban area such as New York City or London, England, prorated at 1/7 daily, as a full and complete non-accountable allowance, for all living and incidental expenses.  Fox shall not be responsible for any other living expenses or perquisites of Artist.  If Lender can demonstrate to Fox's satisfaction that said living expense allowance is inadequate for any particular location, then Fox shall give good-faith consideration to an increase, with Fox's decision being final.

15.   FUNDAMENTAL ELEMENTS/APPROVALS:  Artist shall have the right to approve the designs, attributes (including voices, other than recognizable celebrity voices), and characterization of then-existing characters from the Property ("Characters") that are to be included in such Picture (collectively, "design approval"), as well as the story lines related thereto ("storyline approval") and new characters introduced therein that interact or are shown as having a familial relationship with then existing Characters ("new character approval"), for the purpose of verifying that such Characters are depicted therein in a manner reasonably consistent with or related to the integrity and artistic representation of such Characters as the same have been depicted theretofore.  Such approval shall not be unreasonably withheld or

delayed by Artist, any such delay being acknowledged to constitute approval for all purposes hereunder. With respect to the design approval, Fox and Artist have agreed that Artist's approval rights shall be determined by its approval of a basic animation test, and once approved, Fox shall not vary from the basic animation test, other than non-material changes that are required for extrapolating the test into a feature-length picture, and the exigencies of film production, and with respect to which Artist shall be fully and meaningfully consulted. With respect to storyline approval, Artist and Fox have agreed that Artist's approval right shall be determined by Artist's approval of a treatment, to be commissioned and prepared by Fox. Once approved by Artist, Fox shall adhere to and not vary from the treatment for the purpose of creating the screenplay, other than for non-material changes required by the exigencies of production, and with respect to which Artist shall be fully and meaningfully consulted. With respect to the new character approval, Fox and Artist have agreed that Artist's approval rights shall be determined by its approval of the foregoing basic animation test for new animated characters and by its approval of the foregoing treatment for new live action characters, and once the basic animation test and treatment are approved, Fox shall not vary from the basic animation test and treatment, other than the non-material changes set forth above with respect to the basic animation test and treatment, and with respect to which Artist shall be fully and meaningfully consulted. Notwithstanding the foregoing, Fox has agreed not to depict the then existing characters as using illegal drugs, tobacco, firearms, or engaging in sexual activity.

16.    APPROVALS AND CONTROLS:  Fox shall have all approvals and controls, and the right to initiate action and control access (subject to Paragraph 16(c) below) at any time and in any connection with respect to the Picture, including the right to designate the production manager and production auditor. Notwithstanding the foregoing and provided that Artist does not exercise the approval rights in such a manner so as to frustrate the timely progress or flow of the production of the Picture and subject to the exigencies of production, Artist shall have the rights of approval, access, and meaningful consultation as set forth below:

   (a)    Key Production Elements:  Fox and Artist shall have mutual approval of the final draft screenplay, the director, the principal cast, and the budget. If mutual approval is not reached with respect to any such element, Fox shall have the right to designate such element in its sole discretion.

(b)   Key Creative Personnel and Key Crew:  Fox and Artist shall have mutual approval of the key creative personnel and key crew for the Picture (other than the production manager, casting director and location auditor, all of whom shall be designated by Fox in its sole discretion).  If mutual approval is not reached with respect to any such element, Fox shall have the right to designate such element in its sole discretion.

(c)   Access to Sets and Meetings:  Artist shall have access and open invitation to all meetings attended by the director, other producers or any other non-Fox employee during development, production, and post-production of the Picture, including meetings relating to the story, character design, casting sessions (subject to director's approval), composer, music, special effects and merchandising and licensing meetings relating solely to the Picture.  Subject to the exigencies at the time, Fox shall make reasonable good faith efforts to give Artist reasonable advance notice of all such meetings.  Provided that Artist does not interfere with the production, Artist shall also have on-set access during principal photography of the Picture.

