LOUIS A. KARASIK (State Bar No. 100672)
RACHEL M. CAPOCCIA (State Bar No. 187160)
CASONDRA K. RUGA (State Bar No. 237597)
**ALSTON & BIRD LLP**
333 South Hope Street
Sixteenth Floor
Los Angeles, California 90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100
lou.karasik@alston.com
rachel.capoccia@alston.com
casondra.ruga@alston.com

Attorneys for Defendant
TWENTIETH CENTURY FOX FILM CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BAGDASARIAN PRODUCTIONS, LLC, a California limited liability company, and JANICE KARMAN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, <br><br> Defendant. | Case No. CV 10-02991 MWF (JCGx) <br><br> Referred under Cal. Code Civ. Proc. Section 638 to: <br><br> Hon. Carl J. West (Ret.) <br><br> JAMS Reference No. 1220044628 <br><br> **CONFIDENTIAL FILED UNDER SEAL** <br><br> **DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR ATTORNEYS' FEES AND COSTS** <br><br> [Filed concurrently with Notice of Motion; Memorandum of Points and Authorities; Declaration of Casondra K. Ruga in support of Motion for Attorneys' Fees and Costs; Notice of Application to Tax Costs and Proposed Bill of Costs; Declaration of Casondra K. Ruga in support of Application to Tax Costs; and [Proposed] Order Granting Fox's Motion for Attorneys' Fees and Costs and Fox's Application to Tax Costs] <br><br> Filing Date:        April 21, 2010 |

## DECLARATION OF LOUIS A. KARASIK

I, Louis A. Karasik, declare and state as follows:

1.      I am a partner with Alston & Bird LLP ("A&B"), counsel for Defendant Twentieth Century Fox Film Corporation ("Fox") in this action.  I submit this declaration in support of Fox's Motion for Attorneys' Fees and Costs ("Motion") against Plaintiffs Bagdasarian Productions, LLC ("BPL") and Janice Karman ("Karman") (collectively "Plaintiffs").  I have personal knowledge of the facts stated in this declaration and would competently testify thereto if called as a witness in this matter.

## I.      SUPPORTING INFORMATION ABOUT FOX'S FEES IN DEFENSE OF THE COPYRIGHT-RELATED CLAIMS

2.      In this declaration and the accompanying exhibits, I detail the legal services performed by A&B since October 6, 2009 to defend against Plaintiffs' "Copyright-related Claims", which refers to the claims asserted in the first four Counts of Plaintiffs' Complaint for a declaration of co-ownership and accounting based on claimed "joint author" status under the Copyright Act (Count I), copyright infringement (Count II) and claims for unjust enrichment for Fox's use of Karman's alleged writing (Count III) and graphic designs (Count IV).  All of the fees incurred in defense of the Copyright-related Claims that are the subject of this Motion have been paid by Fox.  To aid the Court in its evaluation of the reasonableness of the fees associated with the defense of these claims, we have prepared a spreadsheet (Exhibit 1) that reproduces the time-entries from A&B's billing statements to Fox (both the description of the work and amount of time associated with that work) related to defense of the Copyright-related Claims from October 2009, when Plaintiffs' counsel threatened copyright claims, through December 3, 2012, when the Referee issued his Ruling on the Motion to Dismiss dated November 14, 2012, dismissing the Copyright-related Claims.  Except as noted herein, the time-entries and hours information that appear in Exhibit 1 are identical to the corresponding entry on the original billing

1

1   statements A&B sent to Fox.

2          3.      The time-entries in Exhibit 1 only include entries from the billing

3   records that reflect activity related to defense of the Copyright-related Claims.  In

4   some cases, those entries, just as they appear on the bills sent to Fox, include

5   additional information about work related to the defense of other claims.  In Exhibit 1,

6   we have in most cases redacted from those entries the description of work not

7   associated with the defense of the Copyright-related Claims.  In each case where the

8   time-entry included activity unrelated to the Copyright-related Claims, we have

9   conservatively apportioned the time between the Copyright-related Claims and the

10  other activity.  That apportionment is represented in Exhibit 1 by the column labeled

11  "Copyright related," under which there is a percentage allocation for each time-entry

12  on the spreadsheet.  I have personally reviewed each of these allocations to ensure that

13  they are reasonable and apportion the time in a manner that affords Fox recovery only

14  for the time reasonably spent to defend against the Copyright-related Claims.

15         4.      In submitting this detailed information about the legal services

16  provided to Fox, Fox intends no waiver of attorney-client or work product privilege.

17  In some cases, we have redacted information from the time-entries that contain

18  information we consider unnecessary to reasonably establish the services provided and

19  the reasonableness of the fees.  Where such redactions have been made to time-entries

20  reflecting work on the Copyright-related Claims, we have inserted a parenthetical to

21  generally describe the activity and to identify where confidential content has been

22  omitted.  For example, in various time-entries we have redacted the names of Fox

23  counsel with whom A&B has communicated from time to time and inserted a

24  parenthetical indicating that we communicated simply with "[Fox legal]".  In other

25  cases we have provided a description of the legal services provided that generalizes

26  the activity to avoid revealing privileged information or overly invasive details.  The

27  inadvertent disclosure of any privileged information should not be considered a

28  waiver of applicable privilege and Fox expressly reserves the right to amend or

1  withdraw any information disclosed herein in the event of any assertion of privilege

2  waiver.

### a.   Detailed Summary of Legal Services Rendered in Defense of the Copyright-related Claims

5.     Fox's defense of the Copyright-related Claims required extensive legal services that took place over a four-year period.  To further enable the Referee to evaluate these services, in Exhibit 1 we have provided allocations of the time-entries into five general categories:  Factual Investigation, Legal Analysis, Briefing, Hearings and Other Case Activity.  These allocations are found under the heading "Allocations" of Exhibit 1 and are represented by percentages that apportion each time-entry into one or more of these five categories.  I have personally reviewed each of these allocations to ensure that they reasonably apportion the services between these categories.

6.     As further detailed below and in Fox's accompanying Memorandum of Points and Authorities, Fox's defense of the Copyright-related Claims included enforcement of the parties' agreement to resolve all disputes in accordance with Cal. Code Civ. Proc. Section 638 ("638 Reference").  In Exhibit 1 we have provided the Referee with allocations that indicate the amount of time devoted to 638 Reference issue.  These allocations are found in the column labeled "638 Reference" on Exhibit 1, which indicates the percentage of each time-entry associated with defense of the Copyright-related Claims associated with the 638 Reference issue. I have personally reviewed each of these allocations to ensure that they reasonably apportion the services directed to 638 Reference issue.

7.     Exhibits 2, 3 and 4 use the allocation information from Exhibit 1 to provide detailed information about the fees incurred by Fox in each year from 2009 to 2012 to defend against the Copyright-related Claims, with specific information about the hours spent by each of the partners, associates or para-professionals who rendered services.  Exhibit 2 provides a summary of all fees incurred on Copyright-related

3

Claims with specific information about the number of hours spent by each time-biller over the 2009-2012 time period and their billable rates for the work performed. Exhibit 3 provides detailed information specifying the number of hours and corresponding fees in defense of the Copyright-related Claims for activity not involving the 638 Reference issue and Exhibit 4 provides detailed information about the fees incurred for the 638 Reference related issue.

### b. Description of Legal Services in Defense of Copyright-related Claims

8.      As detailed in Exhibits 1 through 4, Fox incurred $837,006 in fees to defend against Plaintiffs' Copyright-related Claims for which it seeks recovery by this Motion.  *See* Ex. 2.  All of these fees were reasonable and necessary to defend against the Copyright-related Claims.  We review below the legal services that A&B rendered to Fox to defend against the Copyright-related Claims that comprise these fees.

### i. Plaintiffs' Assertion of Copyright-related Claims and Fox's Retention of A&B

9.      On October 6, 2009, Larry Shire, Esq., of the Grubman Indursky & Shire firm, sent a letter to Fox on behalf of Plaintiffs threatening claims (among others) for copyright infringement directed to Fox's anticipated December 23, 2009 release of *Alvin and the Chipmunks: The Squeakquel* ("*The Squeakquel*").  Mr. Shire asserted that the film was based on or included written materials and graphic designs contributed by Karman and that release of the picture would result in copyright infringement litigation.  The letter also asserted claims for breach of contract based on the Purchase Price term of the parties' March 2004 Purchase/Producer Agreement – Literary Material "Alvin and the Chipmunks"  (hereinafter "Agreement"), breach of merchandising obligations, violation of approval rights and other contract claims, all of which Plaintiffs ultimately asserted against Fox in their initial pleading filed on April 21, 2010.  Attached hereto as Exhibit 5 is a true and correct copy of Mr. Shire's

4

letter.  Fox released *The Squeakquel* as planned on December 23, 2009.

10.    My firm was retained by Fox to represent it in connection with the copyright and other claims described in the October 2009 letter and to thereafter represent the company in the litigation.  On December 7, 2009, I responded to Mr. Shire's letter on behalf of Fox.  My letter addressed each of the claims identified in Mr. Shire's letter and explained in detail why the facts and plain language of the Agreement defeated each claim, and included citation to pertinent authorities supporting Fox's position.  Attached hereto as Exhibit 6 is a true and correct copy of my letter to Mr. Shire.

