# EXHIBIT 5

GRUBMAN INDURSKY & SHIRE, P.C.

ATTORNEYS AT LAW

CARNEGIE HALL TOWER

152 WEST 57th STREET

NEW YORK, N.Y. 10019-3301

TELEPHONE: (212) 554-0400

TELEFAX: (212) 554-0444

WRITER'S DIRECT NUMBER

ALLEN J. GRUBMAN
ARTHUR INDURSKY
DONALD R. FRIEDMAN
JONATHAN A. EHRLICH
LAWRENCE SHIRE
DAVID R. TORAYA
JESS R. DRABKIN
KENNETH R. MEISELAS
JOSEPH M. BRENNER
THEODORE P. HARRIS
STUART FRIED
KAREN J. GOTTLIEB
ERIC D. SACKS
GIL A. KARSON
STUART PRAGER
JOSEPH D. PENACHIO
PETER E. GRANT
SONYA W. GUARDO
ROBERT A. STRENT

ALISA S. DEROSA
EDWARD K. SHAPIRO
GRACE KIM
CHARLES O. PRINCE
ANDREW A. GOLDSTONE
MEGAN A. JONES
——
LARRY H. SCHATZ
MICHAEL K. GOLDSMITH *
BRUCE G. GROSSBERG
OF COUNSEL

*ADMITTED IN CALIFORNIA ONLY

<u>Via Facsimile (310.369.3759)</u>
<u>and Regular Mail</u>

October 6, 2009

Stephen Plum, Esq.
Executive VP Business Affairs
Twentieth Century Fox,
a Unit of Twentieth Century Fox Film Corporation
P.O. Box 900
Beverly Hills, California 90213

Re:   *Alvin and the Chipmunks:  The Squeakquel*

Dear Steve:

You and I have had many discussions over the past several months.  The lack of material substantive response to the many claims I have raised with you is extremely troubling.  For the record, I wanted to set forth below a list of some of the more significant issues that remain outstanding between us.  While my clients remain eager to resolve these matters in an amicable fashion, they are increasingly frustrated and concerned by the lack of progress after nearly a year (dating back to Steve Waterman's involvement), and, in particular, the absence of any substantive response whatsoever to the proposal I made to you by telephone back in August, 2009.

1.  <u>Writing Services of Janice Karman</u>:  The writing services rendered by Janice Karman and literary materials created by her in the course of the development of the forthcoming motion picture sequel (the "New Picture") fall outside the scope of the Purchase/Producer Agreement dated as of March 26, 2004 (the "Agreement").  We reject your view that the proceeds of those services are work for hire for Fox under the terms of the Agreement or that those literary materials fall within the definition of "Property" and the grant of underlying rights therein.  Accordingly, Ms. Karman reserves sole ownership of the copyright in the literary materials written by her in the course of the development of the New Picture and she will not transfer her copyright interest to Fox or authorize Fox to use those materials in connection with the New

318317.
100609

GRUBMAN INDURSKY & SHIRE, P.C.

Stephen Plum, Esq.
October 6, 2009
Page 2 of 5

Picture or otherwise unless and until the parties have entered into a written agreement providing, among other things, compensation and credit satisfactory to Ms. Karman.

2. <u>Graphic Design Services of Janice Karman</u>: The graphic design materials for The Chipettes created by Ms. Karman in the course of the development of the New Picture fall outside the scope of the Agreement. Accordingly, Ms. Karman reserves the copyright in the design elements created by her in the course of the development of the New Picture. She will not transfer her copyright interest to Fox or authorize Fox to use those materials in connection with the New Picture or otherwise unless and until the parties have entered into a written agreement providing, among other things, compensation and credit satisfactory to Ms. Karman.

3. <u>Fox's Breaches of the Agreement</u>:

   a) <u>Picture-Related Merchandising Rights</u>:

      i. <u>Style Book</u>:   Despite repeated requests from Bagdasarian Productions, LLC ("Bagdasarian"), Fox failed to issue a style book for Picture-Related Merchandise in connection with the initial picture produced under the Agreement (the "Initial Picture") until approximately three months after release. A style guide is an essential marketing tool in soliciting interest from merchandise licensees. In order to ensure timely delivery of merchandise to retail to coincide with a picture's initial theatrical release, the style guide should be issued significantly in advance of the theatrical release. (This explains the negotiated "Merchandising Window" in the Agreement wherein Fox was granted the right to exploit Picture-Related Merchandising Rights, i.e., a period commencing nine months prior to a picture's theatrical release and ending four years after release.) In failing to issue the style book until it was too late to enable merchandise licensees to capitalize on the marketing of the initial theatrical release or DVD release, Fox squandered the opportunity to generate meaningful sales, thereby depriving Bagdasarian, a 50% participant in "Merchandising Net Receipts", of a substantial amount of income. Fox's unreasonable delay in issuing the style book impaired the value of Bagdasarian's contractual right to approve the style book with respect to the Initial Picture and, therefore, constitutes a breach of the Agreement.

      ii. <u>McDonald's</u>:   Despite repeated requests from Bagdasarian over a period of months, Fox's U.S. marketing department failed to provide Bagdasarian with the proposed promotional materials for the McDonald's U.S. commercial tie-in for the New Picture until after Fox had already finalized those materials. Fox has admitted in writing that it should have submitted the materials for our client's approval at a much earlier stage and you have acknowledged in our discussions that this failure constitutes a breach of the Agreement. This breach has caused and will cause substantial

318317.
100609

Grubman Indursky & Shire, p.c.
Stephen Plum, Esq.
October 6, 2009
Page 3 of 5

damages to our client due to the inferior designs of the "Characters" (i.e., the Chipmunks and other characters that are the property of Bagdasarian) contained in the McDonald's materials.

iii.   <u>Razor & Tie Agreement</u>:  Fox's failure to obtain the prior approval of Bagdasarian with respect to the selection of Razor and Tie as licensee of the soundtrack album for the Initial Picture constitutes a breach of Fox's obligation to obtain Bagdasarian's approval of Fox's merchandising licenses with respect to pictures produced under the Agreement.

b)   <u>Exclusion from Production and Post-Production Meetings</u>:  Fox has repeatedly breached its contractual obligation to allow Janice and Ross access and open invitation to all meetings attended by the director, other producers or any other non-Fox employees (e.g., Chris Bailey, Steve Dubin and Matt Friedman) during development, production and post-production of the New Picture, including the animation meetings with Rhythm & Hues as set forth in my letter to you of September 24, 2009.  Our clients' attendance at these meetings is especially important insofar as the meetings are critical in determining the essence of how our client's property is depicted in the picture.

c)   <u>Digger</u>:  As stated in our letters to you of September 15 and 19, 2009, Fox has breached its contractual obligation to obtain Janice's and Ross' approval of the introduction of the character of "Digger" proposed by Fox for the New Picture. We acknowledge receipt of Bonnie Bogin's letter of September 24 rejecting our claim on this issue.  While we intend to respond to that letter in more detail under separate cover, please be advised that we completely disagree with Ms. Bogin's analysis and conclusions.  Our client views the nonsensical appearance of Digger at a moment at which the New Picture is approaching its dramatic climax as misleading and nothing more than a blatant attempt by Fox to exploit the Chipmunks brand to promote one of Fox's unrelated proprietary characters in reckless disregard for the integrity of the Chipmunks franchise.  Indeed, in a conversation last Wednesday evening, Elizabeth Gabler confirmed to our client that the proposed inclusion of Digger in the New Picture resulted from Fox trying to create synergy between its divisions rather than the motion picture studio's concerns for the quality and success of the New Picture.[1]

---

[1] Our client's outrage at Fox's disregard for the integrity of the Chipmunks franchise through the arbitrary introduction of Digger is compounded by Fox Television's recent airing of an episode of the "Simpsons" television series in which a poster spoofing the Chipmunks is displayed, a use which Fox failed to clear with our client beforehand.  Fox's willingness to promote one of its own characters by a gratuitous plug via the immensely popular Chipmunks franchise at the same time as Fox is making fun of the Chipmunks brand in one of its most popular television shows is profoundly disturbing to our client.

318317.
100609

GRUBMAN INDURSKY & SHIRE, P.C.
Stephen Plum, Esq.
October 6, 2009
Page 4 of 5

d) <u>Approvals and Consultation Rights</u>: Fox has consistently disregarded our clients' approval and consultation rights with respect to additional matters too numerous to detail at this time.

e) <u>WGA Matter</u>: Janice Karman's prospects for receiving credit as a writer of the sequel have been significantly undermined by Fox's actions in the WGA credit determination process, including its omission of her name as a participating writer and credit recipient in Fox's original Tentative Notice of Writing Credits. We also have reason to believe that Fox had conversations with the WGA during this process that ultimately compromised Janice's ability to receive an impartial determination of writing credits under the auspices of the WGA.

f) <u>"THE SQUEAKQUEL" Trademark</u>: Janice Karman originated this name and our client proceeded in good faith to apply for a Federal trademark registration therein. Fox, we understand, initially claimed that one of its executives had coined the name despite the fact that there are email exchanges between our client and Fox executives clearly indicating that this was solely Janice's creation.

4. <u>Fixed and Contingent Compensation</u>: There appears to be a dispute as to the interpretation of the Agreement with respect to the relationship between the fixed compensation of $3,000,000 payable to Bagdasarian for each sequel and remake and the contingent compensation payable for those pictures. The Agreement does not provide that the $3,000,000 payable for a sequel or remake may be applied against any contingent compensation earned. Accordingly, our client will expect its back-end participation on the New Picture and all future pictures made under the Agreement to be actually paid from "first dollar" of each picture rather than allowing Fox to apply the first $3M in back-end accrued toward recoupment of the fixed compensation paid for that picture, as was contractually permitted for the first picture.

5. <u>Audit</u>: Please note that our client has many questions and objections regarding the participation and royalty statements rendered to date under the Agreement and has decided to commence an examination of the books and records of Fox in order to verify the accuracy of those statements. Pursuant to Section VII.G. of Exhibit "A" of the Agreement, notice is hereby given of our client's intention to initiate an examination with respect to all participation statements rendered to date. We will inform Fox of our client's choice of a CPA firm shortly. We assume that Fox will accommodate the commencement of such an examination promptly following receipt of this letter and that this letter will toll the running of all periods of limitation set forth in Exhibit "A" with respect to objecting, auditing and initiating legal actions in respect of such statements. If this differs from your understanding, please provide us with an appropriate tolling letter immediately.

GRUBMAN INDURSKY & SHIRE, P.C.

Stephen Plum, Esq.
October 6, 2009
Page 5 of 5

Fox's breaches and disregard for the integrity of our client's valuable property is
particularly disturbing in view of the circumstances leading up to the making of their deal with
Fox. Early on in the discussions, various executives of Fox (Elizabeth Gabler, Chris Meledandri
and John Cohen) visited Ross and Janice's home and made certain commitments that ultimately
formed the spirit in which the deal was reached. The Fox executives were well aware that the
Bagdasarians had offers from other Hollywood studios. The Bagdasarians shared with the
executives the difficulties they had had in their dealings with Universal, which ultimately were
only resolved when the parties negotiated a settlement enabling our client to recapture all rights
in the Property. Our clients made it clear to the Fox team that they were hesitant to make a new
deal with another studio unless that studio understood and agreed that the Bagdasarians would be
involved in every aspect of development and production. The Bagdasarians told the Fox
executives, "Don't marry us if you aren't prepared for that." We are told that in order to entice
our clients to sign with Fox, Elizabeth Gabler said: "We don't just want your help, we need your
help. You are the Chipmunk experts."

From that assurance, the current contractual relationship was born, based upon the
approvals and rights to participate in the creative process that are essential to our clients. What is
most troubling of all to our clients is that at a time when other studios are searching desperately
to find a valuable franchise in family entertainment, Fox's handling of the present dispute
indicates a cavalier attitude towards the valuable Chipmunks franchise and its proprietors.

It is my sincere hope that you will respond to my recent financial proposal to resolve all
outstanding issues pending between the parties. Please be advised that if these matters are not
satisfactorily resolved within the next twenty-one (21) days, our clients will have no choice but
to retain litigation counsel. Surely, this is not an option that any of the parties would welcome
considering the forthcoming motion picture and the relationship of the parties.

I look forward to your immediate reply.

This letter shall be without prejudice to any of our clients' rights or remedies, all of
which are hereby specifically reserved.

Very truly yours,

Lawrence Shire

cc:     Legal Department, Twentieth Century Fox Film Corp., Attn: Bonnie Bogin, Senior Vice
        President of Legal Affairs (via facsimile 310.369.3759 and regular mail)
        Janice Karman
        Ross Bagdasarian
        Jonathan Ehrlich, Esq.

318317.
100609

5

# EXHIBIT 6

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Louis A. Karasik
Direct Dial: 213-576-1148
E-mail: casondra.ruga@alston.com

December 7, 2009

_Via E-mail & U.S. Mail_
Lawrence Shire
Jonathan Ehrlich
Grubman, Indusrky & Shire, P.C.
Carnegie Hall Tower
1523 West 57th Street
New York, NY 10019-3301

Re: _Alvin and the Chipmunks:  The Squeakquel_

Dear Larry and Jon:

    We are writing in response to Larry's letter dated October 6, 2009.  We have now had an opportunity to investigate the issues you have raised about Twentieth Century Fox Film Corporation's ("Fox's") activities in connection with _Alvin and the Chipmunks: the Squeakquel ("Squeakquel")._

    Fox values its relationship with your clients, Janice Karman, Ross Bagdasarian and Bagdasarian Productions, LLC (collectively, "the Bagdasarians"). Nevertheless, the Bagdasarians have made serious claims about Fox's performance under the March 2004 Purchase/Producer Agreement – Literary Material ("Agreement") and we are now obliged to respond.[1]  As detailed below, Fox disagrees it has breached the Agreement in any respect.  For each of the issues identified in the October 6th letter, we believe the answer to the questions posed is found in the plain language of the Agreement.  In this regard, there appears to be some misunderstanding by the Bagdasarians of basic terms and conditions that govern the parties' contractual relationship.  We draw attention to the relevant terms and also identify pertinent authorities that govern the interpretation of these terms.

---

[1] The Agreement includes the Standard Terms and Conditions (Exhibit A) attached thereto and made a part thereof ("ST&C").  References to the Agreement in this letter include the ST&C.

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

LEGAL02/31624961v2

BP00005028

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 2

We address the issues in essentially the same order as they appear in your letter.

1. Written or Graphic Materials

Ms. Karman claims that she has copyright interests in written materials provided to Fox in the course of production.  Respectfully, she does not.

Creative producers, such as your clients, are often involved in many details relating to the development and production of a film.  For example, a creative producer often renders writing services that are well within the scope of his or her employment as a producer.  As detailed below, that is the situation here and the Agreement fully encompasses the services the Bagdasarians performed.  For the reasons detailed below, Fox purchased all rights enumerated in the Agreement, including any writing that Ms. Karman rendered for the *Squeakquel*, and therefore no additional payment is owed to Ms. Karman.[2]

The Agreement is clear that "all results and proceeds of [the Bagdasarians'] services . . . (including all original ideas in connection therewith)" are "specially ordered by Fox for use as part of a motion picture and shall be considered a **"work made for hire"** for Fox and, therefore, Fox shall be the author and copyright owner thereof for all purposes throughout the universe." (ST&C, para.24(a).)  Ms. Karman's claim to copyright interests is rejected because the materials are Fox's sole and exclusive property under the plain language of the Agreement.

Moreover, Fox's ownership of the motion picture and other enumerated rights, including Ms. Karman's written materials, is alternatively established by the definition of "Property" acquired by Fox under the Agreement.  The Agreement states that Fox, for substantial consideration, purchased from the Bagdasarians the following rights:

"(a) **"Property"**:  That certain pre-existing property generally known as "Alvin and the Chipmunks" a.k.a. "Chipmunks" a.k.a. "Chipmunks Go to the Movies," "Alvin and the Chipmunk Series," "The Alvin Show," including various television series produced commenced in 1961, 1983 through 1987, and 1988 through 1991, created and/or controlled by Ross Bagdasarian, Sr., Ross Bagdasarian, Jr., Janice Karman, Bagdasarian Productions, LLC, and any and all associated characters (including Simon, Theodore, Alvin, and David Seville) now or hereafter created and to the extent owned and/or controlled by Owner, and any

---

[2] Of course, while Ms. Karman was providing her writing contributions to the *Squeakquel*, she never once conditioned Fox's use of that writing on additional compensation, or stated that she would not continue to make script revisions or script notes unless she received additional compensation.

LEGAL02/31624961v2

000100

BP00005029

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 3

and all other plots, themes, titles, story lines, names related thereto, *and any and all other elements relating to any of the foregoing*, now existing or created hereafter."

Agreement, para. 1(a), (emphasis added).

As detailed by the language of the Agreement, Fox purchased rights associated with the Chipmunks, in existence at the time the contract was signed *and created* "[t]hereafter". *Id.* Fox thus acquired rights to all materials related to the Chipmunks and/or related characters created by Ms. Karman prior to and after the March 2004 contract date. The Agreement also provides that Fox purchased "all other plots, themes, titles, story lines, names related thereto, **and any and all other elements** relating to [the Chipmunks and any and all associated characters] now existing or created hereafter." *Id.* Any screenplay materials that Ms. Karman prepared would be considered "plots, themes, titles, story lines, names related thereto, and any and all other elements relating to any of the foregoing all other elements relating to" the Chipmunks and would thus necessarily be part of the "Property" acquired by Fox.

Further confirmation of Fox's ownership of all written materials prepared by Ms. Karman is found in paragraph 9 of the ST&C, which provides that "[a]ll rights granted to Fox hereunder may be exercised by Fox without the payment of any additional consideration by Fox with respect to the Property as presented to Fox *and all other existing and future drafts, revisions, arrangements, adaptations, dramatizations, translations and other versions of the Property which may heretofore have been written or which may hereafter be written by or with the sanction of Owner . . . ."* (ST&C, para. 9 (emphasis added).) Again, the contract is clear that all "future drafts" of the Property which "may hereafter [after March 2004] be written" belong exclusively to Fox.

Despite the clear contractual language establishing that Fox is the exclusive owner of all written materials, to ensure that the parties could continue a productive and amicable relationship, Fox offered Ms. Karman additional compensation in appreciation for her efforts in connection with the *Squeakquel*. Again, Fox made this offer even though it was under no obligation to pay her any additional sums. Ms. Karman declined Fox's offer. Fox has no further obligations in that regard. Accordingly, Ms. Karman's demand to be compensated for literary materials she prepared in the course of production of the *Squeakquel* is rejected.

Ms. Karman also claims that she has copyright interests in graphic designs for the Chipette characters as they appear in the *Squeakquel*. Again, we respectfully disagree. First, the graphic designs for the Chipette characters used in the *Squeakquel* are girl versions of the Chipmunk characters that were created for the initial picture. It is undisputed that Fox owns the graphic designs for the Chipmunks as they appear in the

BP00005030

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 4

initial picture.  Moreover, any contributions Ms. Karman made to the graphic designs for the Chipettes are materials created for Fox as a "work for hire" (ST&C, para. 9), are elements related to the Characters that constitute Property purchased by Fox (Agreement, para. 1(a)) and are future drafts or versions of the Property likewise owned by Fox (ST&C, para. 24).

We next address the issues you raised with respect to Fox's merchandising activities and other issues involving claimed approval rights.

2. Approval Rights

The Agreement affords the Bagdasarians two kinds of approval rights: Fundamental Elements/Approvals (for convenience, "Fundamental Approvals", paragraph 15) and Approvals and Controls (for convenience, "Other Approvals", paragraph 16).  Fundamental Approvals extend to designs, attributes and characterization of then-existing characters from the Property ("design approval"), storyline ("storyline approval") and new characters ("new character approval").  For each of these issues, the Bagdasarians approval rights are limited to **verifying that the Characters are depicted in a manner reasonably consistent with or related to the integrity and artistic representation of the Characters as the same have been depicted before**.  Further, the Bagdasarians' approval may not be unreasonably withheld or delayed.[3]

With regard to Other Approvals, the contract specifies that Fox has "all approvals and controls, and the right to initiate action and control access" (Agreement, para. 16), except as follows:

(a)    Key Production Elements and Key Creative Personnel and Key Crew:

Fox and the Bagdasarians have "mutual approval" of key production elements and key creative personnel and crew (as specified in the Agreement), provided that if mutual approval is not reached with respect to any such element, Fox has the right to designate the element "in its sole discretion." (Agreement, para. 16(a) and 16(b).)

