# EXHIBIT 16

# ALSTON&BIRD LLP

333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax: 213-576-1100
www.alston.com

Louis A. Karasik                    Direct Dial: 213-576-1148                    Email: lou.karasik@alston.com

April 5, 2013

*Via US Mail and Email*
Steve Marenberg
IRELL & MANELLA LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067

> Re:   Meet and Confer over Plaintiffs' Deficient Discovery Responses
>         and Initial Disclosures; Fox's Motion for Summary Judgment
>         and/or Partial Summary Judgment

Dear Steve:

   We write to meet and confer over the deficiencies of Plaintiffs' recent interrogatory responses[1] and Fox's motion to compel further responses, as well as Plaintiffs' ongoing failure to provide adequate damages information in Plaintiffs' Amended Disclosures, even after Fox previously met-and-conferred about their inadequacy.  As discussed more fully below, Plaintiffs' discovery responses reveal that certain of Plaintiffs' claims lack any factual basis for liability, damages, or both.  Fox accordingly demands that Plaintiffs cease prosecuting claims for which they have no basis.  If Plaintiffs believe that they have a factual basis to proceed on their claims, we look forward to Plaintiffs promptly supplementing their responses or otherwise detailing why Plaintiffs believe their current discovery responses are legally sufficient.  Otherwise, Fox intends to promptly move for Summary Judgment and/or Partial Summary Judgment, all as detailed more fully below.

> 1.   Plaintiffs' Deficient Discovery Responses and Disclosures and Fox's
>       Anticipated Motion

   Plaintiffs' Responses fail to provide sufficient (and in some cases any) factual information about the basis for Plaintiffs' claims.  The Responses consist for the most part of material that parrots the conclusory allegations of Plaintiffs' First Amended

---

[1] We refer to Plaintiffs Bagdasarian Productions, LLC, And Janice Karman's First Amended Responses And Objections to Defendant's First Set of Interrogatories (Nos. 1-12) ("Responses"), and to the First Amended Initial Disclosures of Plaintiffs Bagdasarian Productions, LLC and Janice Karman ("Amended Disclosures")  We refer to Bagdasarian Productions, LLC as "BPL".

Atlanta • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

Steve Marenberg
April 5, 2013
Page 2

Complaint ("FAC"). Lacking are dates, times, events, particular transactions, specific information, the identity of any individuals at Fox who purportedly engaged in conduct, or any other factual material which might support Plaintiffs' claims.

Throughout the Responses Plaintiffs use the phrase "For example" in identifying the basis for their claims (*see* Responses at pp. 9, 14, 18, 20). This phrase suggests that Plaintiffs are withholding additional facts that may serve as the basis of their claims, and that they have not even attempted to meet their burden to identify all supporting evidence. Indeed, Plaintiffs repeatedly object to Fox's demand that Plaintiffs identify "all facts" upon which Plaintiffs rely. If Plaintiffs are using the phrase "for example" in order to leave open the opportunity to develop yet-unknown facts that may serve as the basis for a claim, this is fundamentally improper.

The absence of facts in a written discovery response is grounds by itself to support a motion for summary judgment or summary adjudication of issues. *See MacKay v. Am. Potash & Chem. Co.*, 268 F.2d 512, 517 (9th Cir. 1959) (granting defendant's motion for summary judgment because plaintiff's responses to interrogatories were conclusory and did not raise a genuine issue of material fact); *Carter v. Clark County*, 459 Fed. App'x 635, 636 (9th Cir. 2011) (refusing to find a genuine issue where Plaintiff's interrogatory responses were vague and conclusory and the only evidence presented was uncorroborated and self-serving testimony); *see also S & S Logging Co. v. Barker*, 366 F.2d 617, 624 (9th Cir. 1966) ("Rule 56 provides that a summary judgment may be based upon answers to interrogatories and affidavits may be opposed by answers to interrogatories."). If Plaintiffs decline to cease prosecuting the claims for which they lack basis, Fox intends to promptly file a motion for partial summary judgment addressing the claims for which Plaintiffs fail to identify any supporting facts. To illustrate the inadequacy of Plaintiffs' Responses, and to provide clear information on how these deficiencies reveal the insufficiency of Plaintiffs' claims, we summarize our anticipated motion below. For each issue, we invite Plaintiffs to promptly supplement their Responses with any facts which they claim would avoid summary adjudication and/or, through the meet-and-confer process, explain how they believe their Responses are sufficient to survive summary judgment.

Plaintiffs' inadequate damages disclosures force Fox, for a second time, to meet and confer. Under FRCP 26(a)(1)(A)(iii), parties must provide as part of their initial disclosures "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." A damages computation is required even where the precise amount of damages is still uncertain, and where the precise amount of damages may require expert testimony to determine. *See Frontline Med. Associates, Inc. v. Coventry Health Care*, 263 F.R.D. 567, 570 (C.D. Cal. 2009) ("Future expert analysis does not relieve Plaintiff of its obligation to provide information reasonably available to it as to gross revenues, expenses and any other component of its lost profits computation.").

Steve Marenberg
April 5, 2013
Page 3

After Fox advised Plaintiffs of their obligations under the Federal Rules, Plaintiffs served Amended Disclosures on February 14, 2013. Those disclosures, unfortunately, remain deficient. As detailed below, for certain claims Plaintiffs do not identify any damages or methodology for computing them. For other claims, Plaintiffs offer only an unadorned number without the computations required by Rule 26.

Less than two months before the close of fact discovery, and months or even years after the Rules required Plaintiffs to provide basic details of their claims, Fox still lacks basic information about what it is accused of doing and how Plaintiffs believe they have been harmed. Fox therefore calls upon Plaintiffs to comply immediately with their obligations under the Rules: either to cease prosecuting claims for which they lack basis or to disclose sufficient factual and legal basis for their prosecution of their claims.

a. *Purchase Price*

Interrogatory No. 3 seeks all facts that support Plaintiffs' claim that the "Purchase Price" provided for in the parties' Agreement constitutes a non-recoupable advance. Plaintiffs' Responses refer solely to the language of paragraphs 6, 7 and 12 of the Agreement. (Responses, p. 12.) Plaintiffs make no reference to the course of dealing between the parties, to the parties' negotiation history, or any extrinsic evidence suggesting that the language of the Agreement does not mean what it says. In the Referee's Ruling on Fox's Motion to Dismiss, the Referee noted that "it appears that Plaintiffs' claim . . . for additional compensation for the sequels will be precluded by the express terms of the Agreement" and "under the Agreement[,] the terms of Paragraphs 6 and 7 appear to preclude Plaintiffs' claims." Ruling on Motion to Dismiss (Nov. 14, 2012) at 4:7-9 & 4:13-15. The Referee nonetheless allowed the claim to proceed to discovery on the basis that "[t]he parties' course of dealing over several years, and in connection with the earlier sequel and original will provide an evidentiary basis for determination of this claim." *Id.* at 4:5-6 & 4:15-18. Plaintiffs now admit that there is no evidentiary basis for their claim beyond the language of the Agreement. Fox will thus move for summary adjudication that there has been no breach of the parties' Agreement because as Judge West previously indicated, under the plain language of the Agreement, the Purchase Price for sequels is an advance.

b. *Writing Services*

Interrogatory No. 9 seeks all facts that support Plaintiffs' claim that Ms. Karman is entitled to compensation for purported writing services she rendered in connection with *The Squeakquel*. The Responses state that Fox "formally asked Karman to rewrite the screenplay" in October 2008, and that she was asked to "revise the screenplay" in December 2008 and January 2009. Plaintiffs make vague references to exchanges between Fox and Plaintiffs over offers to pay Plaintiffs for her writing. The remaining information in the Responses identifies materials Karman allegedly wrote and the results of the WGA proceeding. The Responses are devoid of any specific information

Steve Marenberg
April 5, 2013
Page 4

concerning the dates, events, or particular transactions that purportedly give rise to the
implied contract claim, and further responses are required.[2]

Plaintiffs' Amended Disclosures regarding damages are similarly lacking in
required detail. Plaintiffs assert that they cannot calculate damages without Fox
producing documents, including documents showing "the amounts paid other
screenwriters for their writing services in connection with *The Squeakquel* screenplay."
Amended Disclosures at 7:9-10. Beyond that, Plaintiffs assert only that they are entitled
to "the full amount of damages permitted by the applicable laws, including all damages
that resulted from such breaches, for example the reasonable value of Karman's writing .
. . services." *Id.* at 7:25-28. As we previously advised you, "[a] party is not excused
from making its disclosures because it has not fully investigated the case," and the Rules
require a "computation" not merely a boilerplate recitation. Fed. R. Civ. P. 26(a)(1)(E).
And even if these damages numbers will be informed by expert testimony or further
discovery, that does not relieve Plaintiffs from their burden of providing some estimate of
damages (which could later be refined by supplemental disclosures). *See Frontline Med.
Associates*, 263 F.R.D. at 570. Fox is entitled to know what Plaintiffs believe Ms.
Karman's uncredited "writing services" are worth without any further delay.

c.   *Graphic Design Services*

Interrogatory No. 10 seeks all facts that support Plaintiffs' claim that Ms. Karman
is entitled to compensation for purported graphic design services she rendered in
connection with *The Squeakquel*. The Responses insufficiently state that "[i]n mid-2008
at Fox's request, Karman provided to Fox graphic design service in connection with the
re-design of the pre-existing animated Chipettes for CGI motion picture format."
(Response, p. 23.) Plaintiffs further state that Ms. Karman provided services on the
condition that she would receive "adequate compensation for those graphic designs and
her attendant services." (*Id.*) Plaintiffs' Responses are devoid of any specific
information concerning the dates, events, or particular transactions that purportedly give
rise to this implied contract claim. Plaintiffs' supposed evidentiary basis, therefore, is no
more than the bare allegations of the Complaint, and Fox will thus move for summary
adjudication that there is no evidence to support Plaintiffs' claim for breach of an implied
contract predicated on Ms. Karman's purported graphic design services.

The record on Plaintiffs' damages disclosures for the supposed "graphic design
services" is substantially the same as the record on Plaintiffs' supposed writing services.
For the same reasons, Fox is entitled to know what Plaintiffs believe that claim is worth.

---

[2] Though further responses are required, Fox does not intend to move for summary
adjudication on the writing services claim at this time, though it will move to compel
further responses if Plaintiffs decline to supplement their Responses.

Steve Marenberg
April 5, 2013
Page 5

d. *FX Distribution*

Interrogatory No. 2 seeks all facts that support Plaintiffs' claim that Fox breached the Agreement with respect to the distribution of the *Alvin* picture with FX. The only purported facts provided in the Responses are that Fox "licens[ed] . . . [*Alvin*] to its affiliate FX for an amount far below what the film would normally have received in an arms-length agreement with an unaffiliated party in violation of Section VIII(BB)(4) of Exhibit A to the Standard Terms and Conditions of the parties' Producer Agreement." (Responses, p. 10.) Plaintiffs offer no supporting facts for this empty conclusion. Amongst other things, Plaintiffs offer no facts even suggesting that any free-TV network was willing to license *Alvin* for a higher amount than FX. There are no facts that the terms of Fox's license with FX were not comparable to transactions Fox enters into with unrelated third parties. Fox will seek summary adjudication that Plaintiffs have no evidence to show that Fox's transaction with FX for *Alvin* was conducted on monetary terms that were not comparable to the terms on which Fox enters into similar transactions with unrelated third parties. While Fox bears no burden to show the favorability of the transaction, the motion will further demonstrate that the license obtained for *Alvin* was the most lucrative free-TV license fee available to Fox for that picture.

With regard to Plaintiffs' damages disclosures, Plaintiffs merely state that they believe themselves entitled to "contingent compensation based upon the difference between the amount Fox paid Bagdasarian Productions for licensing certain television distribution rights to the Alvin films . . . and what Bagdasarian Productions would have received absent Fox's breaches." Amended Disclosures at 8:5-8. Plaintiffs allege no amount regarding what Fox would have received for licensing the free-TV rights absent its supposed breaches; as noted above, that is because there is no such evidence. Plaintiffs Amended Disclosures demonstrate that they have no basis to believe that they have been damaged on this claim; indeed, they have not.

e. *HBO Distribution*

Interrogatory No. 2 also seeks all facts that support Plaintiffs' claim that Fox breached the Agreement by distributing the *Alvin* picture to HBO under the HBO/New Regency arrangement. The only purported facts offered by Plaintiffs to support this claim is that "Fox discriminated against Bagdasarian Productions in violation of Section VIII(BB)(1) of Exhibit to the Standard Terms and Conditions of the parties' Producer Agreement by permitting [*Alvin*] and [*The Squeakquel*] to be licensed to HBO under ██████████████████████████████ Plaintiffs further state they were "never informed of Fox's intent, nor agreed" to make *Alvin* or *The Squeakquel* ██████ ██████ Finally, Plaintiffs claim that Fox "unilaterally decided to bring in Regency in order to reduce its own financial risk and burden" and that this decision "improperly reduced the amounts it owed to Plaintiffs, in violation of the Producer Agreement." (Responses, pp. 9-10.)

Steve Marenberg
April 5, 2013
Page 6

Fox will thus move for partial summary judgment that there are no facts to support any claim for breach of the Agreement related to HBO distribution. The Agreement provides that, except as specifically provided in the Agreement, Fox has the "complete, exclusive and unqualified control of the distribution . . . and other disposition of the Picture . . ., in accordance with such sales methods, plans, patterns, programs, policies, terms and conditions as Fox in its sole business judgment may determine proper or expedient." (Agreement, Section VII(B) of Exhibit to the Standard Terms & Conditions.) The Agreement further provides that Fox's exercise of business judgment shall be on a "reasonable and non-discriminatory basis." (*Id.* at VII(BB)(1).)

Plaintiffs offer no facts to show that Fox breached this standard. There are no facts to suggest that Fox's decision to co-finance *Alvin* ███████████████ was an unreasonable exercise of business judgment. Plaintiffs provide no facts to support their bare assertion that Fox made "assurances" regarding its capability to finance an *Alvin* picture, but even if such facts existed, any purported non-contractual "assurances" are irrelevant. Equally irrelevant are assertions that Plaintiffs were never informed of Fox's co-financing decision – the Agreement contains no restrictions on Fox's co-financing determinations and affords Plaintiffs no consultation rights on that subject. Nor is there any evidence that the co-financing decision was discriminatory – Fox and Plaintiffs participated in the same revenue stream of Regency's distribution arrangement with HBO.

f. *Soundtrack Royalties*

Interrogatory No. 2 further seeks all facts to support any claim that Fox failed to pay the proper amount of Soundtrack Royalties. Other than references to the language of the Agreement, the only purported facts offered by Plaintiffs in support of this claim are statements, on information and belief, that Fox "underreported the number of units sold of the soundtrack" and that Fox took "certain deductions, including a package allowance and a digital distribution allowance, and reduced the royalty on foreign sales in a manner not provided for in the Producer Agreement." (Responses, p. 11.)

With regard to underreporting, as Fox has earlier advised, when Fox became concerned that the soundtrack company (Razor & Tie) had underreported certain soundtrack sales it commenced an audit and ultimately paid BPL its share of the proceeds of additional revenues that were identified in the audit. There are no remaining underreported soundtrack sales, and Plaintiffs provide no facts supporting any claim that there are other sales that have not been included in Gross Proceeds.

With regard to deductions, Plaintiffs offer no facts to explain their position that the deductions identified in the Responses are not permitted by the Agreement. Fox will move for summary judgment because the Agreement, on its face, provides that payment of royalties for soundtrack sales is based on net sales, and there are ample admissions by

Steve Marenberg
April 5, 2013
Page 7

Plaintiffs in the documents that soundtrack royalties are paid based on net sales.[3] Likewise, Plaintiffs offer no facts to support any claim that Fox reduced the royalty on foreign sales in a manner not provided for in the Agreement. Absent facts supporting this conclusory assertion, Fox will likewise move for summary adjudication of this issue.

Plaintiffs' damage assertion regarding their soundtrack royalty claim also remains deficient. A damages computation cannot simply be a standalone number because a damages computation requires at least "some analysis." *See Frontline Med. Associates*, 263 F.R.D. at 569 ("By its very terms Rule 26(a) requires more than providing-without any explanation-undifferentiated financial statements; it requires a 'computation,' supported by documents.") (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir.2006)); *see also City & County of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003) ("the plaintiff should provide more than a lump sum statement of the damages allegedly sustained."). The Amended Disclosures declared that the damages for the soundtrack royalty claim are $972,889 plus interest as of June 30, 2010. The Amended Disclosures provide no analysis whatsoever to demonstrate how Plaintiffs arrived at this number. Fox is entitled to information required under the Rules.

     g.   *Digger*

Interrogatory No. 8 seeks all facts that support Plaintiffs' claim that Fox breached the Agreement by including the character Digger in *The Squeakquel*. The only purported facts provided in the Responses are that "the chipmunks converse with one another in a manner that suggests that there is a pre-existing relationship or familiarity with one another" and that during a preview screening of the picture, "some viewers expressed confusion over Digger's appearance in the film and their belief that Digger was a relative of the Chipmunks." (Responses, p. 20.)

Fox will thus move for summary adjudication that there has been no breach of the parties' Agreement because (a) Digger does not "interact with" and is not "shown as having a familial relationship with" existing characters; (b) there is no evidence to suggest that Plaintiffs exercised their approval right consistent with the Agreement; *i.e.*, Plaintiffs never objected that, by including Digger, the existing characters were not depicted in a manner reasonably consistent with or related to the integrity and artistic representation of the existing characters as they have been depicted previously; and (c) in any event, any such objection by Plaintiffs would be objectively unreasonable.