(d)   Advertising Campaign and Distribution Pattern:  Artist shall have a right of meaningful consultation, with Fox's decisions controlling, as to the initial advertising campaign and initial distribution pattern for the theatrical exhibition of the Picture in the United States.

(e)   Exercise of Consultation and Approval Rights by Artist:  All consultation rights and rights of approval granted to Artist under this Paragraph 16 shall be exercised exclusively by RB, JK or either of them, or, if both RB and JK are deceased or permanently disabled, by a single representative selected by a majority in interest of the owners of Bagdasarian Productions, or such other person or persons as Owner may designate with Fox's prior written approval.  RB and JK, or either of them acting for both of them, hereby agree to make themselves available on reasonable notice to exercise such consultation rights and rights of approval.  In accordance with the foregoing, Fox shall use reasonable good-faith efforts, subject to Artist's availability, to give Artist access to and keep Artist fully informed of all aspects of development, pre-production, production, post-production, advertising, marketing, and merchandising activities.

17.    PREMIERE:  Each Artist and each Artist's spouse or non-business-related companion shall be invited to attend all major "celebrity" premieres, if any, of the Picture, if any other producer is invited to such premieres.  Artist's children shall be invited to the primary United States celebrity premiere.  If Artist attends a "celebrity" premiere which is farther than 100 miles from Artist's principal place of residence as set forth in Paragraph 14, then Artist and Artist's spouse or other non-business-related companion shall be provided with round-trip business-class transportation (if available and if used) from such principal place of residence and Artist shall be provided with the expenses set forth in Paragraph 14.

18.    DVD:  Upon written request of Owner, Fox shall lend to each Artist a DVD of the Picture if and when commercially available, subject to Fox's then current DVD loan practices.

19.    OWNER'S REPRESENTATIONS AND WARRANTIES:  Owner represents, warrants and agrees that as of the date of this agreement and continuing thereafter:

(a)    Sole Proprietor:  Owner is the sole and exclusive proprietor throughout the universe of the Property with full right and authority to grant the Granted Rights and to agree to the restrictions upon the exercise of the Reserved Rights as set forth in the Purchase Agreement.

(b)    Citizenship:  Each Artist is a citizen of the United States.  Owner's company is incorporated in _____ and Owner is duly organized and validly existing under the laws of the state or country of incorporation.

(c)    Authorship/Copyright Ownership:  Owner is the sole author of the Property within the meaning of the copyright law of the U.S. and any similar or analogous law of other territories and is the sole copyright owner of the Property.  The Property is not in the public domain anywhere in the universe.

(d)    Trademark Ownership:  Applications for trademark registration for goods and services related to the Property (or related to the anticipated exploitation of the Property) were registered in the U.S. Patent and Trademark Office (or the trademark office of the country of _____ ) on _____, in the name of _____, under application serial number _____.

(e)    <u>Domain Name Ownership</u>: Domain names related to the Property (or to the anticipated exploitation of the Property) were registered on _____ with registrars of gTLD and ccTLD domain names, in the name of _____, as follows: _____. Owner and Fox agree to cooperate with each other so that the foregoing domain names and any other domain names owned or controlled by Owner relating to the Property will also include links to the Picture(s) if and when reasonably requested by Fox; likewise, Fox shall include links on its Picture(s)' website(s) to Owner's website(s) if and when reasonably requested by Owner.

(f)    <u>No Prior Exploitation</u>:  Other than the existing television episodes and television specials based on the Property, no motion picture version (other than the 1987 movie previously released by Samuel Goldwyn Studios, which rights expire in 2008) of the Property or any part thereof has been previously produced, presented, exhibited, exploited or authorized; and no development of the Property or any part thereof for the purpose of producing a motion picture has been previously undertaken or authorized, other than by Universal Studios, which rights have lapsed.

(g)    <u>No Prior Grant</u>:  None of the Granted Rights have been optioned, assigned or licensed by Owner or any party acting under the authority of or on behalf of Owner to any party other than to Fox; and no written or oral agreements or commitments whatsoever with respect to the Property or with respect to any rights of any kind and nature therein, including the Granted Rights, have previously been made or entered into by Owner or any party acting under the authority of or on behalf of Owner.