11.    On January 27, 2010, Plaintiffs' litigation counsel, Gerald Harper of Paul, Weiss, Rifkind, Wharton & Garrison LP, responded to my letter of December 7, 2009.  Plaintiffs' counsel rejected Fox's position.  Attached hereto as Exhibit 7 is a true and correct copy of Mr. Harper's letter.

12.    Plaintiffs filed their Complaint on April 21, 2010 and asserted the Copyright-related Claims.  The Complaint also alleged BPL's claim for alleged breach of contract and/or the covenant of good faith and fair dealing based on the Agreement (Count V) with respect to provisions involving (i) the "Purchase Price" and sequel compensation terms of paragraphs 6, 7 and 12 of the Agreement ("Purchase Price Claim"); (ii) "Picture-Related Merchandising" under paragraph 9 of the Agreement (the "Merchandising Claim"); (iii) approval and consultation rights under paragraphs 15 and 16 of the Agreement ("Approval Rights Claim"); and (iv) access and invitation to meetings under paragraph 16 of the Agreement ("Access to Meetings Claim").

13.    After the Ninth Circuit dismissed Plaintiffs' appeal of the District Court's order enforcing the 638 Reference (detailed more fully below), on July 17, 2012, I participated in a telephone discussion with Steve Marenberg, counsel for Plaintiffs, during which I advised Mr. Marenberg that Fox intended to move to dismiss certain of Plaintiffs' claims, including the Copyright-related Claims.  During the discussion, I detailed the factual and legal basis for Fox's motion and identified

5

relevant provisions of the Agreement that contradicted Plaintiffs' claims.

14.   Following my discussion with Mr. Marenberg, on August 10, 2012, Plaintiffs filed their First Amended Complaint ("FAC").  The FAC reasserted the Copyright-related Claims and added claims for breach of implied contract directed to asserted writing services ("Writing Services Claim") (Count V) and asserted graphic design services ("Graphic Design Services Claim") (Count VI).   BPL added claims to the breach of contract/implied covenant claim (newly renamed Count VII) asserting breaches involving (i) "Soundtrack Royalties" payable for the *Alvin and the Chipmunks* ("*Alvin*") soundtrack album under paragraph 10 of the Agreement ("Alvin Soundtrack Claim"); (ii) pay television distribution ("*Alvin* HBO Distribution Claim") under paragraphs 5 and 10 of the Agreement and (iii) cable television distribution ("FX Distribution Claim") under paragraphs 5 and 10 of the Agreement.

## ii.   Fees In Defense of Copyright-related Claims to Investigate, Assess and Obtain Dismissal on the Merits

15.   Exhibits 2 and 3 detail the fees incurred by Fox in defense of the Copyright-related Claims on matters unrelated to enforcement of the 638 Reference.  Fox's defense of the Copyright-related Claims involved substantial activity in each of the categories of Fact Investigation, Legal Analysis, Briefing, Hearings and Other Case Activity.  The following is a description of those activities:

a.   **Fact Investigation**:  Exhibit 3 reflects that A&B expended time resulting in $95,345 in fees from 2009 to 2012 for fact investigation of the Copyright-related Claims.  Fact investigation extended over the period October 2009 when Mr. Shire sent his letter threatening Fox with copyright infringement claims, and intensified after the Complaint was filed in April 2010.

(1)   The time-entries reproduced on Exhibit 1 reflect the substantial scope of factual investigation necessary to defend against the Copyright-related Claims.  Plaintiffs pursued claims seeking 50% of the profits of *The Squeakquel*, a film that produced world-wide box office revenues of over $360

million.  A&B was tasked to develop the factual background into such claims and to

determine the nature and extent of defenses available to Fox.  Given the claimed

damages, prudence dictated a thorough investigation of all aspects of the claim,

despite the strength of Fox's position under the Agreement.  A&B initiated review of

the parties' contractual relationship, their dealings in connection with development

and production of *The Squeakquel* over a two year period, the parties' prior dealings

in connection with production and development of the *Alvin* film, and claims that

Plaintiffs contributed writing and graphic designs that were a material part of *The*

*Squeakquel*.  This activity included interviews with key executive such as Elizabeth

Gabler, Erin Siminoff, Karen Rosenfelt and Stephen Plum and gathering and

reviewing numerous custodian files.

(2)     One of the important tasks in connection with the factual

investigation into Plaintiffs' claims was to gather, review and analyze Karman's

purported producer notes and screenplay materials for *The Squeakquel* and to

determine whether or in what manner these materials were reflected in the film.  If

Karman's materials were not used in the film, if the claimed materials could not

reasonably be attributed to Karman, or if the claimed materials were generic and failed

to reflect expression protectable under the Copyright Act, Plaintiffs' copyright claims

would fail to that extent.  Any purported damages claims would substantially depend

on an analysis of such issues and whether any meaningful part of the picture was

based on Karman's claimed contributions.  This was a time-consuming process

because of the enormous volume of notes and screenplay materials exchanged over

the lengthy course of development of the picture.

(3)     Fact investigation into these issues included investigation

into the Writers Guild of America ("WGA") proceedings in which Karman

participated in the May to September 2009 time frame.  Karman advanced arguments

in these proceedings about her alleged contributions to *The Squeakquel* in an effort to

obtain screenplay credit – arguments rejected by all three WGA arbitrators, who found

1   Karman's claimed contributions insufficient to warrant any credit.  Fox was not a

2   participant in the WGA proceedings and learned of the details of Karman's arguments

3   and the arbitrator's written decisions during our factual investigation into the claims

4   and during the course of discovery.

5           (4)    Factual investigation was also necessary into the copyright

6   registrations secured by Karman in or about April 2010 when the Complaint was filed,

7   purporting to describe her claimed copyright interest in screenplay materials.  Fox

8   pursued defenses that the copyright registrations themselves defeated Plaintiffs'

9   infringement claims, as many of them identified Fox as a co-author of the materials,

10  and there can be no infringement claim by one co-author against another co-author.

11  Factual investigation into such issues was particularly appropriate because the

12  Complaint purported to allege alternative claims for co-author status and copyright

13  infringement, and it was necessary and appropriate to determine whether the copyright

14  registrations supported either claim or defeated each claim.  This activity included

15  obtaining and evaluating materials provided by Karman to the Copyright Office.

16          (5)    Factual investigation also extended into defenses such as

17  Fox's implied license defense.  Plaintiffs requested throughout 2008 and 2009 that

18  Karman's materials be included in *The Squeakquel*, and such activity is inconsistent

19  with any claim for copyright infringement.  Fox further investigated the facts

20  associated with Plaintiffs' assertion in her "joint authorship" claim that Fox intended

21  Karman to have co-author status for screenplay materials she prepared for *The*

22  *Squeakquel*.

23          (6)    We also investigated Plaintiffs' damages claims and the

24  manner in which any purported accounting of profits would be conducted should

25  Plaintiffs recover on their theories.  Such analysis was necessary and appropriate to

26  assist Fox in evaluating the claims and the claimed damages exposure.

27          b.    **Legal Analysis**:  Exhibits 2 and 3 reflect A&B's fees in the

28  amount of $167,044 from 2009 to 2012 for substantive legal analysis in defense of

8

DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S
MOTION FOR ATTORNEYS' FEES AND COSTS

Copyright-related Claims (unrelated to the 638 Reference issue).  The legal analysis commenced when Fox received the October 2009 letter from Shire and continued throughout the period Fox was required to defend against the claims.

(1)      Plaintiffs Copyright-related Claims required substantial legal analysis in many different categories of defense.  A&B performed research and analysis into whether the materials Karman claimed to have submitted contained protectable elements/expression.  Fox investigated Plaintiffs' ability to prosecute alternative and inconsistent claims for joint author status and copyright infringement and the impact of Karman's copyright registrations on her purported claims.   We researched Fox's preemption defenses with respect to the unjust enrichment claims and defenses of implied license.  We examined the authorities in connection with the potential damages and relief available to Plaintiffs under their Copyright-related Claims.

(2)      One key area of legal analysis – which ultimately was dispositive of the claim – was the bar to Plaintiffs' Copyright-related Claims posed by the plain language of the Agreement.  Fox conducted analysis of the authorities that preclude prosecution of claims inconsistent with the terms of the parties' contract and the availability of a motion to dismiss to terminate such claims.  In this area, Fox was required to conduct research into the arguments Plaintiffs raised seeking to avoid dismissal, including their assertion that the Agreement did not afford Fox the right to use screenplay materials generated by Karman, even though the Agreement grants Fox the right to use every constituent element found in a screenplay and all drafts and arrangements of such elements and contains other language reflecting the parties' plain intent that Fox have the right to use all materials generated by Karman.  Fox was also required to research other arguments advanced by Plaintiffs in their opposition to the motion to dismiss seeking to avoid dismissal of the Copyright-related Claims.

c.   **Drafting Briefs:**  On August 31, 2012, Fox moved to dismiss the Copyright-related Claims, the Merchandising Claim and the Purchase

1   Price Claim.  The motion directed to the Copyright-related Claims was based on

2   defects in these claims that Fox had detailed to Plaintiffs' counsel as early as

3   December 2009.  The briefing related to Fox's Motion to Dismiss Plaintiffs'

4   Copyright-related Claims resulted in $56,666 in fees (inclusive of the opening and

5   reply paper).  The motion focused on the language of the Agreement that disposed of

6   the Copyright-related Claims.  The fees for this activity detailed in Exhibit 3 do not

7   include any time incurred by Fox to brief other issues raised in Fox's Motion to

8   Dismiss (directed to the Purchase Price Claim and Merchandising Claim).  In a

9   November 14, 2012 Ruling on Fox's Motion to Dismiss ("MTD Order"), the Referee

10   granted Fox's motion as to the Copyright-related Claims.  The Referee's December 3,

11   2012 Order confirmed that the MTD Order would stand as the ruling of the Referee on

12   Fox's Motion to Dismiss.  Attached hereto as Exhibit 8 is a true and correct copy of

13   the MTD Order and the Referee's December 3, 2012 Order.