---

[3] The Fundamental Approvals have further limitations.  The contract specifies that the design approval rights are determined by the Bagdasarians approval of a basic animation test; storyline approval is determined by approval of a treatment; and new character approval, which applies only to new characters that interact with or are shown to have a familial relationship with existing Characters, is determined by approval of the basic animation test for animated characters and approval of the treatment for new live action characters.  (Agreement, para. 15.)

LEGAL02/31624961v2

BP00005031

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 5

(b)  <u>Access to Sets and Meetings:</u>

The Bagdasarians have "access and open invitation" to "meetings"
attended by the director, other producers or any other non-Fox employee
(for convenience, we refer to these in this letter as "Production Meetings")
during development, production and post-production.  Subject to
exigencies in the production activity, Fox is obligated to make "reasonable
good faith efforts" to afford the Bagdasarians reasonable advance notice of
such Production Meetings.

(c)  <u>Advertising Campaign and Distribution Pattern:</u>

The Bagdasarians have a right to "meaningful consultation", with "Fox's
decisions controlling" as to initial advertising campaign and initial
distribution pattern in the United States.

(d)  <u>Merchandising:</u>

Fox exclusively owns and controls all Picture-Related Merchandising
Rights during the Merchandising Window, subject to the Bagdasarians
right to Fundamental Approvals as described in paragraph 15, provided
that these fundamental approval rights only apply if the element involved
in the merchandising is "inconsistent with the element previously
approved" under paragraph 15.  (Agreement, para. 9(a). The contract also
states that the Bagdasarians have a right of approval, that may not be
unreasonably withheld, over the "style book" or art-reference materials
used in conjunction with merchandising, and Fox's merchandising
licenses with respect to the picture provided that (a) Fox's decision in all
such areas "shall be controlling"; (b) where mutual approval is not timely
reached, Fox's decision "shall be final", and (c) in all decisions relating to
financial and other terms of licensing agreements and shall be made "in
Fox's sole discretion." *Id.*

These are the undisputed terms and conditions that define the
Bagdasarians approval rights in connection with the *Squeakquel*.  While we appreciate
the Bagdasarians' interest to provide input and feedback to Fox on many different facets
of the picture, and Fox has been pleased to collaborate with the Bagdasarians in that
regard, the Bagdasarians' contractual rights are limited to the areas identified above.  As
noted, outside the area of Fundamental Approvals, Fox's rights are controlling and final
or Fox has sole discretion.  Even in the area of Fundamental Approvals, the
Bagdasarians' rights are limited to verifying that the Characters are depicted in a manner
reasonably consistent with or related to the integrity and artistic representation of the

LEGAL02/31624961v2

000103

BP00005032

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 6

Characters as the same have been depicted before, are determined by approvals of the
basic animation test or treatment, and the Bagdasarians approval under the contractual
standard may not be unreasonably withheld or delayed.

With this background, we turn to the specific issues raised in the October
6th letter regarding merchandising and other matters.[4]

### 3. Merchandising Rights

#### (a) Style Book

The first contention made about merchandising is that Fox failed to timely
make available the "Style Book" for merchandising on the initial picture, and that this
supposedly "squandered" the opportunity to make meaningful sales.

The first problem with this claim is that the contract imposes no deadlines
or timelines for pursuing merchandising activity, and in fact, Fox has no obligation under
the Agreement to engage in any merchandising activity at all.  The Agreement grants Fox
the exclusive right, but imposes no obligation, to conduct merchandising. (ST&C, para.
18 (stating that Fox "shall be under no obligation to exercise or put to use any of the
rights acquired by Fox hereunder.")  Of course, the express agreement that Fox has no
obligation to exercise merchandising rights defeats any claim that Fox had implied
obligations with respect to how to conduct merchandising.  *Carma Developers, Inc. v.
Marathon Development Ca., Inc.,* 2 Cal.4[th] 342, 374 (1992).

But even if Fox had some obligation to conduct merchandising (though
Fox plainly did not), Fox's merchandising activities for the initial picture were pursued in
complete good faith based on reasonable business judgments as to timing and other
substantive decisions.  Prior to the release of the film, Fox encountered significant lack of
interest by vendors to pursue Chipmunk-related merchandising.  Fox capitalized on the
interest in the Chipmunks generated by the movie's release.  This business judgment was
not only reasonable, but beyond any challenge under the Agreement which affords Fox
"controlling," "sole" and "final" discretion in connection with merchandising activity.
(Agreement, para. 9(b).)  Moreover, after the Style Book was prepared, Fox consulted
with the Bagdasarians and received their full input.  Fox's conduct is fully consistent with
the terms of the Agreement.

---

[4] Your letter asserts that Fox has "consistently disregarded our clients' approval and consultation rights
with respect to additional matters too numerous to detail at this time."  (October 6, 2009 letter, p. 4.)  We
disagree that Fox has violated any obligations owed under the Agreement.  We reserve the right to more
specifically respond at such time as the Bagdasarians identify any purported instances of Fox's alleged
failure to comply with the Agreement.

LEGAL02/31624961v2

BP00005033

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 7

Your reference to the "Merchandising Window" of the Agreement does not support a different result. The definition of Merchandising Window in the contract simply specifies the outer limits of Fox's merchandising rights; they extend from 9 months prior to the release of a picture and expire 48 months after the release. Nothing in this definition imposes on Fox any obligation to conduct merchandising (as noted, the contract is to the contrary), much less to initiate merchandising with any particular timing.

### (b) McDonald's

Your letter asserts that Fox failed to provide the Bagdasarians proposed promotional materials for the McDonald's U.S. commercial tie-in for the *Squeakquel* until after they were finalized. You claim that Fox has "admitted" its failure to submit written materials for your client's approval at a much earlier stage and that Fox has admitted that this conduct constitutes a breach of Agreement. Fox has made no such admissions, and none of these assertions give rise to any claims against Fox.

First, with respect to Fundamental Approvals, the Bagdasarians' approval rights for commercial tie-in materials are limited to elements that are inconsistent with elements the Bagdasarians previously approved in other contexts. (Agreement, para. 9.) The McDonald's tie-in materials were fully consistent with the previously approved elements. Moreover, any Fundamental Approval rights that might exist with respect to the McDonald's tie-in materials are limited to verifying that the designs of the Characters contained in the promotional materials are "consistent with" and "related to the integrity and artistic representation" of the Characters as they have been depicted before. (Agreement, para. 15.)   That standard is fully met here.

Finally, the Bagdasarians have not been damaged by any inadvertent delay in Fox's submittal of the materials. Fox's practice was to be over-inclusive with the Bagdasarians with respect to soliciting their input, and Rita Drucker apologized in June 2009 for not giving the Bagdasarians more advance notice of the McDonald's promotional materials. The Bagdasarians' position, as we understand it, is that certain Chipmunk clothing details for the McDonald's tie-in were not "sassy" enough.  Under the contract, the Bagdasarians' right of approval for any art-reference material in connection with tie-ins cannot be unreasonably withheld, and Fox's decision "shall be controlling."  (Agreement, para. 9.)  Fox's use of the McDonald's tie-in materials complies fully with the contractual standard.

### (c) Razor & Tie Agreement

The Bagdasarians contend that Fox failed to obtain their prior approval with respect to the selection of Razor and Tie as the licensee of the soundtrack album for

BP00005034

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 8

the initial picture. The most fundamental problem with this argument is that the soundtrack album is not a merchandising activity and the Bagdasarians have no approval rights over potential licensees for any soundtracks.

But even assuming that the Bagdasarians did have approval rights for licensing of soundtracks (which they do not), the record reveals that Mr. Bagdasarian assisted in securing the deal with Razor & Tie. After being made aware that Fox intended to license the soundtrack album to Razor & Tie, the Bagdasarians reported back favorably that they previously utilized Razor & Tie in connection with a Chipmunks compilation album. The Bagdasarians thus effectively approved Fox's selection of Razor & Tie. In light of this prior exchange, any assertion now that the Bagdasarians disapprove of this licensee is plainly untimely and unreasonable (again, even assuming the Bagdasarians had any approval rights, which they do not).

4.   Digger

We have previously responded to the issues raised about Digger. Our views on that point are set forth in our emails dated October 21 and 29, and we incorporate that material here. In sum, Fox's inclusion of Digger in the picture fully complies with all relevant contractual standards.

5.   Production Meetings

Your letter asserts that Fox has "repeatedly breached" its contractual obligation to allow the Bagdasarians access and open invitation. We disagree. Our analysis indicates that Fox has consistently complied with its contractual obligations.

The parties' disagreement on this point may stem from the Bagdasarians misunderstanding of the purpose and intent of the contractual provisions relating to meetings. The contract does not require that Fox give the Bagdasarians advance notice of every possible personal exchange or face to face discussion that may occur between production personnel in the course of making the picture. For example, the Bagdasarians are no doubt aware that there are innumerable exchanges between a director and her staff that occur on a fluid basis in the course of making a picture; these do not constitute "meetings." It would seem that the Bagdasarians interpret the Agreement to mean that every time any exchange occurs, there is a breach if the Bagdasarians were not present. This position is entirely unrealistic and unreasonable.

Fox has made "reasonable good faith efforts" to give the Bagdasarians "reasonable advance notice" of Production Meetings. (Agreement, para. 16(c).) The Bagdasarians have never been turned away from any Production Meetings they desired to attend. In this regard, the relevant substance of discussions between the director and her

LEGAL02/31624961v2

BP00005035

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 9

staff during the course of production ultimately were shared with the studio and with the Bagdasarians for their input. Fox is aware of no circumstance where the Bagdasarians were not given an opportunity to provide their feedback. Indeed, the Bagdasarians have been involved in providing input for the minutest details in both the initial picture and the *Squeakquel*, even where their involvement was not required by the Agreement. It would be impossible in this letter to document the innumerable exchanges, meetings, conversations and other points of contact throughout the production process where the Bagdasarians provided their input.

6.   WGA

Fox took no action to undermine or influence the outcome of the WGA's independent credit determination.

As noted in your letter, Fox did not submit Ms. Karman's name as a participating writer in the initial Notice of Tentative Writing Credits for a few reasons, including the mistaken assumption that Fox could not do so because she was not a WGA member. After Ms. Karman objected to the initial Notice, Fox revisited the matter and included her name as a participating writer in a revised Notice of Tentative Writing Credits, but did not submit her name for an on screen writing credit. Ms. Karman then delivered a written protest to the revised Notice claiming that she was entitled to an on screen credit based on her contributions to the screenplay. Intimations that Ms. Karman was going to claim an ownership interest in her material were also made to a Fox representative. Therefore, after receipt of Ms. Karman's protest, Fox informed the WGA that if Ms. Karman disputed Fox's sole and exclusive ownership over the material written by her while simultaneously seeking a writing credit, Fox would, in keeping with what Fox believed were WGA rules, request that she be removed as a participating writer as the WGA did not have jurisdiction to resolve ownership issues in the context of a credit determination.

Because of its lack of jurisdiction to resolve the ownership issue, the WGA concluded it could not proceed to make a credit determination until the issue of ownership was resolved. When it became apparent to everyone that the stalemate in resolving the credit issue could jeopardize the timely release of the picture, both Fox and Ms. Karman's representatives encouraged the WGA to go forward with the credit determination with the understanding that the WGA's decision would in no way affect the parties' dispute as to ownership. The WGA then agreed to proceed on that basis and thereafter rendered its independent determination of writing credits for the picture. Fox had no input into the substance of that determination whatsoever. The discussion between Fox and the WGA was solely and exclusively about whether the WGA would proceed to a credit determination before the ownership issue was decided, and never about what that determination should be. Pursuant to its own internal policies and

LEGAL02/31624961v2

BP00005036

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 10

procedures, the WGA concluded that Ms. Karman was not entitled to writing credit in connection with the picture. Ms. Karman appealed that decision and her appeal was denied. The WGA rendered its decision based on its independent assessment of the merits of Ms. Karman's credit claim.

7.   Trademark Issues

Of the many issues raised by the Bagdasarians, one of the most troubling to Fox is the matter of trademark rights for "*The Squeakquel*." The Bagdasarians' claim of trademark protection for "The Squeakuel" threatens Fox's full and free exercise of its rights under the Agreement. (The trademark applications filed by the Bagdasarians are for the mark "The Squeakuel." Fox's trademark is for the mark "The Squeakquel", which includes the letter "q" as part of the mark. Regardless of the spelling of the two marks, they are phonetically identical and have the same commercial impression.)

First, it is beyond argument that Fox owns the exclusive rights to use all titles for the picture. Even assuming that the Bagdasarians created the title "The Squeakuel," the Agreement makes clear that their services under the Agreement are "work for hire" and that all results and proceeds of their activity belong exclusively to Fox (ST&C, para. 24(a).) Specifically, the Agreement provides that "Fox shall solely and exclusively own . . . all rights of every kind and nature whether now or hereafter known or created in and in connection with [the] results and proceeds [of the Bagdasarians' services] including: . . . all neighboring rights, trademarks and domain names related to elements contained in the Picture (including without limitation *titles*, story lines, characters and characterizations) . . . . (ST&C, para. 24(a) (emphasis added).) Moreover, Fox has the "sole and exclusive right . . . in its sole discretion . . . to use all of the elements contained in the Property (including, notwithstanding any other provision of this Agreement, the . . . titles or any variations thereof . . . ), to change the title of the Property . . . and to register and secure copyright, trademark and domain name registrations and renewals therein in Fox's name throughout the universe." (ST&C, para. 6(b).)[5]

Notwithstanding these clear contract terms, on January 13, 2009, the Bagdasarians, without notice to Fox, filed various trademark applications for the mark "The Squeakuel". These applications and the Bagdasarians' claim to have rights in the title are fundamentally inconsistent with the Agreement.

Notably, the Bagdasarians have admitted in proceedings before the Trademark Trial and Appeals Board ("TTAB") that there is likelihood of confusion

---

[5] Of course, Fox acquired the exclusive right to conduct merchandising activities for any film, with any title, based on the Property. (Agreement, para. 5.)

LEGAL02/31624961v2

BP00005037

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 11

between the Bagdasarians' claimed mark "The Squeakuel" and Fox's trademark for "The Squeakquel." Yet the Agreement provides that the Bagdasarians shall not perform any acts to encumber, diminish or impair Fox's rights under the Agreement. (Agreement, para. 19(h).) The filing of trademark applications for a mark that creates a likelihood of confusion to Fox's mark, and which the Bagdasarians cannot lawfully use without infringing Fox's rights, undermines this covenant.

The Bagdasarians have argued before the TTAB that they are entitled to pursue trademark rights in "The Squeakuel" because the contract obligates them to "maintain" all rights that have been sold to Fox. (ST&C, para. 6(b).) This is a meritless position. The plain meaning of "maintain" in the Agreement is to ensure that no *existing* title or trademark rights that have been purchased by Fox lapse or lose their enforceability as a result of the Bagdasarians' failure to take necessary steps to maintain them. The sentence affords no rights on the Bagdasarians to file *future* trademark applications on titles that are Fox's exclusive property.

Fox sincerely hopes the parties can amicably resolve their dispute relating to the trademark issues.[6] To that end and for the reasons set forth above, Fox requests that the Bagdasarians: (1) identify all of their applications or registrations for "The Squeakuel" and all similar marks, including without limitation U.S. and Canadian applications; and (2) assign all rights in the foregoing applications or registrations to Fox. Alternatively, Fox requests that the Bagdasarians withdraw all trademark applications for "The Squeakuel" and all similar marks by filing the required Notice of Abandonment forms.

## 8.    Fixed and Contingent Compensation

Your letter claims that the $3,000,000 purchase price paid to the Bagdasarians for remakes and sequels is not applied to Contingent Compensation. The Agreement says exactly the opposite.

Paragraph 6 provides that the $3,000,000 Purchase Price paid to the Bagdasarians "shall be deemed an advance against the Contingent Compensation" described in paragraph 7. Paragraph 7 provides that "Subject to the last sentence of paragraph 6" (the sentence providing that the Purchase Price is deemed an advance against Contingent Compensation), the Bagdasarians are entitled to a "Contingent Compensation," defined as an interest in certain gross proceeds for each picture.

---

[6] If the parties are unable to resolve their dispute over trademark rights or any other dispute that has arisen, Fox's position is that the controversy must be resolved in accordance with the dispute resolution proceedings of the Agreement. The Agreement provides that any claim or dispute arising out of the Agreement must be submitted to a general, non-jury reference to hear and decide all matters relating to the claim or dispute pursuant to California Code of Civil Procedure Section 638. (ST&C, para. 21(a)(ii).)

LEGAL02/31624961v2

BP00005038

Lawrence Shire
Jonathan Ehrlich
December 7, 2009
Page 12

Paragraph 12 provides that, for each sequel or remake, the Bagdasarians are entitled to receive a Purchase Price and Contingent Compensation in the amount described in paragraph 7. The amount described in paragraph 7 is Contingent Compensation that is subject to the $3,000,000 advance.

Under the plain terms of the Agreement, the $3,000,000 Purchase Price is an advance against Contingent Compensation for each picture, including the Initial Picture, sequel or remakes.

9.   Audit

In order to request an audit, the Bagdasarians must comply with the provisions set forth in Section VII.G of Exhibit "A", titled "Definition of Defined Net Proceeds." Although the October 6th letter alerts Fox that the Bagdasarians intend to commence an audit, the Bagdasarians' must first give notice in compliance with the requirements set forth in Exhibit "A," and all periods of limitation shall apply as set forth in Exhibit "A." Fox will take all appropriate action in response to a proper audit demand in compliance with Exhibit "A".

Fox looks forward to the success of the *Squeakquel* and is grateful to the Bagdasarians for their many contributions. We are hopeful that the parties can resolve their disputes amicably and informally. To that end, if you believe there are any issues that are not fully answered by the Agreement and the analysis set forth above, please contact me so we can further discuss.

We look forward to your reply.

This letter is without prejudice to any of Fox's rights and remedies, all of which are expressly reserved.

Very truly yours,

Louis A. Karasik

LAK:jll

LEGAL02/31624961v2

BP00005039

# EXHIBIT 7

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K GARRISON   (1946-1991)
RANDOLPH E PAUL   (1946-1956)
SIMON H. RIFKIND   (1950-1995)
LOUIS S. WEISS   (1927-1950)
JOHN F WHARTON   (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3263

WRITER'S DIRECT FACSIMILE
(212) 373-2225

WRITER'S DIRECT E MAIL ADDRESS
gharper@paulweiss.com

UNIT 3601 FORTUNE PLAZA OFFICE TOWER A
NO 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE S REPUBLIC OF CHINA
TELEPHONE (86 10) 5828 6300
FACSIMILE (86 10) 6530 9070/9080

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846 0300
FACSIMILE (852) 2840 4300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU U K
TELEPHONE 44 20 7367 1600
FACSIMILE 44 20 7367 1650

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWA-CHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81 3) 3597 8101
FACSIMILE (81 3) 3597 8120

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

MATTHEW W. ABBOTT
ALLAN J ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
HENK BRANDS
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL
JEANETTE K. CHAN
YVONNE Y H CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHARLES E DAVIDOW
DOUGLAS R. DAVIS
THOMAS V DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M DUBIN
ALICE BELISLE EATON
ANDREW J EHRLICH
LESLIE GORDON FAGEN
MARC FALCONE
ANDREW C. FINCH
ROBERTO FINZI
PETER E FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ROBERT D. GOLDBAUM
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES F GOOGE, JR
ANDREW G GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
DAVID S HUNTINGTON
MEREDITH J KANE
ROBERTA A. KAPLAN
BRAD S. KARP
JOHN C. KENNEDY
ALAN W KORNBERG

DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P LAMB[*]
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LI
JEFFREY D. MARELL
JULIA TARVER MASON
MARCO V MASOTTI
EDWIN S. MAYNARD
DAVID W MAYO
ELIZABETH R MCCOLM
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG K OH
JOHN J. O'NEIL
KELLEY D PARKER
ROBERT P PARKER
MARC E. PERLMUTTER
MARK F POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW W. ROSENBERG
PETER J. ROTHENBERG
JACQUELINE P RUBIN
RAPHAEL M. RUSSO
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
STEPHEN J. SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
MARILYN SOBEL
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
JUDITH R. THOYER
DANIEL J TOAL
MARK A UNDERBERG
LIZA M. VELAZQUEZ
MARIA T VULLO
LAWRENCE G WEE
THEODORE V WELLS JR
BETH A WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I WITDORCHIC
JORDAN E. YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
T ROBERT ZOCHOWSKI JR

*NOT ADMITTED TO THE NEW YORK BAR

January 27, 2010

**By First Class Mail and Email**

Louis A. Karasik, Esq.
Alston & Bird LLP
333 South Hope Street
16th Floor
Los Angeles, CA  90071-1410

*Alvin and the Chipmunks: The Squeakquel*

Dear Mr. Karasik:

On behalf of Bagdasarian Productions LLC, Ross Bagdasarian and Janice Karman, I write in response to your December 7, 2009 letter to Larry Shire and Jonathan Ehrlich concerning *Alvin and the Chipmunks: The Squeakquel.*

My clients, too, would like to resolve this matter. But your December 7 letter does little to address the significant concerns raised in Larry's October 6, 2009 letter and in the many direct contacts between our clients. I see no reason to repeat the substance of Larry's letter, but several statements in your December 7 letter warrant a direct response.