Plaintiffs have also failed to disclose any damages related to the supposedly improper use of Digger. Fox submits that this omission is intentional and necessary:

---

[3] Fox's investigation of the matter is continuing, but we anticipate showing that Plaintiffs have received an overpayment of soundtrack royalties because the soundtrack company did not fully account for all applicable deductions before making royalty payments, and Fox reserves all rights to recoup that overpayment from Plaintiffs.

Steve Marenberg
April 5, 2013
Page 8

Plaintiffs have not been damaged in any cognizable way. Fox will move for partial summary judgment on this basis as well.

 h. *Licensing & Merchandising*

Interrogatory No. 4 seeks all facts that support Plaintiffs' claim that Fox breached any obligations respecting licensing and merchandising. Plaintiffs have earlier confirmed that the merchandising claim is not based on any asserted breach of express provisions of the Agreement (see February 14, 2013 letter from Steve Marenberg) and reaffirm in the Responses that this claim is based on a purported breach of an implied "obligation to act in good faith and deal fairly" with BPL in the exploitation of Fox's Picture-Related Merchandising rights. (Responses, p. 13.)

In determining the adequacy of the Responses on this issue, and to outline the contours of Fox's motion for summary adjudication, it is useful to point out the express contractual standards of the Agreement which foreclose claims on an implied covenant basis that seek to impose obligations inconsistent with the contract.

First, the Agreement provides that Fox has "no obligation" to conduct any merchandising. (Agreement, ST&C, ¶18.). This language forecloses any claim that Fox can be liable for failing to make best efforts to maximize merchandising revenue. This is the precise holding of *Third-Story Music, Inc. v. Waits*, 41 Cal.App.4th 798 (1995) on materially indistinguishable facts. Second, subject only to Plaintiffs' fundamental approval rights of paragraph 15, and only to the extent a merchandising element is inconsistent with an element previously approved under paragraph 15, Fox "exclusively own[s] and control[s] all Picture-Related Merchandising Rights . . . ." This language forecloses any implied covenant claim directed to the manner in which Fox conducts merchandising. This result is compelled by *Wolf v. Walt Disney Picture and Television*, 162 Cal.App.4th 1107, 112 (2008). Where Fox's rights are "exclusive" and "controlling," Fox's exercise of rights cannot be second-guessed by Plaintiffs. As you will recall, Judge West previously determined that "the fact that merchandising was within the sole discretion of Fox will likely preclude any recovery on this claim." Ruling on [Fox's] Motion to Dismiss at 4:9-13.

Third, the Agreement provides that BPL has a right of approval, "which approval shall not be unreasonably withheld or delayed," over the "'style book' or art-reference materials used in conjunction with Picture-Related Merchandising Rights, and of [Fox's] merchandising licenses with respect to the Picture; provided that Fox's decision shall be controlling and provided that all decisions relating to the financial and other terms of Fox's licensing arrangements shall be in Fox's sole discretion. In the event mutual approval is not reached in a timely manner, Fox's decisions shall be final." (Agreement, ¶9(a).) Under this language, BPL has certain approval rights over the artistic content of the style guide or art-reference materials used by Fox, but BPL has no say on the financial and other terms of the licenses. Those are in Fox's sole discretion. Fox is unaware there are any claims that the licenses were not approved for artistic content

Steve Marenberg
April 5, 2013
Page 9

reasons, but Fox's decisions are "controlling" and "final" even with respect to these matters.

The Responses contain no facts that would support any claim for breach of implied covenant. Plaintiffs assert that Fox's "negotiations" concerning approval rights over the style book would have been "misleading" and the grant of rights "illusory" if Fox were under no obligation to create a style guide. (Responses, p. 14.) This assertion provides no facts supporting any claim. The Agreement imposes no obligation to create any style guide, but rather affords Plaintiffs approval rights over any "style guide or art-reference materials used" by Fox (emphasis added). No claim for implied covenant seeking to impose an obligation on Fox to create a style guide can withstand the express standard of the Agreement that Fox's obligations are limited to affording Plaintiffs limited approval rights over a style guide or art-reference materials used by Fox. There is nothing "illusory" about affording Plaintiffs approval rights over materials found in a style guide or art-reference materials.

The Responses further state that Fox "repeatedly acknowledged the importance of and promised to create a 'style book' in connection with its exploitation of its Picture-Related Merchandising Rights, but failed to do so in a timely manner." (Responses, p. 14.) Plaintiffs additionally state that a "style book is an essential marketing tool in soliciting interest from merchandise licensees" and that Fox "fail[ed] to issue the style book until it was too late to enable the merchandise licensees to capitalize on the marketing of the initial theatrical release or DVD release, [thereby] squander[ing] the opportunity to generate meaningful sales . . ." (Responses, p. 15.) Plaintiffs contend that "Fox's unreasonable delay in issuing the style book impaired the value of Bagdasarian's contractual right to approve the style book . . ." (Responses, p. 15-16.)

None of these assertions provides any facts, rendering the Responses inadequate for that reason alone. Plaintiffs provide no dates, no individuals and no specifics associated with any of the asserted conduct by Fox. Moreover, purported acknowledgements or promises by Fox respecting a style guide do not change the terms of the Agreement or give rise to any implied covenant obligations. Implied covenant obligations are determined from the contours of the contract language, not from alleged conversations about performance issues years after the contract was executed. Further, none of these assertions is material to Plaintiffs' claim for breach of implied covenant. In contravention to the express standards of the Agreement, Plaintiffs seek to impose an implied obligation on Fox to use a style guide and an obligation to issue a style guide in some particular timeframe, even though such matters are expressly within the "exclusive control" of Fox.

Finally, Plaintiffs assert that after release of the Alvin picture, Fox promised to "treat Alvin and the Chipmunks as an 'A list priority'" but failed to do so. In this regard, Plaintiffs assert that Fox (a) "continued to delay the preparation of a 'style book'"; (b) "misrepresented" the Alvin property on sales sheets; (c) failed to consider BPL's comments and input on "potential merchandising opportunities in good faith"; and (d)

Steve Marenberg
April 5, 2013
Page 10

failed to "work cooperatively with [BPL], often letting weeks pass before responding to [BPL's] questions and efforts to assist Fox in merchandising efforts." (Responses, pp. 18-19.)

Once again, Plaintiffs offer no facts supporting any of these assertions. Plaintiffs provide no dates, identify no individuals and offer no specifics associated with any of this asserted conduct by Fox. Moreover, purported promises by Fox to treat Alvin property as a priority do not change the terms of the Agreement or give rise to any implied covenant obligations. And again, none of these assertions is material to Plaintiffs' claim for breach of implied covenant. As noted above, Fox had no obligations to use any style guide or issue one at a particular point in time. There are no facts supporting any purported "misrepresentation" of the Alvin property. And no implied obligation can be imposed to require Fox to consider Plaintiffs' input on merchandising opportunities or to require cooperation with Plaintiffs in their purported efforts to assist Fox where the Agreement affords Fox "exclusive control" over merchandising.

In short, Plaintiffs' inadequate Responses on the merchandising claim are devoid of any facts and establish the absence of any basis for Plaintiffs to assert breach of any implied covenant.

Plaintiffs' Amended Disclosures echo the lack of a cognizable theory for alleged breach of licensing and merchandising obligations. Plaintiffs assert only that they are due "merchandising royalties based upon the difference between the amount Fox paid Bagdasarian Productions and what Bagdasarian Productions would have received absent Fox's breaches." Amended Disclosures at 8:10-12. Even if, as Plaintiffs assert, Fox was obligated to issue a style guide, and to do so prior to release of the *Alvin* picture (all contrary to the express terms of the Agreement), Plaintiffs have offered no evidence to suggest that such supposed breaches cost any merchandising opportunities or revenue. Plaintiffs have identified no licensees or retailers, for example, that would have sold Alvin products had a style guide been released at an earlier time, nor have Plaintiffs offered any facts that the terms of such hypothetical transactions would have been superior to those that Fox entered into (in the exercise of its sole discretion). Plaintiffs' vague claim for "lost profits" has no evidentiary basis, is not legally cognizable, and does not even bear a causal nexus to the alleged breaches. These matters are susceptible to summary judgment as well.[4]

---

[4] With regard to the merchandising claims, Plaintiffs have refused to produce documents reflecting disputes with Universal Studios over the adequacy of Alvin merchandising activity. If Plaintiffs' claims in this case are based in some way on the adequacy of Fox's merchandising activity – though no facts supporting any such claims have been identified at this time, and the contract bars any such implied covenant claim – Plaintiffs will necessarily be required to produce the materials they are withholding that reveal Plaintiffs' position on the standards for conducting merchandising.

Steve Marenberg
April 5, 2013
Page 11

\* \* \* \*

For the reasons set forth above, Fox submits that Plaintiffs' discovery responses reveal that their claims lack evidentiary basis and are amenable to summary adjudication. In the event Plaintiffs maintain there are facts not found in the Responses that support any of these claims, we demand that Plaintiffs supplement their responses no later than Friday, April 12. In that regard, we note that this case has been pending for nearly three years and Plaintiffs have had more than adequate opportunity over this lengthy period to identify any facts supporting their claims. Judge West has given Plaintiffs wide latitude to assert claims, including certain claims not even alleged in the FAC, but has made clear he will not tolerate surprise tactics or gamesmanship in discovery. In that light, the only fair inference is that Plaintiffs have not disclosed facts to support their claims because there are no such facts. If Plaintiffs seek to avoid summary adjudication of these baseless claims, they must promptly identify any purported facts upon which they intend to rely. Alternatively, if Plaintiffs believe that the facts they have disclosed are sufficient to withstand Fox's forthcoming motion, we look forward to understanding, through the meet-and-confer process, the basis for that belief.

2.   Rule 11 and Recovery of Expenses

Plaintiffs' Responses and failure to articulate any damages underscore Fox's concern that Plaintiffs have pursued claims lacking the factual and legal support required under the Federal Rules. Indeed, our initial review of documents produced by Plaintiffs in this matter suggests that Plaintiffs have pursued claims not only lacking in factual basis, but contrary to the facts known to Plaintiffs even before filing suit. Rule 11, of course, forbids claims lacking in factual or legal support, and does not permit suits to be filed in the hope that facts may be discovered to support baseless claims.

Fox has no desire to pursue sanctions for filing frivolous claims where such matters can be resolved by the prompt dismissal of claims lacking factual or legal basis. Even at this late date, we invite Plaintiffs to re-examine their course and dismiss the claims detailed above that lack factual support and that are contrary to the parties' Agreement. As the parties stand at the threshold of yet-more significant expenditures for discovery, prompt dismissal of these claims will avoid Fox incurring continued fees and costs. Respectfully, and with regret that it is necessary, Fox reserves all rights to seek appropriate relief under Rule 11 and other applicable laws for the continued maintenance of frivolous claims lacking any factual or legal support. *See* 28 U.S.C. § 1927; *Lahiri v. Universal Music and Video Distr. Corp.*, 606 F.3d 1216 (9th Cir. 2010) (affirming District Court's sanctions against Plaintiff's counsel for knowingly and recklessly pursuing frivolous action and litigating it in bad faith for five years); *see also* Fed. R. Civ. P.

Steve Marenberg
April 5, 2013
Page 12


37(c)(2) (improper failure to admit what is requested under Requests for Admission may lead to award of attorneys' fees).


Sincerely,

Louis A. Karasik


Cc:   Douglas Dixon
      Melissa McCormick

LEGAL02/34033126v1

# EXHIBIT 17

## ALSTON & BIRD LLP

333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax: 213-576-1100
www.alston.com

Louis A. Karasik                    Direct Dial: 213-576-1148                    Email: lou.karasik@alston.com

April 18, 2013

***VIA US MAIL & EMAIL***
Steve Marenberg
IRELL & MANELLA LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067

Re:    Doug Dixon's letter of April 10, 2013 re: Fox's Meet and Confer

Dear Steve:

I have Doug Dixon's letter dated April 10, 2013 responding to Fox's letter of April 5 regarding the inadequacies of Plaintiffs' Responses and Amended Disclosures [1]

Mr. Dixon's letter levels a host of false accusations against Fox, but it does not agree to supplement discovery responses. With the exception of the writing services claim -- for which Fox has indicated we would await further discovery before seeking summary disposition -- Mr. Dixon's letter does not identify any facts or point to any documents supporting Plaintiffs' claims. Even as to the writing services claim, Plaintiffs' Responses and Amended Disclosures are inadequate and will be the subject of a forthcoming motion to compel.

Plaintiffs' letter thus confirms that Plaintiffs have no facts to support their claims. So that there can be no mistake regarding the state of the record as of this date, this letter (1) corrects Mr. Dixon's misstatement of the standard for summary judgment in Federal Court, (2) summarizes the state of the disclosed legal and factual basis on each issue for which Fox intends to move for summary judgment, and finally (3) responds briefly to some of Mr. Dixon's more egregious misstatements.

Though Fox has met its obligations to meet and confer on these matters, I would like to invite you to participate in an additional meet and confer in an effort to avoid unnecessary motion practice. We would make ourselves available to have that face-to-face at any time next week that is convenient for your schedule. This would afford you an opportunity to identify any existing evidence you believe material to Fox's motion for

---

[1] We use the same short forms as in our April 5 letter.

Atlanta • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

000210

Steve Marenberg
April 18, 2013
Page 2

summary judgment, or any evidence you believe will result from discovery that would avoid dismissal of Plaintiffs' claims. A direct exchange may help focus the parties on the disputes, if any, that exist about the relevant evidence. Please promptly let me know if you are prepared to participate in this exchange.

## I.     Standard for Summary Judgment

A "no evidence" motion for summary judgment has long been part of Federal Procedure. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Mr. Dixon's letter cites *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105 (9th Cir. 2000) for the proposition that a party may not move for summary judgment on the basis that the nonmovant lacks evidence. Mr. Dixon is not correct.

As *Nissan Fire* explains, to prevail on summary judgment, a moving party bears an initial burden of production and an ultimate burden of persuasion. *Id.* at 1102. A moving party's initial burden of production is "the burden of producing evidence, <u>or showing the absence of evidence</u>, on a motion for summary judgment." *Id.* (emphasis added); *see also id.* ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense <u>or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.</u>" (emphasis added) (citation omitted)); *see also id.* at 1106 ("The Supreme Court has clearly indicated that, in appropriate cases, a moving party may carry its initial burden of production by showing that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial.")

*Nissan Fire* further explains that summary judgment motions should not be used as a substitute for discovery. That is the context for the quotation that Mr. Dixon pulls from *Nissan Fire* – "[a] moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." The very next sentence of the case shows that Fox has done all that is required to pursue its motion for summary judgment:

> In a typical case, in order to carry its initial burden of production by pointing to the absence of evidence to support the nonmoving party's claim or defense, the moving party will have made reasonable efforts, using the normal tools of discovery, to discover whether the nonmoving party has enough evidence to carry its burden of persuasion at trial.

*Id.* at 1105. Here, Fox has "made reasonable efforts, using the normal tools of discovery" – requests for admission, interrogatories, and Rule 26(a) disclosures -- to confirm that Plaintiffs lack any evidence to carry their burden of persuasion at trial. Nothing more is required.

Steve Marenberg
April 18, 2013
Page 3

*Nissan Fire* also mentions that the opposing party will ordinarily have the opportunity to conduct *necessary* discovery before opposing a motion for summary judgment. Here, Plaintiffs have attested that they lack evidence that is necessary to their claims that is solely within their control. For that reason, and because Plaintiffs have not identified through the meet-and-confer process any specific discovery that would cure the defects in their claims, Plaintiffs may not oppose Fox's motion for summary judgment by a Rule 56(f) affidavit. *E.g., Margolis v. Ryan,* 140 F.3d 850, 853 (9th Cir. 1998) (to demonstrate entitlement to further discovery under Rule 56(f), non-movant must "make clear what information is sought and how it would preclude summary judgment"); *see also Cambridge Electronics Corp. v. MGA Electronics, Inc.,* 227 F.R.D. 313, 324-25 (2004) (excluding non-movant's proffered evidence in opposition to summary judgment that was not mentioned in its interrogatory responses).

We assume Plaintiffs will not rely on the mis-reading of *Nissan Fire* set forth in Mr. Dixon's letter in their opposition to Fox's forthcoming Motion for Partial Summary Judgment.

Again, we invite Plaintiffs to disclose any basis they have to proceed on the claims outlined below. If Plaintiffs intend to argue that further discovery is required, we invite them through this meet-and-confer process to "make clear what information" they might seek and explain "how it would preclude summary judgment." *Margolis v. Ryan, supra,* 140 F.3d at 853.

II.     **The Disclosed Basis For Plaintiffs' Claims As Of April, 2013, Three Years After Plaintiffs Filed Their Complaint**

Plaintiffs filed their initial Complaint in April 2010, nearly 3 years ago to this date. Plaintiffs amended their Complaint in August 2012, 8 months ago. Plaintiffs were required to have conducted a pre-filing inquiry into the basis for their claims before filing. *E.g., Cambridge Electronics Corp.,* 227 F.R.D. at 323 ("The discovery was propounded almost a year after plaintiff moved to amend its complaint. Surely within that time, if not prior to its filing of the amended pleading, plaintiff must have identified some factual basis for the allegations it was making." (citing Fed. R. Civ. P. 11(b)(3)).

a.   *Purchase Price*

In our April 5 letter, we noted that Plaintiffs' Response to Interrogatory No. 3 points solely to the language of paragraphs 6, 7 and 12 of the Agreement. (Responses, p. 12.) If Plaintiffs possessed evidence suggesting that both parties (or even the Plaintiffs unilaterally) intended the Purchase Price to be non-recoupable with respect to Sequels, Plaintiffs were obligated to identify such evidence. They did not.