(h)    <u>No Impairment of Rights</u>:  Owner has not committed, or omitted to perform, any act by which the Granted Rights could or will be encumbered, diminished or impaired or failed to perform any act necessary to prevent the Granted Rights from being encumbered, diminished or impaired. To the best of Owner's knowledge in the exercise of reasonable prudence, there is no claim or litigation pending or threatened against or involving the Granted Rights, including the title, ownership or copyright in the Property, or any part thereof.  No attempt hereafter will be made by Owner or with Owner's authorization to encumber, diminish or impair any of the Granted Rights and all appropriate protection of the Granted Rights will continue to be maintained by Owner.

(i)   No Infringement or Violation of Third-Party Rights:  The Property is wholly original with Owner, and the plot, characters, scenes, sequence and story of the Property have not been adapted or copied from any other literary or dramatic work or other work of expression except for material which is in the public domain, which shall not be a material or substantial part thereof; insofar as Owner has knowledge in the exercise of reasonable prudence (i) the Property does not infringe upon or violate any common law, statutory or other right in any other literary or dramatic work or other work of expression; (ii) the material in the Property does not violate the right of privacy of any person or defame any person and the full use of the Granted Rights will not violate any rights of any party; and (iii) copyright in the Property has been secured in all countries of the world which accord copyright protection to works of expression.

(j)   Publication:  The Property was first published in November 1958 by Ross Bagdasarian under the title "The Chipmunk Song" and was registered for copyright in the name of _____ under copyright registration number _____ in the Office of the United States Register of Copyrights, Washington, D.C.

20.   NOTICES AND PAYMENTS:  Payments and written notices to Owner shall be sent as follows:

| | |
|---|---|
| Mail and | Bagdasarian Productions, LLC |
| Messenger: | 1192 East Mountain Drive |
| | Montecito, CA 93108 |
| | |
| Facsimile: | (805) 969-7466 |

with a courtesy copy of notices to Bagdasarian Productions, LLC,  747 Riven Rock Road, Montecito, CA  93108, Attention:  Steve Waterman, facsimile (805) 695-0340.

21.   ENTIRE AGREEMENT:  This Agreement, the June 17 and 18, 2004 cover letters and any other attachments incorporated by reference above, expresses the entire agreement between Fox and Owner and shall replace and supersede all prior arrangements and representations, either oral or written, as to the subject matter hereof.

By signing in the spaces provided below, Owner and Fox agree to all of the terms and conditions hereof.

BAGDASARIAN PRODUCTIONS, LLC
("Owner")

By _____
Title CEO

_____
ROSS BAGDASARIAN                ("Artist")

_____
JANICE KARMAN                ("Artist")

TWENTIETH CENTURY FOX FILM CORPORATION
("Fox")

By _____
Title

ROBERT B. COHEN
EXECUTIVE VICE PRESIDENT
LEGAL AFFAIRS

## STANDARD TERMS AND CONDITIONS – PURCHASE/PRODUCER

Standard Terms and Conditions of the Agreement dated as of March 26, 2004 between BAGDASARIAN PRODUCTIONS, INC. ("Owner") and TWENTIETH CENTURY FOX FILM CORPORATION ("Fox"), in connection with the Property entitled "ALVIN AND THE CHIPMUNKS".