14              d.    **Preparation/Attendance at Hearing**:  Fox incurred

15   $15,511 in fees for A&B's preparation for and attendance at the hearing on the

16   Motion to Dismiss the Copyright-related Claims.

17              e.    **Confer with Plaintiffs' Counsel/Other Litigation**

18   **Activity**:  Fox incurred $13,106 in fees over the 2009 to 2012 period in connection

19   with A&B's participation in meet and confer activity, exchanges with Plaintiffs'

20   counsel in correspondence and telephone calls and other case-related activity pertinent

21   to the defense of Plaintiffs' Copyright-related Claims.

22              iii.   **Fees in Defense of the Copyright-related Claims to Enforce**

23                   **the 638 Reference**

24       16.    Exhibits 1 and 4 detail that Fox incurred $489,335 in fees in

25   defense of the Copyright-related Claims as a result of Plaintiffs' refusal to participate

26   in 638 Reference for these claims.  Specifically, Fox incurred $261,793 in fees for

27   Legal Analysis, $129,725 in fees for Briefing, $86,936 in connection with Hearings

28   and $10,882 for Other Case Activity.  The time-entries comprising this work are

1 detailed in Exhibit 1 and a detailed account of the activity for each of the above-

2 described categories is set forth in Exhibit 4. The following is a description of the

3 activity resulting in these fees.

4        17.   Shortly after Plaintiffs filed the Complaint, on April 28, 2010 I

5 spoke with Plaintiffs' counsel Lynn Bayard and requested that Plaintiffs stipulate to

6 adjudicate their claims pursuant to Cal. Code Civ. Proc. Section 638 ("638

7 Reference"), the dispute resolution mechanism agreed upon under paragraph 21(c) of

8 the Agreement. Plaintiffs refused to participate in 638 Reference. On May 27, 2010,

9 we sent Ms. Bayard a letter formally initiating a meet and confer process over Fox's

10 anticipated motion to enforce the 638 Reference provision. Attached hereto as Exhibit

11 9 is a true and correct copy of our May 27 letter to Ms. Bayard. On June 4, 2010, I

12 had a meet and confer discussion with Ms. Bayard regarding Plaintiffs' assertion that

13 the 638 Reference provision in the Agreement did not apply to Karman's copyright

14 claims, the substance of which I subsequently confirmed in a June 7, 2010 letter to

15 Ms. Bayard, attached hereto as Exhibit 10. Plaintiffs' position was that their pursuit

16 of copyright claims precluded 638 Reference.

17        18.   As a result of Plaintiffs' refusal to participate, Fox was forced to

18 file a motion to compel enforcement of the 638 Reference to defend against the

19 Copyright-related Claims. The motion to enforce the 638 Reference was filed on June

20 18, 2010. Fox incurred substantial fees for legal analysis necessary to enforce the

21 parties' 638 Reference. This analysis included briefing of controlling Ninth Circuit

22 authority (*Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 512 (9th Cir.

23 1988)) that a claim "arises out of" a contract and is subject to a contractual forum

24 selection clause whenever contract interpretation will be necessary to adjudicate the

25 claim. Fox was also compelled to respond to Plaintiffs' various arguments that a

26 federal court's exclusive jurisdiction over copyright claims precludes resolution of

27 copyright disputes through 638 Reference.

28        19.   On August 12, 2010, the District Court, the Honorable Jacqueline

11

1   H. Nguyen, granted Fox's motion, finding that the copyright claims arise out of the

2   Agreement because the controversy requires interpretation of the Agreement, and

3   rejecting all of Plaintiffs' jurisdictional challenges ("Reference Order").  Attached

4   hereto as Exhibit 11 is a true and correct copy of the Reference Order.  Judge Nguyen

5   directed the parties to proceed expeditiously with the 638 Reference.  (Ex. 11,

6   Reference Order at 6.)

7          20.    On August 25, 2010, I had a telephone conversation with Ms.

8   Bayard wherein she advised that Plaintiffs would be seeking a writ of mandamus to

9   challenge the Reference Order.  Attached hereto as Exhibit 12 is a true and correct

10  copy of my August 31, 2010 letter to Ms. Bayard memorializing our discussion.  I

11  confirmed in this letter my efforts to dissuade Plaintiffs from pursuing challenges to

12  the Reference Order that would only delay the proceedings further.  I noted Judge

13  Nguyen's direction that the parties proceed expeditiously to initiate the 638 Reference.

14  Despite these efforts, on September 1, 2010, Plaintiffs filed a Petition for Writ of

15  Mandamus with respect to the Reference Order, and on September 10, 2010, Plaintiffs

16  filed a Notice of Appeal relating to the Reference Order.

17         21.    On November 2, 2010, the Ninth Circuit issued an order denying

18  the Petition for Writ of Mandamus stating "Petitioners have not demonstrated that

19  [the] case warrants the intervention of this court by means of the extraordinary remedy

20  of mandamus."  On September 23, 2010, the Ninth Circuit issued an Order to Show

21  Cause re Jurisdiction, directing the Plaintiffs to show cause why the matter should not

22  be dismissed for lack of jurisdiction, and authorizing Fox to file a response.  Fox filed

23  its response on November 4, 2010.  On November 30, the Ninth Circuit discharged the

24  OSC and directed the parties to brief the jurisdictional issue as part of their

25  submissions on appeal.  Substantial briefing of the issues followed, and Fox was

26  forced to prepare for and participate in oral argument before the Ninth Circuit, with a

27  host of issues – both substantive and procedural – before the Court.

28         22.    Plaintiffs' challenge on appeal to their participation in 638

Reference forced Fox to incur further fees in defense of the Copyright-related Claims to enforce the expeditious resolution of claims envisioned by the parties' agreement to 638 Reference. Plaintiffs advanced a barrage of arguments, all proceeding from the premise that the copyright claims prevented enforcement of the 638 Reference, that Fox was required to address in briefing on the OSC re Jurisdiction and its appellate brief. Fox was required to engage in legal analysis of all of the following issues framed by Plaintiffs in support of their argument that the Copyright-related Claims were not subject to 638 Reference:

(1) Copyright claims are beyond the 638 Reference clause because:

a. Copyright claims arise solely under the Copyright Act and do not arise out of the contract. In that connection, Plaintiffs invited the District Court and Ninth Circuit to follow Plaintiffs' interpretation of Second Circuit authority instead of Ninth Circuit authority to determine if copyright claims arise out of a contract.

b. The Ninth Circuit test of *Manetti-Farrow*, finding that claims arise out of a contract whenever contract interpretation will be necessary to adjudicate the claims, should not be followed for copyright claims or should be limited.

c. The numerous District Court cases from courts in the Ninth Circuit that have applied *Manetti-Farrow* to enforce forum selection clauses when disputes require contract interpretation are distinguishable or should be set aside as incorrectly decided.

(2) 638 Reference cannot be enforced in federal court for copyright claims because:

a. 638 Reference is a uniquely state procedure that requires adjudication by state court judges under state rules of civil procedure.

b. The federal court has exclusive federal jurisdiction under the

13

Copyright Act that precludes 638 Reference.

c.  A reference can only be made in federal court under Rule 53 and federal law under Rule 53 precludes reference of disputes pursuant to 638 Reference because this results in no Article III review of the parties' disputes.

d.  Federal cases enforcing arbitration of federal claims (including copyright claims) under arbitration agreements, including agreements to arbitrate in accordance with Cal. Code Civ. Proc. Section 1281, provide no support for enforcement of 638 Reference.

(3)  Plaintiffs were entitled to immediate appeal of the District Court's order enforcing the 638 Reference as to copyright claims because:

a.  Granting of Fox's motion to enforce the 638 Reference will leave Plaintiffs "out of court" within the doctrine of *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1 (1983).

b.  The order staying proceedings in federal court and enforcing the 638 Reference "conclusively determined[ed] the disputed question", "resolved an important issue completely separate from the merits of the action" and was "effectively unreviewable on appeal from a final judgment" thereby justifying immediate appeal under the collateral order doctrine.

c.  The result of the 638 Reference is effectively unreviewable because the Statement of Decision must be "rubber stamped" by the District Court and enforcement of the reference thus leads to impermissible direct appeal to the Ninth Circuit of a decision made by the Referee.

d.  Plaintiffs are irreversibly prejudiced by the denial of their right to jury trial on copyright claims.