BP00006047

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Louis A. Karasik, Esq.                                                                    2

*Ms. Karman's Writings*

At Fox's formal request, Janice Karman provided substantial screenwriting services – plainly of the sort performed by studio-hired screenwriters, not by producers – in connection with *The Squeakquel*. Ms. Karman wrote the 33-page treatment (containing full scenes and dialogue) on which the screenplay and motion picture are based. She wrote multiple versions of the screenplay itself. And throughout the writing process and the beginning of filming, she made extensive revisions to the screenplay drafts.

Your assertion that Ms. Karman's "Screenplay Writings" fall within the scope of the work-for-hire and grant of rights provisions of the March 2004 Purchase/Producer Agreement between Fox and our clients cannot be squared with that Agreement's plain language, industry custom, or the parties' conduct.

First, the Agreement is a "Purchase/Producer Agreement" – that is, a producing and underlying rights agreement – and nothing more. The Agreement describes the precise services that were to be rendered by Ms. Karman and Mr. Bagdasarian in connection with *The Squeakquel*. Paragraph 5 of the Agreement engages Ms. Karman and Mr. Bagdasarian specifically "as producers" and commits them to perform services "customarily rendered by producers in the motion picture industry…" (Agmt. ¶ 5.) The Agreement provides for a credit for only the underlying rights and the producing services. (*Id.* ¶ 13.) It nowhere states (or even suggests) that Ms. Karman would provide screenwriting services and lacks each and every provision customarily found in writer or producer/writer agreements – *e.g.*, specified "writing steps" for the writer to undertake, specified compensation for the first draft of the screenplay and subsequent drafts and revisions, a specified delivery period, the method by which writing credit determinations would be made, and the customary representation by a screenwriter engaged by a Writers' Guild of America signatory confirming that the writer is or will soon thereafter become a member of the WGA.

The Agreement, in fact, provides that Fox would write the screenplay. (Agmt. ST&Cs ¶ 2 ("Fox shall have the right throughout the Option Period, if any, to engage in all customary development and pre-production activities in connection with the Picture, including the preparation and submission of treatments, screenplays, teleplays, and all other writings based in whole or in part upon the Property…").) The Agreement's credit provisions further confirm that someone other than Ms. Karman or Mr. Bagdasarian would draft the screenplay. (*See* Agmt. ¶ 13(a) (contrasting the underlying rights and producer credits that Bagdasarian Productions, LLC would receive with the "Written by" or "Screenplay by" credit).) The Agreement details Ms. Karman's screenplay-related duties as the mere "supervision of the screenplay materials" (*Id.* ¶ 5) – duties typically performed by a producer, not a screenwriter, and duties that indisputably do not encompass the extensive writings created by Ms. Karman.

BP00006048

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Louis A. Karasik, Esq.                                                          3

Put simply, because the Screenplay Writings are the fruit of services by Ms. Karman rendered entirely outside the scope of the Agreement, they are not the "results and proceeds of [Ms. Karman's] services [there]under," and thus are not, as you mistakenly claim, works-for-hire under the Agreement. (Agmt. ST&Cs ¶ 24(a).)

Nor are the Screenplay Writings subject to the Agreement's grant of rights to the underlying "Property." The "Property" definition recites the underlying rights granted as including "characters" and "plots, themes, titles, story lines, [and] names related thereto, and any and all other elements relating to any of the foregoing, now existing or created hereafter." (Agmt. ¶ 1.) The "Property" definition tellingly omits any reference to a "screenplay" – a term used elsewhere in the Agreement that could have been (but was not) included in the "Property" provision. (See id. ¶¶ 5, 16(a).) Further, none of the Screenplay Writings constitutes a "plot[], theme[], title[] [or] story line[]" within the plain meaning and industry understanding of those terms. The Screenplay Writings are, as Fox knows, far more than broad sketches of a plot or story line included in the "Property" grant; they contain extensive dialogue and full scenes that create the entire dramatic arc of the film. Because the Screenplay Writings are in scope and scale beyond "plots, themes, titles [or] story lines," they are not "elements" (i.e., smaller components) or "versions" of "any of the foregoing." (Id. ¶ 1, Agmt. ST&Cs ¶ 9.)

If the plain language of the Agreement were not enough (and it is), the parties' conduct confirms that the Screenplay Writings are outside the scope of the Agreement. As an initial matter, Fox hired a screenwriter other than Ms. Karman – Jon Vitti, the individual who wrote the screenplay for the first film. Only when Fox became dissatisfied with Mr. Vitti's work did it then ask Ms. Karman to provide writing services. At that time, and in no uncertain terms, Fox began negotiations with Ms. Karman concerning a *separate* agreement for her writing services and the proceeds thereunder. Although the parties disputed the value of those services, Ms. Karman's provision of them and the Screenplay Writings was with the express understanding that she would be paid consideration beyond that owed to my clients under the Agreement for the underlying rights and their producing services. Your suggestion that Fox's offer of $100,000 to Ms. Karman was a "gift" simply is not credible.

In sum, Ms. Karman is the author and copyright owner of the Screenplay Writings, which she and Fox intended to merge into the screenplay for *The Squeakquel*. Thus, she is a co-owner of the copyright in *The Squeakquel* screenplay and is entitled to be compensated accordingly.

### *The Graphic Designs of the Chipettes*

For the same reasons, Ms. Karman's services in connection with the graphic design of the Chipettes and the resulting graphic designs are outside the scope of the Agreement. Graphic design services are not services "customarily rendered by producers." (Agmt. ¶ 5). Indeed, Fox separately engaged and paid another individual,

BP00006049

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Louis A. Karasik, Esq.                                                              4

Buck Lewis, to perform these exact services in connection with the first film under the Agreement. Moreover, Ms. Karman's graphic designs are not subject to the definition of "Property." Graphic designs are not "characters" or "plots, themes, titles [and] story lines." Thus, Fox has no right to use the Chipettes graphic designs in the absence of additional compensation to Ms. Karman.

**_Contingent Compensation_**

Finally, Fox's claim that the fixed compensation payable for _The Squeakquel_ under Paragraph 12 of the Agreement is applicable against contingent compensation also has no basis in the plain language of the Agreement.

Paragraph 12 of the Agreement states that the payment for sequels and remakes shall be:

> "[A]n amount equal to (i) the Purchase Price, and (ii) a percentage of the Defined Gross Proceeds of such sequel [or remake] equal to the rate of percentage participation in the Defined Gross Proceeds from "1st dollar" of the Picture payable pursuant to Paragraph 7."

Thus, the two elements of compensation for _The Squeakquel_ are an amount equal to the Purchase Price "and" a percentage of 1st dollar proceeds – not an amount equal to the Purchase Price "against" a percentage of 1st dollar proceeds. The reference to Paragraph 7 does not, as you claim, change the provision's plain meaning. The reference is solely to the rate of 1st dollar proceeds (_i.e.,_ 2.5%), and not to the terms of Paragraphs 6 and 7, which make the fixed compensation applicable against the contingent compensation _for the first picture_.

In fact, where, as here, the underlying property is an "A+ level" property like Alvin and the Chipmunks and the producers associated with that property have extensive experience, an improvement in the compensation terms between the first film in a franchise and the second – as Paragraph 12 plainly provides – would be expected.

\*            \*            \*

Regarding the various other issues set forth in Larry's October 6 letter, that letter amply states our position on each of those outstanding issues, and I understand that several of them have also been the subject of recent discussions between Mr. Bagdasarian and Robert Marick at Fox. I will not retread that ground here.

As I stated at the outset, it is my client's desire to resolve all of these issues quickly -- a desire I trust is shared by Fox. I hope that we can put the letter-writing behind us and begin a productive dialogue to that end.

BP00006050

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Louis A. Karasik, Esq.                                     5

            Of course, this letter is without prejudice to any of our clients' rights or remedies, all of which are hereby expressly reserved.

                         Sincerely,

                         Gerard E. Harper

cc: Ross Bagdasarian
     Janice Karman
     Lawrence Shire
     Jonathan A. Ehrlich
     Lynn B. Bayard

BP00006051

# EXHIBIT 8

1  HON. CARL J. WEST, RET.
   JAMS
2  707 Wilshire Blvd.
3  46th Floor
   Los Angeles, CA 90017
4  Tel: 213-620-1133
   Fax: 213-620-0100
5
6  Referee
7
8
                    UNITED STATES DISTRICT COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
11
12  BAGDASARIAN PRODUCTIONS, LLC,      )   Case No. CV 10-02991 MWF (JCGx)
13  and JANICE KARMAN,                 )
                                       )   JAMS Reference # 1220044628
14              Plaintiffs,            )
                                       )
15  vs.                                )   **RULING ON MOTION TO DISMISS**
                                       )
16  TWENTIETH CENTURY FOX FILE         )
17  CORPORATION,                       )
                                       )
18              Defendants.            )
                                       )
19                                     )
20

21  Defendant's Motion to Dismiss was filed on August 31, 2012.  Plaintiffs' Opposition to the

22  Motion to Dismiss was filed on September 26, 2012.  Defendant's Reply to the Opposition was

23  filed on October 5, 2012.  A hearing on the Motion was held on October 31, 2012.  The Referee

24  has read and considered the parties' briefs and has considered the argument of counsel at the

25  hearing.  The Referee makes the following Order on the Motion.

26

27  ////

28  ////

                                      1

1  Motion is granted as to Counts I through IV.  The express terms of the "Purchase/Producer

2  Agreement-Literary Materials" dated March 26, 2004 are dispositive of the claims asserted in

3  these Counts.  The Agreement defines "Property" as follows:

> "That certain pre-existing property generally known as "Alvin and
> the Chipmunks" a.k.a. "Chipmunks" a.k.a. "Chipmunks Go to the
> Movies," "Alvin and the Chipmunks Series," "The Alvin Show,"
> including various television series produced commencing in 1961,
> 1983 through 1987, and 1988 through 1991, created and/or
> controlled by Ross-Bagdasarian, Sr., Ross Bagdasarian, Jr., Janice
> Karman, Bagdasarian Productions, LLC, *and any and all*
> *associated characters* (including Simon, Theodore, Alvin, and
> David Seville) *now or hereafter created and to the extent owned*
> *and/or controlled by Owner, and any and all other plots, themes,*
> *titles, story lines, names related thereto, and any and all other*
> *elements relating to any of the foregoing, now existing or created*
> *hereafter.* (Agreement, ¶1(a) (emphasis added).)

When this language is considered in conjunction with the language contained in the Standard

Terms and Conditions there is no question that the screenplay and graphic designs are literary

material within the meaning of Property as defined in the Agreement.  Plaintiffs have failed to

explain how the screenplay and graphics produced by Ms. Karmen do not come within the

language of ¶1(a) that embraces "…any and all other elements relating to any of the foregoing,

now existing or created hereafter." The Standard Terms and Conditions include the following:

1      "[t]he sole and exclusive right . . . to use all of the elements

2      contained in the Property . . . to adapt, rearrange and make any

3      changes in, deletions from or additions to the Property, to change

4      the sequence thereof, to use a portion or portions of the Property . .

5      . to change the characters in the Property, to change the

6

7      descriptions of said characters, and to use all or any part of the

8      foregoing in new versions, adaptions, other motion pictures,

9      Remakes and Sequels (including Additional Motion Picture,

10     Author Written Sequel Motion Pictures, Studio Sequel Motion

11     Pictures and Remakes). . . .

12

13     (Agreement, ST&C, ¶6(b).)

14

15 The work performed by Ms. Karman constitutes "all or any part of the foregoing in new

16 versions, adaptions, other motion pictures, Remakes and Sequels" and as such are subject to the

17 Agreement. The screenplay for which Ms. Karman seeks compensation, while within the

18 definition of Literary Material (STC §26(i)), is an element of the Property subject to the

19 Agreement. Plaintiffs' suggestion that the screenplay and graphic designs are outside the

20 Agreement would defeat the purpose and intent of the Agreement.  Literary Material as defined

21 in the Standard Terms and Conditions is within the definition of Property to the extent it consists

22 of "*and any and all other plots, themes, titles, story lines, names related thereto, and any and all*

23 *other elements relating to any of the foregoing, now existing or created hereafter.*"

24

25

26 This is further confirmed by the fact that Ms. Karman's co-ownership claim to *The Squeakquel*

27 screenplay as alleged at §33 of the First Amended Complaint is inconsistent with in direct

28

3

Case 2:10-cv-02991-MWF-JCG   Document 175-3   Filed 07/21/14   Page 30 of 104   Page ID
#:8640
Case 2:10-cv-02991-MWF-JCG   Document 54   Filed 11/15/12   Page 4 of 5   Page ID #:1057

1   contravention of the grant of rights contained in the parties' Agreement. STC §§ 6(f), 9, 15, and

2   24.

3

4

5   The motion is denied as to Counts V, VI, and VII. The implied contract and breach of contract

6   claims cannot be adjudicated on a motion to dismiss as there are factual issues raised by the

7   pleading.  Notwithstanding the denial of the motion as to Count VII, it appears that Plaintiffs'

8   claims for failure to merchandise and for additional compensation for the sequels (and the

9   original film) will be precluded by the express terms of the Agreement.  Specifically, the fact that

10   merchandising was within the sole discretion of Fox will likely preclude any recovery on this

11   claim. See *Third Story Music, Inc. v. Waits* 41 Cal.App.4th 798 (1996) and *Wolf v. Walt Disney*

12   *Picture and Television*, 162 Cal.App.4th 1107, 1112 (2008).  With respect to the claim for

13   additional compensation for sequels, under the Agreement the terms of Paragraphs 6 and 7

14   appear to preclude Plaintiffs' claims. The parties' course of dealing over several years, and in

15   connection with the earlier sequel and original will provide an evidentiary basis for

16   determination of this claim as well as the merchandising claim.

17

18

19   The parties are ordered to meet and confer regarding the form of an appropriate order

20   implementing the Referee's ruling on Defendant's Motion to Dismiss.  If the parties are in

21   agreement as to the form of order, the order is to be submitted approved as to form by both

22   counsel; in the absence of agreement, Defendant is directed to submit a proposed order.  The

23   agreed or proposed order is to be submitted on or before November 30, 2012.

24

25   Dated: November 14, 2012

26                                                          CARL J. WEST
                                                           Judge of the Superior Court (Ret.)
27                                                         Referee

28

4

## PROOF OF SERVICE BY U.S. MAIL

Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation
Reference No. 1220044628

I, Jo-El Fequiere, not a party to the within action, hereby declare that on  November 14, 2012 I served the attached RULING ON MOTION TO DISMISS on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA   90012-4793

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on  November 14, 2012.

Jo-El Fequiere

1   HON. CARL J. WEST, RET.
    JAMS
2   707 Wilshire Blvd.
3   46th Floor
    Los Angeles, CA 90017
4   Tel: 213-620-1133
    Fax: 213-620-0100
5
6   Referee
7
8                      UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11
12  BAGDASARIAN PRODUCTIONS, LLC,    )   Case No. CV 10-02991 MWF (JCGx)
13  and JANICE KARMAN,               )
                                     )   JAMS Reference # 1220044628
14            Plaintiffs,            )
                                     )
15  vs.                              )   **Order on Parties' Proposed Further Orders**
                                     )   **on Motion to Dismiss**
16  TWENTIETH CENTURY FOX FILE       )
17  CORPORATION,                     )   **Order Setting Further Status Conference**
                                     )
18            Defendants.            )
19  ─────────────────────────────── )
20
21  The Referee has read the Proposed Order on Motion to Dismiss submitted by Fox, Mr. Karasik's

22  letter that accompanied the submission of the proposed order, and the Plaintiffs' Proposed Order

23  and Objections to Fox's Proposed Order.  The request in the Referee's Ruling on Motion to

24  Dismiss for a proposed order implementing the Ruling was not intended as a request for Fox to

25  rewrite the ruling, but rather a request for an order that would facilitate review of the ruling as

26  discussed at the hearing.  The Referee is not inclined to dismiss the supplemental state law

27  claims as proposed by Plaintiffs. 28 U.S.C 1367(c) vests the District Court, and thus the Referee

28

                                        1

with discretion to retain jurisdiction over supplemental state law claims following dismissal of federal claims. The exercise of that discretion is founded on considerations of judicial economy, fairness, convenience, comity, and efficiency.  The judicial reference in this case was made pursuant to the parties' agreement that disputes would be resolved through such a reference made pursuant to California Code of Civil Procedure §638.  Dismissal of the state law claims, and the refiling of the claims in state court, as proposed by Plaintiffs, would frustrate the economies and efficiencies of the §638 reference procedure adopted by the parties for resolution of any disputes arising under the Purchase/Producer Agreement.  The Referee will allow the Ruling on the Motion to Dismiss to stand and will forego any further order on the motion in the absence of a jointly proposed order intended by the parties to facilitate review of the Ruling.  The parties should meet and confer for the purpose of addressing discovery and scheduling issues. A Further Status Conference will be held on January 11, 2013 at 9:00 a.m. at the JAMS Los Angeles office. The parties are to file a joint statement addressing discovery and scheduling issues on or before January 4, 2013.

Dated: December 3, 2012

CARL J. WEST
Judge of the Superior Court (Ret.)
Referee

**PROOF OF SERVICE BY U.S. MAIL**

Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation
Reference No. 1220044628

I, Kathryn Cisneros, not a party to the within action, hereby declare that on December 04, 2012 I

served the attached ORDER ON PARTIES' PROPOSED FURTHER ORDERS ON MOTION TO

DISMISS AND ORDER SETTING FURTHER STATUS CONFERENCE in the within action by

depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the

United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Hon. Michael Fitzgerald
U.S. District Court
312 N. Spring St., # G-8
Los Angeles, CA   90012-4793

I declare under penalty of perjury the foregoing to be true and correct. Executed in Los Angeles,

CALIFORNIA, on December 04, 2012.

Kathryn Cisneros

# EXHIBIT 9

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Casondra K. Ruga                    Direct Dial: 213-576-1133          E-mail: casondra.ruga@alston.com

May 27, 2010

<u>VIA EMAIL (lbayard@paulweiss.com)</u>
<u>AND U.S. MAIL</u>

Lynn B. Bayard
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York   10019-6064

      Re:   *Bagdasarian Productions et al. v. Fox*

Dear Lynn:

      On behalf of Twentieth Century Fox Film Corporation ("Fox"), we write pursuant to Local Rule 7-3 to initiate a meet and confer with Bagdasarian Productions, LLC and Janice Karman (collectively "Plaintiffs") concerning a motion to enforce the Forum Selection Clause found in the parties' March 2004 contract. Fox's position is that the Complaint should be dismissed pursuant to 12(b)(3) for improper venue. At a minimum, and in the alternative to dismissal, the case should be stayed and Plaintiffs ordered to pursue their claims, if at all, in accordance with the contractually mandated reference proceeding under Cal. Code Civ. Proc. Section 638.

      We are generally available next week to speak with you about this matter. We would welcome participation by your local counsel located in Los Angeles, and would be happy to have them participate in our exchange in a face to face meeting, with you participating by telephone.

      Let me also confirm your recent advice that Plaintiffs will not stipulate to dismissal of the lawsuit in favor of a reference proceeding, and that Plaintiffs otherwise decline to pursue their claims in accordance with Section 638. We are disappointed that it will be necessary for Fox to pursue a motion to enforce the parties' agreement that all disputes arising under the contract are to be decided by a 638 reference, and we respectfully request that Plaintiffs provide Fox with any factual or legal basis for disregarding the Forum Selection Clause.

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

Lynn B. Bayard
May 27, 2010
Page 2


      We are prepared to engage in the meet and confer process at your earliest opportunity so please provide us with dates and times that work for you and your co-counsel.  We look forward to hearing from you.


            Sincerely,

            Casondra K. Ruga

cc:    Steven A. Marenberg, Esq.
       Carter Batsell, Esq.