In Mr. Dixon's April 10 letter, in lieu of evidence, Plaintiffs argue that "Fox has yet to produce, or complete its production of, documents responsive to Plaintiffs' RFPs that are directly relevant to this claim and uniquely within Fox's possession." D. Dixon

Steve Marenberg
April 18, 2013
Page 4

April 10 letter at 2. While we will not be drawn into a dispute regarding Plaintiffs' misleading assertions,[2] Plaintiffs cannot avoid summary judgment by claiming they require more discovery when they cannot identify what discovery is necessary or what they anticipate it will show that would avoid dismissal of their claim. This is particularly true where Fox's understanding that the Purchase Price is an advance for sequels is shown not just by the plain language of the contract (as found by Judge West), but by the participation statements Fox issued to Plaintiffs (*See e.g.,* FOX00012151-FOX00012243) and all other documents. The evidence is uniform that Fox performed the contract in exact accordance with its terms, and Fox's motion for summary judgment will be based on undisputed evidence from Fox in that regard.

Mr. Dixon has made clear that Plaintiffs have no evidence on this point other than the contract language. We cannot understand how evidence in Fox's possession would avoid dismissal of the Purchase Price claim, and Plaintiffs have not identified any specific discovery that would support their claim. Absent Plaintiffs' identification of any such discovery, Plaintiffs will be precluded from seeking additional discovery after Fox files its motion.

   b. *Graphic Design Services*

Our April 5 letter points out that Plaintiffs' response to Interrogatory 10 provides no facts. Rather, the Response appears largely to be a cut-and-paste from general allegations found in the Amended Complaint. *Compare* First Amended Complaint ¶ 38 ("In mid-2008, Karman performed substantial graphic design services in connection with the re-design of the pre-existing animated "Chipettes" for CGI motion picture format.") *with* Plaintiffs Response to Interrogatory 10 ("[i]n mid-2008 at Fox's request, Karman provided to Fox graphic design service in connection with the re-design of the pre-existing animated Chipettes for CGI motion picture format.") As we explained, those Responses are insufficient and do not even reflect a serious effort to identify the evidentiary basis for Plaintiffs' claim, assuming that there is one. Similarly, Plaintiffs' Rule 26 damages disclosure does not list a damages figure for this claim or even a theory or method by which damages would be calculated.

Mr. Dixon's letter makes no mention of any additional facts or any damages theory; indeed, the letter does not even mention this claim. Mr. Dixon's letter also does not even identify this claim as one on which discovery is needed or supposedly outstanding. The claim is thus ripe for summary judgment. Again, if you contend that further discovery is necessary before the Court decides the issue, we request that you promptly identify such discovery and the basis for any contention that such further

---

[2] Suffice it to say that Mr. Dixon knows that Fox substantially completed its production of documents in response to RFP 1 by March 27, 2013 and produced some additional documents on April 9, 2013. Responses (if any) to Plaintiffs' overbroad and facially objectionable RFPs 74 and 75, untimely served on April 2, are not yet due.

Steve Marenberg
April 18, 2013
Page 5

discovery would avoid dismissal of the claim. Fox's motion for summary judgment may
additionally rely on undisputed evidence from Fox that Ms. Karman was never asked to
provide any graphic design services.

    c. *FX Distribution*

    With regard to Plaintiffs' claim for breach based on the basic cable license to FX,
Mr. Dixon's letter again offers nothing other than the false assertion that Fox has not yet
responded to RFPs 63 and 64, and the misleading assertion that Fox has not yet answered
an irrelevant interrogatory (for which the response is not yet due). Mr. Dixon's letter
does not agree to supplement the Responses or Amended Disclosures, nor do Plaintiffs
offer any new facts or otherwise suggest that Plaintiffs have any evidence to prove their
claim. Fox has fully complied with the Referee's order to produce documents deemed
relevant to this claim. Those documents reflect no basis for Plaintiffs to proceed on the
FX claim. Indeed, Fox anticipates supporting its motion, *inter alia*, with evidence drawn
from that document production, showing that Fox's license of *Alvin* to FX was not only
fair and reasonable, but by far the most advantageous business opportunity. Moreover,
because there is no evidence that any other buyer would have paid more for *Alvin*, as the
absence of discussion in your Amended Disclosures makes clear, there are no cognizable
damages on this claim.

    Once again, if you believe you can "make clear what information is sought and
how it would preclude summary judgment" on this claim, the time to do so is now.

    d. *HBO Distribution*

    In our April 5 letter, we explained that Plaintiffs' response to Interrogatory No. 2
offered only legal conclusions, but no facts, in support of its claim. In Mr. Dixon's April
10 letter, the only mention of this claim is that Plaintiffs require evidence regarding
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D. Dixon April 10, 2013 letter at
2. But Plaintiffs already have that evidence – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Fox has fully responded to
RFP 52 by providing a verified statement, pursuant to stipulation, that provides Plaintiffs
more information than they would have received merely by production of the document
requested under RFP 52.

    Absent from Mr. Dixon's letter is any suggestion that Plaintiffs have any
evidence, or believe they can adduce any evidence through further discovery, that the
decision to co-finance the *Alvin* picture was not a reasonable exercise of business
judgment. From Plaintiffs' interrogatories, we understand Plaintiffs to be searching for
some evidence that the co-financing decision was "discriminatory" towards Plaintiffs.
But there is no such evidence – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Much of the remaining discovery
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Steve Marenberg
April 18, 2013
Page 6

sought in Plaintiffs' untimely document production requests patently irrelevant information pertaining to *other* co-financed films.

Once again, absent Plaintiffs' identification of any evidence to be adduced in discovery that might preclude summary judgment, the claim is ripe for adjudication.

### e. *Digger*

Our April 5 letter explains why, factually and legally, Plaintiffs cannot proceed on their claim regarding "Digger." Mr. Dixon's April 10 letter does not mention this claim at all – not even with the rote assertion that more discovery is needed. We understand this as a concession that Plaintiffs cannot prove their *prima facie* case or establish any damages on their "Digger" claim. Despite the complete lack of merit in the claim, Fox invites Plaintiffs one last time to identify any admissible evidence to support their claim. Fox's motion for summary judgment will rely on undisputed evidence (including a clip from the movie itself) that use of Digger did not give rise to any new character approval rights, and that even if it did, Plaintiffs have advanced no objection or introduced any evidence directed to the applicable contractual standard.

### f. *Licensing & Merchandising*

In its April 5 letter, Fox explained the legal defects in Plaintiffs' theory on the licensing and merchandising claim and pointed out that Plaintiffs' Responses offered no facts supporting their theory of breach of implied covenant. Fox further advised that, even leaving aside those insurmountable obstacles to recovery, Plaintiffs offered no theory of damages (and certainly no calculation), thereby confirming that any damages sought on this claim would be impermissibly speculative.

Plaintiffs' only response in Mr. Dixon's April 10 letter is to point to Plaintiffs outstanding and untimely discovery. Specifically, Plaintiffs point to untimely requests for production that pertain solely to *other* movies (*Garfield: The Movie, Dr. Seuss' Horton Hears a Who!, Space Chimps*, and *Ice Age*). Plaintiffs do not attempt to explain how this information, even if discoverable, would preclude summary judgment on its claim. Plaintiffs also point to a single interrogatory that asks Fox to detail its L&M efforts. Fox will. But as explained in Fox's April 5 letter, even though Fox vigorously pursued licensing and merchandising activity, Plaintiffs' claim fails without regard to an evaluation of that activity. Completely lacking is any claimed evidence that would demonstrate a breach of any implied obligation that could survive the express terms of the parties' contract, or any suggestion of damages resulting from any such unidentified evidence.

If Plaintiffs believe their claim has any legal merit or cognizable damages, we invite them to explain their theory and the evidence (if any) underlying it. If Plaintiffs believe outstanding discovery will preclude summary judgment, we invite them to explain how.

Steve Marenberg
April 18, 2013
Page 7

Finally, we once again point out that proceeding on claims that lack factual and legal basis is inconsistent with the Rules. We have on more than one occasion invited Plaintiffs to drop these unsupported claims, most recently with particular attention to Plaintiffs' Responses and Amended Disclosures that attest to the lack of adequate basis to proceed. Fox again respectfully reserves all rights to recover fees and expenses under the authorities cited in our April 5 letter resulting from Plaintiffs' continued prosecution of these baseless claims.

### III.   Response to False Assertions in Mr. Dixon's April 10 Letter.

Fox sent the April 5 letter to engage in a meaningful exchange about the substance of the case. Mr. Dixon's response contains a series of unfounded accusations. While we will not seek to respond to each of those allegations, several of the more inflammatory misstatements warrant a response.

Plaintiffs assert that Fox previously sought to meet-and-confer on an "unmeritorious 12(c) motion." As you will recall, through that meet-and-confer process, Plaintiffs agreed in your February 14, 2013 letter that the merchandising claim is not predicated on Fox's breach of any express standards of the contract. Plaintiffs also confirmed that the claims based on HBO and FX distribution are not based on the breach of any implied obligations. These resolutions made it unnecessary for Fox to pursue a motion for judgment on the pleadings at that time. Far from pursuing an "unmeritorious" Rule 12(c) motion, Fox pursued a meaningful meet-and-confer process that made it unnecessary to file any motion on these issues.

Plaintiffs also advance the strange notion that they have no obligation to respond to discovery because Fox supposedly already has knowledge about the issues. *See* D. Dixon April 10 letter at 1 ("Fox cannot feign ignorance. . . ."). That is not, obviously, the test for Plaintiffs' discovery obligations. Plaintiffs' assertion that Fox already has some information about the case does not provide them a "free pass" to avoid their obligations. Indeed, from the outset of this matter, Fox has asked Plaintiffs to identify what basis they have for their claims. After nearly three years of litigation and too much in attorneys' fees, the answer is "none."

In that vein, we also reject Plaintiffs' assertion that Fox is concerned about what information might be revealed through depositions. Fox is concerned that Plaintiffs' meritless case continues to distract its executives (and third-party witnesses) from their important duties. Fox is concerned about Plaintiffs continuing to seek overbroad, harassing, and expensive "fishing expedition" discovery in support of their meritless claims. Fox is concerned about Plaintiffs' pursuit of claims not even articulated in the Amended Complaint, including claims for which it is evident that Plaintiffs at no point had any evidence to support them. The summary judgment procedure exists to weed out meritless claims, like those identified in this letter. Mr. Dixon wrongly speculates that Fox "has something to hide."

Steve Marenberg
April 18, 2013
Page 8

     Finally, we also reject Plaintiffs' false carping about the status of discovery. If Plaintiffs believe they have not received material that they are entitled to, they should initiate a meet-and-confer process to seek to resolve the dispute. Fox has fully complied with its discovery obligations, and Plaintiffs' reliance on these unfounded and manufactured complaints only confirms to Fox that Plaintiffs have no evidence in support of their claims.

     Fox has attempted to meet and confer with Plaintiffs in good faith to afford Plaintiffs every opportunity to identify any pertinent evidence. As noted, we invite you to participate in a further meet and confer any time next week involving a direct exchange that would focus on any evidence you believe material to Fox's anticipated motion for summary judgment. We are also prepared to further exchange on the standards for summary judgment under the Federal Rules, should you believe there are any remaining disputes about that matter. We think both parties are served by such discussions that may lead to narrowing of the issues without the necessity of further prolonged litigation. After three years of litigation, however, Fox is not prepared to tolerate unreasonable delay in setting up this meeting. We look forward to hearing from you promptly.

                      Sincerely,

                      Louis A. Karasik

LAK:jll

# EXHIBIT 18

# Re: chipmunks

**From:**

steve waterman <waterent@gmail.com>

**To:**

bagdasarian@aol.com

**Date:**

Fri, 19 Sep 2008 15:59:53 -0700

let me think about how I get Avi to discuss it.

On Fri, Sep 19, 2008 at 2:36 PM, <Bagdasarian@aol.com> wrote:

Steve,

Can you find out if Fox paid Marvel or Avie Arad (spelling?) more money on the sequel of X-Men. If they did, and it wasn't called for in the contract, then that is something that they are used to doing and they should do it for us.

I am still waiting to hear from Tom about my taking over the licensing. As I mentioned, if they don't give me that, then we will have to look at their various breaches and either put a number to it or figure out another approach.

Let me know about the X-Men deal.

Ross

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Looking for simple solutions to your real-life financial challenges? Check out WalletPop for the latest news and information, tips and calculators.
(http://www.walletpop.com/?NCID=emlcntuswall00000001)

BP00032545

# EXHIBIT 19

# ALSTON & BIRD LLP

333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax: 213-576-1100
www.alston.com

Louis A. Karasik                   Direct Dial: 213-576-1483                   Email: lou.karasik@alston.com

July 8, 2013

VIA U. S. MAIL & EMAIL

Steve Marenberg
IRELL & MANELLA LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067

Re:   *Bagdasarian Productions, LLC et al. v. Twentieth Century Fox Film Corp.*

Dear Steve:

I write to follow-up on our telephone call on June 28, 2013, where we discussed scheduling and other issues.

Discussion of the Evidence

As a prelude to the discussion of a revised schedule, I invited you during our call to have a meaningful exchange about the evidence. In particular, we focus attention on the admissions that have surfaced in Mr. Waterman's documents and the additional materials Plaintiffs identified after Mr. Waterman's documents were produced.

In Fox's view, the new materials, both individually and together with prior evidence, fully invalidate Plaintiffs' claims. For example, on the Purchase Price claim, the new materials show that Mr. Bagdasarian understood in 2008 and 2009 that the Purchase Price is an advance for sequels. On the writing and graphic services claims, the evidence is now clear that these activities were undertaken with no expectation of compensation, were never conditioned on Fox's agreement to pay any amounts and/or were undertaken without Fox's consent (and in some cases, without even Fox's knowledge). On the soundtrack claim, any claim that BPL did not understand that the determination of royalty payments would include deductions as called for by the Agreement and the Razor & Tie contract is belied by Mr. Bagdasarian's email exchanges where he recognized these deductions. And the merchandising claim represents Mr. Bagdasarian's admitted attempt to obtain additional compensation because he "could not live with [his] present deal." (SW0088).

Fox's view is that there is no good faith basis to proceed with these claims. While we have previously expressed our views about the requirements of Rule 11 of the Federal

Atlanta • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

Steve Marenberg
July 8, 2013
Page 2

Rules of Civil Procedure and 28 U.S.C. § 1927, the application of these principles becomes even clearer in light of the admissions found in the newly produced materials. No matter how strongly your clients feel about pursuing their claims, the contemporaneous documentary record poses insuperable factual and legal barriers to your clients' recovery and this litigation should end. We invite your close review of the recently identified materials (many of which were apparently not available to your firm when the litigation commenced) before continuing to pursue these claims. Fox must respectfully reserve all rights.

We remain open to further discussion, including a face-to-face meeting with documents in hand, to discuss the parties' respective views of the evidence. We believe frank discussion of the evidence is consistent with the Referee's view that the parties should directly exchange about the claims in an effort to avoid needless disputes. Of course, any narrowing of the claims that results from this discussion will have a significant impact on schedule.

<u>Status of the Remaining Claims</u>

You indicated during our call and confirmed in the telephonic hearing with Judge West on July 1 that Plaintiffs intend to pursue an amended complaint that will add some claims, but also drop some claims. We are unclear what specific additional claims Plaintiffs seek to add, but my understanding is that they relate to soundtrack issues directed to the second picture. I explained during our June 28 call that Fox would be moving for summary judgment on certain claims, and our motion (targeting the Purchase Price and FX claims) was filed on Friday. The Referee has set an August 26 hearing date for the motion.[1]

With respect to Plaintiffs' proposed amended pleading, Fox has objected to Plaintiffs' attempt to amend at this late date to add soundtrack claims directed to the second picture. There is no basis to add any claims nearly a year after the First Amended Complaint was filed, over three years after this lawsuit was filed, and after the close of document discovery. Fox objects to the prejudice to Fox associated with Plaintiffs' untimely pursuit of new claims. Though we will evaluate the proposed amended complaint in good faith, we think it likely that Fox will oppose any amendment that enlarges the claims. The Referee set the deadline for Plaintiffs to file a motion for leave to amend on July 9, 2013, with the hearing on the matter set for August 26.

---

[1] I am surprised by your email of June 28 expressing astonishment that Fox filed its motion for partial summary judgment on Friday. I thought I was clear on our call that the motion was forthcoming. You will recall that I invited a discussion over developing a schedule that would take into account Fox's motion and Plaintiffs' desire to add claims and possibly drop claims.

Steve Marenberg
July 8, 2013
Page 3

We think it makes sense in determining the schedule to recognize that the claims remaining in issue are not fully known. The remaining discovery may be narrowed by the voluntary or involuntary dismissal of claims and could be broadened if Plaintiffs (by agreement or through leave of the Referee) pursue new claims. Of course, should the Referee permit amendment, Fox would have a right to challenge the sufficiency of any purported new claims and would also be entitled to re-open document discovery targeted to new claims.

We would suggest that resolution of Fox's motion for summary judgment, possible disputes over Plaintiffs' pursuit of an amended complaint and challenges Fox might bring to the sufficiency of purported new claims may involve proceedings extending through September. Based on the three rulings the Referee issued earlier today, the parties are now obligated to produce additional documents. The schedule should therefore allow for the production of these additional materials in setting a schedule for additional deposition discovery.

<u>Next Steps to Complete Discovery</u>

You indicated during our June 28 call that the prior schedule should be adjusted by moving all dates one month forward. We think that this proposal fails to account for the currently uncertain scope of the case, as set forth above.

Moreover, as I explained on our call, Fox seeks additional discovery to address the discovery failures that Plaintiffs revealed on June 7.

Specifically, Fox seeks the following additional discovery:

1.  A 30(b)(6) deposition of BPL on the subjects of evidence preservation and production of relevant documents. If Plaintiffs intend to designate Mr. Bagdasarian as the deponent on these topics, we will expect the time associated with covering these topics to not count against Fox's seven hours of deposition of Mr. Bagdasarian on the merits.