1.    NOTICES: All notices hereunder shall be given in writing by mail (postage prepaid), messenger or facsimile. The earlier of: (a) actual receipt; (b) the date of messengering, faxing or of personal delivery; or (c) 3 business days after the date of mailing, shall be deemed to be the date of service. Payments and written notices to Owner shall be sent as set forth in the cover agreement to which these standard terms are attached. At Fox's option, Fox may deliver notices regarding a suspension or termination of this agreement or the exercise of the Option to Owner personally, either orally or in writing; however, such oral notices shall be confirmed in writing within a reasonable period of time after such oral notice. Notices to Fox shall be sent as follows:

Mail:    P.O. Box 900                             Messenger:    2121 Avenue of the Stars, Suite 1300
         Beverly Hills, California 90213                         Los Angeles, California 90067
         Attention: Legal Department                            Attention: Legal Department

Fax:    (310) 369-3759

2.    DEVELOPMENT DURING OPTION PERIOD: Fox shall have the right throughout the Option Period, if any, to engage in all customary development and pre-production activities in connection with the Picture, including the preparation and submission of treatments, screenplays, teleplays, and all other writings based in whole or in part upon the Property for use in connection with any of the Granted Rights, and the right to register such writings or any portion thereof for copyright, trademark or domain name purposes. All of the results and proceeds of any such activities shall at all times be the sole and exclusive property of Fox whether or not the Option, if any, is exercised.

3.    RESTRICTIONS: During the Option Period, if any, Owner shall not exercise, authorize or permit any party to exercise any of the Granted Rights nor any Reserved Rights, other than Publication Rights (except insofar as the Publication Rights are subject to the Right of First Negotiation or Right of Last Refusal); nor shall Owner use or permit the use of any other rights Owner has of any kind, in any manner or for any purpose that would unfairly compete with, interfere with or conflict with the full and unrestricted use of the Granted Rights.

4.    EXERCISE OF OPTION: If applicable, the following shall apply. The Option may be exercised by notice to Owner at any time during the Option Period. Whether or not Fox serves such notice, commencement of principal photography of the Picture during the Option Period shall be deemed to be the exercise of the Option and proper notice thereof. Upon exercise of the Option, Fox shall have the right to date the Short Form Assignment and record it with the U.S. Copyright Office.

5.    CREDITS:

(a)    Excepted Ads: "Excepted Ads" shall mean paid advertising in the following forms: advertising of 1200 lines or less; group, list or institutional advertisements, including catalogues; advertising in program guides; teaser or special advertising; publicity; narrative advertising; advertising relating primarily to the source material upon which the Picture is based, or primarily to the author, any member of the cast, directors, the producers or any other personnel involved with the production of the Picture; so-called "nominating," "award" or "congratulatory" advertisements; billboards of 3 sheets or more; advertising not relating primarily to the Picture; trailers, film clips, promotional films and tapes or advertising on screen, radio, television; advertising relating to subsidiary or ancillary rights in the Picture (including novelizations, screenplay and other publications, by-products or merchandising (including video games or interactive products), commercial tie-ins, soundtrack recordings, videocassettes, videodiscs and other devices used in conjunction with the exhibition of the Picture for home use, and the covers, packages, containers or jackets therefor).

(b)   Artwork Title:  If both a regular title and an artwork title are used, any position and/or percentage size requirements for Owner's credit in relation to the title of the Picture shall apply to the regular title only.  If only an artwork title is used such position and percentage size requirements shall not apply.

(c)   General:  As used herein, size means only height, width and thickness.  "Main titles" shall only be deemed to have been used if the "directed by" credit appears before or as the Picture begins to run.  If an end title format is utilized, any position requirement for Owner's credit in relation to the title of the Picture shall not apply.  The inclusion of a person's name in an advertisement as part of a review or critic's quote shall not be deemed a credit to or a display of such person's name in such advertisement.  The casual or inadvertent failure by Fox or any failure by a third party to comply with the CREDIT provisions hereof or the Agreement shall not be deemed to be a breach by Fox.  Upon Fox's receipt of written notice from Owner of a failure to comply with the CREDIT provisions of the Agreement, Fox shall take such steps as are reasonable and practicable to cure such failure on a prospective basis as to positive prints not yet made and advertisements not yet created and/or placed, as applicable, under Fox's control.