14

1    (*See* 9th Cir. Dkt. No. 10-56430, Dkt Entry Nos. 9 and 15.)

2        23.    Fox defeated Plaintiffs' attempts to avoid 638 Reference, with the

3    Ninth Circuit dismissing their appeal in a unanimous published opinion that cleared

4    the way for the reference to proceed.  *Bagdasarian Productions, LLC v. Twentieth*

5    *Century Fox Film Corp.*, 673 F.3d 1267, 1273 (9th Cir. 2012).  In determining that

6    Plaintiffs had no right to appeal the order enforcing the 638 Reference, the Ninth

7    Circuit held that under the Cal. Code Civ. Proc. Sections 638 and 645, the Referee's

8    Statement of Decision "must stand as the decision of the Court . . . and . . . judgment

9    may be entered thereon in the same manner as if the action had been tried by the

10   court", and further that the Statement of Decision "may be excepted to and reviewed

11   in like manner as if made by the court."  *Id.* at 1271 (quoting CCP Sections 638 and

12   645).  The Ninth Circuit determined that the District Court's review of the Statement

13   of Decision would then be appealable to the Ninth Circuit and found no reason to treat

14   orders enforcing 638 Reference differently from orders enforcing agreements to

15   arbitrate (*id*. at 1273), thus effectively rejecting the principal arguments made by

16   Plaintiffs challenging enforceability of 638 Reference in federal court.

17        **II.    FEES INCURRED IN DEFENSE OF OTHER BASELESS CLAIMS**

18        24.    As detailed in Fox's Motion, Fox seeks an award of $850,000 in

19   fees to compensate Fox for at least some portion of the substantial fees incurred to

20   defend against Plaintiffs' numerous baseless claims aside from the Copyright-related

21   Claims.  The proposed Statement of Decision agreed to by the parties reflects that,

22   aside from the Copyright-related Claims, Plaintiffs pursued fifteen claims against Fox,

23   all of them dismissed with prejudice.

24        25.    As noted, the Copyright-related Claims resulted in $837,006 in

25   fees to Fox.  Attached hereto as Exhibit 13 is a summary billing statement prepared at

26   my direction by A&B's accounting department that reflects the total fees incurred by

27   Fox in defense of Plaintiffs' claims (net of write-offs, write-downs and other

28   adjustments) from October 2009 through April 2014.  Fox incurred fees over this

15

DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S
MOTION FOR ATTORNEYS' FEES AND COSTS

period of over ███████. Plaintiffs' pursuit of claims aside from the Copyright-related Claims has thus cost Fox over ███████. The billing statements and time entries associated with litigation of these issues over the five years of this litigation are voluminous, and Fox has not attempted to summarize this activity with the same level of detail as the Copyright-related Claims. A preparation of that detailed summary would require further substantial fees and expenses. Rather, to ensure that Fox seeks only a reasonable recovery of fees associated with defending Plaintiffs' other baseless claims, Fox seeks an award of only $850,000 for this activity – a fraction of the amount Fox incurred.

26. As set forth in Fox's Memorandum of Points and Authorities in support of the Motion, Fox seeks recovery of fees based on Federal Rule 37(c)(2) for Plaintiffs' unjustified denial of Fox's Requests for Admission ("RFAs"), and under the Court's inherent power. In Section II(a) below I describe the work required and fees incurred as a result of Plaintiffs' unjustified denial of the RFAs. In Section II(b) below I describe fees incurred as a result of Plaintiffs refusal to withdraw claims that lacked factual or legal support, despite repeated efforts by Fox to bring the deficiencies of the claims to their attention, and in Section II(c) I describe fees incurred as a result of the aggressive manner in which Plaintiffs conducted the litigation, including broad discovery demands and assertion of new baseless claims after their primary theories were found deficient.

### a. **Plaintiffs' Failure to Admit Fox's Request for Admissions**

27. On February 20, 2013, Fox served RFAs directed to Plaintiffs' claims in the FAC, including the Purchase Price Claim (RFA #s 1-3), Merchandising Claim (RFA #s 4-6), FX Distribution Claim (RFA # 11), *Alvin* HBO Distribution Claim (RFA # 12), and the Graphic Design Services Claim (RFA #10). In each instance, consistent with Federal Rule Civil Procedure 36, Fox requested that Plaintiffs admit matters going to the heart of the controversy. On March 22, 2013, Plaintiffs denied Fox's RFAs directed to each of those claims. Attached hereto as

Exhibit 14 is a true and correct copy of Plaintiffs' Responses to Fox's RFAs.

### a. **Purchase Price Claim**

28.     From review of the billing records, I estimate that fees associated with the activities necessary to establish the merits of Fox's position on the Purchase Price Claim over the period March 22, 2013 (when Plaintiffs denied the RFAs) to February 11, 2014 (when the Referee granted summary judgment on this issue) was on the order of $500,000.

29.     Among other things, over this period Fox was forced to conduct substantial document review of the lengthy negotiating history and documentation of the parties' Agreement, which included generating a privilege log for the numerous privileged materials generated during this process.  Fox served document demands on Plaintiffs for materials pertaining to the negotiating history and served a document subpoena on Steve Waterman, and was required to conduct review of these materials as well.  Fox interviewed witnesses such as Michael Ross (the Fox attorney who was the principal drafter of the Agreement for Fox) and Steve Plum (the principal negotiator of the Agreement for Fox) and was required to prepare both witnesses for their depositions and defend that at deposition, which required substantial activity to lay out the chronology and relevant document history.  Fox also deposed Bagdasarian in some detail on issues relating to the Purchase Price Claim, which of course required substantial preparation and review of documents related to the negotiating and documentation history.

30.     Fox also responded to document discovery demands for Fox "template" forms and was required to produce numerous Rights Agreements from other films, which involved the time consuming step of redacting confidential information not pertinent to the Purchase Price issue pursued by Plaintiffs.  Fox retained and began to prepare an expert to rebut any purported "custom and industry" evidence purporting to construe the parties' Agreement contrary to its plain terms (though Fox's consistent position was that Plaintiffs had no basis to introduce any

1  purported expert testimony seeking to vary or contradict the Agreement's

2  unambiguous terms or to opine on the parties' contractual intent).

3        31.    Fox was required to pursue dispositive motions directed to the

4  Purchase Price Claim.  The first was a "no evidence" summary judgment that relied

5  on Plaintiffs' admissions in their discovery responses that they had no facts, other than

6  the Agreement itself, to support their Purchase Price Claim.  The Referee determined

7  that the issue should be decided on a more complete record after Plaintiffs' objected

8  that they should have further opportunity to conduct discovery into Fox's Rights

9  Agreements with third-parties (the "Marvel" issue).  Once that discovery was

10  completed, Fox then moved for summary judgment based on the undisputed extrinsic

11  evidence that only confirmed the plain meaning of the Agreement, and the Referee

12  granted Fox's motion.  The Referee's order granting summary judgment ("MSJ

13  Order") concluded that the "plain language of the Agreement as supported by the

14  undisputed extrinsic evidence provides that the Purchase Price is an advance for

15  sequels, as it is for the first picture."  (MSJ Order, p. 11, attached hereto as Exhibit

16  15.)  Plaintiffs at no time identified any admissible extrinsic evidence that would

17  support their claims, but forced Fox to incur substantial fees to establish the merits of

18  the matter.

19        ii.    **Merchandising Claim**

20        32.    From review of the billing records, I estimate that fees associated

21  with the activities necessary to litigate the merits of the Merchandising Claim over the

22  period March 22, 2013 (when Plaintiffs denied the RFA's) to July 9, 2013 (when

23  Plaintiffs advised they were abandoning the claim) was in the order of $250,000.

24        33.    Among other things, over this period Fox was required to conduct

25  review and organize the voluminous files on licensing and merchandising activity of

26  the *Alvin* film over the period 2004 to approximately December 2011.  The document

27  base for the merchandising issue was, by volume, the largest collection of any

28  materials Fox was required to review and produce, with substantial numbers of emails

documenting the numerous licensing initiatives pursued by Fox with third-party vendors, internal meetings and planning sessions to review the status of merchandising activity, frequent exchanges with Bagdasarian over merchandising activity and financial records reflecting the results of this activity.  Fox interviewed numerous members of the *Alvin* merchandising team to review the history of Fox's merchandising activity, including Elie Dekel, the former head of Fox merchandising, as well as Richard Borsini, a member of Fox's in-house legal team with responsibility for merchandising issues who interfaced with Bagdasarian over the merchandising activity.  Fox prepared Mr. Dekel for deposition as Fox's 30(b)(6) designee before Plaintiffs advised that they were abandoning the claim.  The preparation required significant work to review and assemble documents relating to the merchandising of *Alvin*.  Fox also identified, interviewed and began preparation of a merchandising expert who would opine on the degree of success Fox achieved with respect to its merchandising activity for *Alvin*.

34.   Fox deposed Plaintiffs' witness Chris Minks on merchandising issues, with a substantial portion of the deposition focused in this area.  Fox also incurred fees to respond to document demands in which Plaintiffs sought to compel Fox to produce voluminous documents on licensing and merchandising activity conducted by Fox on completely separate projects, resulting in Joint Statement activity to bring this issue before the Referee.  Fox interviewed merchandising experts to develop testimony, should the claim go forward.