LEGAL02/31940895v1

# EXHIBIT 10

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Louis A. Karasik                    Direct Dial: 213-576-1148                    E-mail: lou.karasik@alston.com

June 7, 2010

VIA EMAIL (lbayard@paulweiss.com)
AND U.S. MAIL

Lynn B. Bayard
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:    *Twentieth Century Fox Film Corp. adv. Bagdasarian Production, et al.*
       *CV102991*

Dear Lynn:

I'm writing to acknowledge and confirm our meet and confer exchange (pursuant to Local Rule 7.2) on Friday, June 4, respecting Fox's upcoming motion to enforce the reference provision of the parties' agreement.  We appreciate your team's participation and the information you provided about plaintiffs' position.

Without trying to capture all of the details of our exchange, our understanding is that plaintiffs dispute that the reference provision of the contract applies to the copyright-based claims in plaintiffs' complaint, and maintain that exclusive federal jurisdiction for copyright claims under the Copyright Act precludes their resolution through the state law reference procedure of Cal. Code Civ. Proc. Section 638.  For the reasons we discussed and the authorities we described, Fox respectfully disagrees.  Our position is that the authorities compel enforcement of the reference procedure for all claims in the Complaint, including copyright-based claims.  We also understand your position to be that the state-law claims, even if they are otherwise subject to the reference provision, should be heard together with the federal claims and thus the Court should decline to order them to reference (assuming the Court declines to order the copyright-based claims to reference).  Again, we disagree, and believe that the reference clause should be enforced, not only as to the copyright-based claims, but also the state-law claims.

We do not intend by this short summary to foreclose the fuller and more detailed statement of your position, and if we have misstated your views, we trust you will correct our misunderstanding of your position in your opposition papers, or before.  Likewise, we

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

000130

Lynn B. Bayard
June 7, 2010
Page 2


do not intend this letter to reflect a definitive statement of Fox's views, and we reserve all
rights to more fully detail our legal position in connection with the motion.

Let me also acknowledge your request that Fox agree to a stipulated briefing
schedule for the motion that would afford plaintiffs until July 30th to respond to Fox's
motion.  We are reviewing that matter further with our client and will be back in touch at
the earliest opportunity to further discuss.


Very truly yours,

Louis A. Karasik


LEGAL02/31956536v1

# EXHIBIT 11

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11 | BAGDASARIAN PRODUCTIONS, )    Case No. 2:10-cv-02991-JHN-JCGx
LLC, a California limited liability )
company, and JANICE KARMAN, an ) **ORDER GRANTING**
individual, ) **DEFENDANT'S MOTION TO**
) **ORDER ALL DISPUTES TO**
) **REFERENCE UNDER CAL. CODE**
Plaintiffs, ) **CIV. PROC. § 638 AND TO STAY**
) **THIS ACTION**
vs. )
)    Judge: Honorable Jacqueline H. Nguyen
)
TWENTIETH CENTURY FOX )
FILM CORPORATION, a Delaware )
corporation, )
)
Defendant. )
)
_____ )

12

13

14

15

16

17

18

19

20      This matter is before the Court on Defendant's Motion to Order All

21 Disputes to Reference under Cal. Code Civ. P. Section 638 and to Stay this

22 Action ("Motion") (Docket No. 13), filed on June 18, 2010. The Court has

23 considered the briefs filed in this matter and has previously deemed the matter

24 appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; Local

25 Rule 7-15. For the reasons herein, the Court GRANTS Defendant's Motion to

26 Refer and Stay the matter.

27

28

# I.

## BACKGROUND

This case involves disputes regarding a written agreement between Plaintiffs Bagdasarian Productions, LLC and Janice Karman ("Karman"),[1] and Defendant Twentieth Century Fox Film Corporation ("Defendant" or "Fox"), pertaining to the production of "Alvin and the Chipmunks" ("Alvin") movies. Plaintiff is the owner and licensor of Alvin properties. (Compl. ¶ 2; Mot. 1.)  In 2004, Plaintiff entered into a Purchase/Producer agreement ("the Agreement") with Fox, which granted Fox an option for the right to develop, produce and distribute motion pictures based on Alvin properties and engaged Plaintiff to render services in connection with the motion pictures on a "work for hire" basis. (Compl. ¶ 2; Mot. 12–13.)  The Agreement, entitled "Purchase/Producer Agreement–Literary Material," grants to Fox,

> the right to develop, produce, distribute, exhibit, exploit, advertise, promote and publicize, throughout the universe, in and by any and all manner, . . . exclusively and in perpetuity, Theatrical Motion Pictures and Home Video Motion Pictures based on the Property, Merchandizing Rights and Commercial Tie-In Rights as rights related thereto . . . in and to the Property[.]

(Karasik Decl. Ex. A ¶ 5.)

The Agreement also included a forum selection provision stating:

> Any claim or dispute arising out of this Agreement *shall* be submitted to a general, non-jury reference ("Referee") to hear and decide all matters relating to the claim or dispute pursuant to California Code of Civil Procedure Sec. 638 . . . If the parties cannot agree upon a Referee . . . then . . . each side shall exchange its own list of four retired Judges of the California state *or federal* courts that it wishes to nominate as potential Referees.[2]

---

[1] For purposes of this order, Plaintiffs Bagdasarian and Karman will be collectively referred to as "Plaintiff."

[2] Section 638 of the California Code of Civil Procedure provides for the appointment of a referee "upon the agreement of the parties filed with the . . . judge, or . . . upon the motion of a party to a written contract . . . that provides that any

2

(*Id.* at Ex. A, p. 46, ¶ 21(a)(ii)) (emphasis added.)

The first film produced under the Agreement, *Alvin and the Chipmunks*, was released in 2007 and achieved significant box office success. (Compl. ¶ 2; Mot. 1.) Following the success of the first film, Fox produced a second, equally successful movie, *Alvin and the Chipmunks, The Squeakquel* ("*The Squeakquel*"), released in 2009. (Compl. ¶ 3; Mot. 1.) Plaintiff contends that Karman rendered numerous writing services in connection with the development of the second film, including a number of original treatments, screenplays, scenes, and dialogue that became "critical and significant portions" of the final screenplay for *The Squeakquel*. (Compl. ¶ 3; Opp'n 1.) Plaintiff also contends that Karman contributed graphic design services in connection with certain key characters for the second film. (*Id.* at ¶ 4.) Plaintiff claims that Karman's writing and graphic design services were not covered by the Agreement, and that Fox improperly refused to recognize Karman as co-owner of *The Squeakquel* screenplay or compensate her for her writing and design services rendered in connection with the second film. (Compl. ¶ 4.)

On April 21, 2010, Plaintiff filed a Complaint in this Court stating five causes of action: (1) a declaration that *The Squeakquel* screenplay constitutes a "joint work" within the meaning of 17 U.S.C. § 101, and that, pursuant to 17

---

controversy arising therefrom shall be heard by a referee" where the court finds that the parties agreed to have a referee "hear and determine any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision." Cal. Code. Civ. Pro. § 638(a). In addition, although a referee's report is often only advisory, where the parties have agreed to a "consensual general reference," the referee's decision "upon the whole issue must stand as a decision of the court, and upon filing of the statement of decision with the clerk of the court . . . judgment may be entered thereon in the same manner as if the action had been tried by the court." *Id.* at §§ 644(a)–(b). Furthermore, under the Section 638 procedure, the referee's statement of decision is entered by the trial court as a judgment, and the decision "may be excepted to and reviewed in like manner as if made by the court." *Id.* at § 645.

U.S.C. § 201(a), Karman and Fox are co-owners of the copyright in *The Squeakquel* screenplay and for an accounting of profits with respect to the second film; (2) in the alternative, copyright infringement of Karman's screenplay writings in violation of 17 U.S.C. § 106; (3) unjust enrichment through exploitation of Karman's screenwriting services; (4) unjust enrichment through exploitation of Karman's graphic design services; (5) breach of contract. (Compl. ¶¶ 55-79.) On June 18, 2010, Defendant filed the instant Motion, asking the court to order the dispute to reference under California Code of Civil Procedure Section 638 and to stay the action. (Docket No. 13.) Plaintiff filed an Opposition ("Opp'n"), and Defendant filed a Reply ("Reply"). (Docket Nos. 17, 18.)

## II.
## LEGAL STANDARD

Forum-selection clauses are presumed valid and will be enforced unless the resisting party demonstrates it would be unreasonable or unjust to do so under the circumstances. *See The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 18, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972) (holding that it is "incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court."); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 512 (9th Cir. 1988). Enforcement is unreasonable where it would "contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *The Bremen*, 407 U.S. at 15; *Fireman's Fund Ins. Co. v. M.V. DSR Atlantic*, 131 F.3d 1336, 1338 (9th Cir. 1997).

## III.
## DISCUSSION

Plaintiff's opposition to the Motion focuses primarily on two arguments.

4

First, Plaintiff argues that its copyright and unjust enrichment claims do not "arise out of" the Agreement and consequently, are not subject to the forum selection clause. (Opp'n 2–3.) Second, Plaintiff argues that its claims under the Copyright Act are subject to the exclusive jurisdiction of the federal courts under 28 U.S.C. § 1338(a), and cannot be decided by a "state court referee." (Opp'n 16–18.) Plaintiff concedes that its state law breach of contract claim arises out of the Agreement and would be subject to the forum selection clause, but contends that enforcement of the clause with respect to this claim alone would cause unreasonably "duplicative and divided litigation." (Opp'n 3–4.) For the following reasons, the Court finds Plaintiff's arguments unpersuasive.

## A. Plaintiff's Claims "Arise Out Of" the Agreement

Plaintiff argues that its copyright and unjust enrichment claims do not "arise out of" the Agreement, and consequently, are not subject to the forum selection clause. (Opp'n 2–3; 11–16.) In *Manetti-Farrow, Inc. v. Gucci America, Inc.*, the Ninth Circuit held that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims *relates to interpretation of the contract*." 858 F.2d 509, 514 (9th Cir. 1988) (emphasis added). In *Graham Technology Solution, Inc. v. Thinking Pictures, Inc.*, the District Court applied the *Manetti-Farrow* test in the copyright context, holding that a copyright dispute arises out of a contract when it is necessary to interpret the contract to resolve the dispute. 949 F. Supp. 1427, 1433 (N.D. Cal. 1997). The Seventh Circuit applied the standard set forth in *Manetti-Farrow* in *Omron Healthcare, Inc. v. McLaren Exports, Ltd.*, 28 F.3d 600 (7th Cir. 1994), and subsequent cases have noted that *Omron* is in line with the Ninth Circuit approach. *See Graham*, 949 F. Supp. at 1433–34; *Lumascape USA, Inc. v. Vertex Lighting, Inc.*, 2006 WL 825411 at *1 (N.D. Cal., Mar. 29, 2006).

Plaintiff attempts to avoid *Manetti-Farrow* by limiting its holding to the specific forum selection clause at issue in that case. (Opp'n 15.) However, as

1   Defendant correctly points out, nothing in the decision suggests that the Ninth

2   Circuit intended to so limit its ruling.  (Reply 6.)  Moreover, a host of subsequent

3   decisions have applied the *Manetti-Farrow* test to a variety of forum selection

4   clauses.  *See e.g.*, *Multimin USA, Inc. v. Walco International, Inc. et al.*, 2006 WL

5   1046964 (E.D. Cal., Apr. 11, 2006) (applying *Manetti-Farrow* test to "disputes

6   arising under" the contract); *Modius, Inc. v. Psinaptic, Inc.*, 2006 WL 1156390 at

7   *7 (N.D. Cal., May 6, 2006) (applying *Manetti-Farrow* test to forum selection

8   clause for "disputes under" the contract).  In addition, Plaintiff criticizes *Graham*

9   as having misapplied *Manetti-Farrow*'s narrow holding.  (Opp'n 15.)  The Court

10  is not only unconvinced that *Manetti-Farrow*'s holding is so limited, but also

11  notes that *Graham* remains good law and has been cited with approval by other

12  district courts within this circuit.  *See Lumascape*, 2006 WL 825411 at *10;

13  *Multimin*, 2006 WL 1046964 at *7.

14       The Court finds ample Ninth Circuit authority for the proposition that, for

15  purposes of a forum selection clause, a claim arises out of a contract when it is

16  necessary to interpret the contract to resolve the dispute.[3]  For the following

17  reasons, the Court finds that all of Plaintiff's claims "arise out of" the Agreement.

18  _____

19       [3] Part and parcel with Plaintiff's attempt to distinguish *Manetti-Farrow*,
    *Graham*, and *Omron* is its reliance on *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d
20  Cir. 2007) to supply the test for whether a claim "arises out of" a contract for forum
    selection purposes.  (Opp'n 14.)  In that case, the Second Circuit held that a copyright
21  dispute does not arise under a contract if "[plaintiff] denies that the contract has any
    role or relevance whatever with respect to his copyright claims," and the contract is
22  "only relevant as a defense in [the] suit."  *Phillips*, 494 F.3d at 391.  However, that
23  decision relied upon *Corcovado Music Corp v. Hollis Music. Inc.*, 981 F.2d 679 (2d
    Cir. 1993), a prior Second Circuit decision that the court rejected in *Graham* as
24  inconsistent with "the Ninth Circuit approach adopted in *Manetti-Farrow* . . . which
25  upholds the forum selection clause where the claims alleged in the complaint *relate
    to* the interpretation of the contract."  *Graham*, 949 F. Supp. at 1433 (emphasis in
26  original).  At any rate, the Court cannot ignore relevant Ninth Circuit authority in
27  favor of a different standard set out by the Second Circuit.

28

1    Plaintiff's co-ownership claim is predicated on its assertion that the

2  Agreement's definition of "property" does not encompass screenplays and

3  treatments.  (Opp'n 5.)  In order for Plaintiff to prove co-ownership of the

4  *Squeakquel* screenplay, it necessarily must prove that the rights to the screenplay

5  were not transferred to Fox under the Agreement's broad grant of rights.[4]

6  Moreover, Plaintiff's unjust enrichment argument hinges on its contention that

7  Karman's screenwriting and graphic design services fall "outside the scope" of

8  the Agreement.  (Opp'n 9.)  Logically, examination of the Agreement is

9  necessary to determine the extent of Karman's obligations under the Agreement.

10  The Court finds that resolution of each of Plaintiff's claims requires interpretation

11  of the Agreement.  Therefore, the entire matter is subject to the Section 638

12  reference procedure stipulated to by the parties in the Agreement.

13  **B.    Jurisdiction**

14    Plaintiff contends that, even if the Court finds the claims subject to the

15  forum selection clause, jurisdictional issues prevent proper invocation of the

16  Section 638 Reference procedures in this case.  Plaintiff argues that a 638

17  Reference can only be initiated in state court and that the exclusive federal

18  jurisdiction for claims under the Copyright Act precludes enforcement of the 638

19  Reference because the "state court referee" appointed to oversee the case would

20  lack jurisdiction to hear the copyright claims.  (Opp'n 16–20.)  The Court finds

21  Plaintiff's jurisdictional objections to be factually and legally unsupported.

22    Defendant directs the Court's attention to the fact that neither the

23  Agreement nor Section 638 dictates appointment of a "state court referee."

24  ————————————

25    [4] The Agreement's definition of "property" to be granted to Fox is expansive,

26  including not only "certain pre-existing property" relating to Alvin, but also to "any

27  and all characters . . . now or hereafter created . . . and any and all other plots, themes,
titles, story lines, names related thereto, and any and all other elements relating to any

28  of the foregoing, now existing or created hereafter."  (Karasik Decl. Ex. A ¶ 1(a).)

7

1    (Reply 18.)  Under the Agreement, the parties are to mutually agree upon a

2    referee, or if a consensus is not reached, a *retired judge* "of the California state *or*

3    *federal courts*" will be selected to adjudicate the dispute from a list supplied by

4    each of the parties.  (Karasik Decl. Ex. A, p. 46, ¶ 21(a)(ii).)  Furthermore,

5    Plaintiff erroneously relies on *Housing Grp. et al., v. United Nat. Insur. Co.*, 90

6    Cal. App. 4th 1106 (Cal. Ct. App. 2001), for the proposition that any Section 638

7    Reference must originate in the California Superior Court and that California state

8    courts must have jurisdiction over claims referred to a Section 638 Referee.  (*See*

9    Opp'n 18 (quoting *Housing Group* for the assertion that "the circumstances

10   allowing reference under [S]ection 638 are statutorily defined, and require an

11   action or proceeding over which the [California Superior Court] has

12   jurisdiction.")  In *Housing Group*., the California Court of Appeal held that

13   parties who proceeded directly to private dispute resolution, *without ever filing an*

14   *action in any court*, could not ask the court to appoint a Section 638 referee to

15   facilitate entry of an enforceable settlement.  *Housing Grp.*, 90 Cal. App. 4th at

16   1108.  The decision does not purport to limit Section 638 application to cases

17   pending in California Superior Court.  Furthermore, as Defendant correctly notes,

18   Plaintiff's insertion of the parenthetical "California Superior Court" in the

19   decision fundamentally modifies the language of the case.  The actual quote states

20   only that a 638 Reference requires "an action or proceeding over which *the court*

21   has jurisdiction." *Housing Grp.*, 90 Cal. App. 4th at 1118 (emphasis added).  As

22   such, the California Court of Appeal did not limit the application of the statute to

23   cases brought in California Superior Court.

24        In short, the Court can find no persuasive authority stating that a Section

25   638 referee lacks jurisdiction to hear federal claims.  Moreover, "the Supreme

26   Court has established a strong policy in favor of enforcement of forum selection

27   clauses." *E. & J. Gallo Winery v. Andina Licores, S.A.*, 446 F.3d 984, 992 (9th

28   Cir. 2006).  By signing on to the Agreement, Plaintiff consented to the provision

1   that all disputes arising out of the Agreement would be decided by a Section 638

2   Referee.  The Court does not find that Plaintiff has raised a "compelling and

3   countervailing reason" for the Court to refrain from enforcement of the negotiated

4   forum selection clause in the parties' Agreement.  *See Bremen v. Zapata Off-*

5   *Shore Co.*, 407 U.S. 1, 12 (1972).

6       Finally, in a case clearly analogous to this one, where Fox sought to

7   enforce an identical forum selection clause, the late Judge Cooper upheld the

8   parties' agreement, ordering the case to reference and staying the federal action

9   pending the referee's decision.[5]  *See Quarles v. Twentieth Century Fox Film*

10  *Corp.*, No. CV 05-8843 (C.D. Cal. May 5, 2006).  Plaintiff criticizes Judge

11  Cooper's decision, arguing that the unpublished decision is "wrongly decided"

12  and "unpersuasive," and that Judge Cooper "misunderstood fundamentally" the

13  nature of a 638 Reference.  (Opp'n 3, 20, 21.)  However, the Court finds no

14  reason to disapprove of *Quarles*, and notes that the case was affirmed on appeal

15  by the Ninth Circuit, without opinion.  *See Quarles v. Twentieth Century Fox*

16  *Film Corp.*, No. 06-55120 (9th Cir. May 18, 2006).

17      In conclusion, the Court finds no jurisdictional bar to enforcement of the

18  parties' agreement to refer their disputes to a Section 638 Referee.  Because

19  resolution of Plaintiff's claims depends upon interpretation of the Agreement, the

20  entire case is subject to the forum selection clause.  This Court has broad

21  discretion to stay cases when it is "efficient for its own docket and the fairest

22  course for the parties."  *Levya v. Certified Grocers of California, Ltd.*, 593 F.2d

23

24      [5] Defendant has requested that the Court take judicial notice of the Court's order
25  and the pleadings in *Quarles*.  (Mot. 19.)  Plaintiff has not opposed Defendant's
    request and does not dispute the accuracy of these documents.  The Court finds that
26  the information in these documents constitutes matter appropriate for judicial notice,
    as it is capable of accurate and ready determination by resort to sources whose
27  accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Accordingly, the
28  Court GRANTS Defendant's request for judicial notice.

9

857 (9th Cir. 1979).  As all of the claims in the dispute will be determined by a

Section 638 Referee, a stay is appropriate.

## IV.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion to Refer and to Stay (Docket No. 13).  The Court stays this action in its entirety pending the completion of the reference proceedings.

The parties are ordered to participate in the reference proceedings pursuant to the procedures set forth in the Agreement, and to file the referee's statement of decision with the Court.  **The Court expects the parties to move expeditiously to ensure that the reference proceedings are completed in a timely manner.**

Defendant is ordered to file a status report with this Court by **no later than December 13, 2010**, and every three (3) months thereafter, concerning the status of the case.

IT IS SO ORDERED.