2.  A subpoena and 30(b)(6) deposition directed to FTI, *inter alia*, on the steps taken to collect, preserve and identify potentially relevant evidence.

3.  A subpoena and 30(b)(6) deposition directed to AOL on their communications with Plaintiffs and/or FTI over the production of potentially relevant AOL records.

4.  To the extent that the above discovery does not establish that appropriate preservation, search, and collection has been undertaken, a third-party expert examination of Plaintiffs' hard drives and other sources of electronic evidence to determine, among other things, what has been preserved, searched, what

Steve Marenberg
July 8, 2013
Page 4

has yet to be searched, what efforts have been made to recover relevant records and what materials may have been deleted.

This discovery is made necessary by the spoliation of evidence now established by the record, and the fact that substantial new materials (at least 10,066 documents) would not even have been identified by Plaintiffs but for Fox's subpoena to Mr. Waterman. The discovery outlined above represents the minimum relief Fox is entitled to pursue to uncover the scope of spoliation that has occurred. We believe all of the above-described discovery should be paid for by Plaintiffs so that the further prejudice to Fox is minimized, and further that Fox should be compensated for the expenses it has occurred to date as a result of the spoliation.[2]

Fox would suggest that the above-described discovery should go forward next, during the same time that Fox's motion for summary judgment and Plaintiffs' motion for leave to amend is under consideration. This will avoid yet another circumstance where Fox is forced to participate in depositions before Plaintiffs have identified all relevant evidence (or the claims to be litigated are even fully known). With Plaintiffs' cooperation, the above-referenced discovery should be completed by August.

We would appreciate Plaintiffs' prompt response to Fox's demand for this additional discovery. We acknowledge that you previously declined to provide the information requested on an informal basis, as shown in our correspondence of June 18, 2013 and Plaintiffs' response of June 20, 2013. To the extent Plaintiffs remain unwilling to provide access to information necessary to address the taint on this proceeding, we are prepared to present the matter to Judge West so that the issues can also be heard on the August 26 hearing date.

We are prepared to commence the above-referenced discovery immediately. Depending on the results of this discovery, we would anticipate that any remaining deposition discovery (for witnesses whose depositions were previously noticed) that may be necessary could be completed in September, after the remaining issues are defined in light of the pending summary judgment motion (and soon-to-be pending request for leave to amend).

Though we think the above-described discovery should precede any further depositions of the parties' witnesses, as we indicated in the telephonic hearing with Judge West, Fox is nonetheless amenable to going forward with Mr. Waterman's deposition in July, as Plaintiffs have identified this discovery as essential to BPL's opposition to Fox's

---

[2] Plaintiffs' spoliation of evidence justifies (in our view, compels) serious sanctions. Before seeking appropriate relief from the Referee, however, we intend to pursue the discovery detailed above so that the matter can be decided on a complete record and the full extent of Plaintiffs' failure to preserve and produce evidence can be determined.

Steve Marenberg
July 8, 2013
Page 5

motion for summary judgment.  To that end, we look forward to coordinating dates for Mr. Waterman's deposition.

Remaining Schedule

If deposition discovery is completed by September, we would suggest a two month period thereafter for consideration of dispositive motions.  We see no reason to pursue a crammed schedule that would require either party to spend money on experts before the Referee has ruled on dispositive motions that do not require any expert evidence.  Assuming deposition discovery is closed at the end of September, we would propose that the last day to file motions for summary judgment be set at the end of October.

The Referee has earlier indicated his view that the mandatory mediation should take place while summary judgment motions are pending.  Assuming motions for summary judgment are filed in October, we would propose that a mediation session be scheduled in November, with the Referee deciding the dispositive motions at a hearing in November or December if the matter is not resolved.

Expert reports and expert discovery, if necessary, would go forward next, to be completed by February.  We would propose a briefing period in February for any *Daubert* or expert-based summary judgment challenges to the remaining claims, as this may impact the scope of issues remaining for trial.  Pre-trial and trial dates would be set for March or April 2014.  We assume you agree that a two or three month delay in any trial date in this proceeding remains extremely expedited in light of the disruption of the schedule by Plaintiffs' discovery failures.

We look forward to your prompt response.  If you think an in-person meet and confer on these matters would be helpful, please let us know.

Sincerely,

Louis A. Karasik

LAK:jll

**EXHIBIT 20**



P.O. Box 900
Beverly Hills, California 90213-0900
Phone 310 369 5351 • Fax 310 969 0885

**TWENTIETH CENTURY FOX**
A UNIT OF TWENTIETH CENTURY FOX FILM CORPORATION

Stephen H. Plum
Executive Vice President
Business Affairs

VIA FACSIMILE 805 695-0340 and U.S. MAIL

November 20, 2003

Steve Waterman
Waterman Entertainment
747 Riven Rock Road
Santa Barbara, CA 93108

Re: "ALVIN & THE CHIPMUNKS"

Dear Steve:

As discussed in our conversation yesterday, I am setting out below in summary what I understand your client's proposal to be for the exclusive motion picture and allied rights to this property:

Fees, etc.: $250,000 for each of two eighteen month options, against a combined purchase price and producing fee of $3,000,000, which shall in turn be applicable against 2.5% of first dollar gross. Home Video will be accounted on a standard 20% royalty basis, but with the understanding that if a director or star receives a higher Home Video royalty percentage, then so shall the Bagdasarians. Rather than the traditional passive payments of one-half for sequels and one-third for remakes, sequels and remakes would be compensated at 100%. In addition, you would receive a producing fee of $500,000. You and Ross Bagdasarian would each receive a "Produced by" credit, on screen and in the billing block of paid ads.

Merchandising: The Bagdasarians would control "Classic" Alvin merchandising, while Fox would control new merchandising arising out of the new uses of the property, with Fox and the Bagdasarians sharing the net merchandising revenue equally after a 20% fee to Fox, and costs, but capped at 5% (unless a higher costs number is agreed to between Fox and the Bagdasarians).

Soundtrack: You had previously suggested a 50/50 split of revenue, with Fox taking no fees. We agreed to that for any "Alvin & The Chipmunk" cover songs (i.e., those recorded in the uniquely distinctive character voices) within any soundtrack, and added that in any event the Bagdasarians would receive no less

h170v01

**A   N E W S   C O R P O R A T I O N   C O M P A N Y**

than one soundtrack royalty point.  Most recently you suggested a flat $1.50 per record sold, and I have a call into you to discuss.

TV Rights, Direct To Video, etc:  The original "Alvin & The Chipmunks" animated TV series will continue to be shown on television, and the newly-produced "Baby Alvin" direct to video production can likewise be released and distributed. Otherwise, "Alvin & The Chipmunks" productions by the Bagdasarians would be frozen between Fox and the Bagdasarians for so long as Fox continues to exploit the "Alvin & The Chipmunks" features.

Creative Issues: We would establish some "character integrity" standards for Alvin and The Chipmunks, such as those characters not smoking, drinking, taking illegal drugs, etc., and otherwise the Bagdasarians as producers would be closely involved in the development of the storyline and the portrayal of Alvin and the Chipmunks generally.

The definition we use for gross receipts, etc., will be the form that has been broadly accepted by representatives for "A" level talent.

There are obviously other issues that are covered in the long form rights and producing agreements, but I hope this sets out the key points we have been discussing.

Please give me a call to confirm I have accurately reflected your latest position.

Sincerely yours,

Stephen H. Plum

cc:    Chris Brock

SHP/eg



lt170v01

CONFIDENTIAL

FOX00003715

# EXHIBIT 21

747 River Rock Road * Montecito, California  93108
805/695-0440/Phone * 805/695-0340/Fax * waterent@aol.com

**RECEIVED**

NOV 2 1 2003

**STEPHEN H. PLUM**

TO:        STEVE PLUM, ESQ. – 310/969-0885

FROM:    STEPHEN WATERMAN

DATE:    NOVEMBER 21, 2003

RE:        **ALVIN AND THE CHIPMUNKS**

12/1/03

*****************************************************************************

Thanks for sending over your summary today. It does clarify a number of points.  I do appreciate your humor that the summary reflects an understanding of my "client's proposal." Oh, how I wish that were the case.  Our proposal was certainly many millions of dollars higher and far greater participations, as you must recall.  In any event, your proposal incorporates the essence of much of our discussions and a number of areas we need to address further.

Most importantly, I do think there is a meeting of the minds on most aspects and that the Bagdasarians are enthusiastic about moving this forward. I hope you don't mind if I just outline the terms once again.

1.      OPTION – Two Hundred Fifty Thousand Dollars ($250,000) for eighteen (18) months, applicable against purchase price.

2.      SECOND OPTION – Two Hundred Fifty Thousand Dollars ($250,000) for an additional eighteen (18) months, non-applicable. (October 21, 2003, most recent discussion).

3.      PURCHASE PRICE AND BAGADASARIAN PRODUCING FEES: Total of Three Million Dollars ($3,000,000).  Payment allocations at Bagdasarians' discretion (July 7, 2003 discussion - payment schedule not discussed), applicable against profit participations.

CONFIDENTIAL                        000230                        FOX00003726

Steve Plum, Esq.                    -2-                    November 21, 2003

4.     PROFIT PARTICIPATION – Two and One-Half Percent (2.5%) of first dollar gross.

5.     HOME VIDEO – Accounted on a Twenty Percent (20%) royalty basis or on a most favored nations basis, which ever is higher.

*will define that*

6.     SEQUELS AND REMAKES – My notes reflect that as early as April 24, 2003, the Bagdasarians would anticipate a fee increase of One Hundred Percent (100%) per sequel or remake. We also discussed that sequel and remake rights would terminate after a period of time and I suggested three (3) years.

*5 years - rolling right + 2 years of media $1mm per CAT/HAT*

7.     CREDITS – Ross and Janice Bagdasarian would each receive a "Produced by" credit. As it was not discussed, we can address all aspects of the credits, but it should be viewed in a similar manner to all other top producers. Not discussed as well, but I hope you understand that in all other productions of Alvin, from touring shows, cartoon series, merchandising and licensing, they have received a company credit, Bagdasarian Productions. I would hope and anticipate that this continues.

*prod credit is ok*

8.     MERCHANDISING – Fox and Bagdasarians share fifty/fifty (50/50) in all merchandising revenue based on the movie. Fox to retain a Twenty Percent (20%) fee and a cap of Five Percent (5%) expenses unless otherwise agreed to by Fox and Bagdasarians. Term of two and one-half (2.5) years from the end of principal photography. (April 24, 2003 discussion)

*look it up.*

9.     SOUNDTRACK – In discussion :

10.    TELEVISION RIGHTS, DIRECT TO VIDEO, ETC. – You mentioned the inclusion of this clause last night as I was driving home. We recognize the need to work with Fox, particularly at the time of release of the movie if and when that occurs, but this paragraph would inhibit the Bagdasarian company from building the Alvin brand for what could be three or more years. I'm sure that is not your intent. You must remember that Bagdasarian Productions is an on-going concern that has and continues to brand the Alvin image around the world. We should discuss this further.

*1) Serves ok*
*2) Both Alvin - ok*
*3) "Alvin" soundtrack - ok*
*4) "Alvin" VHS/DVD & pre-existing - ok*
*5) sus freezing in development - a time - troubling in timing - advance*

*Gonfield; amm 1% / not on new. he are proper*

*CM: Prime time & animation chipnels wow be fatal. live action.*

*will amm h ...*

11/21/2003  18:02  8056969340

CONFIDENTIAL                    000231                    FOX00003727

Steve Plum, Esq.                    -3-                    November 21, 2003

    11.    CREATIVE ISSUES -- We are under the impression from Chris and
Elizabeth that this would be a collaborative creative effort between Fox and the
Bagdasarians. I don't believe this reflects the spirit in which those discussions
were held.

    12.    DEFINITIONS OF GROSS RECEIPTS -- Could you please give me a
better understanding of the "...broadly accepted by representatives for "A" level
talent."

    13.    I almost forgot my FEE AND CREDIT - Five Hundred Thousand
Dollars ($500,000) and Producer credit on similar terms as Bagdasarians.

    This reflects my understanding of our discussions and the dates are based
on review of my notes. I do believe we are in sync on most points and that we
can move this forward positively. Once again, thanks for initiating this to a
written form.

                        All the best,


                        STEVE WATERMAN


SW/jen

*Handwritten note in right margin:*
CM + EG :
Look at
Canfield .
Approve director
Screen writer +
lead actor .
OK

CONFIDENTIAL                    000232                    FOX00003728

# EXHIBIT 22

# RE: ALVIN FOLLOW UP

**From:**

Michael Peikoff <michael.peikoff@fox.com>

**To:**

bagdasarian@aol.com, krosenfelt@adelphia.net, Elizabeth Gabler <elizabeth.gabler@fox.com>

**Cc:**

Elie Dekel <elie.dekel@fox.com>, Nicole Spiegel <nicole.spiegel@fox.com>

**Date:**

Fri, 27 Apr 2007 13:08:45 -0700

Ross,
My office will set a 'physical' meeting to discuss Alvin and the L&M strategy-
Nicole, please schedule and coordinate with Elie's office and include ;creative ,retail, international and my sales team .
Ross, Please advise form your team who will be attending.
Sincerely,
Michael

**From:** Bagdasarian@aol.com [mailto:Bagdasarian@aol.com]
**Sent:** Friday, April 27, 2007 11:55 AM
**To:** Michael Peikoff; KRosenfelt@adelphia.net; Elizabeth Gabler
**Subject:** Re: ALVIN FOLLOW UP

Michael,

Chris has sent me a copy of your request/wish list. We appreciate that none of us has the amount of time we'd like. We'd like another 6 months to make the film, but that's not possible, so we are delivering a great movie in a much shorter period than usual. That's what we need from your group. We may not be able to get 6 pieces of character art by your June date. Perhaps you could touch base with either R & Hues or another artist to see what art could be created for this purpose. You should definately speak with Karen Rosenfelt about arranging this.

As you know, we've been asking about Fox' plans for Licensing Show for a month now, and only this week have we gotten a response. The largest licensing revenue, aside from the soundtrack album and video game, will be the plush dolls, so we should focus on that. If you don't believe that you can get all three chipmunks in the stores by December, we should look at only having Alvin this December and let Simon and Theodore follow for the DVD release next year. We know this isn't ideal, but great things can still be done. It would be criminal not to capitalize on the tens of millions in promotion for the film, and plush dolls are a great way to do that. If we wait for the traditional style guide of assets, I'm afraid we'll leave tens of millions of dollars on the table this December.

We look forward to meeting with your team and thinking outside the box. I'm sure if we put our collective creative thoughts together we'll come up with an exciting licensing program to help launch this very special film. I don't know if you've seen any of the dailies, but it looks great, is very funny and the music is what you'd expect from a Grammy winning group that has sold nearly 45 million records.

Sincerely,

Ross

************************************
See what's free at http://www.aol.com.

BP00032180

# EXHIBIT 23

# RE: ALVIN 2- Rhino Ross' comments

**From:**

Thomas Cavanaugh <thomas.cavanaugh@fox.com>

**To:**

bagdasarian@aol.com

**Date:**

Fri, 01 May 2009 15:39:52 -0700

I will relay your comments to Rhino, but I believe the reserves policy for all Warner labels is 25% (lower than Razor &
Tie's 35%), and 2-year liquidation is standard.

**From:** Bagdasarian@aol.com [mailto:Bagdasarian@aol.com]
**Sent:** Friday, May 01, 2009 3:37 PM
**To:** Thomas Cavanaugh; Bagdasarian@aol.com
**Subject:** Re: ALVIN 2- Rhino Ross' comments

Tom,

Thanks for sending this to us. I'm in Hawaii and just took a quick look, but please make sure that there's no deduction for
free goods. That we and Fox are paid on 100% of records sold (not the previous deal at 85%). That the packaging
deduction is limited to the actual cost (about 60 cents - rather than the previous Fox deal of 25%), that there's no
packaging deduction on digital downloads. That we and Fox are paid on 100% of digital download, not a percentage of
our record royalty, and that the reserves are actual or 15% whichever is lower. And finally that the reserves for each
period are liquidated the next accounting period (not 2 years).

Thanks,

Ross

**************
Access 350+ FREE radio stations anytime from anywhere on the web. Get the Radio Toolbar!
(http://toolbar.aol.com/aolradio/download.html?ncid=emlcntusdown00000003)

BP00032478

# EXHIBIT 24

HON. CARL J. WEST, RET.
JAMS
707 Wilshire Blvd.
46th Floor
Los Angeles, CA 90017
Tel: 213-620-1133
Fax: 213-620-0100

Referec

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BAGDASARIAN PRODUCTIONS, LLC, a California limited liability company, and JANICE KARMA, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, <br><br> Defendant. | Case No. CV 10-02991 MWF (JCGx) <br><br> JAMS Reference #1220044628 <br><br> ORDER <br><br> (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF BAGDASARIAN PRODUCTION'S MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT <br><br> (2) DENYING DEFENDANT TWENTIETH CENTURY FOX'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

## PLAINTIFF BAGDASARIAN PRODUCTION'S MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT

### Introduction

Plaintiffs Bagdasarian Productions, LLC and Janice Karman brought an action against Defendant Twentieth Century Fox Film Corporation in the United States District Court for the Central District of California. On June 14, 2012, this action was referred under Cal. Code Civ.