6.   MOTION PICTURE AND ALLIED RIGHTS:  Except with respect to the Reserved Rights, motion picture and analogous and allied rights in and to the Property shall include all rights of every kind, nature and description, solely and exclusively throughout the universe, in and to the Property, including the following exclusive rights:

(a)   Motion Pictures:  The sole and exclusive right, throughout the universe, to make, produce, adapt, sell, lease, rent, exhibit, perform, make copies of and generally deal in and with in any manner of exploitation, distribution and disposition of motion picture versions of every kind, nature and description of the Property, or any part or portion thereof, including without limitation theatrical motion pictures, television motion pictures (inclusive of television series) (which television rights are either frozen or reserved to Owner), and Home Video motion pictures, and to register and obtain copyright and copyright renewal therein throughout the universe, including the right to make, produce, adapt, project, exhibit and/or transmit, visually and/or audibly, copy and otherwise exploit motion pictures or any other versions of the Property or any part thereof in and by any and all manner, media, devices processes and technology, whether now or hereafter known or created, including by means of the medium known as home video cassettes and discs or by any process now known or hereafter devised analogous thereto and/or by means of the medium known as television or by any process now known or hereafter devised analogous thereto by any and all means of transmission now known or hereafter devised, including live television, free television, pay television, subscription television, cable television, satellite television, public television and educational television, video-on-demand, Internet, and all analogous communication uses and exhibitions pursuant to or on any form or device of electronic communication by which pictures and sound are exhibited or transmitted to the public (and if applicable, subject to Owner's reservation of Live Television Rights pursuant to the cover agreement).  Without limiting the generality of the grant of rights to Fox in the Property (and irrespective of Owner's reservation of Live Television Rights, if applicable), Fox shall have the right to telecast the Property or any part or version thereof (whether direct from living actors or from motion pictures or otherwise) in connection with the advertising, publicity or exploitation of any motion picture which may be produced hereunder.

(b)   Characters, Adaptations, Title, Remakes, Sequels:  The sole and exclusive right throughout the universe in its sole discretion, without limitation, to use all of the elements contained in the Property (including, notwithstanding any other provision of this Agreement, the characters, story lines, title or any variations thereof, and characterizations) and any motion picture versions thereof, in any and all languages, with or without sound accompaniment and with or without the interpolation of musical numbers therein, to translate the Property into any and all languages, to adapt, rearrange and make any changes in, deletions from or additions to the Property, to change the sequence thereof, to use a portion or portions of the Property, to change the title of the Property, to use said title or any components thereof in connection with materials, works or motion pictures wholly or partially independent of the Property and/or for any musical or lyrical composition whether or not contained in the sound track of any of said motion picture versions, to change the characters in the Property, to change the descriptions of said characters, and to use all or any part of the foregoing in new versions, adaptations, other motion pictures, Remakes and Sequels (including Additional Motion Picture, Author Written Sequel Motion Pictures, Studio Sequel Motion Pictures and Remakes), and if applicable, subject to Owner's reservation of Author Written Sequel Rights pursuant to the cover agreement, in any and all languages, and to register and secure copyright, trademark and domain name registrations and renewals therein in Fox's name throughout the universe.

(c)   Sound Recordings: The sole and exclusive right, throughout the universe, by mechanical, electronic, digital or any other means, to produce, reproduce and license the reproduction of spoken words, taken from or based upon the text or theme of the Property, on records, films, tapes or other devices, now known or hereafter created, designed or used for the purpose of producing and reproducing sound separately or in synchronism with, accompaniment of or supplementary to motion pictures, using for that purpose all or a part of the text, theme, title of or dialogue contained in the Property.

(d)   Music: The sole and exclusive right to include in any version of the Property musical accompaniment, and to further include in any such version interpolations of musical compositions or lyrics to be performed or sung by the performers in any such version.

(e)   Radio: The right to broadcast the Property (irrespective of Owner's reservation of Radio Rights, if applicable, pursuant to the cover agreement), or any part or version thereof, by means of radio processes in conjunction with or exploitation of, or as an advertising medium or tie-up with, the production, distribution or exhibition of any motion picture which may be produced hereunder.