35.   Having denied Fox's RFAs and forced Fox to incur fees for all of these activities, on July 9, 2013, by virtue of their motion for leave to amend the FAC and in their proposed Second Amended Complaint ("SAC").  Plaintiffs advised they were abandoning the claim.  Under the proposed Statement of Decision, the Merchandising Claim is dismissed with prejudice.  Fox has fully prevailed, but was forced to incur substantial fees before Plaintiffs acknowledged the claim had no merit.

//

19

### iii.   **FX Distribution Claim**

36.     From review of the billing records, I estimate that fees associated with the activities necessary to establish the merits of Fox's position on the FX Distribution Claim over the period March 22, 2013 (when Plaintiffs denied the RFAs) to July 30, 2013 (when Plaintiffs abandoned the claim in response to Fox's motion for summary judgment) was on the order of $125,000.

37.     Among other things, over this period Fox was required to conduct factual investigation and witness interviews into the background of Fox's "free-TV" licensing activity for the *Alvin* film.  This included meetings with Jodie Rea, Senior Vice President of Sales and Credit Administration for Twentieth Television, Inc., who ultimately served as Fox's 30(b)(6) witness on this issue.  Fox was required to prepare Ms. Rea for her deposition and to defend the deposition.  Fox was required to produce substantial documents that detailed, not only Fox's efforts to license the *Alvin* film, but license agreements for other films in the two-year period surrounding the release of *Alvin*.  This included time-consuming activity to redact confidential information not pertinent to the issues raised by Plaintiffs about the licensing activity.  Fox incurred fees to participate in briefing of Joint Statement positions on the range and scope of license agreements it was required to produce. Fox also identified and began preparation of an expert regarding licensing of theatrical films to free and basic cable television outlets.

38.     Fox produced documents substantiating Fox's position that the license arrangement Fox achieved for *Alvin* was the most lucrative license deal available for the picture, and that Fox secured this arrangement with FX after numerous other potential licensees passed on the film.  Fox produced documents substantiating Fox's position that the license fees for *Alvin* were not just comparable to, but more favorable than, license fees Fox obtained for similar films.  In April 2013, Fox gave notice that it would move for summary judgment on the FX Distribution Claim, noting the complete absence of evidence to support Plaintiffs' claims.  Fox

20

1    invited Plaintiffs to withdraw the claim, thus avoiding the necessity of further fees and

2    expenses on the matter.  Plaintiffs refused to dismiss, forcing Fox to move for partial

3    summary judgment.  Then, in their opposition papers filed on July 30, 2013, Plaintiffs

4    advised they were not contesting summary judgment.   The claim is dismissed with

5    prejudice in the Statement of Decision.

6            iv.    **HBO Distribution Claim**

7            39.    From review of the billing records, I estimate that fees associated

8    with the activities necessary to establish the merits of Fox's position on the HBO

9    Distribution Claim over the March 22, 2013 (when Plaintiffs denied the RFAs) to

10   February 14, 2014 (when the Referee granted Fox's motion for summary judgment)

11   was on the order of $150,000.

12           40.    Among other things, over this period Fox was required to conduct

13   review for documents bearing on Fox's decision to co-finance the *Alvin* picture,

14   including financial analysis of co-financing scenarios and the risks to Fox of

15   proceeding without financing.  Fox incurred fees to develop and execute a stipulation

16   regarding the difference in Plaintiffs' participation between distribution under the Fox

17   and New Regency agreements for HBO distribution.  Fox pursued discovery from

18   Plaintiffs to determine the basis, if any, for this claim.  Fox deposed Bagdasarian on

19   this issue, and Fox's in-house counsel, Jonathan Gottlieb, deposed George Calvelli,

20   Plaintiff's auditor.  Fox incurred fees to prepare for and take the Bagdasarian

21   deposition and with respect to Mr. Calvelli's deposition, A&B was required to gather

22   the relevant documents for Mr. Gottlieb' review and assisted him to prepare for the

23   deposition.  Fox interviewed Fox's former Chairman Tom Rothman regarding the

24   history of the co-financing decision and defended him at his deposition.  Fox was

25   required to move for dismissal of the HBO Distribution Claim on summary judgment,

26   which included responding to BPL's baseless cross-motion for summary judgment on

27   this issue.

28           41.    In the order granting Fox's motion for summary judgment on the

21

HBO claim the Referee determined that BPL's "discrimination" claim was untenable because Fox and BPL "are not similarly situated as only Fox faced the risk of $60 million in losses" from an unsuccessful film and that the "co-financing decision resulted in diminished HBO revenue that impacted both BP and Fox."  (Ex. 15, MSJ Order at 21.)  These facts were known to Plaintiffs from the outset of the litigation. Plaintiffs at no time introduced any evidence to support their claim that Fox's co-financing decision was discriminatory towards BPL.

v.   **Graphic Design Services Claim**

42.     From review of the billing records, I estimate that fees associated with the activities necessary to establish the merits of Fox's position on the Graphic Design Services Claim over the March 22, 2013 (when Plaintiffs denied the RFAs) to February 14, 2014 (when the Referee granted Fox's motion for summary judgment) was on the order of $125,000.

43.     Among other things, over this period Fox conducted document review into the development of the Chipette graphic designs and CGI characters. Documents were gathered from Fox's files as well as from files of Rhythm & Hues, the third-party vendor who developed the CGI images.  Relevant documents were also reviewed from materials subpoenaed from Steve Waterman and Deborah Ann Hayes. Fox was required to produce contracts entered into with graphic artists such as Buck Lewis who worked on graphic designs for the chipmunk characters in the first Alvin film.  Fox conducted interviews with numerous witnesses, including Christina Garberson, Vice President in the Visual Effects Department of Fox, who served as Fox's 30(b)(6) witness on this issue.  Fox incurred fees to prepare the witness for deposition and to participate in the deposition.

44.     Fox deposed both Bagdasarian and Karman on the graphic design issues, and defended depositions of Fox witnesses such as Elizabeth Gabler, to whom Plaintiffs directed inquiries regarding the graphic designs.  Fox exchanged with Deborah Ann Hayes, the graphic artist that Karman retained (unbeknownst to Fox) for

22

approximately $6400 to prepare pencil sketches of the Chipettes.  Fox incurred fees to defend against Karman's baseless motion for partial summary judgment directed to this issue, and to pursue Fox's successful motion for summary judgment.  This briefing included legal analysis to rebut Plaintiffs' assertion to the Referee that, in considering an implied contract claim, "bilateral intent is beside the point" in deciding whether there is a basis to recover.  (JAMS Dkt No. 7849; Plaintiffs' Opposition to Fox's Motion for Summary Judgment, at 28:15-16.)  In dismissing this claim, the Referee determined that "Karman's implied contract claim based on her graphic designs fails as a matter of law."  (Ex. 15, MSJ Order at 28.)  The Referee noted the absence of any evidence that Fox knew Karman had provided Chipette artwork to Rhythm & Hues until August 2008 (*Id.*), and further, that Karman failed to show any bilateral intent to compensate her for any such purported services.  (Ex. 15, MSJ Order at 29.)

45.     In sum, the fees associated with establishing the merits of matters and otherwise prevailing on claims for which Plaintiffs denied Fox's RFAs are as follows:

| Claim | Fees |
|---|---|
| Purchase Price | $500,000 |
| Merchandising | $250,000 |
| FX Distribution | $125,000 |
| HBO Distribution | $150,000 |
| Graphic Design Services | $125,000 |

### b. **Plaintiffs' Failure to Withdraw Meritless Claims After Meet and Confer Activity**

46.     Fox incurred substantial fees to defend claims whose fundamental deficiencies were repeatedly brought to the attention of Plaintiffs' counsel in meet and confer exchanges, briefing and other exchanges.  As noted above, Fox initially

1  advised Plaintiffs of the deficiencies in their claims in its pre-litigation letter of

2  December 9, 2009.  *See* Exhibit 6.  After document discovery had been substantially

3  completed in March 2013 (except for Plaintiffs later disclosure that they had not even

4  reviewed an additional 10,000 documents, resulting in a suspension of the

5  proceedings), on April 5, 2013, I sent a letter to Mr. Marenberg advising of Fox's

6  intent to promptly move for summary judgment and/or partial summary judgment on

7  the remaining claims.  In the letter, attached hereto as Exhibit 16, Fox detailed why

8  Plaintiffs' remaining claims lacked factual support and further advised that "our initial

9  review of documents produced by Plaintiffs in this matter suggests that Plaintiffs have

10  pursued claims not only lacking in factual basis, but contrary to the facts known to

11  Plaintiffs even before filing suit."  I invited "Plaintiffs to re-examine their course and

12  dismiss the [remaining claims] detailed [in the letter] that lack[ed] factual support and

13  that [were] contrary to the parties' Agreement."

14        47.    On April 18, 2013, I sent another letter to Mr. Marenberg detailing

15  the infirmities with Plaintiffs' claims.  I advised that "on more than one occasion

16  [Fox] invited Plaintiffs to drop [their] unsupported claims, most recently with

17  particular attention to Plaintiffs' Responses and Amended Disclosures that attest to the

18  lack of adequate basis to proceed."  In the letter Fox again reserved "all rights to

19  recover fees and expenses . . . resulting from Plaintiffs' continued prosecution of

20  [their] baseless claims."  Attached hereto as Exhibit 17 is a true and correct copy of

21  my April 18, 2013 correspondence.