Dated: August 12, 2010

Honorable Jacqueline H. Nguyen
UNITED STATES DISTRICT COURT

000142

# EXHIBIT 12

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Louis A. Karsik                                                                 E-mail: lou.karasik@alston.com

August 31, 2010

VIA EMAIL (lbayard@paulweiss.com)
AND U.S. MAIL

Lynn B. Bayard
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re:   *Bagdasarian Productions, LLC et al. v. Twentieth Century Fox Film Corporation*

Dear Lynn:

I am writing to confirm our conversation on Wednesday, August 25 wherein you informed us that you will be seeking a writ of mandamus to challenge Judge Nguyen's order enforcing the reference provision of the parties' agreement. You have demanded that Fox hold-off initiating the formal process of selecting a Referee pursuant to the procedures and timetable specified in the agreement, and you have represented that plaintiffs will seek an immediate stay of proceedings should Fox send a written demand commencing the process.

Let me first say that Fox sees no basis of any kind for plaintiffs to challenge Judge Nguyen's well-grounded order. Much less is there a basis to pursue a writ of mandamus, a procedure reserved for exceptional cases involving "clearly erroneous" decisions involving prejudice that cannot be remedied through later appeal. Judge Nguyen's order is based on well-established Ninth Circuit precedent and consistent with numerous prior decisions by district courts in the Ninth Circuit. There is nothing erroneous about the Court's decision, no basis to appeal the decision, and plaintiffs cannot, in any event, meet the very high burden to obtain mandamus relief.

While we see no basis for plaintiffs to pursue either a writ or stay, Fox wishes to avoid the expense of litigating the issue of whether plaintiffs should be

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

Lynn B. Bayard
August 31, 2010
Page 2

entitled to a stay pending decision on the writ. For this reason, Fox will accede to your demand to hold-off, for the moment, formally initiating the Referee selection process. Our expectation is that plaintiffs writ will be swiftly decided by the Ninth Circuit (we hope with no need for Fox to file any response) so that we can then move forward with the reference proceeding with no further delay.

As you know, however, Judge Nguyen has asked that the parties proceed with the reference expeditiously and report to her regularly on our progress. As you also are aware, under the agreement the parties have only 5 business days from the time a written demand is made to reach agreement on a Referee. If agreement is not reached in that time period, there is a 10 business day period to exchange lists of candidates. Before taking the step of formally initiating the selection process, I called to solicit your input on possible candidates to serve as a Referee. This was a few days after the parties received Judge Nguyen's August 12 order. Both you and I were on vacation in the days immediately following receipt of the order, and we agreed to speak during the week of August 16. On August 20 (I believe you were still on vacation then), you indicated that plaintiffs were considering whether to challenge the order, and we agreed to speak further when you were back in the office. When I called on August 25 to again solicit your input on possible Referees, and to express Fox's intent to formally initiate the process for selecting a Referee under the agreement, you advised that your clients intended to file a writ of mandamus and you demanded that Fox hold-off triggering the 5 business day period for selecting a Referee in light of the writ.

While we will hold-off initiating the formal demand, nevertheless we request that you promptly participate in informal discussions about a possible Referee. Perhaps, during the same time plaintiffs are pursuing their writ, we can reach agreement on a Referee. We think both parties are well served to turn their attention now to possible Referee candidates, thus possibly making it unnecessary to later trigger the time periods specified in the agreement for selection of a Referee and avoiding any further delay in moving the litigation forward.

Fox expressly reserves all rights, in law and equity, including the right to initiate the formal demand for appointment of a Referee that triggers the 5 business day process. In particular, should plaintiffs refuse to participate in discussions over possible Referee candidates, or should it develop that plaintiffs' pursuit of a writ results in a protracted process that could cause further delay of the reference proceeding, we may find it necessary and appropriate to move forward. Alternatively, the parties may be required to move forward if Judge Nguyen so orders in the absence of a stay. Moreover, Fox, of course, fully reserves its rights

Lynn B. Bayard
August 31, 2010
Page 3

to assert responsive pleadings (including possible Rule 12(b) motions) and counterclaims once the timetable for conducting the litigation is established.

Very truly yours,

Louis A. Karasik

LAK:jll

**EXHIBIT 13**

# EXHIBIT 13 FILED UNDER SEAL

(Pg. 148)

# EXHIBIT 14

1  Steven A. Marenberg (101033) (smarenberg@irell.com)
2  Melissa R. McCormick (180384) (mmccormick@irell.com)
   Douglas J. Dixon (275389) (ddixon@irell.com)
3  IRELL & MANELLA LLP
4  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
5  Telephone: (310) 277-1010
6  Facsimile: (310) 203-7199

7  Attorneys for Plaintiffs

8

9              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
10                    WESTERN DIVISION

11

12 BAGDASARIAN PRODUCTIONS,            ) Case No. CV-10-02991 MWF
   LLC, a California limited liability  )
13 company, and JANICE KARMAN,          ) Referred under Cal. Code Civ. Proc.
14 an individual,                       ) Section 638 to:
                                        )
15              Plaintiffs,             ) Hon. Carl J. West (Ret.)
                                        )
16                                      ) JAMS Reference No. 1220044628
17        v.                            )
                                        )
18                                      )
19                                      ) **PLAINTIFFS BAGDASARIAN
   TWENTIETH CENTURY FOX FILM           ) PRODUCTIONS, LLC, AND
20 CORPORATION, a Delaware              ) JANICE KARMAN'S RESPONSES
   corporation,                         ) AND OBJECTIONS TO
21                                      ) DEFENDANT'S FIRST SET OF
22              Defendant.              ) REQUESTS FOR ADMISSION
                                        ) (NOS. 1 – 12)**
23                                      )

24 _____

25

26

27

28

2781479.2

000150

| | |
|---|---|
| 1 | **PROPOUNDING PARTY:** | **DEFENDANT TWENTIETH CENTURY FOX** |
| 2 | | **FILM CORPORATION** |
| 3 | **RESPONDING PARTY:** | **PLAINTIFFS BAGDASARIAN** |
| 4 | | **PRODUCTIONS, LLC AND** |
| 5 | | **JANICE KARMAN** |
| 6 | **SET NUMBER:** | **ONE** |

7      Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure,

8  Plaintiffs Bagdasarian Productions, LLC ("Bagdasarian Productions") and Janice

9  Karman ("Karman") (collectively, "Plaintiffs") hereby make these objections and

10  responses to Defendant Twentieth Century Fox Film Corporation's ("Fox") First Set

11  of Requests for Admission, dated February 20, 2013, as follows:

12                              **PRELIMINARY STATEMENT**

13      These responses and objections, while based on diligent inquiry and

14  investigation by Plaintiffs, necessarily reflect only the current state of Plaintiffs'

15  knowledge, understanding, and belief based upon those facts and information

16  presently and specifically known and readily available to Plaintiffs at this time.

17  Plaintiffs anticipate that they may discover further facts and information related to

18  the subject matter of this action.  Without in any way obligating themselves to do so,

19  Plaintiffs reserve the right to supplement, modify, revise or amend these responses

20  and objections and to correct any inadvertent errors or omissions which may be

21  contained herein, based upon information that Plaintiffs may subsequently obtain or

22  discover.  Furthermore, Plaintiffs' responses will be given without prejudice to their

23  right to produce, use, or rely upon, at hearing, trial, or otherwise, evidence, facts,

24  documents, things, or information that is subsequently discovered, the relevance of

25  which has not yet been determined, or which was omitted from their responses by

26  mistake, error, inadvertence, excusable neglect, or otherwise.  A partial response to

27  any request that has been objected to in whole or in part is not a waiver of the

28

2781479.2

1    objection. By asserting various objections, Plaintiffs do not waive other objections

2    that may become applicable.

3                              **GENERAL OBJECTIONS**

4          1.      These responses are made solely for the purposes of this action, and are

5    subject to all objections as to competence, authenticity, relevance, materiality,

6    privilege, and admissibility. All such objections and grounds are expressly reserved

7    and may be interposed at the time of trial.

8          2.      Each and all of Plaintiffs' general objections are hereby expressly

9    incorporated into each and all of Plaintiffs' specific responses. For particular

10   emphasis, one or more of these general objections may be reiterated in a specific

11   response.  The absence or inclusion or any reiteration in a specific response is

12   neither intended as, nor shall be construed as, a limitation or waiver of any general

13   objection or any other specific objection made herein.

14         3.      The fact that Plaintiffs have answered or objected to all or part of a

15   request should not be construed or taken as an admission that Plaintiffs accept or

16   admit the existence of any purported facts set forth or assumed by such request or

17   that Plaintiffs have waived or intended to waive any part of any objection to the

18   request.

19         4.      Plaintiffs object to the requests on the ground and to the extent such

20   requests seek information (a) prepared in anticipation of litigation or trial, or

21   otherwise protected by the attorney work-product doctrine, or (b) protected from

22   disclosure by the attorney-client privilege.  No waiver of this privilege or doctrine is

23   intended by or should be construed from the responses given herein.

24         5.      Plaintiffs object to the requests on the grounds and to the extent such

25   requests seek information that is not relevant to the subject matter involved in this

26   action, not admissible in evidence and not reasonably calculated to lead to the

27   discovery of admissible evidence.

28

6.      Plaintiffs object to the requests to the extent any particular requests calls for the disclosure of information that constitutes a trade secret, or that is confidential commercial or otherwise proprietary information.

7.      Plaintiffs object to the requests, including the definitions and instructions contained therein, to the extent that they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the Central District of California, or any order or ruling by the Court in this action.

8.      Plaintiffs object to the requests, including the definitions and instructions contained therein, as overly broad and unduly burdensome to the extent that they seek discovery into claims or defenses not at issue in this action.

9.      Plaintiffs object to the requests, including the definitions and instructions contained therein, to the extent that they call for legal conclusions.

10.      Plaintiffs object to the requests, including the definitions and instructions contained therein, to the extent that they are vague and ambiguous.

## RESPONSES TO OF REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that KARMAN is not entitled to any ADDITIONAL AMOUNTS.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Plaintiffs incorporate the General Objections recited above as if set forth fully herein.  Plaintiffs object to the request, including the definitions and instructions contained therein, to the extent that it calls for legal conclusions. Plaintiffs object to this request to the extent it calls for information protected from discovery under the attorney-client privilege, attorney work product doctrine or any other applicable privilege, immunity, or protection.  Plaintiffs object to phrase "ADDITIONAL AMOUNTS" as vague and ambiguous.  Subject to and without waiving Plaintiffs' objections, this request is denied.

2781479.2

1 **REQUEST FOR ADMISSION NO. 2**:

2 Admit that the PURCHASE PRICE paid to PLAINTIFFS in connection with

3 THE SQUEAKQUEL is an advance against the CONTINGENT COMPENSATION

4 as set forth in the AGREEMENT.

5 **RESPONSE TO REQUEST FOR ADMISSION NO. 2**:

6 Plaintiffs incorporate the General Objections recited above as if set forth fully

7 herein.  Plaintiffs object to the request, including the definitions and instructions

8 contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

9 this request to the extent it calls for information protected from discovery under the

10 attorney-client privilege, attorney work product doctrine or any other applicable

11 privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

12 objections, this request is denied.

13 **REQUEST FOR ADMISSION NO. 3**:

14 Admit that the PURCHASE PRICE paid to PLAINTIFFS in connection with

15 CHIPWRECKED is an advance against the CONTINGENT COMPENSATION as

16 set forth in the AGREEMENT.

17 **RESPONSE TO REQUEST FOR ADMISSION NO. 3**:

18 Plaintiffs incorporate the General Objections recited above as if set forth fully

19 herein.  Plaintiffs object to the request, including the definitions and instructions

20 contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

21 this request to the extent it calls for information protected from discovery under the

22 attorney-client privilege, attorney work product doctrine or any other applicable

23 privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

24 objections, this request is denied.

25 **REQUEST FOR ADMISSION NO. 4**:

26 Admit that the FOX has no obligation under the AGREEMENT or otherwise

27 to prepare a "style book" or 'style guide" in connection with its exercise of its

28 PICTURE-RELATED MERCHANDISING RIGHTS for any PICTURE.

2781479.2                                  000154  - 4 -

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 4**:

2      Plaintiffs incorporate the General Objections recited above as if set forth fully

3  herein.  Plaintiffs object to the request, including the definitions and instructions

4  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

5  this request to the extent it calls for information protected from discovery under the

6  attorney-client privilege, attorney work product doctrine or any other applicable

7  privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

8  objections, this request is denied.

9  **REQUEST FOR ADMISSION NO. 5**:

10      Admit that in every respect in which FOX allegedly failed to adequately

11  exercise its PICTURE-RELATED MERCHANDISING RIGHTS, FOX made its

12  decision on the merchandising issue reasonably and in good faith.

13  **RESPONSE TO REQUEST FOR ADMISSION NO. 5**:

14      Plaintiffs incorporate the General Objections recited above as if set forth fully

15  herein.  Plaintiffs object to the request, including the definitions and instructions

16  contained therein, to the extent that it calls for legal conclusions. Plaintiffs object to

17  this request to the extent it calls for information protected from discovery under the

18  attorney-client privilege, attorney work product doctrine or any other applicable

19  privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

20  objections, this request is denied.

21  **REQUEST FOR ADMISSION NO. 6**:

22      Admit that in every respect in which FOX allegedly failed to adequately

23  exercise its PICTURE-RELATED MERCHANDISING RIGHTS, FOX made its

24  decision after considering PLAINTIFFS' input in good faith.

25  **RESPONSE TO REQUEST FOR ADMISSION NO. 6**:

26      Plaintiffs incorporate the General Objections recited above as if set forth fully

27  herein.  Plaintiffs object to the request, including the definitions and instructions

28  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

2781479.2

1  this request to the extent it calls for information protected from discovery under the

2  attorney-client privilege, attorney work product doctrine or any other applicable

3  privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

4  objections, this request is denied.

5  **REQUEST FOR ADMISSION NO. 7**:

6       Admit that the character known as Digger does not interact with any *ALVIN*

7  *AND THE CHIPMUNKS* characters in *THE SQUEAKQUEL.*

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 7**:

9       Plaintiffs incorporate the General Objections recited above as if set forth fully

10  herein.  Plaintiffs object to the request, including the definitions and instructions

11  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

12  this request to the extent it calls for information protected from discovery under the

13  attorney-client privilege, attorney work product doctrine or any other applicable

14  privilege, immunity, or protection.  Plaintiffs object to the request as vague and

15  ambiguous due to its use of undefined terms like "interact."  Subject to and without

16  waiving Plaintiffs' objections, this request is denied.

17  **REQUEST FOR ADMISSION NO. 8**:

18       Admit that the character known as Digger is not shown as having a familial

19  relationship with any *ALVIN AND THE CHIPMUNKS* character in *THE*

20  *SQUEAKQUEL.*

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 8**:

22       Plaintiffs incorporate the General Objections recited above as if set forth fully

23  herein.  Plaintiffs object to the request, including the definitions and instructions

24  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

25  this request to the extent it calls for information protected from discovery under the

26  attorney-client privilege, attorney work product doctrine or any other applicable

27  privilege, immunity, or protection.  Plaintiffs also object to the request as vague and

28

1  ambiguous due to its use of undefined terms like "familial relationship." Subject to

2  and without waiving Plaintiffs' objections, this request is denied.

3  **REQUEST FOR ADMISSION NO. 9**:

4      Admit that FOX engaged in no conduct leading PLAINTIFFS to believe that

5  FOX intended to compensate PLAINTIFFS for engaging in any writing services in

6  connection with THE SQUEAKQUEL.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 9**:

8      Plaintiffs incorporate the General Objections recited above as if set forth fully

9  herein.  Plaintiffs object to the request, including the definitions and instructions

10  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

11  this request to the extent it calls for information protected from discovery under the

12  attorney-client privilege, attorney work product doctrine or any other applicable

13  privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

14  objections, this request is denied.

15  **REQUEST FOR ADMISSION NO. 10**:

16      Admit that FOX engaged in no conduct leading PLAINTIFFS to believe that

17  FOX intended to compensate PLAINTIFFS for engaging in any graphic design

18  services in connection with *THE SQUEAKQUEL*.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 10**:

20      Plaintiffs incorporate the General Objections recited above as if set forth fully

21  herein.  Plaintiffs object to the request, including the definitions and instructions

22  contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to

23  this request to the extent it calls for information protected from discovery under the

24  attorney-client privilege, attorney work product doctrine or any other applicable

25  privilege, immunity, or protection.  Subject to and without waiving Plaintiffs'

26  objections, this request is denied.

27

28

**REQUEST FOR ADMISSION NO. 11:**

Admit that FOX licensed ALVIN to FX on monetary terms comparable to those FOX enters into for similar transactions with unrelated third-parties.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Plaintiffs incorporate the General Objections recited above as if set forth fully herein.  Plaintiffs object to the request, including the definitions and instructions contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to this request to the extent it calls for information protected from discovery under the attorney-client privilege, attorney work product doctrine or any other applicable privilege, immunity, or protection.  Plaintiffs object to the request as vague and ambiguous due to its use of undefined terms and phrases like "monetary terms comparable to," "similar transactions," and "unrelated third-parties."  Subject to and without waiving Plaintiffs' objections, this request is denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the license of ALVIN for distribution to HBO under the HBO/NEW REGENCY DISTRIBUTION ARRANGEMENT in connection with FOX's decision to co-finance the ALVIN picture with NEW REGENCY was an exercise of FOX's sole business judgment in a reasonable and non-discriminatory manner.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Plaintiffs incorporate the General Objections recited above as if set forth fully herein.  Plaintiffs object to the request, including the definitions and instructions contained therein, to the extent that it calls for legal conclusions.  Plaintiffs object to this request to the extent it calls for information protected from discovery under the attorney-client privilege, attorney work product doctrine or any other applicable privilege, immunity, or protection.  Plaintiffs object to the request as vague and ambiguous due to its use of undefined terms and phrases like "business judgment,"

1    "reasonable ," and "non-discriminatory."  Subject to and without waiving Plaintiffs'

2    objections, this request is denied.

3

4    Dated:  March 22, 2013                      As to Objections:

5

6                                                IRELL & MANELLA LLP
                                                 Steven A. Marenberg
7                                                Melissa R. McCormick
8                                                Douglas J. Dixon

9

10                                               By: /s/ Douglas J. Dixon

11                                                   Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### PROOF OF SERVICE

2      I am employed in the County of Orange, State of California.  I am over the age of 18 and
not a party to the within action.  My business address is 840 Newport Center Dr., Suite 400,
3   Newport Beach, CA 92660.

4      On March 22, 2013, I served the foregoing document described as **PLAINTIFFS
BAGDASARIAN PRODUCTIONS, LLC, AND JANICE KARMAN'S RESPONSES AND
5   OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION
(NOS. 1 – 12)** on each interested party, as follows:
6

7      Louis A. Karasik (lou.karasik@alston.com)
       Rachel M. Capoccia (rachel.capoccia@alston.com)
8      Casondra K. Ruga (casondra.ruga@alston.com)
       **ALSTON + BIRD LLP**
9      333 South Hope Street
       Sixteenth Floor
10     Los Angeles, California  90071
       Telephone: (213) 576-1000
11     Facsimile:  (213) 576-1100

12

13     Attorneys for Defendant

14

15     Executed on March 22, 2013, at Newport Beach, California.

16     I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.
17

18   _____            _/s/ Douglas J. Dixon_____
          Douglas J. Dixon                        _/s/ Douglas J. Dixon_
19        (Type or print name)                       (Signature)

20

21

22

23

24

25

26

27

28

2781479.2 08

000160

# EXHIBIT 15

1 | HON. CARL J. WEST RET.
JAMS
2 | 707 Wilshire Blvd.
46th Floor
3 | Los Angeles, CA  90017
Tel: 213-620-1133
4 | Fax: 213-620-0100

5 | Referee

6

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

11 | BAGDASARIAN PRODUCTIONS, | Case No. CV 10-02991 MWF (JCGx)
LLC, a California limited liability
12 | company, and JANICE KARMAN, an | JAMS Ref. No. 1220044628
individual,
13

14 |                 Plaintiffs, | ORDER

15 |        v.

16

17 | TWENTIETH CENTURY FOX FILM
CORPORATION, a Delaware
18 | corporation,

19 |                 Defendant.

20

21 | **I.    Introduction**

22 |           Plaintiffs Bagdasarian Productions, LLC ("BP") and Janice Karman

23 | ("Karman") (collectively, "Plaintiffs") brought an action against Defendant

24 | Twentieth Century Fox Film Corporation ("Fox") in the United States District Court

25 | for the Central District of California.  On June 14, 2012, this action was referred

26 | under Cal. Code Civ. Proc. § 638 to the undersigned referee ("Referee").