1   Proc. §638 to the undersigned referee ("Referee").  Subsequently, Plaintiffs filed a First

2   Amended Complaint for Declaration of Copyright of Co-Ownership of Copyright and

3   Accounting for Profits, Copyright Infringement, Unjust Enrichment, Breach of Implied Contract,

4   and Breach of Contract.  Currently before this Referee is Plaintiff Bagdasarian Productions,

5   LLC's Motion for Leave to Amend the First Amended Complaint.

6

7                                              Background

8          The following facts are alleged in the First Amended Complaint ("FAC"):

9          Plaintiff Bagdasarian Productions, LLC ("Bagdasarian"), a company owned and run by

10  Ross Bagdasarian, Jr. and his wife Janice Karman ("Karman"), is the owner and licensor of the

11  properties known as Alvin and the Chipmunks.  (FAC ¶2.)  In 2004, Twentieth Century Fox

12  Film Corporation ("Fox") and Bagdasarian entered into a Purchase/Producer Agreement

13  ("Producer Agreement"), pursuant to which Bagdasarian granted Fox an option for the right to

14  develop, produce and distribute motion pictures based on the underlying Alvin and the

15  Chipmunks properties.  (Id.)  The first film produced under the Producer Agreement, Alvin and

16  the Chipmunks ("Alvin I"), was released in 2007.  (Id.)

17         Following the success of the first film, Fox and Bagdasarian began work on The

18  Squeakquel, in early 2008.  (Id. at ¶3.)  In March 2008, Karman wrote the 33-page treatment for

19  The Squeakquel screenplay.  (Id.)  In connection with the development of The Squeakquel

20  screenplay, over the course of almost one year, Karman created numerous original treatments,

21  draft screenplays, scenes and dialogue.  (Id.)  Karman's screenplay writings constitute a

22  substantial portion of The Squeakquel's final screenplay.  (Id.)

23         To date, Fox has refused to account to Karman as co-owner of The Squeakquel

24  screenplay, or, in the alternative, as the owner of her substantial copyrighted contributions used

25  by Fox, without authorization, in The Squeakquel screenplay.  (Id. at ¶4.)  Further, Fox has

26  separately and repeatedly breached the Producer Agreement between Fox and Bagdasarian.  (Id.)

27  Consequently, Karman and Bagdasarian seek relief in this action.  (Id.)

28  ////

<u>The Claims Sought to be Added</u>

In its Motion for Leave to Amend, Bagdasarian seeks leave to amend its FAC to add two contract-related claims for underpayment of compensation due to Bagdasarian from Fox on the soundtrack to the film Alvin and the Chipmunks: The Squeakquel ("The Squeakquel") and on the licensing of the picture to HBO, both in violation of the Producer Agreement between the parties, as well as a claim for rescission under California Civil Code § 1689(b). Bagdasarian contends that it has met the liberal standards under Federal Rule of Civil Procedure 15 because the claims sought to be added are either identical to or closely related to claims already in the case. It further contends that it is beneficial to litigate all claims now rather than in a separate proceeding.

Federal Rule of Civil Procedure 15(a) states in pertinent part that A[a] party may amend the party=s pleading once as a matter of course . . . . Otherwise a party may amend the party=s pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.@ Fed. R. Civ. P. 15(a). This policy is to be applied with Aextreme liberality.@ <u>See</u> <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186 (9th Cir. 1987) (citing <u>United States v. Webb</u>, 655 F.2d 977, 979 (9th Cir. 1981)); <u>see also</u> <u>Morongo Band of Mission Indians v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990).

The United States Supreme Court stated that while it is in the court's discretion to grant or deny an opportunity to amend, a court's outright refusal to grant leave [to amend] without any justifying reason appearing for the denial is not an exercise of discretion . . . it is merely an abuse of that discretion. <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Reasons which may justify denial include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, prejudice to the opposing party, and futility of the amendment. <u>See id.</u>; <u>see also</u> <u>DCD Programs, Ltd.</u>, 833 F.2d at 186. "Absent prejudice, or a strong showing of any of the remaining <u>Foman</u> factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." <u>Eminence Capital , LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003).

3

<u>Leave to Amend to Add the Contract Claim for Underpayment of</u>

<u>Soundtrack Royalties on The Squeakquel Is Warranted</u>

Bagdasarian seeks to add a claim for underpayment of royalties relating to The Squeakquel soundtrack.  In the FAC, it already alleges that Fox has underpaid royalties relating to the soundtrack to Alvin I.[1]  In the proposed Second Amended Complaint ("SAC"), Bagdasarian alleges that for sales of The Squeakquel soundtrack, as the basis for calculating royalties, Fox had calculated Bagdasarian's royalty upon the wholesale price of the album of ███ (called the "Purchase Price to Dealer" or "PPD") rather than the SRLP.  Bagdasarian contends that Fox also reduced the royalty payable to it ███ when computing the royalty due Bagdasarian on album sales in Canada.

In its Opposition, Fox asserts that The Squeakquel soundtrack claim is futile because Bagdasarian agreed that such claims could only be brought against Rhino records.  Relying on the Producer Agreement, Fox states that where Fox obtains a written agreement with the record company to pay and account for soundtrack royalties directly to Bagdasarian, "Fox shall be relieved" of those obligations and Bagdasarian "shall look solely to the Record Company for such royalties." (Agreement, ¶10(e)).  Fox states that it entered into such agreement with Rhino in August 2009, and only Rhino pays and accounts to Bagdasarian for its royalties.

In response, Bagdasarian points to the entire language of Paragraph 10(e) of the Producer Agreement, which provides:

> Fox agrees to use its reasonable efforts to cause the Record Company to account for and pay the Soundtrack Royalty directly to Owner hereunder (unless such Record Company does not ordinarily render direct third party accountings), and if Record Company agrees in writing to Owner to so account, Fox shall be relieved of such obligations and Owner shall look solely to Record Company for such record royalties.

(Producer Agreement, ¶10(e).)  According to Bagdasarian, Rhino did not agree "to account for and pay the Soundtrack Royalty directly" to it.  As a result, Fox is not "relieved" of its obligations to account to Bagdasarian for the payment of royalties.

---

[1] Specifically, Bagdasarian alleges that Fox underpaid royalties on the sales of the Alvin I soundtrack by basing the royalty upon an amount other than the full SRLP (suggested retail list price).

1    Given the parties' contentions, the Referee finds that alleging this claim is not futile.

2    Under Rule 15, a claim is futile if no set of facts can be proved under the amendment to the

3    pleadings that would constitute a valid and sufficient claim. Miller v. Rykoff-Sexton, Inc., 845

4    F.2d 209, 214 (9th Cir. 1998). In the proposed SAC, Bagdasarian contends:

5    Fox deprived Bagdasarian Productions of substantial royalties on
     sales of The Squeakquel soundtrack by calculating Bagdasarian
     Productions' royalty based upon the wholesale price of the album

6    (called, in record industry parlance, the "Purchase Price to Dealer"
     or "PPD") rather than the full SRLP. Moreover, Fox also reduced

7    the royalty ███████ when computing the royalty due Bagdasarian
     Productions on album sales of The Squeakquel soundtrack in

8    Canada. Neither is permitted by the Producer Agreement.

9    

10   (Proposed SAC ¶43.) In arguing that this claim is futile, Fox goes beyond what is plead, relying

11   on an agreement it claims was entered with Rhino, and further, Bagdasarian alleges that in this

12   agreement, Fox permitted Rhino to account to Bagdasarian for royalty amounts less than the

13   Soundtrack Royalty – one that is calculated based upon the wholesale price of The Squeakquel

14   album rather than the SRLP. Thus, leave to amend is warranted.

15       Fox asserts that even if the soundtrack claim is not futile, the delay in asserting them

16   requires that leave to amend be denied. It contends that Bagdasarian was aware in May 2009

17   that Fox was negotiating an agreement with Rhino under which Bagdasarian's royalties were

18   subject to percentage rate deductions for various territories and that PPD accounting was

19   applicable, yet Bagdasarian did not sue for the claimed breach in the original complaint (April

20   2010) or the FAC (August 2012) and now raises the issue for the first time over four years later

21   without reasonable excuse. Fox argues that this delay plainly prejudices it because it will be

22   required to obtain evidence in the custody and control of Rhino records.

23       The Referee finds no undue delay or prejudice to Fox. Bagdasarian states that it only

24   recently learned of the facts underlying The Squeakquel royalties claim following Fox's

25   production of documents relating to the calculation and payment of those royalties. Specifically,

26   it states that on December 27, 2012, it served a Second Set of RFPs which sought Fox's

27   soundtrack agreements with the record distributors for The Squeakquel and Chipwrecked

28   soundtracks as well as other documents related to Fox's calculation and payment of soundtrack

     royalties on sales of those soundtracks. Bagdasarian states that while Fox produced its

1  agreements with the record distributors, it failed to produce other documents relating to its

2  calculation and payment of royalties until Bagdasarian complained on April 26, 2013.

3  Subsequently, Bagdasarian sought a stipulation from Fox to allow it to file a second amended

4  complaint containing a claim for the underpayment of royalties on sales of The Squeakquel

5  soundtrack.  Furthermore, "[u]ndue delay by itself . . . is insufficient to justify denying a motion

6  to amend."  Bowles v. Reade, 198 F.3d 752, 757-58 (9th Cir. 1999).  Fox would still need to

7  show undue prejudice, and its bare claim that it would need to seek discovery from Rhino

8  records is insufficient.  As Bagdasarian points out, Fox can seek such evidence over the next two

9  and a half months before fact discovery closes on October 18, 2013.  In addition, as stated above,

10  a similar claim relating to the royalties for the Alvin I soundtrack already exists in this case. [2]

11  Thus, Bagdasarian is granted leave to amend to add a contract claim based on the royalties on the

12  sales for The Squeakquel soundtrack.

13

### Leave to Amend to Add Claim for Breach of Implied Covenant of
### Good Faith and Fair Dealing Is Not Warranted

16      In Count VII (Breach of Contract) of the proposed SAC, Bagdasarian contends that the

17  underpayment of soundtrack royalties also constitutes a breach of the implied covenant of good

18  faith and fair dealing.  (SAC at ¶75.)  In its current Motion, Bagdasarian argues that if Fox is

19  correct that it is permitted to reduce all soundtrack royalties to Bagdasarian in accordance with

20  the provisions of the distribution agreements with the soundtracks' distributors, then Fox, when

21  negotiating and then later using these third-party agreements as a basis to reduce Bagdasarian's

22  royalties, breached either Section VII (BB)(1) of Exhibit A of the Standard Terms and

23  Conditions to the Agreement, which prohibits Fox from exercising its business judgment on a

24  discriminatory basis, or the implied covenant of good faith and fair dealing, which prohibits Fox

25  from engaging in conduct that frustrates Bagdasarian's rights of the benefits of the contract, or

26

27  [2] The Referee notes that in its Opposition to this Motion, Fox argues that the Alvin I soundtrack claims

28  are time barred.  However, such argument on this claim, which was first plead in the FAC, is not properly brought before the Referee on this Motion for Leave to Amend.

1   both. Fox asserts that Bagdasarian's proposed implied covenant soundtrack claims are futile

2   because they cannot, as a matter of law, be based on the same facts as a breach of contract claim.

3          Fox is correct that an implied covenant cannot be read into a contract that has express

4   terms governing the parties' conduct. "[T]he implied covenant will only be recognized to further

5   the contract's purpose; it will not be read into the contract to prohibit a party from doing that

6   which is expressly permitted by the agreement itself." <u>Wolf v. Walt Disney Picture and</u>

7   <u>Television</u>, 162 Cal. App. 4th 1107, 1120 (2008). Accordingly, leave to amend to assert this

8   claim is not warranted.

9

10   <u>Leave to Amend to Add Breach of Contract Claim For Discrimination</u>

11   <u>in Licensing The Squeakquel to HBO Is Warranted</u>

12          Bagdasarian alleges that through discovery, it has learned that Fox allowed The

13   Squeakquel to be licensed to HBO ████████████████████████

14   ████████████████████████████████████

15   ████████████████████████ [3] (SAC ¶ 40.) It alleges that

16   Fox accepted less money for the lucrative HBO license ██████████████

17   ████████████████████████████████████

18   ████████████████████████ (<u>Id</u>.)

19          In its Opposition, Fox argues that this proposed claim is futile. Specifically, Fox argues

20   that "non-discriminatory" means disparate treatment of similarly situated persons, and here, the

21   assertion that Fox was "discriminatory" is particularly impossible because all profit participants

22   for The Squeakquel had diminished revenue from HBO ████████████████

23   █████████████████ [4]

24

25

26   [3] Bagdasarian asserted a claim in the FAC alleging that Fox breached the Producer Agreement by allowing Alvin I to be licensed to HBO ████████████████████████

27   ████████████████████████

28   [4] Fox also asserts this argument with respect to the claim based on Alvin I as alleged in the FAC, but this claim is not at issue here in this Motion for Leave to Amend.

The Referee finds that Bagdasarian's contract claim based on the licensing to HBO does not fail to state a claim, and as such, is not futile. Rather, based on Fox's arguments, resolution of this claim will depend on the interpretation and application of the Agreement's language that "Fox exercise its business judgment in a 'reasonable and non-discriminatory manner.'" Thus, the Referee finds that leave to amend to add this claim is warranted.

### Leave to Amend to Add a Claim for Rescission Is Not Warranted

Bagdasarian contends that discovery conducted to date suggests that the parties may not have had a meeting of the minds on the conditions under which Fox had the right to produce sequels. Specifically, according to Bagdasarian, discovery shows:

- Bagdasarian always sought more money for sequels than it would receive for the first picture and Fox always wanted to pay less or, at most, the same amount it paid for the first picture than for sequels;

- The parties' course of performance and course of dealing with one another indicates that for each of the two sequels, Fox took the position that the $3million payment was recoupable against contingent compensation, and on each occasion, Bagdasarian objected to Fox's accounting treatment;

- Fox contends that it never agreed, nor would it have agreed, to pay Bagdasarian more money for sequels than Fox paid for the first picture; and

- Bagdasarian did not agree, nor would it have agreed, to execute any deal that did not provide more for sequels than for the first picture and understood the pertinent provisions to require Fox to pay $3 million and 2.5% of Gross Proceeds for sequels.

As such, Bagdasarian asserts that if its interpretation of the Producer Agreement is not accepted by the trier of fact, then there was a mutual mistake as to the conditions under which Fox could produce sequels to Alvin I under the Producer Agreement, rendering the Producer Agreement rescindable due to mutual mistake, and it seeks to add this cause of action as an alternative theory of recovery to the breach of contract claim.

In its Opposition, Fox argues, among other things, that Bagdasarian's purported unilateral misinterpretation of contract terms is not a basis for rescission. It relies on <u>Hedging Concepts,</u>

1   Inc. v. First Alliance Mortgage Co., 41 Cal. App. 4th 1410 (1996).  The Referee agrees that

2   Hedging Concepts is instructive here.  In Hedging Concepts, the appellate court reversed the trial

3   court's rescission of a contract.  Id. at 1422.  It found that the parties' differing subjective

4   understandings of the contract does not constitute a "mistake" for rescission purposes.  Id. at

5   1421.  It stated:

6           There are two reasons courts will not set aside contracts for mere
            subjective misinterpretation.  First, to declare rescission based
7           upon mistaken undisclosed subjective interpretation would conflict
            with the objective theory of enforceable contracts.  If this were the
8           law, the objective theory of contracts would give with one hand,
            while the subjective misunderstanding theory of rescission would
9           take away with the other.  This is not the law.  Second, a unilateral
            misinterpretation of contractual terms, without knowledge by the
10          other party at the time of contract, does not constitute a mistake
            under either Civil Code section 1577 or 1578.  See, generally, 1
11          Witkin, Summary of California Law (9th ed. 1987) Contracts,
            section 379, pages 345-346.
12

13  Id. at 1422.

14          Bagdasarian claims that since the Referee has already held that the disputed provisions

15  are susceptible to multiple interpretations, Fox's unilateral misunderstanding arguments fails.  It

16  argues that a mutual mistake forms the basis of its rescission claim, not its "unilateral

17  misinterpretation."  This is the same situation addressed by the court in Hedging Concepts:

18  when the parties have differing subjective understandings of the contract.  As found by that

19  court, this does not constitute a "mistake" for purposes of Civil Code §1689.  Id. at 1421, 22.

20  Bagdasarian also attempts to distinguish Hedging Concepts by stating that the contract involved

21  there was an unambiguous contract.  However, because the Hedging Concepts court makes no

22  mention regarding the ambiguity of the contract at issue, such a distinction does not appear

23  pertinent to its findings.

24          As aptly stated by the Hedging Concepts court:  "Clearly, each side here placed a

25  different interpretation on the contract, hence all parties did not make the same mistake."  Id. at

26  1421.  Indeed, in the proposed SAC, Bagdasarian alleges "[d]ue to this mutual misunderstanding

27  of Paragraph 12 of the Producer Agreement, the Producer Agreement should be rescinded . . . ."

28  (SAC ¶85.)  Any alleged "misunderstanding" by the parties does not equate to a mistake as that

legal term is used.  The Referee finds that such a claim for rescission cannot be properly plead and therefore is futile.  Leave to amend to add this claim is not warranted.[5]

### Leave to Amend to Add Claim for Unjust Enrichment Is Not Warranted

In the proposed SAC, Bagdasarian seeks to add a claim for unjust enrichment based on its new contract claims.  Fox contends that the proposed unjust enrichment claim is futile, like the two prior unjust enrichment claims dismissed by the Referee, because the Producer Agreement governs the parties' rights and obligations.  According to Bagdasarian, it seeks unjust enrichment along with rescission as an alternative to its damages claims, and in the event the Agreement is rescinded, Bagdasarian alleges that Fox has been unjustly enriched.  However, as explained above, the rescission claim is futile, and leave to add that claim is not granted.  Therefore, the Referee finds that the unjust enrichment claim is also futile, and leave to amend to add this claim is not warranted.