(f)   Publications: The right to prepare, publish and copyright, or cause to be prepared, published and copyrighted, in any and all languages, in any and all territories in the universe, in any form or media (including, but not limited to, press books, press notices, trade journals, periodicals, newspapers, heralds, fan magazines, souvenir programs, picture books, comic books, illustration books and/or activity books or booklets), synopses, revised and/or abridged versions of the Property, adapted from the Property or from any motion picture or other version thereof. Fox shall have the right to publish and copyright, or cause to be published and copyrighted, screenplays, teleplays and scripts adapted from or based upon the Property and novelizations of screenplays, teleplays and scripts adapted from or based upon the Property.

(g)   Commercial Tie-In/Merchandising: The right to exclusively use and exploit and to license others to utilize and exploit throughout the universe all commercial tie-in rights and merchandising rights of any sort and nature arising out of or connected with any or all of the following: (i) the Property; (ii) any motion picture versions of the Property; (iii) the title or any titles of the Property or any motion picture versions thereof; (iv) the characters and characterization contained in the Property or any motion picture versions thereof; (v) the names, likenesses or characteristics of said characters; and (vi) physical properties or other elements or materials appearing or used in or in connection with all or any part of the Property or any motion picture versions thereof.

7.   NAME AND LIKENESS: Fox shall always have the right to use and display Owner's name and/or likeness for advertising, publicizing, promoting and exploiting, in whole or in part, the Picture and any product or material derived therefrom or related thereto. However, Owner's name and/or likeness shall not be displayed as endorsing any product (other than the Picture and/or the Property) without Owner's consent.

8.   INDEMNIFICATION: The following shall apply:

(a)   Fox's Indemnification: Fox shall indemnify Owner and hold Owner harmless from and against any and all claims, liability, judgments, losses, damages, costs and expenses, including penalties, interest, and reasonable attorney's fees and costs in the defense and disposition of such matters (collectively, **"Damages and Expenses"**) (other than with respect to any settlement entered into without Fox's written consent or claim which Fox has not been notified of at the commencement of such action) arising out of any third-party claim against Owner resulting from Fox's development production, distribution and/or exploitation of the Picture or any element thereof (**"Claim"**) and shall provide Owner with a defense, provided (i) Owner cooperates with Fox and follows Fox's reasonable instructions in connection with such Claim, and (ii) such Claim does not arise out of or constitute a breach of Owner's representations, warranties, and/or agreements hereunder. Nothing herein shall be deemed a waiver of Fox's right of subrogation, except that Fox shall waive its right of subrogation to the extent such Damages and Expenses are covered by this indemnity. The foregoing shall not limit Fox's right to include any such Damages and Expenses in the Negative Cost of the Picture or as a Distribution Expense pursuant to the Participation Definition.

(b)   Owner's Indemnification: Owner shall indemnify Fox, its associated, affiliated and related entities, parent, successors, assigns, licensees and each of their officers, directors, employees and agents (collectively, **"Fox**

Parties"), and hold the Fox Parties harmless from and against any and all Damages and Expenses (as defined above) arising out of, based upon or incurred because of a third-party claim against Fox resulting from a breach of Owner's representations, warranties, and/or agreements hereunder.

9.    VERSIONS OF THE PROPERTY: All rights granted to Fox hereunder may be exercised by Fox without the payment of any additional consideration by Fox with respect to the Property as presented to Fox and all other existing and future drafts, revisions, arrangements, adaptations, dramatizations, translations and other versions of the Property which may heretofore have been written or which may hereafter be written by or with the sanction of Owner and all references to the Property, including all of Owner's representations and warranties, shall be deemed to refer to all such existing and future versions of the Property.

10.    COPIES OF PROPERTY: Owner agrees to furnish to Fox, upon Fox's request, 5 printed or typewritten copies of the Property in the same form in which said material was presented to the public or, if no such presentation has been made, then in the form originally presented to Fox.