22        48.    The following are examples of deficiencies Fox identified in the

23  April 5, 18 and other exchanges with Plaintiffs' counsel:

24           **i.**    **Purchase Price Claim**

25        49.    As noted, in December 2009, Fox detailed the deficiencies of this

26  claim in written correspondence to Plaintiffs' counsel.  Specifically, Fox emphasized

27  that the plain language of the Agreement (paragraphs 6, 7 and 12) defeated the claim

28  because the Purchase Price is deemed an advance "[f]or each Picture."  (Ex. 6.)  In

1  April 2013, after receiving Plaintiffs' discovery responses that stated the sole basis for

2  Plaintiffs' claim was the language of the Agreement, Fox again asked Plaintiffs to

3  dismiss the claim.  Ex. 16.  On April 18, 2013, Fox again advised Plaintiffs that in

4  light of Plaintiffs' failure to identify any evidence in support of their Purchase Price

5  claim, it should be dismissed, and failing that, Fox would move for summary

6  judgment.  Ex. 17.

7       50.   On July 8, 2013, after receiving Waterman's documents pursuant

8  to Fox's subpoena, Fox pointed out to Plaintiffs' counsel that admissions in these

9  documents demonstrated that Plaintiffs understood in 2008 and 2009 that the Purchase

10  Price was an advance for sequels.  These documents included an email from

11  Bagdasarian, attached hereto as Exhibit 18, where, in contravention to Plaintiffs'

12  position that the contract required Fox to pay an additional $3 million for sequels in

13  the form of a non-recoupable advance, he directed Waterman to determine if Fox

14  should pay more for sequels:  "if they did [in connection with another picture], and it

15  wasn't called for in the contract, then that is something that they are used to doing and

16  they should do it for us."  We advised that, in Fox's view, there was no good faith

17  basis to proceed on the claim.  A true and correct copy of my letter to Plaintiffs'

18  counsel is attached hereto as Exhibit 19.

19       51.   In the "no evidence" motion for partial summary judgment filed by

20  Fox on June 28, 2013, Fox identified undisputed extrinsic evidence showing that both

21  parties understood that the Purchase Price was an advance for each picture (Ex. 20),

22  including Waterman's written confirmation to Fox in November 21, 2003 that the

23  Purchase Price would be an advance against Plaintiffs' profit participations (Ex. 21.)

24  Attached hereto as Exhibit 20 and 21, respectively, are true and correct copies of a

25  letter from Steve Plum, Fox's chief negotiator over the terms of the Agreement, to

26  Waterman confirming the parties' understanding that the Purchase Price is deemed an

27  advance against profit participations based on "first dollar gross" and Waterman's

28  written confirmation in response.  Further, Fox produced its "template" forms that

1    only confirmed Fox's practice that the Purchase Price is a recoupable advance

2    whenever Contingent Compensation is based on "first dollar gross."

3         52.    As noted, the Referee ultimately concluded that the "plain

4    language of the Agreement as supported by the undisputed extrinsic evidence provides

5    that the Purchase Price is an advance for sequels, as it is for the first picture." (Ex. 15,

6    MSJ Order at 11.)  Even after Fox identified the undisputed extrinsic evidence in

7    Fox's first motion for summary judgment, Plaintiffs opposed dismissal and required

8    Fox to engage in further litigation of the issue, without ever identifying any contrary

9    evidence.  Plaintiffs' litigation over the Purchase Price issue boiled down to

10   Bagdasarian's claim of undisclosed, subjective intent that the Purchase Price would be

11   treated as non-recoupable for sequels – evidence that is inadmissible as a matter of

12   law in interpreting contracts.

13            **ii.**    **Merchandising Claim**

14        53.    In my December 7, 2009 letter to Plaintiffs' counsel, Fox noted

15   that the merchandising claims must fail because Fox had no obligation to conduct any

16   merchandising and possessed sole discretion with respect to the merchandising

17   licenses.  Ex. 6.  In response to Fox's interrogatories seeking to discover the basis for

18   Plaintiffs' claim, Plaintiffs asserted that Fox's liability was predicated on the failure to

19   timely prepare a Style Guide during merchandising for the first *Alvin* film.  In our

20   letter to Plaintiffs' counsel dated April 5, 2013, Fox noted the absence of any facts to

21   support Plaintiffs' claim that Fox was obligated under the Agreement or any implied

22   covenant of good faith and fair dealing to prepare a Style Guide. Ex. 16. Fox further

23   noted the absence of any facts, dates, individuals or specifics to support any claim that

24   Fox promised to prepare a Style Guide at all or by any particular date.  In addition,

25   Fox noted that Plaintiffs had provided no evidence of any damages resulting from any

26   purported failure to prepare a Style Guide in a timely manner.

27        54.    In our April 18 letter to Plaintiffs' counsel, Fox pointed out again

28   that Plaintiffs lacked any evidence that Fox had breached any implied obligations that

26

DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR ATTORNEYS' FEES AND COSTS

1  could survive the express terms of the Agreement that Fox had no obligation to

2  conduct merchandising, and Fox again invited Plaintiffs to drop the claim.  Ex. 17.

3  Fox expressly reserved all rights to recover fees and expenses if Plaintiffs continued to

4  prosecute the claim.

5       55.    During discovery, Plaintiffs produced an e-mail authored by Ross

6  Bagdasarian on April 27, 2007 in which he stated that in light of the December 2007

7  release date for the film, there was inadequate time to prepare a Style Guide and that

8  Fox should instead push forward with plans for plush dolls.  Ruga Dec., Ex. 28.  In

9  July 8, 2013, Fox sent a letter to Plaintiffs' counsel noting that documents produced

10  by Waterman contained admissions that Bagdasarian was pursuing his claims for

11  additional compensation because Fox refused to renegotiate the merchandising terms

12  of the Agreement.  (Ex. 19; *see also* Ruga Dec., Ex. 9.)

13       56.    After Fox incurred substantial fees to conduct discovery and

14  litigate the Merchandising Claim, Plaintiffs abandoned the claim in their proposed

15  SAC filed on July 9, 2013.  Plaintiffs never identified any evidence to support their

16  assertion that Fox breached implied obligations to prepare a Style Guide and pursued

17  this claim in the face of admissions that Bagdasarian did not believe Fox should

18  prepare any Style Guide.

19           **iii.**   **FX Distribution**

20       57.    Fox's April 5, 2013 letter (Ex. 16) identified the absence of facts to

21  support the FX Distribution claim.  Specifically, Fox noted there was no evidence that

22  any free TV network was willing to license *Alvin* for more than FX, there were no

23  facts to suggest that the terms of Fox's license with FX were not comparable to deals

24  entered with unrelated third-parties, and no facts to show any violation of Section

25  VIII(BB)(4) of Exhibit A to the ST&C (prohibiting "discriminatory" decisions).  On

26  April 18, 2013, Fox again pointed out that Fox's documents showed that Fox's license

27  of *Alvin* to FX was not just fair and reasonable, but the most advantageous business

28  opportunity available to the company.  Ex. 17.

27

58.     Fox requested that Plaintiffs provide any information in their possession that could preclude summary judgment on this claim.  *Id.*  Plaintiffs provided no evidence, but refused to dismiss, requiring Fox to file its motion for partial summary judgment directed to this issue on July 5, 2013.  In response to the motion, Plaintiffs abandoned the claim.  Fox was required to incur fees to seek dismissal of a claim that Plaintiffs abandoned only after forcing Fox to file a motion for summary judgment.

### iv.     <u>HBO Distribution</u>

59.     In the April 5 letter (Ex. 16), Fox advised it would move for partial summary judgment because of the complete absence of facts to support a claim that Fox breached the Agreement with respect to HBO distribution.  Fox pointed out that the Agreement affords Fox complete, exclusive and unqualified control of film distribution, in accordance with Fox's sole business judgment, subject only to Fox acting in a reasonable and non-discriminatory basis.  Fox noted there were no facts to suggest Fox had breached this standard; in particular, there was no evidence that the co-financing decision was unreasonable or discriminatory.  In the April 18 letter (Ex. 17), Fox further pointed out that Fox and Plaintiffs shared in the same revenue stream of the HBO/New Regency distribution arrangement.  We advised that the claim was ripe for summary adjudication.

60.     On August 22, 2013, during the deposition of Bagdasarian, he testified that "[s]tudios frequently co-finance pictures," that "Fox's decision to co-finance [*Alvin* and *The Squeakquel*] without more, is not discriminatory", and if BPL was paid according to the Agreement then "co-financing in and of itself is not the issue."  (Ruga Dec., ¶18, Ex. 18, Bagdasarian Depo. at 359:5-19.)  On November 13, 2013, Plaintiffs took the deposition of Fox Chairman Tom Rothman, who confirmed the reasons for the co-financing decision were based on mitigation of risk, and had nothing to do with Plaintiffs.  Plaintiffs still refused to dismiss, resulting in Fox's motion for summary judgment directed to this issue, granted by the Referee on

28

1  February 11, 2014.

2      61.    The Referee determined that BPL's "discrimination" claim was

3  untenable because Fox and BPL "are not similarly situated as only Fox faced the risk

4  of $60 million in losses" from an unsuccessful film and that the "co-financing

5  decision resulted in diminished HBO revenue that impacted both BP and Fox."  (Ex.