27 | Subsequently, Plaintiffs filed a Second Amended Complaint for Declaration of

28

- 1 -

1   Copyright of Co-Ownership of Copyright and Accounting for Profits, Copyright

2   Infringement, Unjust Enrichment, Breach of Implied Contract, and Breach of

3   Contract.  Currently before the Referee is:

4          (1) Fox's Motion for Summary Judgment;

5          (2) BP's Motion for Partial Summary Judgment on Certain Breach of Contract

6   Claims;

7          (3) Karman's Motion of Partial Summary Judgment on Implied Contract

8   Claims; and

9          (4) Fox's Application Pursuant to FRCP 56(d).

10  **II.**      **Standards**

11         **A.**      **Motion for Summary Judgment**

12              Under the Federal Rules of Civil Procedure, summary judgment is

13  proper only where the pleadings, depositions, answers to interrogatories, and

14  admissions on file, together with the affidavits, if any, show that there is no genuine

15  issue as to any material fact and that the moving party is entitled to a judgment as a

16  matter of law.@ Fed. R. Civ. P. 56(c).  The moving party has the burden of proof

17  demonstrating the absence of a genuine issue of fact for trial.  See Anderson v.

18  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  It may point to the absence of the

19  nonmovant's evidence (see Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970),

20  or present its own evidence to negate an element of the nonmovant's claim.  See

21  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies the

22  burden, the party opposing the motion must set forth specific facts showing that there

23  remains a genuine issue for trial.  See Anderson, 477 U.S. at 256; Fed. R. Civ. P.

24  56(e).

25         **B.**      **Contract  Interpretation**

26              The interpretation of written contracts is an issue of law for the court.

27  Powers v. Dickson, Carlson &Campillo, 54 Cal. App. 4th 1102, 1111 (1997) ("Our

28  Supreme Court long ago established that interpretation of a written instrument, even

- 2 -

1  thought it involves what might properly be called questions of fact, is essentially a
2  judicial function to be exercised according to the generally accepted canons of
3  interpretation so that the purposes of the instrument may be given effect.")  "[A]
4  contract must be interpreted as to give effect to the mutual intention of the parties as
5  it existed at the time of contracting, so far as the same is ascertainable and lawful."
6  Cal. Civ. Code § 1636.  Further, "[t]he whole of a contact is to be taken together, so
7  as to give effect to every part, if reasonably practicable, each clause helping to
8  interpret the other."  Id. at § 1641.

9         Extrinsic evidence may be admitted to assist contract interpretation only
10  when it is competent and only to prove a meaning to which the language is
11  reasonably susceptible.  The contract must be understood "by reference to the
12  circumstances under which it was made, and the matter to which it relates."  Cal.
13  Civ. Code § 1647.  Those circumstances include the acts of the parties showing what
14  they believed the contract to mean, before any controversy has arisen as to its
15  meaning.  DVD Copy Control Ass'n v. Kaleidescape, Inc., 176 Cal. App. 4th 697, 712
16  (2009) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 749, p.
17  838).  Such evidence may include the post-contracting conduct of the parties.  Id.

18  **III.    Motions for Summary Judgment Re Breach of Express Contract Claims**
19         In the Second Amended Complaint ("SAC"), BP alleges that Fox
20  breached the parties' Purchaser/Producer Agreement – Literary Materials – "Alvin
21  and the Chipmunks" dated March 26, 2004 ("Agreement") by (1) treating up-front
22  "Purchase Price" money for sequels as a recoupable advance against contingent
23  compensation; (2) paying soundtrack royalties for Alvin and the Chipmunks
24  ("Alvin") and Alvin and the Chipmunks: The Squeakquel ("The Squeakquel") net of
25  standard deductions; and (3) failing to report the correct amount of pay-television
26  revenue in connection with the films.  Fox seeks summary judgment with respect to
27  the breach of contract claim based on the Purchase Price, and both Fox and BP seek
28  summary judgment with respect to the breach of contract claims based on the

- 3 -

1    soundtrack royalties and pay-television revenue.  As the parties acknowledge, the

2    rules of contract interpretation apply to the determination of these claims.

3         **A.    Breach of Contract Claim Based on the Purchase Price**

4              In Count VII of the SAC, BP alleges that Fox breached the parties'

5    Agreement by treating the "Purchase Price" described in Paragraph 6 as an advance

6    for sequels or remakes.  In seeking summary judgment on this claim, Fox contends

7    that the unambiguous language of the Agreement is that "[f]or each Picture," the

8    contingent compensation is only payable "subject to" the treatment of the Purchase

9    Price as an advance against that compensation.  In opposition, BP contends that

10   disputed issues of material fact preclude the entry of summary judgment for Fox on

11   this claim.  It argues that BP must be paid a non-recoupable upfront payment in

12   addition to Contingent Compensation for sequels.[1]

13        **1.    The language of the Agreement supports the interpretation**

14              **that the Purchase Price is an advance against Contingent**

15              **Compensation "for each Picture"**

16            The Agreement provides as follows:

17   6.   PURCHASE PRICE:  As consideration in full for the Granted
      Rights and for the representations, warranties and agreements made by
18   Owner, Fox shall to pay to Owner within 10 business days after exercise
      of the Option the sum of $3,000,000 . . . ("Purchase Price") less the
19   amount paid to Owner for the Initial Option Period.  The Purchase Price
      shall be deemed an advance against the Contingent Compensation
20   (defined below).
21

22   _____

[1] At the outset, BP argues that Fox's current Motion for Summary Judgment should be
23   denied because the Referee already has decided that the Purchase Price issue is
      incapable of resolution by dispositive motion as a result of factual disputes.
24   However, as set forth in the prior Order Denying Fox's Motion for Partial Summary
      Judgment, the Referee stated that "the court may entertain extrinsic evidence to assist
25   both in interpreting the agreement and in determining the intent of the parties."
      (9/9/13 Order at 12:12-15.)  As both parties note, the prior motion was based on a
26   limited record.  In this current Motion, both parties have conducted discovery, and
      extrinsic evidence has been submitted by both parties.  As such, based on a more
27   fully developed evidentiary showing, the determination is whether triable issues of
      material fact exist.
28

- 4 -

7.   ADDITIONAL PAYMENTS:  For each Picture that Fox produces and releases, Owner shall be paid:

(a)   Contingent Compensation:  Subject to the last sentence of Paragraph 6, Lender shall be paid "Contingent Compensation" equal to 21/2% of 100% of the "Defined Gross Proceeds" (as defined in the Participation Definition) from "1st dollar" of the Picture.

(Agreement, ¶¶ 6-7(a).)

The Agreement further provides:

12.   STUDIO SEQUELS AND REMAKES:  Within 10 business days after the commencement of principal photography of the applicable studio sequel or remake, Owner shall receive:

(a)   Sequels:  an amount equal to (i) the Purchase Price, and (ii) a percentage of the Defined Gross Proceeds of such sequel equal to the rate of percentage participation in the Defined Gross proceeds from "1st dollar" of the Picture payable pursuant to Paragraph 7.

(Agreement, ¶ 12(a).)

The Arbitrator agrees with Fox that under this language, payment of Contingent Compensation "[f]or each Picture" as set forth in Paragraph 7 is subject to the Purchase Price being "deemed an advance against the Contingent Compensation" as set forth in the last sentence of Paragraph 6.  Use of the words "for each Picture" means that this applies to sequels, and contrary to BP's assertion, not just to the first picture.

BP argues that under Paragraph 12, what Fox pays for sequels is described as "an amount equal to (i) the Purchase Price," and this cannot be equated with the "Purchase Price."  In other words, according to BP, something other than the "Purchase Price" is paid for sequels.  BP additionally argues that the payment of the "Purchase Price" is tied to a specific event that occurs only once - "within 10 days

- 5 -

000166

1  after the exercise of Option," while the payment of the advance for the sequel is tied

2  to a different event - "within 10 business days after commencement of principal

3  photography of the applicable studio sequel." It concludes that this limits the

4  Purchase Price to the first picture only.

5          With respect to BP's reference to "an amount equal to (i) the Purchase

6  Price," BP's interpretation is that the phrase "an amount equal to" negates the

7  specific language that the "Purchase Price shall be deemed an advance against the

8  contingent compensation" for "each Picture." However, the words "an amount equal

9  to" can be interpreted in their ordinary meaning consistent with the remaining terms

10  of the Agreement to reflect that the Purchase Price is an advance for each picture.

11  The pertinent language provides: "an amount equal to (i) the Purchase Price, and (ii)

12  a percentage of the Defined Gross Proceeds of such sequel equal to the rate of

13  percentage participation . . . payable pursuant to Paragraph 7." In other words, BP

14  receives a total of two things:  the Purchase Price and the contingent compensation of

15  Paragraph 7, with that amount subject to the requirement that the Purchase Price is

16  "deemed an advance" for "each picture." Under BP's interpretation, the language of

17  Paragraph 7 would be negated. This is contrary to the canon that all provisions of a

18  contract are to be given effect, each provision helping to explain the other, not to

19  create unexplainable contradictions. See Civ. Code § 1641; F.T.C. v. EDebitPay,

20  LLC, 695 F.3d 938, 944 (9th Cir. 2012) (rejecting defendants' interpretation because

21  it would render certain contract phrases inoperative or meaningless).

22          With respect to BP's argument that it receives something other than the

23  Purchase Price for sequels because the Purchase Price is "tied to a specific event,"

24  this interpretation ignores the language of Paragraph 7, which provides the Purchase

25  Price is deemed an advance for contingent compensation paid "for each Picture."

26  Furthermore, while Paragraph 6 does specify when the Purchase Price will be paid, it

27  does not limit the definition of Purchase Price to that single payment. Similarly,

28  Paragraph 12 specifies the timing of the payment of the Purchase Price for a sequel,

1  but nothing suggests the parties intended the payment for sequels to be non-
2  recoupable.

3         In sum, the parties expressed in the Agreement that Contingent
4  Compensation "[f]or each Picture," not just the first picture, is "subject to" treating
5  the Purchase Price as an advance.  There would be no reason for Paragraph 7 to
6  specify that "for each Picture," payment of Contingent Compensation is "subject to
7  the last sentence of paragraph 6," providing that the Purchase Price is deemed an
8  advance.  BP acknowledges that "for each picture" BP receives Contingent
9  Compensation pursuant to Paragraph 7.  Yet, it would ignore the first phrase
10  "[s]ubject to the last sentence of Paragraph 6" when it applies the definition of
11  Contingent Compensation in Paragraph 7(a) to payments for sequels.  Instead, BP
12  attempts to argue that the phrase "[s]ubject to the last sentence of Paragraph 6" in
13  Paragraph 7(a) applies only to the upfront payment for the first picture.  This is a
14  strained interpretation that would ignore provisions of the Agreement.  Thus, the
15  Referee finds that the plain language of the Agreement controls and provides that the
16  Purchase Price is a recoupable advance against Contingent Compensation for each
17  picture.

18         **2.     Extrinsic Evidence supports the meaning of the plain**
19                 **language of the Agreement**
20                 **(a)     Extrinsic evidence surrounding the negotiations and**
21                         **drafting**
22         In support of its Motion, Fox contends that the extrinsic evidence of the
23  parties' negotiations confirms that the Agreement means what it says.  The Referee
24  agrees with Fox.
25         It is undisputed that Stephen Plum ("Plum") negotiated the Agreement
26  on behalf of Fox, and Steve Waterman ("Waterman") negotiated on behalf of
27
28

- 7 -

000168

1  Plaintiffs. (Fox's MSJ, UF 1-2.)[2]  The parties documented the deal only after Plum

2  and Waterman expressed their shared understanding in writing that the Purchase

3  Price would be an advance against BPL's profit participations. (Id. at UF 3; see Plum

4  Dec., ¶9, Ex. 4 (Waterman November 21, 2003 memo expressing a "meeting of the

5  minds" that "PURCHASE PRICE AND BAGDASARIAN PRODUCING FEES"

6  would be $3 million, "applicable against profit participations" of 2.5% first dollar

7  gross).)  At no point in the negotiation did Waterman or anyone from BP propose to

8  treat the Purchase Price differently for sequels than the first picture– i.e., make it

9  nonrecoupable for sequels. (Id. at UF 4.)

10       In response, BP argues that even if Waterman had agreed to accept the

11  same compensation for each film, that agreement would have exceeded his authority

12  with respect to the negotiations and thus could not bind BP.  It claims that Fox knew

13  that Waterman was not authorized to agree to any deal point without consulting

14  Bagdasarian.  However, the evidence does not support BP's claim.  First, Waterman

15  expressly affirmed to Fox that the parties had reached agreement on the points in the

16  November 21, 2003 memorandum, and this is chargeable to BP as a matter of law.

17  See Civil Code § 2332; O'Riordan v. Fed. Kemper Life Assur., 36 Cal. 4th 281, 288

18  (2005) (agent's knowledge is imputed to principal even if not actually communicated

19  to the principal).  Moreover, after the November 2003 exchange, the parties never

20  again discussed the issue whether the Purchase Price would be an advance against

21  contingent compensation.  (Plum Decl., ¶ 12.)  The parties documented the deal

22  based on the understanding reflected in the November 2003 memorandum.  BP never

23  repudiated the understanding that the Purchase Price would be an advance against its

24  profit participations, but instead executed the Agreement which provided that, "for

25  each Picture," contingent compensation is only payable if the Purchase Price is

26  _____

[2] The Referee makes the findings of fact based on the referenced Separate Statements of
27  Undisputed Facts, the Statements of Genuine Disputes of Material Fact, and the Responses
to the Statements of Genuine Disputes.

28

- 8 -

1  deemed an advance.  As such, BP ratified the parties' deal by signing the Agreement

2  negotiated by Waterman.  <u>Gladium Co. v. Thatcher</u>,  95 Cal. App. 85, 91 (1928)

3  (acceptance of contract precludes principal from denying authority of agent through

4  whom it was consummated).

5         BP argues that, as testified to by Bagdasarian, it was adamant that it

6  receive more compensation for sequels than for the first picture.  However, even

7  assuming this is true, there is no evidence that BP expressed its subjective intent that

8  the Purchase Price would be non-recoupable for sequels.  "The true intent of a

9  contracting party is irrelevant if it remains unexpressed." <u>Crow v. P.E.G.</u>

10 <u>Construction Co., Inc.</u>, 156 Cal. App. 2d 271, 278-279 (1957).  Put another way,

11 BP's desire for "more" for sequels doesn't equate to a demand to treat the Purchase

12 Price as a non-recoupable advance for sequels.  It is undisputed that Fox expressed

13 that the Purchase Price would be recoupable against contingent compensation, and

14 the sequels would be treated the same.  BP points to no evidence that it ever

15 suggested at that time that the Purchase Price would be recoupable for the first

16 picture only.

17        BP points to the exchange of drafts and its proposal of additional

18 language to Paragraph 6 to clarify that the Purchase Price was "for the first motion

19 picture." (<u>See</u> Plum Ex. 5 at BP00000284.)  It states that Fox deleted that language

20 in the next draft it circulated without explanation, and the parties did not include that

21 language in the final Agreement.  It claims that this was because the language was

22 "unnecessary," as Bagdasarian testified.  According to BP, the language of Paragraph

23 6 when read with Paragraph 12, was clear without the language BP proposed.  It was

24 clear to BP that the Purchase Price was paid only once, "within 10 business days

25 after exercise of the Option," and a separate paragraph dealing with sequel

26 compensation provided more for sequels.  However, BP relies on the undisclosed,

27 subjective intent of Bagdasarian that the language was "unnecessary."  BP did not

28 say anything to Fox about the change it proposed; it provided its draft with no

- 9 -

1  explanation, and then it accepted Fox's rejection without explanation.  (Fox's MSJ,

2  UF 14.)  Contract interpretation follows the objective rule of contracts where only

3  what the parties say in the Agreement or to each other has any bearing.  Civ. Code §

4  1639.  As such, the Referee finds that the extrinsic evidence of the negotiating

5  history confirms the interpretation found above that the Agreement means what it

6  says.

7          **(b)**      **Extrinsic evidence of Fox's other deals and templates**

8        Fox submits evidence that none of its other third-party agreements

9  provide that a "Purchase Price" or its equivalent is recoupable against contingent

10  compensation for a first picture but non-recoupable for subsequent pictures.

11  (Karasik Del., ¶ 11, Ex. F.)  It claims that the third-party agreements validate that the

12  most Fox agreed to pay for sequels is the same as what is paid for the original

13  picture.  ██████████████████████████████████████████

14  ████████████████████████████████████ (UF 10;

15  Plum Decl., ¶ 7, Ex. 2; Karasik Decl., ¶ 11.)

16        BP argues that the third-party agreements produced by Fox support BP's

17  understanding that the language of Paragraph 12 means that the advance given in

18  connection with the sequels is non-recoupable.  ██████████████████

19  ████████████████████████████████████████

20  ██████████████████████████████████

21  ██████████████████████ (Plaintiffs' Opp, Ex. N; Ex. O at 116:18-117:7.)  As

22  Fox explains, however, "net" deals are fundamentally different from First Dollar

23  Gross deals.  ████████████████████████████████████

24  █████████████████████████████ (Karasik Decl., ¶ 11, Ex.

25  F, Plum Depo. at 110:21-114:18; Plum Decl., Ex. 1.)  T██████████████

26  ███████████████████████████████████

27  ██████████████████████████

28  ██████████ (Fox's MSJ, UF 10; Plum Decl., ¶ 7, Ex. 2; Karasik Decl., Ex. N.)

- 10 -

1 │ This is consistent with the Agreement. ████████████████

2 │ ████████████████████████████████████████████

3 │ BP points to no deal wherein Fox has agreed to treat a Purchase Price as recoupable

4 │ on the first picture and non-recoupable on sequels.

5 │       **3.     Summary Judgment in favor of Fox is warranted with respect**

6 │       **to the breach of contract claim based on the Purchase Price**

7 │     Thus, the Agreement provides that the Purchase Price is "deemed an

8 │ advance" for "each picture" and that the Contingent Compensation payable to BP is

9 │ subject to the Purchase Price being treated as an advance. (Agreement, ¶¶ 6, 7, 12.)

10 │ The Referee determines that the plain language of the Agreement as supported by the

11 │ undisputed extrinsic evidence provides that the Purchase Price is an advance for

12 │ sequels, as it is for the first picture.  As such, because there are no genuine issues of

13 │ material fact, Fox is entitled to judgment as a matter of law on this claim.

14 │     **B.**    **Breach of Contract Claims Based on the Soundtrack Royalty**

15 │     In Count VII of the SAC, BP alleges that Fox breached the parties'

16 │ Agreement when calculating BP's royalties for the soundtrack albums for the two

17 │ films, Alvin and The Squeakquel.  Both BP and Fox seek summary judgment with

18 │ respect to this claim.

19 │       **1.     With respect to Alvin, the deductions taken were proper**

20 │       **under the Agreement**

21 │     BP contends that its royalty based on the full suggested retail list price

22 │ ("SLRP") should not have been reduced by "free goods" or deductions taken by the

23 │ Record Company, including packaging deductions and royalty rate deductions that

24 │ governed foreign territories.  Specifically, BP claims that Fox reduced the royalty

25 │ base by 25% for nonexistent "packaging" expenses and another 25% for the fact that

26 │ the sales were in the form of digital downloads.  It also claims that Fox failed to

27 │

28 │

- 11 -

1  report any royalties on sales of over 300,000 Alvin soundtrack albums.[3]  BP

2  concludes that Fox underpaid royalties on top-line album sales of the Alvin

3  soundtrack in the U.S. and Canada through December 31, 2012, by at least $911,185.

4  (Tregellis Decl., ¶ 27.)  Fox, on the other hand, contends that BP's soundtrack claims

5  fail because the Agreement expressly provides that BP's Soundtrack Royalties are

6  subject to all deductions applicable under Fox's contract with the Record Company.

7  For the Alvin soundtrack, Fox contracted with Razor & Tie ("R&T"), and Fox states

8  that its contract with R&T provides for all of the reductions and deductions from

9  Soundtrack Royalties that BP currently challenges.

10  **(a)    The plain language of the Agreement**

11         It is undisputed that Paragraph 10 of the Agreement entitles BP to

12  "Soundtrack Royalties."  It provides as follows:

13         10.    <u>SOUNDTRACK ROYALTY</u>:   Owner shall be entitled to the
   following record royalties (collectively, "Soundtrack Royalty"), as
14         applicable:

15

16         (a)    <u>US & Canada Soundtrack Album Sales</u>:

17                (i)    <u>Rights Royalty</u>: For net sales of any top line album
                sold in any and all distribution channels . . . in the United
18                States and Canada:

19

20                       (A) Rights Royalty: a base phonorecord royalty
                       equal to 1% of the suggested retail list price
21                       ('SRLP') thereof for such Soundtrack Album Sales .
                       . ., and
22

23                       (B) Artist/Producer Royalty: a base phonorecord
                       royalty equal to 13% of SRLP . . . . Said royalty to
24                       be pro rated by the number of "tracks" on which
                       Artist renders services.
25

26

27  [3] This part of BP's breach of contract claim related to the soundtrack royalties for Alvin is addressed in Section V below.