### Conclusion

Based on the foregoing, the Referee grants in part and denies in part Plaintiff Bagdasarian Productions, LLC's Motion for Leave to Amend the First Amended Complaint as follows:

- **Grants** with respect to the breach of contract claim based on soundtrack royalties for The Squeakquel;
- **Denies** with respect to the implied covenant of good faith and fair dealing contained in the breach of contract claim;
- **Grants** with respect to the breach of contract claim based on the licensing to HBO;
- **Denies** with respect to the rescission claim; and
- **Denies** with respect to the unjust enrichment claim.

Plaintiffs shall file and serve the Second Amended Complaint consistent with this Order no later than September 23, 2013.

---

[5] The Referee notes that Fox raises additional arguments regarding the futility of the proposed rescission claim, but it is not necessary to address these further arguments in light of the finding herein.

1  In addition, the Referee notes that in Footnote 1 of their Motion for Leave to Amend,

2  Plaintiffs propose to drop certain claims in the FAC "in an effort to streamline this case." ████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5

6  ## DEFENDANT TWENTIETH CENTURY FOX'S MOTION FOR PARTIAL

7  ## SUMMARY JUDGMENT/SUMMARY ADJUDICATION

8

9  Pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, Fox seeks an order granting

10  partial summary judgment and/or summary adjudication on BPL's "Purchase Price" Claim in

11  Count VII of Plaintiffs' First Amended Complaint.[6]

12  To prevail on a motion for summary judgment or partial summary judgment, a moving

13  party must: (a) meet its *burden of production* by either producing evidence negating an essential

14  element of the non-moving party's claim or showing that the non-moving party does not have

15  sufficient evidence to succeed at trial; (b) meet its *burden of persuasion* by convincing the court

16  that there is no genuine issue of material fact; and (c) demonstrate that it is thus entitled to

17  judgment as a matter of law. In considering whether summary judgment is appropriate, the

18  Referee must view the evidence "in the light most favorable" to the non-moving party.[7]

19  A moving party may not require a non-moving party to produce evidence supporting its claim or

20  defense simply by saying that the non-moving party has no such evidence.[8] Even if the moving

21

22  [6] Fox moved for partial summary judgment on BPL's "Purchase Price" and "FX" Claims in Count VII of

23  Plaintiffs' First Amended Complaint. This Order addresses the "Purchase Price" only, as BPL is "no longer pursuing" the "FX" claim. *See* footnote 1 at page 1, Plaintiffs Bagdasarian Productions, LLC and

24  Janice Karman's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment dated July 30, 2013 (Opposition Brief).

25

26  [7] *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000); *Thorns v. Sundance Properties*, 726 F.2d 1417, 1418 (9th Cir. 1984).

27

28  [8] *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, at 1105.

party can meet the *burden of production*, to prevail on summary judgment, it must **also** meet the *burden of persuasion*—by persuading the court that there is no genuine issue of material fact.[9] Further, where two parties specifically declare contradictory material facts, there is a genuine issue for trial and summary judgment must be denied.[10]

Evidentiary Objections

Fox has lodged objections to the evidence offered by Bagdasarian and Karmen. The Referee makes the following rulings on the evidentiary objections:

1. Fox Objections to Declaration of Ross Bagdasarian, Jr.-Overruled, except to the extent it offers hearsay statements attributable to Steve Waterman.

2. Fox Objections to the Declaration of Frederick I. Bernstein-Overruled. The Plum declaration places at issue factual matters relating to custom and practice in the industry, i.e., the "Marvel" sequel contract, as well as the issue of the interpretation of the word "advance" as a term of art or a term with an accepted meaning in the industry.

Ruling on Motion

Motion is denied. The "Purchase Price" claim is not subject to summary adjudication because there are questions of fact relating to the interpretation of the parties Agreement. Where the parties proffer conflicting interpretations of an agreement, both of which may be found to be reasonable, the court may entertain extrinsic evidence to assist in both interpreting the agreement and in determining the intent of the parties. As to the "FX" Claim, the Referee will defer a

---

[9] *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, at 1106.

[10] *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) "[W]here the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the motion must be denied."

ruling on the motion pending documentation of the withdrawal of the claim as noted in Fn. 1 of Plaintiffs' Opposition Brief.

DATED:  September 9, 2013

_____
Carl J. West
Judge of the Superior Court (Ret.)
Referee

## <u>PROOF OF SERVICE BY U.S. MAIL</u>

**Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation**
Court Case No. CV 10-02991 MWF (JCGx)
JAMS Reference No. 1220044628

      I, Kathryn Cisneros, not a party to the within action, hereby declare that on September 09, 2013 I served the attached **ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF BAGDASARIAN PRODUCTION'S MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT (2) DENYING DEFENDANT TWENTIETH CENTURY FOX'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird LLP
333 S. Hope St.
16th Floor
Los Angeles, CA  90071
    Parties Represented:
    Twentieth Century Fox Film Corp.

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA  90213-0900
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA  90012

      I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on September 09, 2013.

*Kathryn Cisneros*
Kathryn Cisneros

# EXHIBIT 25

1  HON. CARL J. WEST (RET.)
   JAMS
2  707 Wilshire Blvd.
   46th Floor
3  Los Angeles, CA  90017
   Tel: 213-620-1133
4  Fax: 213-620-0100

5  Referee

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11  BAGDASARIAN PRODUCTIONS,          Case No. CV 10-02991 MWF (JCGx)
    LLC, a California limited liability
12  company, and JANICE KARMA, an     JAMS Ref. No. 1220044628
    individual,
13                                    ORDER GRANTING IN PART
                                      DEFENDANT TWENTIETH
14                Plaintiffs,         CENTURY FOX FILM
                                      CORPORATION'S MOTION FOR
15        v.                          LEAVE TO CONDUCT DISCOVERY
                                      TARGETED TO PLAINTIFFS'
16                                    SPOILATION OF EVIDENCE

17  TWENTIETH CENTURY FOX FILM
    CORPORATION, a Delaware
18  corporation,

19                Defendant.

20

21

22  **I.    Introduction**

23        Plaintiffs Bagdasarian Productions, LLC and Janice Karman brought an

24  action against Defendant Twentieth Century Fox Film Corporation in the United

25  States District Court for the Central District of California.  On June 14, 2012, this

26  action was referred under Cal. Code Civ. Proc. § 638 to the undersigned referee

27  ("Referee").  Subsequently, Plaintiffs filed a Second Amended Complaint for

28  Declaration of Copyright of Co-Ownership of Copyright and Accounting for Profits,

- 1 -

1  Copyright Infringement, Unjust Enrichment, Breach of Implied Contract, and Breach

2  of Contract.  Currently before this Referee is Defendant Twentieth Century Fox

3  Film's Motion for Leave to Conduct Discovery Targeted to Plaintiffs' Spoilation of

4  Evidence.

5  **II.**   **Background**

6     A.   **Factual Summary**

7          The following facts are alleged in the Second Amended Complaint

8  ("SAC"):

9          Plaintiff Bagdasarian Productions, LLC ("BP"), a company owned and

10  run by Ross Bagdasarian, Jr. and his wife Janice Karman ("Karman"), is the owner

11  and licensor of the properties known as Alvin and the Chipmunks.  (SAC ¶2.)  In

12  2004, Twentieth Century Fox Film Corporation ("Fox") and Bagdasarian entered

13  into a Purchase/Producer Agreement ("Producer Agreement"), pursuant to which

14  Bagdasarian granted Fox an option for the right to develop, produce and distribute

15  motion pictures based on the underlying Alvin and the Chipmunks properties.  (Id.)

16  The first film produced under the Producer Agreement, Alvin and the Chipmunks

17  ("Alvin I"), was released in 2007.  (Id.)

18          Following the success of the first film, Fox and Bagdasarian began work

19  on The Squeakquel, in early 2008.  (Id. at ¶3.)  In March 2008, Karman wrote the 33-

20  page treatment for The Squeakquel screenplay.  (Id.)  In connection with the

21  development of The Squeakquel screenplay, over the course of almost one year,

22  Karman created numerous original treatments, draft screenplays, scenes and

23  dialogue.  (Id.)  Karman's screenplay writings constitute a substantial portion of The

24  Squeakquel's final screenplay.  (Id.)

25          To date, Fox has refused to account to Karman as co-owner of The

26  Squeakquel screenplay, or, in the alternative, as the owner of her substantial

27  copyrighted contributions used by Fox, without authorization, in The Squeakquel

28

1   screenplay.  (Id. at ¶4.)  Further, Fox has separately and repeatedly breached the

2   Producer Agreement between Fox and Bagdasarian.  (Id.)  Consequently, Karman

3   and Bagdasarian seek relief in this action.  (Id.)

4   **III.   Discussion**

5       **A.   The Parties' Contentions**

6           Fox contends spoliation of evidence by Plaintiffs BP and Karman

7   (collectively "Plaintiffs").  Specifically, it contends that (1) Plaintiffs failed to take

8   adequate measures to preserve their own documents; (2) Plaintiffs failed to take any

9   meaningful measures to preserve the records of Steve Waterman; (3) Plaintiffs failed

10  to review over 10,000 documents and produced crucial documents after the

11  discovery deadline only after being confronted with indisputable evidence that

12  documents had been withheld; and (4) Plaintiffs produced documents with corrupted

13  metadata in violation of the Referee's Order.  Based on these contentions, Fox

14  requests (1) leave to depose a 30(b)(6) witness of BPL pertaining to preservation,

15  collection, and production, with production of documents; (2) leave to depose

16  Plaintiffs' e-discovery vendor, FTI Consulting ("FTI"), with production of

17  documents, and (3) the appointment of an independent expert to inspect the email

18  accounts and hard drives that contain Plaintiffs' materials.  Fox proposes that the

19  Referee supervise these depositions to ensure efficient information-gathering and

20  minimize disputes.  After this discovery, Fox proposes that the Referee order

21  expedited briefing or a hearing to assess the appropriate remedy for these violations.

22          **1.   Preservation of Plaintiffs' documents**

23          Fox, based on an email from Mr. Bagdasarian, contends that Plaintiffs

24  anticipated filing suit against Fox as early as January 2009.  (Ruga Decl., ¶ 11, Ex.

25  8.)  It asserts that in February 2009, Plaintiffs retained the law firm of Grubman,

26  Indursky & Shire to develop their claims against Fox, and that in April 2009, Mr.

27  Waterman counseled that claims could be made against Fox for copyright

28

- 3 -

infringement.  (Id. at ¶¶ 11-12, Exs. 10, 14.)  Fox states that in October 2009, Plaintiffs' counsel sent a lengthy demand letter threatening suit and outlining most of the claims later alleged in the Complaint.  (Id. at ¶ 12, Ex. 16.)  It argues that for a period of over a year before this lawsuit was filed, Plaintiffs had identified a "potential claim" that they intended to bring, thereby giving rise to their duty to preserve, but that Plaintiffs did not preserve documents at any time before they filed their lawsuit in April 20110.

Furthermore, Fox states that every individual who works at BP utilizes one of two email addresses to conduct business on behalf of BP.  (Ruga Decl., ¶ 16, Ex. 27, Minks Depo., at 36:1-37:21; 39:12-40:24.)  It argues that BP has no policy whereby users of the BP email accounts are instructed not to delete materials that might be received in the email accounts.  (Id., Minks Depo. at 329:14-24.)  Fox asserts that given there are no policies that prevent an employee from deleting emails from the BP email accounts, that BP employees with the ability to delete emails were never instructed to preserve documents, and that BP's electronic files were not collected until April 2010, relevant documents may well have been destroyed.

In response, Plaintiffs contend that in February 2009, they retained the law firm of Grubman, Indursky & Shire to negotiate with Fox to settle any disagreements that had arisen between Plaintiffs and Fox.  (Minks Decl., ¶ 7.)  They argue that at the earliest, Plaintiffs actually contemplated imminent litigation in late 2009 when it retained the law firm of Paul Weiss.  They state that BP has retained original copies of the documents it creates or receives, and it does not have a formal, or informal, document destruction policy.  (Mink Decl., ¶ 4.)  They claim that BP did not institute a formal written litigation hold memorandum in connection with filing this lawsuit because there was simply no concern in a company the size of BP, where original documents are preserved as a matter of course, and where there is no routine document destruction schedule, that any documents would be inadvertently, let alone

1   intentionally, destroyed.  (Id. at ¶¶ 2-6, 8.)  They state that in August 2010, FTI

2   collected the AOL server-based email documents and files from BP's AOL email

3   account and in April 2011, FTI mirrored all of the hard drives on BP's computers.

4   (Id. at ¶ 8.)  They argue that BP had no reason to believe that any ESI relevant to the

5   issues in this case had gone missing or was destroyed before the collections.

6                   **2.      Preservation of Steve Waterman's documents**

7               Fox states that Plaintiffs' "reasonable steps" taken to preserve Mr.

8   Waterman's documents was a single email dated June 21, 2010, in which a BP

9   employee said to Mr. Waterman that counsel "wanted us to make sure we remind

10   you to continue to preserve" documents related to Fox.  (Ruga Decl., Ex. 26 at 5.)

11   Fox contends that Plaintiffs made only a "token effort" to preserve Mr. Waterman's

12   documents two months after Plaintiffs initiated their lawsuit, and that Plaintiffs never

13   sought to collect copies of Mr. Waterman's documents or records.  It argues that Mr.

14   Waterman was Plaintiffs' agent, and as such, Plaintiffs had control over Mr.

15   Waterman's documents when their duty to preserve arose in 2009.  Fox further

16   argues that even if Mr. Waterman's documents were outside Plaintiffs' "control" in

17   2009, Plaintiffs did not advise Fox and instead consistently asserted that they had

18   undertaken "reasonable" efforts to preserve Mr. Waterman's data.  Fox concludes

19   that it "lost over three years because Plaintiffs failed to disclose that they had not

20   adequately preserved documents from Mr. Waterman."

21               Plaintiffs respond that they had no reason to be concerned that Mr.

22   Waterman would not retain any documents related to this litigation that he might

23   have.  (Minks Decl., ¶ 9.)  Shortly after filing its complaint, BP and its original

24   litigation counsel asked Mr. Waterman to preserve his documents, and he responded

25   that he had done so and would continue to do so.  (Ruga Decl., Ex. 26(A); Dixon

26   Decl., ¶ 2.)  They state that Mr. Waterman reaffirmed that commitment in August

27   2012 when Irell first spoke with him and asked him to collect his documents for

28

production.  (Dixon Decl., ¶ 2.)  They claim that on February 6, 2013, when BP's counsel asked Mr. Waterman to provide his documents for production, Mr. Waterman refused to cooperate with BP.  (Id. at ¶ 3.)  On that same day, Plaintiffs informed Fox that its counsel did not represent Mr. Waterman, and on February 11, 2013, Plaintiffs issued a subpoena to Mr. Waterman.  (Id., Ex. L.)

### 3.   Additional document production as a result of Mr. Waterman's production

Fox states that Mr. Waterman produced documents consisting of correspondence that Plaintiffs had not previously produced, and as a result, on May 17, Fox wrote to Plaintiffs' counsel to seek an explanation for the deficiencies. Subsequently, Fox states that upon Plaintiffs' request, it detailed the missing documents and their significance to the case.  (Ruga Decl., ¶¶ 18-19, Exs. 30, 32.) On May 29, Plaintiffs' counsel advised that Plaintiffs had failed to identify and review over 4,000 documents, and later, on June 14, Plaintiffs advised that there were over 10,000 documents that Plaintiffs had not previously reviewed.  (Id. at ¶¶ 20-21, Exs. 34, 35.)

In response, Plaintiffs state that after receiving examples of documents from Mr. Waterman that Fox claimed Plaintiffs should have produced, they provided these examples to their e-discovery vendor, FTI, which immediately began to investigate the issue.  FTI reported back its preliminary results, and Plaintiffs informed Fox.  (Ruga Decl., Ex. 34.)  Plaintiffs state that they worked tirelessly to review the newly identified documents, made rolling productions to Fox, and strove to keep Fox informed of what they were learning from FTI.  (Dixon Decl., ¶ 11.) They claim that of the 1,376 document ultimately produced, over 920 (nearly 70%) were either sent to or received by Fox or persons working Fox and thus should have already been produced by Fox.  (Ruga Decl., Ex. 35; Dixon Decl., ¶¶ 10-11.)  In addition, Plaintiffs state that they provided Fox with a sworn declaration from FTI

explaining FTI's error that led to the identification and production of additional documents. (Ruga Decl., Ex. 36.)

### 4.   Documents with missing metadata

On April 16, 2013, Fox advised Plaintiffs that the metadata fields contained in Plaintiffs' production were unintelligible. Of the 4,322 documents Plaintiffs produced, 1,424 of the documents contained corrupted metadata and lacked date or time stamp information as required by the Court's Order. (Ruga Decl., ¶ 26, Ex. 40.) Fox states that after it raised the issue with the Referee on April 25, Plaintiffs began attempting to correct the issues, but Plaintiffs provided corrected files for only 980 of the 1,424 documents. (Id. at ¶ 31.) It claims that the garbled information issues associated with 488 of the documents remain unresolved. (Id. at ¶ 32.) Fox argues that to date, Plaintiffs have offered no further information on their failure to produce intelligible copies of their own email records. It seeks limited additional discovery to discover how these documents became corrupted and why Plaintiffs failed to produce intelligible email documents from their AOL accounts.

Plaintiffs respond that they initially reported back to Fox that there were technical issues in connection with collecting email from the AOL servers that are beyond their control, and that they were working with their processing vendor to see whether they can extract additional data. (Ruga Decl., Ex. 42.) They claim that on April 25, they provided Fox with an overlay containing the missing metadata for 980 of the affected documents, and on April 29, they provided Fox a chart identifying where the missing date and time information for the 127 of the 444 remaining documents with certain missing metadata could be found in duplicates produced by either Fox or Plaintiffs. (Dixon Decl., Ex. P; Ruga Decl., Ex. 26.) They further claim that they asked Fox to identify specific email for which no date information is identifiable, and they will see if the date is ascertainable by other means, but that Fox never did so. (Ruga Decl., Ex. 26.)