11.    ANNOTATION OF PROPERTY: Unless the Property is wholly fictional, then: (a) within two (2) weeks after delivery to Fox of the Property, Owner shall deliver to Fox full and detailed annotations **("Source Annotations")** attached hereto; and (b) Owner shall deliver to Fox Source Annotations as to any added material in subsequent versions of the Property within two (2) weeks after each such version has been delivered to Fox. Upon Fox's reasonable request and subject to Owner's professional availability, Owner shall consult and cooperate with Fox or any insurance company providing errors and omissions insurance for the Picture.

12.    EXERCISE OF OWNER'S RESERVED RIGHTS: Owner agrees that any sale, lease, license or other transfer of the Reserved Rights, if any and if applicable, shall be made subject to all of the terms and conditions of this agreement. Owner further agrees that each purchaser, lessee, licensee or other transferee of the Reserved Rights, if any and if applicable, shall be notified by Owner of the terms and conditions of this agreement. Without derogating from Fox's Rights of First Negotiation and Rights of Last Refusal, Owner agrees to inform Fox of any such transfer of Owner's Reserved Rights, if any.

13.    INSTITUTION OF LEGAL ACTION: Owner agrees that Fox shall have the free and unrestricted right (but not the obligation) to institute in the name and on behalf of Owner, at Fox's own cost and expense, any and all suits and proceedings at law or in equity to enjoin and restrain any infringements of the rights herein granted. To implement Fox's right to bring such actions, Owner hereby assigns to Fox any and all causes of action arising or resulting by reason of or based upon such infringements and any and all recoveries obtained in any such action. Owner agrees that Owner will not compromise, settle or in any manner interfere with any such litigation, if instituted; and Fox does hereby agree to indemnify and save harmless Owner from any costs or damages which Owner may suffer as a direct result of any such suits or proceedings instituted by Fox.

14.    ADDITIONAL DOCUMENTATION: Owner agrees to execute and procure any other and further instruments necessary to secure, assign and transfer registrations and renewals of copyright, trademark and domain names derived from the Granted Rights in any territory throughout the universe. If it shall be necessary under the laws of any territory that copyright registration be acquired in the name of Owner, Fox is authorized by Owner to apply for said copyright registration in the name of Owner; and, in such event, subject to exercise of the Option by Fox, as applicable, Owner shall and does hereby assign and transfer the same unto Fox, subject to Owner's Reserved Rights, if any and if applicable, in the Property. Owner further agrees to duly execute, acknowledge, procure and deliver to Fox such short form options and assignments as may be requested by Fox for the purpose of recording in the United States or elsewhere. If Owner shall fail to so execute and deliver or to cause the execution and delivery to Fox of the copyright, trademark or domain name assignments or other instruments herein referred to, Fox is hereby irrevocably granted the power coupled with an interest with rights of substitution and delegation to execute such assignments and instruments in the name and on behalf of Owner and as Owner's attorney-in-fact.

15.    COPYRIGHT OF PROPERTY: If the Property is hereafter published in any territory in the universe, Owner shall take and complete, and shall require any party operating under Owner's authority to take and complete, any and all steps and proceedings required by the laws of any territory within which such publication occurs to secure copyright in the Property and to prevent the Property from falling into the public domain by reason of such publication. Owner shall take such steps and proceedings as may be necessary to renew or extend any and all copyrights now or hereafter

secured upon the Property. As a material part of the consideration to Fox hereunder, Owner, without the payment of any further consideration by Fox, shall (promptly upon any such renewal or extension) assign to Fox for such renewed or extended term all of the rights in the Property which are granted to Fox under this agreement. If, pursuant to any copyright or similar law, Owner or Owner's heirs become entitled to a reversion, or to exercise any right of recapture or termination, of all or part of the Granted Rights and Owner or such heir(s) exercises such right, then, as soon as Owner or such heir(s) has the right pursuant to applicable law to transfer all or part of such rights ("Recaptured Rights"), Fox shall have a Right of First Negotiation and a Right of Last Refusal to acquire such Recaptured Rights. If Owner shall fail to do any of the things specified in this paragraph, Fox is hereby irrevocably granted the power coupled with an interest with rights of substitution and delegation and the right and authority to perform such acts and take such proceedings in the name and on behalf of Owner and as Owner's attorney-in-fact. Should any provision of this paragraph be held unenforceable, such provision shall be either deemed amended to the extent necessary to achieve enforceability or, if such amendment is impossible, deleted herefrom without rendering unenforceable or otherwise modifying the remaining provisions hereof.