6  15, MTD Order at 21.)  These facts were known to Plaintiffs from the outset.

7  Plaintiffs never identified any evidence to suggest that Fox's co-financing decision

8  was unreasonable or discriminatory.

9                    **v.    Soundtrack Claims**

10     62.    In the April 5, 2013 letter (Ex. 16), Fox advised Plaintiffs that the

11 Agreement on its face provides that payment of royalties for soundtrack sales is based

12 on "net" sales and that there were ample admissions in the documents that soundtrack

13 royalties were subject to deductions.  Fox further advised it would move for summary

14 adjudication of this issue.  On July 8, 2013, I sent a letter to Mr. Marenberg

15 memorializing Fox's objection to Plaintiffs' continued pursuit of any soundtrack

16 claim.  (Ex. 19.)  In this letter I identified specific evidence that contradicted the *Alvin*

17 Soundtrack Claim alleged in the FAC, including Bagdasarian's email exchange with

18 Fox attached hereto as Exhibit 23 that recognizes deductions being taken under the

19 Agreement.  I further detailed why the language of the Agreement and other evidence

20 demonstrated that any proposed amendment to add a soundtrack claim pertaining to

21 *The Squeakquel* would be futile.  My letter highlighted the requirements of Rule 11

22 and expressed Fox's position that Plaintiffs could have no "good faith basis" to

23 proceed on any soundtrack claim given the evidence of record.  Fox further reserved

24 all rights in the event Plaintiffs intended on pursuing the soundtrack claims.

25     63.    The Referee dismissed the Soundtrack Claims for the very reasons

26 Fox identified to Plaintiffs' counsel:  deductions are required by the Agreement and

27 Plaintiffs' performed the contract with that understanding.  In granting summary

28 judgment, the Referee found that "BP's Soundtrack Royalties are subject to all

1   deductions applicable under Fox's contract with the Record Company."  (Ex. 15, MSJ

2   Order at 18-19.)  Plaintiffs never identified any evidence to support their claim that

3   deductions were impermissible.

4          64.     From review of the billing records, I estimate that fees associated

5   with the activities necessary to litigate the soundtrack claims was on the order of

6   $350,000.  Among other things, Fox was required to defend Tom Cavanaugh at

7   deposition (twice) on soundtrack issues.  Fox was required to engage in multiple

8   discovery disputes over soundtrack documents demanded by Plaintiffs, and required

9   to move to compel Plaintiffs to produce their soundtrack album documents.  Fox

10  opposed Plaintiffs' attempt to add soundtrack claims to their proposed SAC.  Fox

11  incurred fees to move for summary judgment, including responding to the baseless

12  cross-motion for summary judgment filed by Plaintiffs.  In that regard, Fox was

13  required to object to Plaintiffs' surprise reliance on expert testimony in support of

14  their summary judgment motion.  Fox also retained and began to prepare its own

15  soundtrack expert in the event the claim went forward.

16              **vi.    Graphic Design Claim**:

17          65.     My April 5, 2013 letter (Ex. 16) detailed for Plaintiffs that their

18  discovery responses provide no specific information concerning the dates, events or

19  particular transactions that purportedly gave rise to this purported implied contract

20  claim.  Fox advised it would move for summary judgment because of the absence of

21  any evidence to support the claim.  On April 18, 2013 (Ex. 17), Fox reiterated its

22  position.  Plaintiffs provided no further discovery responses, and Fox was ultimately

23  required to move for summary judgment, resulting in dismissal of the claim. As noted,

24  the Referee determined that "Karman's implied contract claim based on her graphic

25  designs fails as a matter of law" and was unsupported by any evidence that Fox knew

26  Karman had provided Chipette artwork to Rhythm & Hues until August 2008.  (Ex.

27  15, MTD Order at 29.)  All of these facts were known to Plaintiffs from the outset.

28  ///

### vii. __Rescission Claim__

66.     Fox did not have an opportunity to meet and confer with Plaintiffs over the proposed rescission claim because Plaintiffs identified it for the first time in a proposed SAC filed on July 9, 2013.  Had Plaintiffs met and conferred, Fox would have identified the numerous deficiencies in this claim detailed in Fox's subsequent motion opposing leave to file the SAC.  The Referee denied Plaintiffs' leave to amend to add the rescission claim for reasons advanced by Fox in its opposition papers.  The Referee noted that Bagdasarian's alleged misunderstanding of the Agreement's meaning "does not equate to a mistake as that legal term is used" and thus leave to amend to add the claim was not warranted because the "claim for rescission cannot be properly plead and therefore is futile."  (Ex. 24 at 9-10.)  Attached hereto as Exhibit 24 is a true and correct copy of the Referee's order denying Plaintiffs leave to amend to add the rescission claim.  Plaintiffs' failure to meet and confer over the claim resulted in further fees and costs to oppose a meritless claim.  Notably, Plaintiffs pursued this new rescission theory and other newly asserted claims in the SAC in an effort to prolong the proceedings after Fox's motion for partial summary judgment directed to the Purchase Price claim detailed the infirmities of that claim.

### c. __Plaintiffs' Aggressive Litigation Tactics__

67.     While refusing to dismiss claims lacking factual or legal support, Plaintiffs pursued aggressive discovery against Fox on all of their claims. Plaintiffs' claims and their document requests touched on nearly every aspect of the studio, from the negotiations relating to the Agreement to the development, production, distribution of the *Alvin* film, and to the development and production of *The Squeakquel,* in addition to merchandising activity, free-TV and pay-TV distribution activity, co-financing decisions, and soundtrack business affairs.  Because separate divisions within Fox perform these different functions, the litigation that Plaintiffs prosecuted was tantamount to five or six different suits against different business divisions, vastly multiplying the cost.  Plaintiffs' tactics included overbroad document

1  production demands and multiple motions to compel that required Fox to participate
2  in repeated Joint Statement activity.

3          68.     At the outset of the case, Plaintiffs served voluminous document
4  discovery demands seeking 56 different categories of documents that cut across wide
5  areas of Fox's business operations.  Ultimately, Fox produced over 3,195 documents
6  totaling no less than 16,045 pages, with 596 entries on a privilege log.  Fox was also
7  required to review documents produced by Plaintiffs and third-parties in response to
8  subpoenas, including Razor & Tie, Rhythm & Hues, Deborah Ann Hayes, and Steve
9  Waterman.

10         69.     Plaintiffs served supplemental document discovery demands in
11 December 2012 and April 2013 and ultimately served a total of 84 document requests
12 directed to Fox through the course of the litigation.  These supplemental requests
13 sought information relating to Fox's soundtrack album distribution for each of the
14 three Alvin films (even though the soundtrack claim in the Complaint was directed
15 only to the *Alvin* film) and information pertaining to Fox's activities (e.g., licensing
16 and merchandising revenue, style guides, and pay television revenue) in connection
17 with unrelated films.  .

18         70.     When Fox objected to producing the overbroad materials
19 demanded by Plaintiffs, Plaintiffs increased the cost of the litigation by aggressively
20 pursuing motions to compel.  Plaintiffs brought a motion to compel demanding the
21 production of the merchandising information for other films.  The Referee denied
22 Plaintiffs' motion directed at the merchandising issues concluding that the information
23 and agreements requested "are not relevant to the issued in the case or reasonably
24 calculated to lead to the discovery of admissible evidence."  The Referee further noted
25 that "introduction into the discovery process of third party marketing and licensing
26 efforts for other films would also result in a burdensome, time consuming, costly, and
27 unwarranted expansion of discovery in this case…."  (Referee's Rulings on
28 Discovery Issues Joint Statement Dated May 28, 2013, at 1.)

32

71.     Fox was required to participate in three Joint Statements on motions to compel pursued by Plaintiffs.  Plaintiffs succeeded in using the broad discovery provisions of the Federal Rules to burden Fox with discovery that had no ultimate bearing on the dispositive issues.  On the Merchandising Claim, Plaintiffs moved to compel Fox to produce "ultimates," claiming this material was pertinent to determine whether Fox pursued merchandising in good faith, even after Fox confronted Plaintiffs with admissions in their own documents that Bagdasarian had urged Fox not to pursue a Style Guide, contradicting the claimed premise of this claim.  On the Purchase Price Claim, Plaintiffs moved to compel Fox to produce third-party contracts containing sequel provisions, requiring Fox to engage in extensive redaction activity to protect the confidential terms of these deals, with this exercise providing no information (as Fox told Plaintiffs from the beginning it would not) supporting Plaintiffs' arguments on the Purchase Price Claim and only confirming the testimony given by Mr. Plum at his deposition about sequel pictures.  On the HBO Distribution Claim, Plaintiffs moved to compel Fox to produce its agreement with Regency Entertainment, another highly confidential Fox document for which redactions were necessary to protect information completely irrelevant to this suit, even after Fox provided a verified statement showing the difference in distribution revenue under the Fox and Regency distribution arrangements with HBO.  Further, on the FX Distribution Claim, Plaintiffs moved to compel Fox to produce information on Fox's licensing activities on other films over a two year period, yet again requiring Fox to engage in redactions to protect the confidential terms of these third-party contracts, only to then abandon the claim when Fox moved for summary judgment.