28

- 12 -

     (b)    <u>Other Royalty-Bearing Sales</u>: Soundtrack Royalties shall
be reduced, computed, paid, and defined (including for all other
phonorecords, including  singles, and all international Soundtrack
Album Sales) in accordance with the distribution agreement
between Fox and the Soundtrack Album distributor ('Record
Company').
(Agreement, ¶ 10(a) and (b).)[4]

     Fox claims that Paragraph 10(a) provides the base royalty rates applicable for "top line albums" sold in the United States and Canada, and Paragraph 10(b) provides that the Soundtrack Royalties will be "reduced, computed, calculated, paid and defined" in accordance with Fox's contract with the record company handling distribution of the soundtrack.  By contrast, BP argues that only Paragraph 10(a) applies and does not permit deductions.  It claims that Fox improperly relies on Paragraph 10(b) which applies only to "Other Royalty-Bearing Sales" – i.e. sales other than top-line album sales in the U.S. and Canada, which are the sales described in the preceding Paragraph 10(a).

     The Referee agrees with Fox's application of both Paragraph 10(a) and Paragraph 10(b) to permit the deductions at issue.  "Soundtrack Royalty" in Paragraph 10 is a defined term, and Paragraph 10(b) addresses the same defined term, "Soundtrack Royalties," not any limitation of that term to non-top-line sales and/or those outside the U.S. or Canada.  Soundtrack Royalties in Paragraph 10(b) by definition includes the royalties detailed in Paragraph 10(a).  In addition, the terms "net sales" and "base phonorecord royalty"[5] in Paragraph 10(a) signal that adjustments are to be made, and Paragraph 10(b) sets forth where to look to find those adjustments – "in accordance with the distribution agreement between Fox and

---

[4] The parties agreed to use an "Artist/Royalty" of 9.75%, for a total of 10.75% when combined with the 1% "Right Royalty."

[5] "Net sales" means all sales exclusive of any albums returned or given away (i.e. "free goods," typically for promotional purposes).  (Cavanaugh Decl., ¶ 7.)  "Base" means the starting point before any deductions or adjustments are taken.  (<u>Id.</u>)

- 13 -

1    the Soundtrack Album distributor." Moreover, Paragraph 10(b) notes that it

2    addresses Soundtrack Royalties "including for all other phonorecords." Contrary to

3    BP's assertion, the word "including" means the royalties specified under Paragraph

4    10(a), and the word "other" refers to royalties other than those specified in Paragraph

5    10(a). Under BP's construction, these words would be superfluous.

6         BP asserts that the heading of Paragraph 10(b), "Other Royalty-Bearing

7    Sales," means sales other than top-line album sales in the U.S. and Canada. The

8    Referee agrees that this heading may appear to be misleading.[6] However, the

9    paragraph explaining this heading uses the term "Soundtrack Royalties," which, as

10    explained above, includes the royalties described in Paragraph 10(a), and further

11    addresses Soundtrack Royalties "*including* for all other phonorecords." BP's

12    proposed construction would strictly interpret the heading of the paragraph while

13    ignoring certain phrases of the paragraph defining that heading. The Referee must

14    interpret the Agreement "to effectuate every provision and not in a way that renders

15    some clauses nugatory, inoperative or meaningless." United Artists Corp. v. Strand

16    Productions, Inc., 216 F.2d 305, 310 (9th Cir. 1954).

17         BP additionally argues that even if Paragraph 10(b) would be applied to

18    top-line album sales in the U.S. and Canada, any deductions taken under Paragraph

19    10(b) would be limited by Paragraph 10(c), which provides that BP's soundtrack

20    royalty "shall be subject to the same Record Company policies and practices as are

21    applicable to Fox." BP asserts that Fox is not subject to the same policies and

22    practices ████████████████████████████████████████████

23    ████████████████████████████████████████████

24

---

[6] The Referee disagrees with Fox that this heading can be ignored pursuant to Section VIII(H) of Exhibit A which provides that "captions of paragraphs hereof are inserted for reference only and in no way define, limit or describe the scope or intent of any provision hereof . . . ." (Agreement, Exhibit A, Section VIII(H).) This provision applies only to language found in Exhibit A "Definition of Net Proceeds." There is no similar provision in the Agreement itself. While BP previously relied on Section VIII(H) and argued that headings could not be relied upon, BP did so in the context of contingent compensation.

- 14 -

1  ████████  However, application of Paragraph 10(c) in the manner suggested by BP

2  would ignore the specific provisions of Paragraph 10(a) and (b) that specify the

3  Soundtrack Royalties payable to BP.  As Fox asserts, the "policies and practices"

4  referred to in Paragraph 10(c) make more sense when interpreted as accounting

5  practices.  Indeed, Paragraph 10(c) is entitled "Computation" and is a general

6  provision that cannot override the detailed provisions addressing Soundtrack

7  Royalties.

8         In sum, the Referee finds that application of the plain language of the

9  Agreement permits the challenged deductions to the Soundtrack Royalties for Alvin

10  in accordance with Fox's contract with R&T.

11                      **(b)    Extrinsic evidence**

12         Fox further contends that the extrinsic evidence confirms BP's

13  understanding that deductions would be taken.  It contends that BP received the

14  soundtrack agreement between Fox and R&T, exclusive of the exhibits attached

15  thereto, in January 2008, which referenced that third-party royalties would be

16  computed on SRLP of the album "with customary reductions," and understood by at

17  least April 2008 that free goods and packaging deductions were being taken when it

18  received two soundtrack royalty statements (through the March 2008 period) that

19  detailed these deductions.

20         BP contends that when Bagdasarian discussed the deductions taken

21  under the R&T deal with Fox, he was not aware that BP was subject to any

22  deductions ████████████████████.  It claims that it was not until much

23  later when Bagdasarian learned that BP and Fox were not being paid in the same

24  manner, and as a result, Bagdasarian's conduct in 2009 cannot be taken to represent

25  ████████████████████████████████████████████

26  ████████████████████

27

28

- 15 -

1       It is undisputed that BP received the main body of the R&T Contract in

2  January 2008.  (Fox's MSJ, UF 37.)  Paragraph 5 of this contract provides that

3  royalty participants would receive their royalties ████████████████████████

4  ██████████████████████████████████████████████████

5  ██████████████████  (Id.)  Paragraph 6 provides ██████████████████

6  ██████████████████████████████████████████████████

7  ██████████████████████████  (Id.)  BP does not dispute receiving the

8  R&T contract but instead argues that it was unaware ████████████████████

9  ████████████████████  The Referee finds, however, that this cannot support BP's

10  breach of contract claim which alleges that the deductions, by themselves, constitute

11  a breach.

12       In April 2008, Bagdasarian complained that the deductions being taken

13  were "very high."  (1st Cavanaugh Decl., ¶ 19, Ex. 3.)  In a subsequent conversation

14  to address Bagdasarian's concerns, Cavanaugh clarified to Bagdasarian the nature of

15  the soundtrack deal in terms of Fox's and BP's respective payment streams and the

16  application of deductions to all royalty participants.  (Id. at ¶ 20.)  In addressing this

17  conversation, Bagdasarian states that when he approached Fox in April 2008 about

18  the R&T deal, h███████████████████████████████████████████

19  ██████  (Plaintiffs' Opp. to Fox MSJ, Ex. F at 175:17-177:19, 186:22-23.)

20  However, again, this shows that Bagdasarian's complaint was not that the deductions

21  were improper but that, as Bagdasarian asserts, he believed "the deal [with R&T]

22  was bad for both of them in the same manner."  Further, Minks of BP also had a

23  discussion with Cavanaugh relating to the fact that BP "felt too many deductions

24  were being taken off of [BP's] share."  (Ruga Decl., Ex. 23, Minks Depo. at 220:11-

25  221:14.)  This extrinsic evidence of course of conduct before a dispute was raised is

26  among the most reliable in determining the parties' real intent.  Crestview

27  Cemetery Ass'n v. Dieden, 54 Cal. 2d 744, 752 (1960) ("The acts of the parties under

28

- 16 -

1   the contract afford one of the most reliable means of arriving at their intention");

2   Oceanside 84, Ltd. v. Fid. Fed. Bank, 56 Cal. App. 4th 1441, 1449 (1997) ("the

3   conduct of the parties after the execution of the contract, and before any controversy

4   arose, may be considered in order to attempt to ascertain the parties' intention").[7]

5           **2.      With respect to The Squeakquel, the deductions taken were**

6                     **proper under the Agreement**

7                   **(a)      Plain language of the Agreement**

8           With respect to the Squeakquel, BP contends that calculating BP's

9   royalties based upon the wholesale price or PPD (Purchase Price to Dealer) rather

10  than the SRLP breached the Agreement.  It contends that it was entitled to a royalty

11  based on SRLP (█████████████ not PPD █████████████.  BP claims that

12  Fox underpaid royalties on top-line album sales of The Squeakquel soundtrack in the

13  U.S. and Canada through June 30, 2012, by at least ██████ Fox, by contrast,

14  contends that the PPD calculations under its record company contract with Rhino

15  Entertainment Company ("Rhino") are the dollars-and-cents equivalent of payments

16  based on SRLP with deductions.  It claims that Rhino would not have agreed to pay

17  third-party royalties keyed to SRLP unless it applied standard deductions, and it paid

18  on a PPD basis with the intent of affording BP the equivalent of SRLP with

19  deductions.

20          In applying the language of the Agreement to The Squeakquel royalty

21  payments, the parties rely on the same arguments as discussed above with respect to

22  Alvin.  For the reasons explained above, the Referee finds that the plain language of

23

24  [7] Furthermore, the Referee also agrees with Fox that BP's own auditor's testimony is
    consistent with the plain language of the Agreement and supports the interpretation

25  determined herein.  BP hired Gelfand, Rennert & Feldman to conduct a financial audit in
    connection with Alvin.  (Fox MSJ, UF 27.)  George Cavelli testified on behalf of the audit

26  firm that except for his contentions in this case, he had never audited an SRLP-based record
    royalty deal that did not allow for deductions, that it would be "unusual" for an SRLP

27  royalty deal to not be subject to deductions, and that packaging deductions for physical
    goods and territorial reductions are common in the music industry.  (Id.)

28

- 17 -

1  the Agreement permitted the challenged deductions to the Soundtrack Royalties for

2  The Squeakquel in accordance with Fox's contract with Rhino.

3        **(b)**    **Extrinsic evidence**

4        BP does not dispute that prior to executing the soundtrack contract with

5  Rhino, Fox provided BP with a copy of Exhibit A to the Rhino contract ███

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ███████ (Fox MSJ, UF 32.)  Under Exhibit A, ████████████████████

9  ██████████████████████████████████████████████ (Id. at UF

10 33.)  Further, it is undisputed that BP never asserted that the Agreement did not

11 permit deductions in calculating third-party royalties or that PPD would be

12 inconsistent with the Agreement at any time before Fox executed the Rhino Contract

13 in July 2009.  (Id. at UF 34.)  Finally, it is undisputed that when BP sued Fox in

14 April 2010, it did not claim Fox breached the Agreement by taking deductions in

15 calculating royalties or by using PPD in the Rhino contract.  (Id.)  In response to the

16 above, BP argues that such evidence is irrelevant as Fox is obliged to pay BP a

17 Soundtrack Royalty pursuant to the terms of the Agreement, not the terms of the

18 Rhino contract.  However, contrary to BP's assertion, its conduct demonstrates its

19 pre-dispute understanding that the Agreement permitted deductions in calculation of

20 it royalties.

21      **3.**     **Summary judgment in favor of Fox is warranted with respect**

22                **to the breach of contract claims based on the Soundtrack**

23                **Royalties**

24       The Referee finds that BP's soundtrack claims fail as a matter of law

25 because the Agreement as supported by the extrinsic evidence provides that BP's

26 Soundtrack Royalties are subject to all deductions applicable under Fox's contract

27

28

- 18 -

1  with the Record Company.[8]  Fox is therefore entitled to summary judgment with

2  respect to the breach of contract claims based on the soundtrack royalties.[9]

3                    **4.      BP is not entitled to summary judgment with respect to its**

4                            **breach of contract claim based on the record company deals**

5              BP contends that Fox's deals with R&T and Rhino were a

6  discriminatory exercise of Fox's business judgment in violation of Section

7  VIII(BB)(1) of Exhibit A to the ST&C, which provides, "The exercise by Fox of its

8  sole business judgment hereunder shall be on a reasonable and non-discriminatory

9  basis."  Specifically, BP argues that ███████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████  It seeks summary judgment with respect to this clam.

12  Fox responds that there is no evidence that it discriminated against BP in any respect

13  as Fox treated BP the same as all similarly situated persons.

14              The Referee finds that BP fails to make a sufficient showing in support

15  of this claim.  First, the evidence shows that there were other third-party royalty

16  participants to the two soundtracks, and they were also subject to the record

17  company's standard deductions and reductions.  (1st Cavanaugh Decl., ¶¶ 18, 31-35;

18  2nd Cavanaugh Decl., ¶ 4.)  BP argues that these other royalty participants were not

19  parties to the Agreement and therefore, treating them and BP the same doesn't mean

20  that Fox has not violated Section VIII(BB)(1).  However, as BP sets forth,

21  "discrimination" is defined as "differential treatment; esp., a failure to treat all

22  persons equally when no reasonable distinction can be found between those favored

---

[8] Based on the determinations herein, the Referee need not address Fox's additional argument that BP's Alvin soundtrack claim is time-barred.  Similarly, the Referee need not address Fox's additional argument that Paragraph 10(e) of the Agreement, which provides that "if the Record Company agrees in writing to Owner to so account, Fox shall be relieved of such obligations and Owner shall look solely to Record Company for such record royalties," precludes The Squeakquel soundtrack claim.

[9] Denial of BP's summary judgment motion is correspondingly warranted, with the exception of its claim based on Fox's failure to report any royalties on sales of over 300,000 Alvin soundtrack albums which is addressed in Section V.

- 19 -

1  and those not favored." <u>Black's Law Dictionary</u> (9th ed. 2009).  Here, all royalty

2  participants were treated equally.  With respect to Fox, Fox and BP are not similarly

3  situated as ███████████████████████████████  ███████████

4  ███████████████████████████████████ As such, BP is not entitled to

5  summary judgment with respect to this claim.

6        **D.**    **<u>Breach of Contract Claim Based on the Licensing to HBO</u>**

7       BP asserts a breach of contract claim for the underpayment of

8  contingent compensation on the pay-television licenses to HBO for Alvin and The

9  Squeakquel. ███████████████████████████████████████

10 ███████████████████████████████████████████

11 ███████████████████████████████████████

12 █████████████████████████████████████

13 ██████████████████████ Fox received more significant benefits by

14 mitigating its risk on the films.  BP claims that it received no benefit from Fox's

15 decision to seek co-financing monies from Regency, and as a result, ███████████

16 █████████████████████████████████ It argues

17 that Fox's decision to co-finance with Regency was a "discriminatory" business

18 decision in violation of Section VIII(BB)(1) of the Agreement.  Both parties seek

19 summary judgment with respect to BP's claim.

20       Fox contends that the assertion it was "discriminatory" is impossible

21 because BP was treated the same as all others: ██████████████████████

22 █████████████████████████████████████

23 ██████████████████

24       Section VIII of the Agreement requires Fox to exercise its business

25 judgment in exploiting films "on a reasonable and non-discriminatory basis."  The

26 Referee agrees with Fox that its decision to co-finance the films with Regency, or as

27 BP puts it "exploiting [the deals] in a manner that uniquely benefits Fox when BP

28 would otherwise have a right to a portion of the assets' full value," does not violate

- 20 -

1  this provision.  First, Fox's Chairman during the relevant time period testified that he

2  decided to co-finance the two films ███████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████  (Ruga Decl., Ex. 1, Rothman Depo., 59:14-63:7,

5  70:13-76:7, 151:8-152:1.)  He testified that the co-financing decision was the

6  difference between making the movie and not making the movie.  (Id. at 75:20-76:7.)

7  BP benefited from Fox's decision to co-finance because it would have received

8  nothing by way of contingent compensation had it been decided that the risk of the

9  films was too great.  Moreover, it is undisputed that all profit participants were

10  treated exactly the same as BP; ████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████

13       In sum, under both parties' undisputed definition of "discrimination"

14  (see Bagdasarian and Karman Opposition to Fox's Motion for Summary Judgment,

15  p. 21 n. 9), the Referee determines that Fox and BP are not similarly situated as only

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████  Fox is therefore entitled to

20  summary judgment on this claim as a matter of law.

21  **IV.   Motions for Summary Judgment Re Breach of Implied Contract Claims**

22       In the SAC, Karman asserts breach of implied contract claims alleging

23  that at Fox's request, Karman supplied screenwriting and graphic design services for

24  The Squeakquel, and that Karman was never compensated for these services.  Both

25  Karman and Fox seek summary judgment with respect to these claims.

26       Under California Civil Code § 1621, an implied contract "is one, the

27  existence and terms of which are manifested by conduct."  Such a contract exists

28  "where the circumstances preceding and attending [the offeror's performance],

- 21 -

1  together with the conduct of the offeree acting with knowledge of the circumstances,

2  show a promise [to pay] of the type usually referred to as implied or implied in fact."

3  Grosso v. Miramax Film Corp., 383 F.3d 965, 967 (9th Cir. 2004) (quoting Desny v.

4  Wilder, 46 Cal. 2d 715, 738 (1956)).  The Desny rule that an implied contract will be

5  enforced to compensate an individual who provides an idea to another "is justified on

6  the theory that the bargain is not for the idea itself, but for the services of conveying

7  that idea."  Grosso, 383 F.3d at 967.  To avoid preemption by the Copyright Act, the

8  claim must allege an "extra element," which for an implied contract claim is the

9  implied promise to pay.  Id.

10        Contrary to Karman's reliance on Spinelli v. Tallcot, 272 Cal. App.

11  2d589, 595 (1969), an implied contract will not be formed as long as services are

12  provided and accepted.  See Desny, 46 Cal. 2d at 739 ("The law will not imply a

13  promise to pay for an idea from the mere facts that the idea has been conveyed, is

14  valuable, and has been used for profit."); Faris v. Enberg, 97 Cal. App. 3d 309, 319

15  (1979) ("an obligation to pay could not be inferred from the mere fact of submission

16  on a theory that everyone knows that the idea man expects to be paid").  Rather, the

17  parties' conduct must demonstrate a bilateral intent to compensate for the services.

18  See Grosso, 383 F.3d at 968 (noting that the "extra element" that makes an implied

19  contract claim avoid copyright preemption has been referred to as "the bilateral

20  expectation of compensation"); Montz v. Pilgrim Films & Television, Inc., 649 F.3d

21  975, 976 (9th Cir. 2011) ("the contractual claim requires that there be an expectation

22  on both sides that use of the idea requires compensation").