1    **B.    Fox Has Shown Spoilation Based on Failure to Preserve Evidence**

2        **1.    Standard for spoilation**

3            Spoilation of evidence is "the destruction or significant alteration of

4    evidence, or the failure to preserve property for another's use as evidence in pending

5    or reasonably foreseeable litigation." <u>Demena v. Smith's Food and Drug Centers,</u>

6    <u>Inc.</u>, 2012 WL 3962381 at *1 (D. Nev. Sept. 10, 2012).  The authority to impose

7    sanctions for spoilation arises from a court's inherent power to control the judicial

8    process. <u>Medical Laboratories Mgmt. Consultants v. American Broadcasting</u>

9    <u>Companies, Inc.</u>, 306 F.3d 806, 824 (9th Cir. 2002).  The court's discretion regarding

10   the form of a spoliation sanction is broad, and can include "from least harsh to most

11   harsh – further discovery, cost-shifting, fines, special jury instructions, preclusion,

12   and the entry of default judgment or dismissal (termination sanctions)." <u>Pension</u>

13   <u>Comm. of the Univ. of Montreal v. Banc of America, LLC</u>, 685 F. Supp. 2d 456, 469

14   (S.D.N.Y. 2010).  To determine whether to impose sanctions for spoliation, courts

15   apply the test often used for determining whether to grant an adverse inference

16   spoliation sanction. <u>Reinsdorf v. Skechers U.S.A., Inc.</u>, 2013 U.S. Dist. Lexis

17   107631 at *65 (C.D. Cal. July 19, 2013) (citing <u>Apple, Inc. v. Samsung Electronics,</u>

18   <u>Co., Ltd.</u>, 881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012)).  The party seeking

19   spoliation sanctions must establish "(1) that the party having control over the

20   evidence had an obligation to preserve it at the time it was destroyed; (2) that the

21   records were destroyed with a culpable state of mind; and (3) that the destroyed

22   evidence was relevant to the party's claim or defense such that a reasonable trier of

23   fact could find that it would support that claim or defense." <u>In re Napster , Inc.</u>

24   <u>Copyright Litigation</u>, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006).

25       **2.    Clarifying Fox's request in this Motion**

26           At the outset, it is important to clarify what Fox seeks in its Motion.

27   Fox alleges spoilation based on Plaintiffs' "failure to preserve evidence, failure to

28

identify evidence and failure to produce evidence in intelligible format," as explained above.  Thus, while Fox claims that Plaintiffs failed to preserve evidence, it doesn't specifically claim that Plaintiffs destroyed or altered evidence.  Furthermore, the parties dispute whose burden it is to show spoliation.  Plaintiffs argue that Fox has not shown a reasonable probability that any relevant documents were actually lost or destroyed, and that Fox would be prejudiced by any such loss or destruction.  Fox, by contrast, argues that it cannot possibly be expected to know and prove the contents of evidence that has been lost, withheld, overlooked or destroyed.  As explained above, the burden to show a culpable state of mind and relevance comes into play upon the determination whether to impose sanctions.  However, here, Fox seeks "targeted discovery" to determine "the nature and extent of the problem so that . . . a fair remedy can be determined."  In other words, Fox doesn't seek a sanction at this point.  Instead, it claims that the "evidence adduced to this point amply justifies further inquiry" and it therefore "seeks limited, targeted discovery to either confirm that all relevant documents have been preserved, reviewed and produced, or to determine the extent of evidence lost due to the deficiencies in Plaintiff's conduct of discovery."  As Fox asserts, further discovery has been recognized as an appropriate remedy to address the scope of spoliation.  See Slovin v. Target Corp., 2013 WL 840865 at *6 (S.D.N.Y. 2013) (the range of sanctions available for spoliation include "further discovery, cost-shifting, fines, special jury instructions, preclusion, entry of default judgment, and dismissal"); Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 291-92 (S.D.N.Y. 2009) ("Although an adverse inference is not justified at this time . . . authorizing further discovery . . . will allow the plaintiff the chance to determine whether it is in fact missing relevant evidence.").

       **3.**      **Plaintiffs' failure to preserve supports spoliation, but not the alleged failures to identify and produce**

At this juncture, then, the issue is whether Fox has supported its

- 9 -

1  contention that spoliation has occurred because of Plaintiffs' "failure to preserve

2  evidence, failure to identify evidence and failure to produce evidence in intelligible

3  format." (Fox's Motion, p. 1.) For the reasons explained below, the Referee finds

4  that Plaintiffs failed to meet their duty to preserve documents. Where litigation is

5  reasonably foreseeable and actively being contemplated, the duty to preserve

6  attaches. See In re Napster, 462 F. Supp. 2d at 1067-68 (holding that the "duty to

7  preserve documents attaches when a party should have known that the evidence may

8  be relevant to future litigation"); A. Farber & Partners, Inc. v. Garber, 234 F.R.D.

9  186, 193 (C.D. Cal. 2006) ("[t]here is no doubt that a litigant has a duty to preserve

10  evidence it knows or should know is relevant to imminent litigation).

11  　　　The parties dispute the date when Plaintiffs' duty to preserve documents

12  arose, or more specifically, when litigation was "reasonably foreseeable and actively

13  being contemplated." However, an exact date is not necessary here, as Fox claims

14  that the duty arose in early 2009, and Plaintiffs claim that their duty arose in late

15  2009. The question, then, is whether Plaintiffs properly discharged its duty to

16  preserve documents given this timeframe. The Referee finds that they did not.

17  　　　Plaintiffs claim that a written litigation hold was not necessary given

18  BP's small size. They rely on Kinnally v. Rogers Corp., 2008 WL 4850016 (D. Ariz.

19  Nov. 7, 2008). In Kinnally, the Court held that the absence of a written litigation

20  hold is relevant to a spoliation claim but is not dispositive by itself. Id. at *18. In the

21  case before it, the Court found that appropriate steps were taken to preserve the

22  evidence, including a verbal litigation hold and a collection of documents. Id. Here,

23  Plaintiffs do not claim a verbal litigation hold or a collection of documents. BP does

24  not have a formal document retention policy. (Minks Decl., ¶ 4.) Further, Mr.

25  Minks testified that he could not recall if BP employees were ever directed to refrain

26  from deleting emails or other documents. (Ruga Decl., Ex. 27, Minks Depo. at

27  329:25-330:3.) Instead, Plaintiffs began formal preservation efforts by retaining FTI

28

- 10 -

in August 2010, four months after it filed suit and almost a year after its preservation
duty attached, and they imaged their company hard drives in April 2011, a year after
they filed suit.  Plaintiffs' actions were not consistent with broad preservation
obligations.

With respect to Mr. Waterman, the Referee agrees with Fox that
Plaintiffs have not shown that they met their duty to preserve his documents.  "[A]
party need not have actual possession of documents to be deemed in control of
them."  MGA Entertainment, Inc. v. National Products Ltd., 2012 WL 182158 at *6
(C.D. Cal. Jan. 23, 2012) (quotation omitted).  Courts construe "control" broadly as
"the legal right to obtain documents upon demand."  Id.  Here, at the time Plaintiffs'
preservation duty arose, Plaintiffs had the requisite "control" with respect to Mr.
Waterman.  Mr. Minks states that the first time Mr. Waterman was asked to preserve
documents was in a June 21, 2010 email, two months after the lawsuit was filed.
(Ruga Decl., ¶¶ 15, 16, Exs. 26-27, Minks Depo., 46:13-51:24.)  While Plaintiffs
claim that they had "no reason to be concerned that Mr. Waterman would not retain
any documents related to this litigation that he might have," they admit that they
never made an attempt to collect his documents until they issued a subpoena.
Furthermore, as Fox suggests, even if Mr. Waterman's documents were outside their
control, Plaintiffs could have advised Fox about their failure to preserve Mr.
Waterman's documents.  See Silvestri v. General Motors Corp., 271 F.3d 583, 591
(4th Cir. 2001) ("If a party cannot fulfill this duty to preserve because he does not
own or control the evidence, he still has an obligation to give the opposing party
notice of access to the evidence or of the possible destruction of the evidence if the
party anticipates litigation involving that evidence.")  Instead, Plaintiffs consistently
represented that they had undertaken "reasonable" efforts to preserve Mr.

- 11 -

1  Waterman's data.[1]   (Ruga Decl., ¶ 5.)  Based on the foregoing, Plaintiffs failed to

2  meet their duty to preserve documents in anticipation of this litigation.

3           Fox also claims spoliation based on Plaintiffs' failure to identify

4  evidence, and specifically, the 10,000 documents identified following Mr.

5  Waterman's production of documents.  The Referee finds that this claim is

6  speculative at best.  As set forth above, upon Fox's claim that Plaintiffs should have

7  produced certain documents that were produced by Mr. Waterman, Plaintiffs

8  investigated, and they determined that it was FTI's error.  Plaintiffs provided a sworn

9  declaration from FTI explaining what happened.  (Ruga Decl., Ex. 36.)  As the

10  declaration states, "Irell & Manella and Bagdasarian Productions were unaware that

11  these archive files had not been extracted for processing."  (Id. at ¶ 8.)  As soon as

12  Plaintiffs were made aware of the problem, they responded efficiently and

13  responsibly.  They promptly informed Fox when it learned of the error, explained the

14  cause of the error, and offered to address any specific concerns Fox may have about

15  its productions.  (Id. at Exs. 34, 35, 36, 38.)  While Fox may believe that this incident

16  is masking some suspicious activity, there is no indication that FTI's overall

17  involvement in the process was somehow tainted.  Moreover, this "failure to identify

18  evidence" is not akin to the actual destruction or alteration of evidence.[2]

19           With respect to Fox's claim of spoliation based on the failure to produce

20  evidence in intelligible format, even assuming that this would qualify as "spoliation,"

21  which is doubtful, the Referee agrees with Plaintiffs that Fox exaggerates the extent

---

[1] The Referee notes that Fox's implication that certain emails from 2003/2004 are missing is not persuasive.  Mr. Bagdasarian testified that he did not use emails to communicate with Mr. Waterman concerning the negotiations of the Rights/Producer Agreement. (Dixon, Ex. B at 85:22-25; Ex. U, ¶ 6.)

[2] In its Motion, Fox claims that Plaintiffs still have not produced 10 of the documents that Mr. Waterman produced.  In its Reply, Fox then identifies these 10 documents.  According to Plaintiffs, this is the first time that Fox has made these allegations.  They then submit an additional declaration "to address and rebut [Fox's] accusation." (See Dixon Decl. in Further Support of Plaintiff's Opposition.)  However, the parties' claims surrounding these 10 documents do not alter the determinations made herein.

1    and impact of the documents with missing metadata.  Plaintiffs promptly responded

2    to Fox's complaint regarding the metadata fields, and they explained that technical

3    issues in connection with collecting email from the AOL servers beyond their control

4    led to the problem.  (Ruga Decl., Ex. 42.)  Plaintiffs then proceeded to provide Fox

5    with an overlay containing the missing metadata for 980 of the affected documents

6    (Dixon Decl., Ex. P), and also provided Fox with a chart identifying where the

7    missing data and time information for 127 of the 444 remaining documents with

8    certain missing metadata could be found in duplicates.  (Ruga Decl., Ex. 26 at 2; Ex.

9    26(A).)  Plaintiffs offered that, if Fox would point out any document for which it

10   sought the missing information, they would make further efforts to locate the

11   substantive information.  (Id.)  Plaintiffs state that Fox has not identified a single

12   document for which it seeks additional information.

13              **4.    Fox's request is not untimely**

14              In their Opposition, Plaintiffs argue that Fox's request for more

15   discovery is untimely and necessary.  They assert that Fox never explains why it

16   failed to notice these depositions during the discovery period, when leave of court

17   would not have been necessary and the issue could have been resolved during

18   discovery.  They further claim that Fox already has undertaken an extensive and

19   unlimited examination of the only two people at BP who have knowledge responsive

20   to its new request for a corporate deposition.

21              The Referee agrees with Fox that this Motion is not untimely.  Mr.

22   Minks was deposed on May 9, 2013, before it learned that relevant documents had

23   not been produced by Plaintiffs.  In addition, when Mr. Minks was questioned about

24   Plaintiffs' preservation efforts, Mr. Minks did not know or could not recall

25   information relating to preservation and collection activities.  (Ruga Decl., Ex. 27,

26   Minks Depo. at 28:8-33:23; 176:24-179:20; 180:12-181:2.)  With respect to Mr.

27   Bagdasarian, when Fox's counsel sought to inquire about the circumstances of

28

- 13 -

1   spoliation, Plaintiffs' counsel directed him not to answer on the ground of attorney-

2   client privilege.  (Ruga Supp. Decl., Ex. D, Bagdasarian Depo., 367:1-368:8.)

3   Furthermore, as Fox states, on May 31, 2012, the parties submitted a joint letter

4   where they sought an adjustment to the schedule due to Plaintiffs' new, unreviewed

5   documents after the document discovery cut-off.  (JAMS Doc. No. 65.)  This joint

6   letter states that the extension only applied to depositions that were already noticed,

7   and that Fox reserved its rights with respect to requests for discovery or remedies

8   relating to the new developments.  (Id.)

9        **C.   Additional Discovery Is Warranted to a Limited Extent**

10               Thus, the Referee finds Fox has shown that Plaintiffs failed to meet its

11   duty to preserve evidence.  However, the Referee makes no finding, and indeed, Fox

12   makes no contention, that Plaintiffs' failure was done with a culpable state of mind,

13   or that such evidence may be relevant to Plaintiffs' claim.  It appears that Fox cannot

14   presently support these contentions, and for this reason, it seeks further discovery as

15   "interim relief."  Indeed, as Fox admits, it requests "the opportunity to adduce facts

16   necessary to obtain a full explanation of what caused Plaintiffs' discovery failures

17   and to determine the full extent of the problem.  It is critical to confirm that nothing

18   more has been improperly withheld (or *determine if it has*)."  (Motion, p. 4.)

19   (Emphasis added.)  As such, given the claim of spoliation, the Referee finds that the

20   additional discovery requested by Fox is warranted to a very limited extent.

21   Specifically, Fox is given leave to depose a 30(b)(6) witness of BPL pertaining to

22   preservation, collection, and production, with production of documents.  Fox is not

23   given leave to depose Plaintiffs' e-discovery vendor, FTI, and the appointment of an

24   independent expert to inspect the email accounts and hard drives that contain

25   Plaintiffs' materials is not warranted.[3]  Fox also proposes that following the

26   

27   [3] Plaintiffs contend that Fox should be sanctioned for recklessly multiplying the proceedings and ask for an award of attorneys' fees and costs in connection with responding to this Motion.  Based on the findings herein, this request is denied.

28   

- 14 -

1  discovery requested, the Referee prescribe a procedure by which appropriate
2  sanctions may be determined; however, such a proposal is premature.  The Referee
3  emphasizes that it makes no finding herein that sanctions are or may be warranted.
4  Indeed, as set forth above regarding the standard for spoilation, Fox must establish
5  the elements of a spoliation claim to seek sanctions, and the additional discovery
6  granted could reveal that the spoliation is not sanction-worthy.

7  **IV.   <u>Conclusion</u>**

8          Accordingly, the Referee grants in part Defendant Twentieth Century
9  Fox Film Corporation's Motion for Leave to Conduct Discovery Targeted to
10 Plaintiffs' Spoilation of Evidence.  The Referee orders the following:

11 • A deposition (with production of pertinent documents) of a BPL corporate
12   designee pursuant to Rule 30(b)(6) addressing the steps taken by BPL to
13   preserve its own evidence and evidence within its control, BPL's various email
14   accounts, BPL's email and hardware systems, and BPL's record management
15   activities, including its retention practices.  The deposition shall last no longer
16   than 4 hours.

17 This order is made without prejudice to an order compelling further discovery
18 directed to the claim of spoliation upon an appropriate further showing by Fox based
19 on the discovery permitted.

21 DATED:  November 4, 2013

       Carl J. West
       Judge of the Superior Court (Ret.)
       Referee

- 15 -

000267

## PROOF OF SERVICE BY U.S. MAIL

**Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation**
Court Case No. CV 10-02991 MWF (JCGx)
JAMS Reference No. 1220044628

    I, Kathryn Cisneros, not a party to the within action, hereby declare that on November 4, 2013 I served the attached **ORDER GRANTING IN PART DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR LEAVE TO CONDUCT DISCOVERY TARGETED TO PLAINTIFFS' SPOILATION OF EVIDENCE** on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird LLP
333 S. Hope St.
16th Floor
Los Angeles, CA  90071
    Parties Represented:
    Twentieth Century Fox Film Corp.

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA  90213-0900
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA  90012

    I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on November 4, 2013.

Kathryn Cisneros

**EXHIBIT 26**

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Casondra K. Ruga                    Direct Dial: 213-576-1133           E-mail: casondra.ruga@alston.com

May 21, 2014

VIA EMAIL (ddixon@irell.com)
AND U.S. MAIL

Douglas J. Dixon
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Re:   *Bagdasarian Productions, LLC et al. v. Twentieth Century Fox Film Corporation*

Dear Doug:

During our telephonic meet-and-confer on May 15, 2014, Plaintiffs requested that Fox identify the relevant authorities that support Fox's motion for attorneys' fees ("Motion"). We are writing in response to that request, and to elaborate on the grounds upon which Fox intends to rely, all in order to continue the meet and confer process.