16.    RIGHT OF FIRST NEGOTIATION/RIGHT OF LAST REFUSAL:

(a)    Right of First Negotiation: The term **"Right of First Negotiation"** means that if, after the expiration of any applicable restricted period, Owner desires to dispose of or exercise any of the Recaptured Rights or if applicable, the Reserved Rights, whether directly or indirectly, then Owner shall by written notice notify Fox of such desire and immediately thereafter negotiate with Fox with respect to such Recaptured Right or if applicable, the Reserved Right or any interest therein, and if, after the expiration of 15 business days following such notice from Owner to Fox, no agreement has been reached, then Owner shall be free to negotiate elsewhere with respect to such Recaptured Right or if applicable, the Reserved Right or any interest therein, subject to Fox's Right of Last Refusal.

(b)    Right of Last Refusal: The term **"Right of Last Refusal"** means that if Owner and Fox fail to reach an agreement pursuant to Fox's Right of First Negotiation as to a particular Recaptured Right or if applicable, the Reserved Right or any interest therein, and Owner makes and/or receives any bona fide offer to license or acquire the particular Recaptured Right or if applicable, the Reserved Right or any interest therein, Owner shall notify Fox in writing of such offer specifying the particulars thereof, including the name of the offeror, the proposed financial terms and all other terms of such offer. During the period of 10 business days after said notice, Fox shall have the exclusive option to license or acquire, as the case may be, the particular Recaptured Right or if applicable, the Reserved Right or the interest therein referred to in such offer, upon the same financial terms and such other terms as are set forth in such notice, it being agreed that the terms subject to the option shall not require the performance by Fox of terms which are not capable of performance on a financial basis. If Fox elects to exercise said option, Fox shall notify Owner of the exercise thereof within said 10 business day period, otherwise Owner shall be free to accept said bona fide offer, provided that if any such proposed offer is not consummated within 30 calendar days following the expiration of said 10 business day period, Fox's option shall revive and shall apply to such proposed offer again and to each and every further offer or offers at any time received by Owner relating to the particular Recaptured Right or if applicable the Reserved Right or any interest therein. Fox's said option shall continue in full force and effect, upon all of the terms and conditions of this paragraph, so long as Owner or its heirs retains any right, title or interest in or to the particular Recaptured Right or, if applicable, the Reserved Right.

17.    PUBLICITY RESTRICTIONS:  Owner shall not authorize, circulate, publish or otherwise by means of press, publicity or advertising agencies employed or paid by Owner, or otherwise, authorize, circulate, publish or otherwise disseminate any news stories or articles or other publicity of any kind relating directly or indirectly to the subject matter of this agreement, including the Picture, unless the same are first approved by Fox. Owner may, however, disseminate publicity which contains Owner's name and incidentally identifies the Picture and the services Owner rendered thereon so long as such publicity is not an advertisement for the Picture and does not contain any material which is derogatory in nature to Fox, the Picture or any element thereof or party rendering services in connection therewith.

18.    FOX'S EXERCISE OF RIGHTS:  All rights, licenses, privileges and other property granted herein shall be cumulative and Fox may exercise or use any of them separately or in conjunction with any one or more of the others. Fox shall be under no obligation to exercise or put to use any of the rights acquired by Fox hereunder. If Fox should inadvertently, or under the good-faith belief that it is exercising rights granted hereunder, make any use of rights in the Property not in fact granted hereunder, Fox's liability, if any, shall be limited to the reasonable value of the rights so