72.     Fox had to file two of its own motions due to Plaintiffs' insufficient responses and document productions.  The first motion was directed in part to Plaintiffs' refusal to produce documents relating to their actual or contemplated efforts to exploit their Classic Alvin characters during the same time period that Fox was merchandising for *Alvin*.  The Referee granted Fox's motion to compel by

33

1   ordering Plaintiffs to produce the merchandising related documents for the time period

2   January 2006 through December 2008.

3          73.    The second motion to compel Fox filed was directed to Plaintiffs'

4   insufficient interrogatory responses, their insufficient Rule 26(a) initial disclosure

5   relating to damages, and their refusal to produce soundtrack related documents after

6   they asserted the claim. The Referee ordered Plaintiffs to provide further Rule 26

7   disclosures "that comply with the requirements of FRCP 26(a)(1)(A)(iii), and

8   specifically provide a computation of each category of damages claimed by

9   Plaintiffs." The Referee further ordered Plaintiffs to produce the agreements

10  identified in Fox's requests.

11         74.    After being advised that Fox inadvertently produced certain

12  privileged communications, Plaintiffs' counsel further reviewed and analyzed the

13  subject communications and refused to destroy or return the documents despite Fox's

14  prompt clawback request.  This resulted in a further motion by Fox relating to

15  Plaintiffs' counsel's inappropriate review of privileged materials.

16         75.    Plaintiffs failed to satisfy other discovery obligations.  As detailed

17  by Fox in prior submissions (JAMS Dkt. Nos. 6849-6855, 7088, 7089), Plaintiffs

18  produced voluminous garbled AOL emails lacking dates or meta data that resulted in

19  substantial additional fees to Fox to sort through the materials.  In May 2013, after the

20  deadline to produce documents had passed, Plaintiffs disclosed that they had failed to

21  review over 10,000 documents, resulting in the immediate suspension of proceedings

22  and further fees to Fox to determine the nature and extent of Plaintiffs' discovery

23  failures.  Fox ultimately was required to bring on a motion directed to Plaintiffs'

24  spoliation of evidence, with the Referee agreeing that "Plaintiffs failed to meet their

25  duty to preserve documents" because they only began formal preservation efforts in

26  August 2010, four months after they filed suit and almost a year after their

27  preservation duty attached.  Indeed, it was later determined that Plaintiffs imaged their

28  company hard drives only a year after they filed suit.  The Referee concluded that

34

1  "Plaintiffs' actions were not consistent with broad preservation obligations."

2  Attached hereto as Exhibit 25 is a true and correct copy of the Referee's Order on

3  Fox's Motion for targeted discovery.

4  76.    Plaintiffs were equally aggressive in their deposition activity.  Fox

5  was required to prepare for and defend eleven separate depositions of nine witnesses

6  who are/were employed by Fox:  Erin Siminoff, Thomas Cavanaugh, Stephen Plum,

7  Michael Ross, Elizabeth Gabler, Jodie Rea, Karen Rosenfelt, Tom Rothman and

8  Christina Garberson.  Fox prepared for and took depositions of Plaintiffs' three

9  principal witnesses, Chris Minks, Karman, and Bagdasarian.  Fox also took the

10  deposition of Plaintiffs' auditor, George Calvelli.

11  **III.   FEES ASSOCIATED WITH FOX'S MOTION FOR ATTORNEYS'**

12  **FEES AND COSTS**

13  77.    I have reviewed the original billing statements A&B has prepared

14  for issuance to Fox over the period March 3, 2014 through May 23, 2014 and have

15  determined that Fox incurred no less than $100,000 in fees in connection with the

16  preparation and filing of Fox's Motion as it pertains to recovery of defense fees

17  incurred in connection with defense of the Copyright-related Claims.

18  78.    One reason the Motion has required this level of fees was the need

19  to review the lengthy billing records, make appropriate redactions, calculate and

20  allocate fees attributable to various categories and detail the services provided by

21  A&B in defense of the Copyright-related Claims as shown on Exhibits 1 to 4.  I

22  anticipate that A&B will spend an additional $35,000 to review Plaintiffs' Opposition

23  papers and to prepare a Reply, resulting in Fox incurring approximately $135,000 in

24  fees, not including any time associated with a hearing of the matter, to prosecute the

25  Motion seeking recovery of fees incurred in defense of Copyright-related Fees.

26  79.    Fox engaged in repeated meet and confer activity to avoid the

27  necessity for this Motion.  On May 21, 2014, I participated in a telephone call with

28  Plaintiffs' counsel Steve Marenberg and Doug Dixon where I outlined Fox's

35

anticipated Motion and provided information on the range of fees and costs Fox was pursuing:  a total of about $850,000 in fees on the Copyright-related Claims, with about $375,000 directed to activity not involving the 638 Reference issue, and $475,000 directed to the 638 Reference issue.  I further advised that Fox would be seeking attorneys' fees for Plaintiffs' bad faith pursuit of other claims, in an amount not then fully determined, but anticipated to be in the range of $1 million (as detailed herein, Fox has restricted its claim for fees in this area to only $850,000).  Thereafter, on May 21, 2014 we sent a letter to Plaintiffs' counsel identifying the factual and legal basis for Fox's motion.  A true and correct copy of that letter is attached hereto as Exhibit 26.  In that letter, we invited Plaintiffs to further meet and confer and to advise if there was any amount of fees and costs they were prepared to pay in order to obviate the necessity of Fox's Motion.  Plaintiffs never responded to that inquiry.  In their May 29, 2014 response to Fox's May 21 letter, Plaintiffs did not even respond to Fox's position that it is entitled to fees under Section 505 of the Copyright Act and Rule 37(c)(2).  Attached hereto as Exhibit 27 is Plaintiffs' response.

80.    In response to Plaintiffs' letter, Fox sent Plaintiffs another letter on May 30, 2014 requesting that Plaintiffs meaningfully meet and confer over the attorneys' fees issues.  Attached hereto as Exhibit 28 is a true and correct copy of the May 30, 2014 letter.  In response, Plaintiffs' counsel stated that the parties should "proceed to briefing the issues instead of swapping letters back and forth…."  Attached hereto as Exhibit 29 is a true and correct copy of the June 3, 2014 letter from Plaintiffs' counsel.

81.    The parties' meet and confer exchanges resulted in streamlining one issue:  Plaintiffs agree they do not intend to dispute the reasonableness of the rates charged by A&B for any of the attorneys who provided services to Fox over the 2009 to 2014 period (including me, Ms. Capoccia, Ms. Ruga, Mitra Eskandari-Azari, Grace Kang Shaywitz and Evan Woolley).  See Ex. 27.  Further, Plaintiffs also confirmed that they do not intend to challenge the reasonableness of the hourly rates of A&B's

36

DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR ATTORNEYS' FEES AND COSTS

paralegals and case assistants who worked on the matter (Donna Reznick, Alexis Fierro, Roxanne Moreno and Shermie Villar), except that Plaintiffs reserved the right to challenge the reasonableness of paralegal rates depending on the tasks they performed.  See Ex. 29.  For avoidance of doubt, I declare that the rates charged to Fox for the services which are the subject of this Motion are, based on my participation in entertainment industry and commercial litigation activity over the past 30 years, well within the reasonable range of rates charged by attorneys, paralegals and case assistants in the community for comparable matters.

## IV.   COSTS INCURRED DEFENDING AGAINST PLAINTIFFS' CLAIMS

82.     Concurrently with this Motion, Fox has submitted an Application to Tax Costs and Proposed Bill of Costs.  The total taxable costs incurred by Fox are $89,418.01. *See* Declaration of Casondra K. Ruga filed in support of Application to Tax Costs ("Ruga Dec. re: Costs").

83.     In addition to its taxable costs, Fox also incurred costs that are non-taxable under Rule 54 of the Federal Rules of Civil Procedure (including postage/mail costs and photocopying costs during the time period October 6, 2009 through December 3, 2012) attributable to the Copyright-related Claims in an amount of $7,469.72.  (Ruga Dec. re: Costs, ¶3, Ex. I.)  Fox seeks recovery of these fees under Section 505 of the Copyright Act.

84.     In sum, the total amount of fees and costs that Fox seeks in connection with its defense of this lawsuit is as follows:

| | |
|---|---|
| Copyright-related Claims | $837,006 |
| All other Claims | $850,000 |
| Preparation of Motion | $135,000 |
| Taxable Costs Under Rule 54(d) | $89,418.01 |
| Non-Taxable Costs under Section 505 | $7,469.72 |

37

DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S
MOTION FOR ATTORNEYS' FEES AND COSTS

| | |
|---|---|
| **Total** | **$1,918,893.70** |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of June 2014, in Los Angeles, California.

/s/ Louis A. Karasik

Louis A. Karasik

# EXHIBIT 1 FILED UNDER SEAL

(Pgs. 40 – 85-12)

# EXHIBIT 2



# EXHIBIT 3



# EXHIBIT 4