23  **A.    Genuine Issues of Material Fact Exist With Respect to Karman's**

24  **Breach of Implied Contract Claim Based on Her Writing Services**

25        The following facts are found to be undisputed[10]:

26

27  [10] In finding that these facts are undisputed, the Referee reviewed Fox's Evidentiary
    Objections to Karman's Separate Statement and Karman's Responses to Fox's Evidentiary

28  Objections, in addition to the Separate Statement, Statement of Genuine Disputes, and

- 22 -

1    On March 31, 2008, Karman provided Fox with a detailed treatment,
2  including specific scenes and dialog, for The Squeakquel.  (Karman's PSJ, UF 1.)
3  Jon Vitti prepared the first draft of The Squeakquel screenplay, which he submitted
4  to Fox in mid-October.  (Id. at UF 2.)  Elizabeth Gabler, Karen Rosenfelt, Erin
5  Siminoff, Bagdasarian and Karman agreed that Vitti's mid-October 2008 draft of the
6  The Squeakquel screenplay was unacceptable.  (Id. at UF 3.)  At a meeting on
7  October 21, 2008, involving at least Gabler, Rosenfelt, Bagdasarian and Karman to
8  discuss the development of The Squeakquel screenplay, it was decided that Karman
9  would write the next draft of the screenplay.  (Id. at UF 4.)  Karman provided Fox
10  with the first 29 pages of her screenplay for The Squeakquel on October 22, 2008,
11  and provided Fox with a complete draft of her screenplay on November 10, 2008.
12  (Id. at UF 5.)
13    Elizabeth Gabler of Fox testified that she agreed to offer Karman a
14  writer's agreement to enable Karman to become a member of the Writer's Guild.
15  (Karasik Decl., Ex. X, Gabler Depo., pp. 108:12-109:5.)  On October 21, 2008,
16  Gabler instructed Karen Rosenfelt and Erin Siminoff to contact Fox Business Affairs
17  to implement this decision.  Steven Plum in Fox Business Affairs was advised to
18  make an offer of a writer's agreement including the minimum (i.e., "scale")
19  compensation compliant with the Writers Guild Basic Agreement.  (UF 8; Karasik
20  Decl., ¶ 33, Ex. X, Gabler Depo. at 106:4-109:12; Plum Decl., ¶¶ 17-22, Exs. 6-7.)
21  On October 22, 2008, Fox (through Plum) offered Karman (through Waterman)
22  additional compensation of $29,250 for writing a screenplay, an offer that was based
23  on the Writers Guild of America's ("WGA") guidelines for compensation for non-
24  WGA writers with no precedent.  (UF 9; Plum Decl., ¶¶ 20-21, Ex. 7; Karasik Decl.,
25  ¶ 35, Ex. E, Bagdasarian Depo. 304:5-23.)  On October 24, 2008, after Karman had
26
27  Reply to Statement of Genuine Disputes.  Rulings on the objections shall be deemed
   consistent with the findings of fact when applicable.
28

- 23 -

000184

1    submitted the first 29 pages of her re-write, Fox revised its initial offer and offered

2    Karman $100,000 in additional compensation for any writing services Karman might

3    render in connection with The Squeakquel, with a bonus of $50,000 if Karman

4    received sole writing credit from the WGA and $25,000 bonus if she received share

5    credit from the WGA.  (Plum Decl., ¶¶ 22-24, Exs. 7-8; Karasik Decl., ¶ 35, Ex. E,

6    Bagdasarian Depo., 304:24-305:9.)  Between October 21, 2008 and December 10,

7    2008, Karman was the person actively writing on The Squeakquel screenplay.  (Id. at

8    UF 10.)  In early 2009, Karman rejected Fox's offer.  Fox has refused to pay Karman

9    additional compensation for the writing she submitted on The Squeakquel.  (Id. at UF

10   16.)

11           At the outset, the Referee notes that the time period at issue is from

12   October 21 through December 10.  (See Karman Reply, p. 2 n. 1 ("In this motion,

13   however, we have focused on the services Karman provided from October 21

14   through December 10 because it cannot be disputed that Fox requested these

15   services.").)[11]  This is the time period when Vitti's draft of The Squeakquel

16   screenplay was deemed unacceptable, and it was decided that Karman would write

17   the next draft of the screenplay.  (Karman PSJ, UF 4.)  In support of her claim,

18   Karman contends that an implied contract was formed between Fox and Karman

19   whereby Karman agreed to, and did in fact, provide writing services on The

20   Squeakquel at Fox's request and that Karman expected to be paid, and Fox agreed to

21   pay, for those services.  She concludes that Fox is liable to Karman for the

22   reasonable value of those services, despite the fact that the parties never executed a

23   written agreement.  Fox, on the other hand, asserts that the undisputed facts show

24   that Karman lacked an expectation of additional compensation for any supposed

25

26   [11] At the hearing, Plaintiffs clarified that they focused on this time period in support of their Motion for Partial Summary Judgment, and that with respect to Fox's Motion for Summary
27   Judgment, if they successfully establish their claim during this time period or raise a triable issue, then Fox's motion for summary judgment on this claim cannot be granted.
28

- 24 -

1  writing services, and that it had no expectation to compensate Karman.

2         The Referee finds that genuine issues of material fact exist precluding

3  summary judgment in favor of either party. At issue is the bilateral expectation of

4  compensation. Based on the undisputed facts that Fox offered Karman a writer's

5  agreement, which included compensation, and that the parties negotiated the amount

6  of compensation, reasonable inferences can be drawn in favor of both parties whether

7  Fox expected to compensate Karman, and whether Karman expected compensation.

8  While Fox claims that it never expected to compensate Karman and that it only

9  offered her money "in appreciation for Karman's contributions" and to allow her to

10 become a member of the WGA, a trier of fact could find otherwise. Steve Plum

11 testified with respect to what Fox contemplated prior to its initial offer:

12         I think in the initial conversation I had with Erin Siminoff and Karen
           Rosenfelt, I asked them if they had a point of view about whether
13         [Karman] was going to get paid, and they did have a point of view. So
           prior to my first conversation with Janice's representative, I had an
14         understanding that our side was contemplating paying her on that.
                                    * * *
15
16         What I would say is they expected that she would have a writer's
           agreement which would have compensation involved in the writer's
17         agreement, yes.

18

19 (Dixon Decl., Ex. 22, Plum Depo., 52:25-54:1.) With respect to the ensuing

20 negotiations, Fox's initial offer to Karman was rejected as too low by Steve

21 Waterman, Karman's representative. (Dixon Decl., Ex. 6 at p. 10.) Following this,

22 Fox then offered Karman "$100,000 for an 'all writing' deal that would extend to

23 any further screenplay materials she might prepare in connection with The

24 Squeakquel." (Id.) In addition, while Fox claims that Karman began writing the

25 screenplay prior to any offers of compensation, a trier of fact could reasonably infer

26 that Karman expected to be compensated and that Fox expected to compensate her

27 because it is undisputed that Karman was the only writer on the project during the

28 timeframe of October 21 and December 10, 2008. It was during this timeframe that

- 25 -

1   Karman wrote the next draft of The Squeakquel screenplay, because the screenplay

2   by Vitti, who was hired by Fox, was deemed unacceptable.  Furthermore, the other

3   writers on The Squeakquel received compensation for their similar work on the

4   screenplay.  Fox paid the writing teams of Aibel & Berger and McRobb & Viscardi a

5   total of $800,000 for their work on The Squeakquel screenplay. [12]  (See Dixon Decl.,

6   Ex. 41 at BP00021934-BP00021935.)  Thus, these facts, when viewed in the light

7   most favorable to the nonmoving party, demonstrate disputed issues of material fact.

8            Fox argues that under Paragraph 21(c) of the ST&C's of the Agreement,

9   there cannot be an implied agreement because additional payment for Karman's

10  writing services would necessarily require a written agreement.  The Referee

11  disagrees.  Paragraph 21(c) provides: "This Agreement may be amended or modified

12  only by the written agreement of Owner and Fox."  However, the Agreement does

13  not encompass the writing services at issue here.  Instead, it addresses Fox's

14  purchase of the underlying rights to the Chipmunk characters and covers only the

15  producer services of Karman and Bagdasarian.  (See Agreement, ¶ 5 (engaging

16  Karman and Bagdasarian to perform services "customarily rendered by producers in

17  the motion picture industry, including supervision of the screenplay materials

18  required by Fox").)  As such, the cases relied on by Fox for the proposition that an

19  implied contract cannot exist where an express contract exists concerning the same

20  subject matter are inapposite.  Because Karman's writing services at issue here are

21  outside the scope of the Agreement, it cannot be found that the Agreement already

22  covered the same subject matter.  Furthermore, the fact that Fox offered Karman an

23  "all writing" writer's agreement belies Fox's assertion that Karman's writing

24  services were part of her obligations pursuant to the Agreement.  And, as noted

25  ─────────────────
[12] Similarly, although Fox argues that Karman had previously provided written materials
26  without any expectation of compensation, Karman is correct that the instances showing that
    she voluntarily submitted her writings do not necessarily preclude a finding in her favor
27  regarding the October rewrite of the Vitti screenplay which was of a different nature than
    her prior work.
28

1  above, Karman's rewrite of the screenplay was similar to the work for which Fox

2  compensated other writers, thereby supporting the determination that Karman's

3  writing services at issue were outside the scope of the Agreement and therefore not

4  requiring a written agreement as a matter of law.

5     In sum, an implied contract claim requires a showing of a bilateral

6  expectation of compensation.  Because reasonable inferences can be drawn in favor

7  of both parties regarding the existence or absence of the bilateral expectations of

8  compensation, genuine issues of material fact exist.  Summary judgment is therefore

9  not warranted in favor of either party on the implied contract claim for Karman's

10  writing services.

11    **B.** **<u>Karman Fails to Establish an Implied Contract With Respect to</u>**

12      **<u>Her Graphic Design Services</u>**

13     Karman claims that in or around March 2008, Fox asked Karman to

14  design Brittany, Jeanette, and Eleanor (the Chipettes) for The Squeakquel.  (Karman

15  PSJ, Ex. 18 at 150:6-14; Ex. 8 at 255:19256:11.)  She claims that at Fox's request,

16  she created pencil sketches re-imagining Brittany, Jeanette, and Eleanor so that they

17  could be turned into CGI (computer-generated imagery) characters for The

18  Squeakquel.  (<u>Id</u>. at Ex. 18 at 150:6-14, 166:23-167:2; Ex. 8 at 255:19-256:11; Ex.

19  47.)  She claims that she presented her pencil sketches to Fox in or around June

20  2008, and Fox loved them.  (<u>Id</u>. at Ex. 8 at 255:19-256:11; Ex. 47.)  On July 1, 2008,

21  Karman provided her pencil sketches to Rhythm & Hues, which Fox had hired to

22  create 2D CGO images of the Chipettes for The Squeakquel.  (<u>Id</u>. at Exs. 48, 49, 47,

23  51.)  Karman claims that Rhythm & Hues, with her assistance, turned Karman's

24  pencil sketches into 2D CGO characters for The Squeakquel.  (<u>Id</u>. at Ex. 47, 55.)

25     Based on the above and in seeking summary judgment, Karman

26  contends that an implied contract was formed between Fox and Karman whereby

27  Karman agreed to, and did in fact, provide graphic design services on The

28

- 27 -

1   Squeakquel at Fox's request, and that Karman expected to be paid for those services,

2   which are of the type of services that Fox usually pays for.  Karman concludes that

3   Fox is therefore liable to Karman for the reasonable value of those services.

4          Fox argues that during the period of time that Karman claims to have

5   provided services, it was never aware of the pencil sketches that Karman now claims

6   she created and which are basis for her motion.  Fox claims that no one from Fox

7   ever asked Karman to prepare any pencil sketches or other drawings of the Chipette

8   characters for use in connection with The Squeakquel. (Garberson Decl., ¶ 14;

9   Gabler Decl., ¶ 4; Ruga Decl., Ex. 20, Garberson Depo. at 67:25-69:4.)  It claims that

10  it was not even informed that Karman was providing or had provided any 2D artwork

11  of the Chipettes to R&H until after the 2D design process was complete. (Garberson

12  Decl., ¶¶ 11-14, Ex. D; Karasik Decl., ¶ 40, Ex. BB.)  Fox claims that it never

13  offered to compensate Karman for any graphic design services and at no time had

14  any expectation that it was obligated to pay Karman for providing graphic design

15  services directed to any characters, including the Chipettes, for The Squeakquel.

16  (Plum Decl., ¶ 28; Karasik Decl., Ex. E, Bagdasarian Depo. at 256:19-257:19, Ex.

17  BB; Garberson Decl., ¶¶ 12-14.)

18          The Referee finds that Karman's implied contract claim based on her

19  graphic design services fails as a matter of law.  First, it is questionable whether

20  Karman has shown that Fox knew about her design services at the time.  The only

21  undisputed evidence that Karman relies on is her testimony that she believed that

22  Karen Rosenfelt, the independent third-part producer on the films, knew that she was

23  going to design the Chipettes. (Karman PSJ, Ex. 18, Karman Depo. at 150:6-21.)

24  The evidence is undisputed that no one at Fox knew Karman had provided any 2D

25  artwork for the Chipettes to R&H until August 2008 when the 2D design process was

26  complete. (Fox's Response to Plaintiffs' Statement of Genuine Issues, UF 83.)

27  While Karman argues that Rosenfelt was "acting on behalf of Fox," this argument of

28

- 28 -

1   course raises the issue and requisite proof of agency.

2        Nonetheless, the issue is whether Karman has shown a bilateral intent to

3   compensate, and she has not.  First, it is undisputed that during the development of

4   Alvin (the first film), Karman provided Fox with certain two-dimensional drawings

5   of the Chipmunk characters that had been prepared by a third-party.  Fox never

6   requested these materials, and Karman had no expectation of compensation with

7   respect to this submission.  (Karasik Decl., ¶ 38, Ex. P, Karman Depo., 129:1-130:2,

8   132:18-134:17; Gaberson Decl., ¶¶ 7-8, Ex. C.)  As Fox states, based on Karman

9   providing Fox with graphic design materials on the first film with no expectation or

10  demand for compensation, Fox at no time believed it had any obligation to pay

11  Karman additional compensation for any graphic design activity.  Indeed, "[i]f at the

12  time the services were originally rendered they were intended to be gratuitous or as

13  an accommodation, motivated by friendship, kindness, or some other significant

14  relationship existing between the parties, and were tendered without any expectation

15  of remuneration, they cannot afterwards be converted into an obligation to pay their

16  reasonable value under the theory of an implied contract."  Payne v. Bank of Am.

17  Nat'l Trust & Sav. Ass'n, 128 Cal. App. 2d 295, 304 (1954).

18       Karman seeks to show that Fox intended to compensate her by relying

19  on evidence that Fox paid another individual for the same service on Alvin, the first

20  picture.  However, this cannot establish that Fox intended to compensate Karman for

21  her services on The Squeakquel.  First, Fox did pay for this service on The

22  Squeakquel.  It hired R&H, a professional motion picture graphic design firm, to

23  design the Chipettes, ultimately paying it $55,000 for nine weeks of design services

24  relating to the preparation of those materials.  (Garberson Decl., ¶¶ 10-11, 14; Ruga

25  Decl., Ex. 20, Garberson Depo. at 67:25-69:4.)  Moreover, that Karman may have

26  expected compensation because she knew that Fox had paid for such services on

27  Alvin cannot establish her claim.  "The assumption, intention or expectation of either

28

- 29 -

000190

party alone, not made known to the other, can give rise to no inference of an implied contract." <u>Travelers Fire Ins. Co. v. Brock & Co.</u>, 47 Cal. App. 2d 387, 392 (1941); <u>see also</u> <u>City of Pasadena v. Los Angeles Cnty.</u>, 118 Cal. App. 2d 497, 500 (1953) (finding no implied contract because although services were performed that benefitted defendant, they were never requested by defendant).    Furthermore, it is undisputed that neither Karman nor anyone on her behalf requested or expressed an expectation of additional compensation for Karman's services designing the Chipettes until after the work had been completed.  (Fox's Response to Plaintiffs' Statement of Genuine Disputes, UF 82, 86.)  "It is the expectation of the parties existing at the time the services were rendered or the benefits conferred that controls." <u>Payne</u>, 128 Cal. App. 2d at 304.

Thus, because Karman cannot establish a breach of implied contract claim based on her graphic design services, summary judgment in favor of Fox is warranted.

## V.   **Fox's Application Pursuant to FRCP 56(d)**

In its Motion for Partial Summary Judgment on Certain Breach of Contract Claims, BP contends that Fox breached Paragraph 10(a) of the Agreement by failing to report any royalties on sales of over 300,000 Alvin soundtrack albums. Specifically, BP contends that Fox underreported the number of units sold to BP through December 31, 2012, by 307,984 units, resulting in the underpayment of BP's soundtrack royalty by $581,430.  It also contends that Fox does not appear to have accounted to BP for revenue from Digital Streams, resulting in the underpayment of royalties of at least $11,536.  In making these contentions, BP relies on the expert Declaration of Christian Tregillis, a forensic accountant.

In response, Fox argues that this "underreporting" claim rests entirely on a comparison between "units shipped" (less reserves and returns, as reported on Fox's profit-sharing statement) and royalty-bearing units (as reported in the

statements to BP), but Fox and BP are accounted to on different bases, and reported unit counts are accordingly different.  It claims that BP's asserted difference in unit counts is attributable in substantial part to "free goods," which are records that are given away as incentives to retailers, not sold.  Fox states that it has not had an opportunity to present its evidence or depose Mr. Tregillis about his analysis because expert discovery has not yet commenced.[13]  It asserts Evidentiary Objections to the Tregillis Declaration, and it brings an Application Pursuant to Rule 56(d) to depose Tregillis and to present its own expert's conclusions in a timely manner.[14]

Fed. R. Civ. Pro. 56(d) provides relief where "the party opposing summary judgment makes (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists."  VISA Int'l Serv. Ass'n v. Bankcard Holders of Am., 784 F.2d, 1472, 1475 (9th Cir. 1986); accord Burlington N. Santa Fe. R.R. Co. v. Assinboine & Sioux Tribes of the FortPeck Reservation, 323 F.3d 767, 774-75 (9th Cir. 2003). Once "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" the Court may defer considering the motion, deny it, allow time for the nonmoving party to obtain declarations or conduct discovery, or issue any other appropriate order.  Fed. R. Civ. P. 56(d).

Fox states that Plaintiffs gave it no notice during the parties' meet and confer over the motions for summary judgment that they intended to rely on expert declarations.  (Ruga Dec., ¶4.)  It claims that it learned of these expert declarations

---

[13] According to the Referee's July 23, 2013 Scheduling Order, Initial Expert Disclosures are not due until February 10, 2014, Rebuttal Expert Disclosures are not due until February 24, 2014, and the Expert Discovery deadline is March 30, 2014.

[14] In its Application, Fox also seeks to depose another expert relied on by BP, Frederic Bernstein.  However, the issue related to that testimony (the implied contract claim) has been resolved herein, and Fox's request related and objections to this expert are therefore moot.

1  when they were received along with Plaintiffs' moving papers only on November 8.

2  (Id.)  Fox states that it intends to offer evidence through cross-examination of

3  Tregillis that establishes the flaws and mistaken assumptions of his analysis. (Ruga

4  Decl., ¶¶ 7-10.)  Fox will demonstrate that Tregillis's conclusions relating to the

5  alleged underreporting of units and royalties are simply incorrect.  (Id.)  Fox has

6  retained accounting and industry experts who will provide testimony demonstrating

7  that units were not underreported and that Tregillis's conclusions are flawed and

8  based on his improper comparison of statements reported to two different types of

9  participants – profit share participants and royalty participants.  (Ruga Dec., ¶9.)

10        Based on Fox's showing in its Application, and having read BP's

11  Opposition, and Fox's Reply, the Referee finds that Fox has met its burden under

12  Rule 56(d), and that granting its application is warranted.  As such, the Referee

13  grants Fox's Application Pursuant to Federal Rule of Civil Procedure 56(d) to allow

14  Fox to depose Mr. Tregillis and conduct expert discovery with respect to the

15  remaining issue identified herein.  {**Insert Timing and restrictions**}  Ruling on

16  this remaining issue in Bagdasarian's Motion for Partial Summary Judgment on

17  Certain Breach of Contract Claims is deferred, and the Declaration of Tregillis is

18  stricken as premature.

19  **VI.   Conclusion**

20        Accordingly, the Referee:

21        (1) Grants in Part and Denies in Part Defendant Twentieth Century Fox Film

22  Corporation's Motion for Summary Judgment;

23        (2) Denies Plaintiff Bagdasarian Productions, LLC's Motion for Partial

24  Summary Judgment on Certain Breach of Contract Claims, with the exception of one

25  claim, the determination of which is deferred;

26        (3) Denies Plaintiff Janice Karman's Motion of Partial Summary Judgment on

27  Implied Contract Claims; and

28

- 32 -

1     (4) Grants Fox's Application Pursuant to FRCP 56(d) as set forth herein.

2

3   DATED:  February ___11___, 2014

4                                                   Carl J. West
                                                    Judge of the Superior Court (Ret.)
5                                                   Referee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 33 -

## PROOF OF SERVICE BY U.S. MAIL

Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation
Reference No. 1220044628

I, Kathryn Cisneros, not a party to the within action, hereby declare that on February 11, 2014 I served the attached ORDER DATED FEBRUARY 11, 2014 on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067
    Parties Represented:
    Bagdasarian Productions, LLC
    Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird LLP
333 S. Hope St.
16th Floor
Los Angeles, CA  90071
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA  90012-4793

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660
    Parties Represented:
    Bagdasarian Productions, LLC
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA  90213-0900
    Parties Represented:
    Twentieth Century Fox Film Corp.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on February 11, 2014.

Kathryn Cisneros

000195