There are three legal bases for Fox's Motion. First, the Copyright Act, 17 U.S.C. § 505 (the "Act"), provides for an award of attorneys' fees to prevailing parties who successfully protect their copyright interests. Pursuant to the Act, Fox seeks an award of its fees associated with Fox's total success in defending against Plaintiffs' copyright-related claims, including its reasonable fees incurred to compel Plaintiffs to adjudicate the copyright-related claims in the reference proceeding. Representative cases that support Fox's request for fees under the Act include the following: *Fogerty v. Fantasy*, 510 U.S. 517 (1994), *Fantasy, Inc. v. Fogerty*, 94 F.3d 553 (9th Cir.1996), *Malijack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881 (9th Cir. 1996), *Domingo Cambiero Professional Corp. v. Advent*, 211 F.3d 1273, 2000 WL 262590 (9th Cir. Mar. 7, 2000), *Brayton Purcell LLP v. Recordon & Recordon*, 487 F.Supp.2d 1124 (N.D. Cal. 2007), and *Berry v. Hawaiian Exp. Service, Inc.*, 2006 WL 4102120 (D. Haw. Oct. 21, 2006).

Second, Fox seeks an award of fees on non-copyright related claims pursuant to the Court's inherent authority to sanction Plaintiffs for their bad faith pursuit of claims. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006); *see also Fink v. Gomez*, 239 F.3d 989 (9th Cir. 2001). Plaintiffs forced Fox to engage in costly litigation activity on numerous claims, all lacking in factual or legal support. Fox's position is that these claims were pursued for improper motive, all stemming from Mr. Bagdasarian's

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

000270

Douglas J. Dixon
May 21, 2014
Page 2

dissatisfaction with the terms of his Agreement and from Fox's refusal to renegotiate those terms. Our position is that these claims were never supported by any legitimate factual or legal basis (as Fox noted in letters to Plaintiffs' counsel addressing claims threatened in Mr. Shire's October 2009 letter and in subsequent letters to Plaintiffs' counsel over the course of the litigation). As a result, Fox seeks compensation for the substantial fees it expended on the claims pursued in bad faith, including but not limited to Plaintiffs' Purchase Price, merchandising, soundtrack, FX distribution, and HBO distribution claims and claims for implied contract for graphic services, as well as the attempted claim for rescission.

Fox's Motion on the non-copyright-related claims described above will also be based on the sanctions specified under Federal Rules of Civil Procedure 37(c)(2). Rule 37(c)(2) makes an award of reasonable expenses, including attorneys' fees, mandatory to a party that serves Requests for Admission ("RFAs") under Rule 36 where the responding party improperly denies the requests and the requesting party thereafter proves the genuineness of the matters identified in the RFAs. *See Marchand v. Mercy Medical Center*, 22 F.3d 933 (9th Cir. 1994); *see also Comeaux v. Brown & Williamson tobacco Co.*, 915 F.2d 1264, 1275 (9th Cir. 1990). All of these claims were the subject or RFAs, all of the RFAs were denied, and in each case Fox fully prevailed on the matter. As a result of Plaintiffs' denial of matters that should have been admitted as undisputed, Fox was forced to spend substantial sums to establish the merits and to otherwise defeat those claims.

Pursuant to Local Rule 7-3, please let us know Plaintiffs' position on Fox's Motion. Based on our previous discussions, it would appear that Plaintiffs intend to oppose Fox's request for fees; if so, we look forward to hearing about the basis and authorities for your opposition so that we may consider them. If Plaintiffs intend to oppose the request for fees associated with Fox's enforcement of the reference of Plaintiffs' Copyright-related Claims, or any other component of Fox's fee request, please explain the basis for your position and provide any supporting authorities.

We thank you for agreeing that the attorney fee information we shared with you during our call will be governed by the Protective Order and for indicating that you have no objection to Fox designating the attorney fee information in our Motion as Confidential under the Protective Order. We will proceed on that basis. In view of that, we would like to share further information, subject to the Protective Order, about the attorney and other time-biller hourly rates that will be the subject of our Motion. Mr. Karasik's hourly rate for this matter from 2009 through 2014 ranged from ▮▮▮▮▮ From 2010 through 2014, Ms. Capoccia's hourly rate for this matter ranged from ▮▮▮▮▮ ▮▮▮▮. My hourly rate for this matter from 2009 through 2014 ranged from ▮▮▮▮▮. The hourly rate for other billers hourly rates for this matter (associates, paralegals and document clerks) is in the range of ▮▮▮▮▮. We share this further this information in order to determine if Plaintiffs intend to challenge the reasonableness of the rate structure charged by Alston & Bird. Our view is that these rates are well within the reasonable range.

000271

Douglas J. Dixon
May 21, 2014
Page 3


We would also appreciate if you could advise whether Plaintiffs intend to challenge the reasonableness of the total fee amounts we described for defense of the Copyright-related Claims (approximately $850,000), of which approximately $350,000 was for activity involving factual investigation, legal analysis, brief writing, hearings and other case activity unrelated to enforcement of the 638 Reference.   Approximately $500,000 was spent to enforce the 638 Reference and to oppose Plaintiffs' numerous arguments seeking to avoid 638 Reference for the copyright (i.e. federal law) claims (presented in either the District Court and/or the Ninth Circuit).  Again, our view is that the attorneys' fees incurred for the work performed are entirely reasonable, and we request that you advise whether you intend to challenge the reasonableness of the amounts.

Please confirm what (if any) matters Plaintiffs do not intend to contest so that the parties can streamline their presentations to the Referee.  As the ultimate purpose of meeting-and-conferring is to determine whether the parties can reach an agreement that obviates the need for a motion, please advise whether there is an amount of fees Plaintiffs would be willing to pay to avoid the need for the Motion.

Sincerely,

Casondra K. Ruga


cc:   Steve Marenberg (smarenberg@irell.com)
      Melissa McCormick (mmccormick@irell.com)
      Louis Karasik
      Rachel Capoccia

# EXHIBIT 27

# IRELL & MANELLA LLP

A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CA 90067-4276
TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199

840 NEWPORT CENTER DRIVE, SUITE 400
**NEWPORT BEACH, CALIFORNIA 92660-6324**

TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200
WEBSITE: www.irell.com

**WRITER'S DIRECT**
TELEPHONE (949) 760-5220
FACSIMILE (949) 717-6315
DDixon@irell.com

May 29, 2014

**VIA EMAIL**

Casondra K. Ruga
ALSTON & BIRD LLP
333 S. Hope Street, 16th Floor
Los Angeles, CA 90071
Direct: (213) 576-1133

Re:  *Bagdasarian Productions, LLC, et al., v. Twentieth Century Fox Film Corp.*,
Case No. CV-10-02991 (MWF)

Dear Casondra,

We write in response to your letter of May 21, 2014, regarding Fox's intended motion for attorney fees.

Although we appreciate your attempt to disclose to us, at least in part, the bases for Fox's motion, we dispute that there is any cognizable basis for an award of attorneys' fees in this instance.  For example, the only two cases you identified in support of Fox's request for attorney fees under the Court's inherent power are readily distinguishable.  Likewise, your letter made no effort to substantiate your bald assertion that Plaintiffs pursued any of their claims in bad faith.  We again urge you to reconsider seeking fees on this basis.

However, in response to your inquiry, we can advise you that although we dispute both the reasonableness of the total fee amounts identified and whether certain of the activities – *e.g.*, enforcing the 638 reference – are appropriately identified as "Copyright-related," we do not intend at this time to challenge the reasonableness of the hourly rates for the specific attorneys identified in your letter.[1]  You have provided no support, factual or legal, whereby we could evaluate the reasonableness of the total fee amounts or whether efforts to enforce a 638 reference may be included in a request for fees under 17 U.S.C.

---

[1] We reserve the right to challenge the reasonableness of the hourly rates for the "other billers" identified only as "associates, paralegals and document clerks" until Fox identifies the specific rates associated with each such biller for which fees are sought.

3052807.1 02

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Casondra K. Ruga
May 29, 2014
Page 2


§ 505.  Moreover, you have not even identified the amounts Fox may seek under the Court's inherent power or Rule 37(c)(2) of the Federal Rules of Civil Procedure.


Sincerely,

Douglas J. Dixon


cc:    Louis Karasik
       Rachel Capoccia

# EXHIBIT 28

# ALSTON&BIRD LLP

333 South Hope Street
16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax:213-576-1100
www.alston.com

Casondra K. Ruga                    Direct Dial: 213-576-1133          E-mail: casondra.ruga@alston.com

May 30, 2014

<u>VIA EMAIL (ddixon@irell.com)</u>
<u>AND U.S. MAIL</u>

Douglas J. Dixon
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Re:     *Bagdasarian Productions, LLC et al. v. Twentieth Century Fox Film Corporation*

Dear Doug:

        We have your May 29 response to our May 21 letter.  Our May 21 letter set forth three legal bases for an award of fees:  the Copyright Act, 17 U.S.C. § 505, Plaintiffs' improper denial of Requests for Admission under Federal Rule of Civil Procedure 37(c)(2), and the Court's inherent power to sanction bad faith pursuit of claims.  Your letter states Plaintiffs' opposition only to Fox's request for fees under the Court's inherent power; even as to that, your letter offers only the conclusion that the cases are "readily distinguishable" and that you disagree that Plaintiffs pursued their claims in bad faith.  Plaintiffs have provided no meaningful information as to the grounds for their opposition to fees under the Court's "inherent power," and have provided no information at all on their position with regard to fees under the Copyright Act or Rule 37 of the Federal Rules.

        We acknowledge that Plaintiffs do not intend to challenge the reasonableness of the hourly rates for Lou Karasik, Rachel Capoccia or myself.  So that we can avoid any remaining issues related to rates, we advise (again, subject to the Protective Order) that the hourly rate for Evan Woolley (a junior associate) from 2012 through 2014 ranged from ██████████ the hourly rate for Mitra Eskandari-Azari (a mid-level associate) from 2010 to 2012 ranged from ██████████ and the hourly rate for Grace Kang Shaywitz (a senior associate) in 2012 (who had more limited involvement in the matter) was ██████ per hour.  Additionally, the hourly rates of paralegals who worked on this matter ranged from ██████████ from 2009 to 2014, and a case assistant in 2009 had an hourly rate of ████.  We would appreciate your confirmation that Plaintiffs do not intend to challenge the reasonableness of these rates.

---

Atlanta • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.

Douglas J. Dixon
May 30, 2014
Page 2

Regarding the reasonableness of the fees Fox has paid, we believe the amounts we have described are well within the reasonable range for cases of this nature. One measure you might use to assess the issue is the fees charged by Irell & Manella (and Paul, Weiss & Rifkind) in this case. Of course, since Fox is a much larger organization with many more document custodians than Plaintiffs, and was subjected to many more depositions, it would be reasonable to expect that Fox incurred more fees than Plaintiffs. Even so, it may be that higher rates charged by Irell and Paul Weiss in this matter only underscore the reasonableness of the fees incurred by Fox.

As we previously advised (again, subject to the Protective Order), Fox incurred fees in defense of the Copyright-related Claims of approximately $850,000, of which about $375,000 were unrelated to enforcement of the 638 Reference, and about $475,000 were related to enforcement of the Reference. Plaintiffs are familiar, of course, with the numerous issues Fox was required to investigate and defend in the course of the matter.

Respecting Fox's motion for fees on the remaining claims, we advise (subject to the Protective Order) that Fox anticipates seeking fees in the $850,000 to $1 million range. This represents a fraction of the fees incurred by Fox to defend Plaintiffs' numerous baseless claims, and includes fees incurred as a result of Plaintiffs' failure to admit RFAs, the assertion of claims in bad faith that lacked any factual or legal support (despite Fox's several efforts to bring the deficiencies of the claims to Plaintiffs' attention so that unnecessary litigation could be avoided), and Plaintiffs' pursuit of overbroad discovery and other litigation tactics that unnecessarily multiplied the costs of the proceedings. Again, Plaintiffs are familiar with the substantial litigation activity Fox was required to undertake to litigate Plaintiffs' claims and the numerous meet and confer efforts Fox made to dissuade Plaintiffs' from pursuing baseless claims.

If, after reviewing the data points available to you, Plaintiffs believe that the fees Fox is seeking are unreasonable, we look forward to hearing the basis for your position. We hope that the meet-and-confer process can resolve disputes to limit the number of issues before Judge West.

Sincerely,

Casondra K. Ruga

cc:   Steve Marenberg (smarenberg@irell.com)
      Melissa McCormick (mmccormick@irell.com)
      Louis Karasik
      Rachel Capoccia

# EXHIBIT 29

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CA 90067-4276
TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199

840 NEWPORT CENTER DRIVE, SUITE 400
**NEWPORT BEACH, CALIFORNIA 92660-6324**

TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (949) 760-5220
FACSIMILE (949) 717-6315
DDixon@irell.com

June 3, 2014

**VIA EMAIL**

Casondra K. Ruga
ALSTON & BIRD LLP
333 S. Hope Street, 16th Floor
Los Angeles, CA 90071
Direct: (213) 576-1133

Re:   *Bagdasarian Productions, LLC, et al., v. Twentieth Century Fox Film Corp.*,
      Case No. CV-10-02991 (MWF)

Dear Casondra,

We write in response to your letter of May 30, 2014, regarding Fox's intended motion for attorney fees.

Although your letter purports to criticize Plaintiffs for "provid[ing] no meaningful information as to the grounds for their opposition to fees under the Court's 'inherent power,' and [providing] no information at all on their position with regard to the fees under the Copyright Act or Rule 37 of the Federal Rules," such criticism is without merit. As we explained during the parties' meet-and-confers on this issue and in our letter of May 29, 2014, Plaintiffs oppose Fox's intended motion for attorney fees on all grounds. Moreover, at no time has Fox provided Plaintiffs with sufficient information to evaluate the merit of Fox's request for attorney fees either legally or factually.

Your letter of May 21 simply cited cases contending, in conclusory fashion, that they "support Fox's request for fees," yet Fox did not provide any explanation as to how or why. Many of the cases cited set forth multi-factor tests to determine the appropriateness of requests for attorney fees, *see, e.g., Fogerty v. Fantasy*, 510 U.S. 517, 534 (1994), but your letters failed to identify the factors, let alone analyze them. We can hardly be expected to rebut a legal analysis that Fox failed to provide in the first instance.

Similarly, your letters failed to provide factual details that would permit us to analyze the reasonableness of the amount of fees sought. For example, you simply lump the fees Fox intends to seek in defense of the "Copyright-related Claims" into two broad categories: $350,000 for "activity involving factual investigation, legal analysis, brief writing, hearings and other cases activity" and approximately $500,000 "to enforce the 638

3057701.2 01

I R E L L   &   M A N E L L A   L L P
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Casondra K. Ruga
June 3, 2014
Page 2

Reference."[1] But you have not explained, among other things, how much time was spent on each distinct activity within each category, who was engaged in each activity, or why the amount of time spent on each activity was "reasonable." Indeed, you wrongly attempt to shift the burden to Plaintiffs by asserting that "Plaintiffs are familiar, of course, with the numerous issues Fox was required to investigate and defend in the course of the matter."

Your attempt to justify Fox's request for "fees in the $850,000 to $1 million range" under the court's inherent power fares no better. You claim such fees are justified "as a result of Plaintiffs' failure to admit RFAs," without identifying which RFAs; "the assertion of claims in bad faith that lacked any factual or legal support," without identifying which claims; "and Plaintiffs' pursuit of overbroad discovery and other litigation tactics," without identifying what discovery or purported litigation tactics. Nor have you identified how much time was spent on such activities, who was engaged in each activity, and why the amount of time spent was reasonable. Indeed, you again improperly invite Plaintiffs merely to guess by suggesting that "Plaintiffs are familiar with the substantial litigation activity Fox was required to undertake."

In any event, thank you for providing additional information about the "other billers" whose fees, in addition to your own, Mr. Karasik's and Ms. Capoccia's, Fox will be seeking in its motion. We are not inclined at this time to challenge the reasonableness of their hourly rates as identified in your letter, though we must reserve the right to do so as the reasonableness of these rates may well depend on the tasks they were doing. Just to give one example, ▮▮▮▮▮▮ for paralegals may well be reasonable in some circumstances, but not in others (*e.g.*, if the paralegal were doing largely file maintenance or other clerical-type task).

One final suggestion: why don't we proceed to briefing the issues instead of swapping letters back and forth, before it turns out that we spend more time on letter writing than the actual briefing.

Sincerely,

Douglas J. Dixon

cc:    Louis Karasik
       Rachel Capoccia

_____

[1] Notably, the amount of fees Fox seeks for each category has changed by $25,000 between your letter of May 21 and May 30, 2014.

3057701.2 01

000281

# PROOF OF SERVICE

I, Louis A. Karasik, declare:

I am employed in the County of Los Angeles, State of California.  My business address is Alston & Bird LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071.  I am over the age of eighteen years and not a party to the action in which this service is made.

On June 6, 2014, I served the document(s) described as follows: **DECLARATION OF LOUIS A. KARASIK IN SUPPORT OF DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR ATTORNEYS' FEES AND COSTS** on the interested parties in this action:

☐ BY MAIL:  I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, CA 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Alston & Bird LLP, 333 South Hope Street, Los Angeles, CA 90071.

☒ **BY ELECTRONIC SERVICE-CASE ANYWHERE**:  I transmitted via the internet, a true copy of the above-entitled document(s) to Case Anywhere at www.caseanywhere.com.  I caused the above-entitled document(s) to be sent to the recipients on the service list as maintained by Case Anywhere in this action.

☐ BY ELECTRONIC MAIL TRANSMISSION:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒ [Federal]   I declare under penalty of perjury that the above is true and correct.

Executed on June 6, 2014, at Los Angeles, California.

/s/  Louis A. Karasik
Louis A. Karasik