ruling on the motion pending documentation of the withdrawal of the claim as noted in Fn. 1 of Plaintiffs' Opposition Brief.

DATED:  September 9, 2013

_____

Carl J. West
Judge of the Superior Court (Ret.)
Referee

37

## PROOF OF SERVICE BY U.S. MAIL

**Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation**
Court Case No. CV 10-02991 MWF (JCGx)
JAMS Reference No. 1220044628

I, Kathryn Cisneros, not a party to the within action, hereby declare that on September 09, 2013 I served the attached **ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF BAGDASARIAN PRODUCTION'S MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT (2) DENYING DEFENDANT TWENTIETH CENTURY FOX'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird LLP
333 S. Hope St.
16th Floor
Los Angeles, CA  90071
    Parties Represented:
    Twentieth Century Fox Film Corp.

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660
    Parties Represented:
    Bagdasarian Productions
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA  90213-0900
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA  90012

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on September 09, 2013.

*Kathryn Cisneros*
Kathryn Cisneros

38

# EXHIBIT 5

1  HON. CARL J. WEST RET.
   JAMS
2  707 Wilshire Blvd.
   46ᵗʰ Floor
3  Los Angeles, CA  90017
   Tel: 213-620-1133
4  Fax: 213-620-0100

5  Referee

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11 BAGDASARIAN PRODUCTIONS,          Case No. CV 10-02991 MWF (JCGx)
   LLC, a California limited liability
12 company, and JANICE KARMAN, an    JAMS Ref. No. 1220044628
   individual,
13

14              Plaintiffs,          ORDER

15      v.

16

17 TWENTIETH CENTURY FOX FILM
   CORPORATION, a Delaware
18 corporation,

19              Defendant.

20

21 **I.    Introduction**

22         Plaintiffs Bagdasarian Productions, LLC ("BP") and Janice Karman

23 ("Karman") (collectively, "Plaintiffs") brought an action against Defendant

24 Twentieth Century Fox Film Corporation ("Fox") in the United States District Court

25 for the Central District of California.  On June 14, 2012, this action was referred

26 under Cal. Code Civ. Proc. § 638 to the undersigned referee ("Referee").

27 Subsequently, Plaintiffs filed a Second Amended Complaint for Declaration of

28

                                  - 1 -

                                                                              40

1 Copyright of Co-Ownership of Copyright and Accounting for Profits, Copyright

2 Infringement, Unjust Enrichment, Breach of Implied Contract, and Breach of

3 Contract.  Currently before the Referee is:

4      (1) Fox's Motion for Summary Judgment;

5      (2) BP's Motion for Partial Summary Judgment on Certain Breach of Contract

6 Claims;

7      (3) Karman's Motion of Partial Summary Judgment on Implied Contract

8 Claims; and

9      (4) Fox's Application Pursuant to FRCP 56(d).

10 **II.**    **Standards**

11     **A.**    **Motion for Summary Judgment**

12      Under the Federal Rules of Civil Procedure, summary judgment is

13 proper only where the pleadings, depositions, answers to interrogatories, and

14 admissions on file, together with the affidavits, if any, show that there is no genuine

15 issue as to any material fact and that the moving party is entitled to a judgment as a

16 matter of law.@  Fed. R. Civ. P. 56(c).  The moving party has the burden of proof

17 demonstrating the absence of a genuine issue of fact for trial.  See Anderson v.

18 Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  It may point to the absence of the

19 nonmovant's evidence (see Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970),

20 or present its own evidence to negate an element of the nonmovant's claim.  See

21 Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies the

22 burden, the party opposing the motion must set forth specific facts showing that there

23 remains a genuine issue for trial.  See Anderson, 477 U.S. at 256; Fed. R. Civ. P.

24 56(e).

25     **B.**    **Contract Interpretation**

26      The interpretation of written contracts is an issue of law for the court.

27 Powers v. Dickson, Carlson &Campillo, 54 Cal. App. 4th 1102, 1111 (1997) ("Our

28 Supreme Court long ago established that interpretation of a written instrument, even

1  thought it involves what might properly be called questions of fact, is essentially a

2  judicial function to be exercised according to the generally accepted canons of

3  interpretation so that the purposes of the instrument may be given effect.")  "[A]

4  contract must be interpreted as to give effect to the mutual intention of the parties as

5  it existed at the time of contracting, so far as the same is ascertainable and lawful."

6  Cal. Civ. Code § 1636.  Further, "[t]he whole of a contact is to be taken together, so

7  as to give effect to every part, if reasonably practicable, each clause helping to

8  interpret the other."  Id. at § 1641.

9        Extrinsic evidence may be admitted to assist contract interpretation only

10  when it is competent and only to prove a meaning to which the language is

11  reasonably susceptible.  The contract must be understood "by reference to the

12  circumstances under which it was made, and the matter to which it relates."  Cal.

13  Civ. Code § 1647.  Those circumstances include the acts of the parties showing what

14  they believed the contract to mean, before any controversy has arisen as to its

15  meaning.  DVD Copy Control Ass'n v. Kaleidescape, Inc., 176 Cal. App. 4th 697, 712

16  (2009) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 749, p.

17  838).  Such evidence may include the post-contracting conduct of the parties.  Id.

18  **III.   Motions for Summary Judgment Re Breach of Express Contract Claims**

19        In the Second Amended Complaint ("SAC"), BP alleges that Fox

20  breached the parties' Purchaser/Producer Agreement – Literary Materials – "Alvin

21  and the Chipmunks" dated March 26, 2004 ("Agreement") by (1) treating up-front

22  "Purchase Price" money for sequels as a recoupable advance against contingent

23  compensation; (2) paying soundtrack royalties for Alvin and the Chipmunks

24  ("Alvin") and Alvin and the Chipmunks: The Squeakquel ("The Squeakquel") net of

25  standard deductions; and (3) failing to report the correct amount of pay-television

26  revenue in connection with the films.  Fox seeks summary judgment with respect to

27  the breach of contract claim based on the Purchase Price, and both Fox and BP seek

28  summary judgment with respect to the breach of contract claims based on the

1    soundtrack royalties and pay-television revenue.  As the parties acknowledge, the

2    rules of contract interpretation apply to the determination of these claims.

3         **A.**     **<u>Breach of Contract Claim Based on the Purchase Price</u>**

4               In Count VII of the SAC, BP alleges that Fox breached the parties'

5    Agreement by treating the "Purchase Price" described in Paragraph 6 as an advance

6    for sequels or remakes.  In seeking summary judgment on this claim, Fox contends

7    that the unambiguous language of the Agreement is that "[f]or each Picture," the

8    contingent compensation is only payable "subject to" the treatment of the Purchase

9    Price as an advance against that compensation.  In opposition, BP contends that

10   disputed issues of material fact preclude the entry of summary judgment for Fox on

11   this claim.  It argues that BP must be paid a non-recoupable upfront payment in

12   addition to Contingent Compensation for sequels.[1]

13        **1.**     **The language of the Agreement supports the interpretation**

14                     **that the Purchase Price is an advance against Contingent**

15                     **Compensation "for each Picture"**

16              The Agreement provides as follows:

17        6.     <u>PURCHASE PRICE</u>:  As consideration in full for the Granted

18        Rights and for the representations, warranties and agreements made by
          Owner, Fox shall to pay to Owner within 10 business days after exercise

19        of the Option the sum of $3,000,000 . . . ("Purchase Price") less the
          amount paid to Owner for the Initial Option Period.  The Purchase Price

20        shall be deemed an advance against the Contingent Compensation

21        (defined below).

22   _____

23   [1] At the outset, BP argues that Fox's current Motion for Summary Judgment should be
     denied because the Referee already has decided that the Purchase Price issue is
     incapable of resolution by dispositive motion as a result of factual disputes.

24   However, as set forth in the prior Order Denying Fox's Motion for Partial Summary
     Judgment, the Referee stated that "the court may entertain extrinsic evidence to assist

25   both in interpreting the agreement and in determining the intent of the parties."
     (9/9/13 Order at 12:12-15.)  As both parties note, the prior motion was based on a

26   limited record.  In this current Motion, both parties have conducted discovery, and
     extrinsic evidence has been submitted by both parties.  As such, based on a more

27   fully developed evidentiary showing, the determination is whether triable issues of
     material fact exist.

28

7.    <u>ADDITIONAL PAYMENTS</u>:  For each Picture that Fox produces and releases, Owner shall be paid:

(a)    <u>Contingent Compensation</u>:  Subject to the last sentence of Paragraph 6, Lender shall be paid "Contingent Compensation" equal to 2½% of 100% of the "Defined Gross Proceeds" (as defined in the Participation Definition) from "1st dollar" of the Picture.

(Agreement, ¶¶ 6-7(a).)

The Agreement further provides:

12.    <u>STUDIO SEQUELS AND REMAKES</u>:  Within 10 business days after the commencement of principal photography of the applicable studio sequel or remake, Owner shall receive:

(a)    Sequels:  an amount equal to (i) the Purchase Price, and (ii) a percentage of the Defined Gross Proceeds of such sequel equal to the rate of percentage participation in the Defined Gross proceeds from "1st dollar" of the Picture payable pursuant to Paragraph 7.

(Agreement, ¶ 12(a).)

The Arbitrator agrees with Fox that under this language, payment of Contingent Compensation "[f]or each Picture" as set forth in Paragraph 7 is subject to the Purchase Price being "deemed an advance against the Contingent Compensation" as set forth in the last sentence of Paragraph 6.  Use of the words "for each Picture" means that this applies to sequels, and contrary to BP's assertion, not just to the first picture.

BP argues that under Paragraph 12, what Fox pays for sequels is described as "an amount equal to (i) the Purchase Price," and this cannot be equated with the "Purchase Price."  In other words, according to BP, something other than the "Purchase Price" is paid for sequels.  BP additionally argues that the payment of the "Purchase Price" is tied to a specific event that occurs only once - "within 10 days

1   after the exercise of Option," while the payment of the advance for the sequel is tied

2   to a different event - "within 10 business days after commencement of principal

3   photography of the applicable studio sequel." It concludes that this limits the

4   Purchase Price to the first picture only.

5           With respect to BP's reference to "an amount equal to (i) the Purchase

6   Price," BP's interpretation is that the phrase "an amount equal to" negates the

7   specific language that the "Purchase Price shall be deemed an advance against the

8   contingent compensation" for "each Picture." However, the words "an amount equal

9   to" can be interpreted in their ordinary meaning consistent with the remaining terms

10  of the Agreement to reflect that the Purchase Price is an advance for each picture.

11  The pertinent language provides: "an amount equal to (i) the Purchase Price, and (ii)

12  a percentage of the Defined Gross Proceeds of such sequel equal to the rate of

13  percentage participation . . . payable pursuant to Paragraph 7." In other words, BP

14  receives a total of two things: the Purchase Price and the contingent compensation of

15  Paragraph 7, with that amount subject to the requirement that the Purchase Price is

16  "deemed an advance" for "each picture." Under BP's interpretation, the language of

17  Paragraph 7 would be negated. This is contrary to the canon that all provisions of a

18  contract are to be given effect, each provision helping to explain the other, not to

19  create unexplainable contradictions. See Civ. Code § 1641; F.T.C. v. EDebitPay,

20  LLC, 695 F.3d 938, 944 (9th Cir. 2012) (rejecting defendants' interpretation because

21  it would render certain contract phrases inoperative or meaningless).

22          With respect to BP's argument that it receives something other than the

23  Purchase Price for sequels because the Purchase Price is "tied to a specific event,"

24  this interpretation ignores the language of Paragraph 7, which provides the Purchase

25  Price is deemed an advance for contingent compensation paid "for each Picture."

26  Furthermore, while Paragraph 6 does specify when the Purchase Price will be paid, it

27  does not limit the definition of Purchase Price to that single payment. Similarly,

28  Paragraph 12 specifies the timing of the payment of the Purchase Price for a sequel,

- 6 -

but nothing suggests the parties intended the payment for sequels to be non-recoupable.

In sum, the parties expressed in the Agreement that Contingent Compensation "[f]or each Picture," not just the first picture, is "subject to" treating the Purchase Price as an advance. There would be no reason for Paragraph 7 to specify that "for each Picture," payment of Contingent Compensation is "subject to the last sentence of paragraph 6," providing that the Purchase Price is deemed an advance. BP acknowledges that "for each picture" BP receives Contingent Compensation pursuant to Paragraph 7. Yet, it would ignore the first phrase "[s]ubject to the last sentence of Paragraph 6" when it applies the definition of Contingent Compensation in Paragraph 7(a) to payments for sequels. Instead, BP attempts to argue that the phrase "[s]ubject to the last sentence of Paragraph 6" in Paragraph 7(a) applies only to the upfront payment for the first picture. This is a strained interpretation that would ignore provisions of the Agreement. Thus, the Referee finds that the plain language of the Agreement controls and provides that the Purchase Price is a recoupable advance against Contingent Compensation for each picture.

### 2.     Extrinsic Evidence supports the meaning of the plain language of the Agreement

#### (a)     Extrinsic evidence surrounding the negotiations and drafting

In support of its Motion, Fox contends that the extrinsic evidence of the parties' negotiations confirms that the Agreement means what it says. The Referee agrees with Fox.

It is undisputed that Stephen Plum ("Plum") negotiated the Agreement on behalf of Fox, and Steve Waterman ("Waterman") negotiated on behalf of

1  Plaintiffs. (Fox's MSJ, UF 1-2.)[2]  The parties documented the deal only after Plum

2  and Waterman expressed their shared understanding in writing that the Purchase

3  Price would be an advance against BPL's profit participations. (Id. at UF 3; see Plum

4  Dec., ¶9, Ex. 4 (Waterman November 21, 2003 memo expressing a "meeting of the

5  minds" that "PURCHASE PRICE AND BAGDASARIAN PRODUCING FEES"

6  would be $3 million, "applicable against profit participations" of 2.5% first dollar

7  gross).)  At no point in the negotiation did Waterman or anyone from BP propose to

8  treat the Purchase Price differently for sequels than the first picture– i.e., make it

9  nonrecoupable for sequels. (Id. at UF 4.)

10          In response, BP argues that even if Waterman had agreed to accept the

11  same compensation for each film, that agreement would have exceeded his authority

12  with respect to the negotiations and thus could not bind BP.  It claims that Fox knew

13  that Waterman was not authorized to agree to any deal point without consulting

14  Bagdasarian.  However, the evidence does not support BP's claim.  First, Waterman

15  expressly affirmed to Fox that the parties had reached agreement on the points in the

16  November 21, 2003 memorandum, and this is chargeable to BP as a matter of law.

17  See Civil Code § 2332; O'Riordan v. Fed. Kemper Life Assur., 36 Cal. 4th 281, 288

18  (2005) (agent's knowledge is imputed to principal even if not actually communicated

19  to the principal).  Moreover, after the November 2003 exchange, the parties never

20  again discussed the issue whether the Purchase Price would be an advance against

21  contingent compensation.  (Plum Decl., ¶ 12.)  The parties documented the deal

22  based on the understanding reflected in the November 2003 memorandum.  BP never

23  repudiated the understanding that the Purchase Price would be an advance against its

24  profit participations, but instead executed the Agreement which provided that, "for

25  each Picture," contingent compensation is only payable if the Purchase Price is

26  _____

27  [2] The Referee makes the findings of fact based on the referenced Separate Statements of
    Undisputed Facts, the Statements of Genuine Disputes of Material Fact, and the Responses

28  to the Statements of Genuine Disputes.

1  deemed an advance.  As such, BP ratified the parties' deal by signing the Agreement
2  negotiated by Waterman.  Gladium Co. v. Thatcher, 95 Cal. App. 85, 91 (1928)
3  (acceptance of contract precludes principal from denying authority of agent through
4  whom it was consummated).

5       BP argues that, as testified to by Bagdasarian, it was adamant that it
6  receive more compensation for sequels than for the first picture.  However, even
7  assuming this is true, there is no evidence that BP expressed its subjective intent that
8  the Purchase Price would be non-recoupable for sequels.  "The true intent of a
9  contracting party is irrelevant if it remains unexpressed."  Crow v. P.E.G.
10 Construction Co., Inc., 156 Cal. App. 2d 271, 278-279 (1957).  Put another way,
11 BP's desire for "more" for sequels doesn't equate to a demand to treat the Purchase
12 Price as a non-recoupable advance for sequels.  It is undisputed that Fox expressed
13 that the Purchase Price would be recoupable against contingent compensation, and
14 the sequels would be treated the same.  BP points to no evidence that it ever
15 suggested at that time that the Purchase Price would be recoupable for the first
16 picture only.

17      BP points to the exchange of drafts and its proposal of additional
18 language to Paragraph 6 to clarify that the Purchase Price was "for the first motion
19 picture."  (See Plum Ex. 5 at BP00000284.)  It states that Fox deleted that language
20 in the next draft it circulated without explanation, and the parties did not include that
21 language in the final Agreement.  It claims that this was because the language was
22 "unnecessary," as Bagdasarian testified.  According to BP, the language of Paragraph
23 6 when read with Paragraph 12, was clear without the language BP proposed.  It was
24 clear to BP that the Purchase Price was paid only once, "within 10 business days
25 after exercise of the Option," and a separate paragraph dealing with sequel
26 compensation provided more for sequels.  However, BP relies on the undisclosed,
27 subjective intent of Bagdasarian that the language was "unnecessary."  BP did not
28 say anything to Fox about the change it proposed; it provided its draft with no

- 9 -

48

1   explanation, and then it accepted Fox's rejection without explanation. (Fox's MSJ,

2   UF 14.) Contract interpretation follows the objective rule of contracts where only

3   what the parties say in the Agreement or to each other has any bearing. Civ. Code §

4   1639. As such, the Referee finds that the extrinsic evidence of the negotiating

5   history confirms the interpretation found above that the Agreement means what it

6   says.

**(b)   Extrinsic evidence of Fox's other deals and templates**

8           Fox submits evidence that none of its other third-party agreements

9   provide that a "Purchase Price" or its equivalent is recoupable against contingent

10  compensation for a first picture but non-recoupable for subsequent pictures.

11  (Karasik Del., ¶ 11, Ex. F.) It claims that the third-party agreements validate that the

12  most Fox agreed to pay for sequels is the same as what is paid for the original

13  picture. It states that its templates further demonstrate that Fox's standard practice to

14  pay one-half of the compensation for sequels paid for the preceding picture. (UF 10;

15  Plum Decl., ¶ 7, Ex. 2; Karasik Decl., ¶ 11.)

16          BP argues that the third-party agreements produced by Fox support BP's

17  understanding that the language of Paragraph 12 means that the advance given in

18  connection with the sequels is non-recoupable. It claims that Fox's practice of using

19  language nearly identical to that of Paragraph 12 in net proceeds deals, which Fox

20  admits involve non-recoupable advances, is in fact consistent with BP's

21  interpretation of Paragraph 12. (Plaintiffs' Opp, Ex. N; Ex. O at 116:18-117:7.) As

22  Fox explains, however, "net" deals are fundamentally different from First Dollar

23  Gross deals. Fox's "First Dollar Gross" forms specify that up-front money is always

24  an advance against contingent compensation in such deals. (Karasik Decl., ¶ 11, Ex.

25  F, Plum Depo. at 110:21-114:18; Plum Decl., Ex. 1.) The form pertaining to First

26  Dollar Gross deals requires that the following language be used: "the Fixed

27  Compensation . . . shall be deemed an advance against the Contingent

28  Compensation." (Fox's MSJ, UF 10; Plum Decl., ¶ 7, Ex. 2; Karasik Decl., Ex. N.)

- 10 -

1  This is consistent with the Agreement.  Thus, Fox's agreements with other third-
2  parties confirm that Fox has never entered into a deal like the one BP seeks to have.
3  BP points to no deal wherein Fox has agreed to treat a Purchase Price as recoupable
4  on the first picture and non-recoupable on sequels.

5       **3.**    **Summary Judgment in favor of Fox is warranted with respect**
6             **to the breach of contract claim based on the Purchase Price**

7       Thus, the Agreement provides that the Purchase Price is "deemed an
8  advance" for "each picture" and that the Contingent Compensation payable to BP is
9  subject to the Purchase Price being treated as an advance. (Agreement, ¶¶ 6, 7, 12.)
10  The Referee determines that the plain language of the Agreement as supported by the
11  undisputed extrinsic evidence provides that the Purchase Price is an advance for
12  sequels, as it is for the first picture.  As such, because there are no genuine issues of
13  material fact, Fox is entitled to judgment as a matter of law on this claim.

14    **B.**    **<u>Breach of Contract Claims Based on the Soundtrack Royalty</u>**

15       In Count VII of the SAC, BP alleges that Fox breached the parties'
16  Agreement when calculating BP's royalties for the soundtrack albums for the two
17  films, Alvin and The Squeakquel.  Both BP and Fox seek summary judgment with
18  respect to this claim.

19       **1.**    **With respect to Alvin, the deductions taken were proper**
20             **under the Agreement**

21       BP contends that its royalty based on the full suggested retail list price
22  ("SLRP") should not have been reduced by "free goods" or deductions taken by the
23  Record Company, including packaging deductions and royalty rate deductions that
24  governed foreign territories.  Specifically, BP claims that Fox reduced the royalty
25  base by 25% for nonexistent "packaging" expenses and another 25% for the fact that
26  the sales were in the form of digital downloads.  It also claims that Fox failed to

27
28

                                             - 11 -

report any royalties on sales of over 300,000 Alvin soundtrack albums.[3]  BP concludes that Fox underpaid royalties on top-line album sales of the Alvin soundtrack in the U.S. and Canada through December 31, 2012, by at least $911,185. (Tregellis Decl., ¶ 27.)  Fox, on the other hand, contends that BP's soundtrack claims fail because the Agreement expressly provides that BP's Soundtrack Royalties are subject to all deductions applicable under Fox's contract with the Record Company. For the Alvin soundtrack, Fox contracted with Razor & Tie ("R&T"), and Fox states that its contract with R&T provides for all of the reductions and deductions from Soundtrack Royalties that BP currently challenges.

**(a)    The plain language of the Agreement**

It is undisputed that Paragraph 10 of the Agreement entitles BP to "Soundtrack Royalties."  It provides as follows:

> 10.    <u>SOUNDTRACK ROYALTY</u>:   Owner shall be entitled to the following record royalties (collectively, "Soundtrack Royalty"), as applicable:
>
> (a)    <u>US & Canada Soundtrack Album Sales</u>:
>
> (i)    <u>Rights Royalty</u>: For net sales of any top line album sold in any and all distribution channels . . . in the United States and Canada:
>
> (A) Rights Royalty: a base phonorecord royalty equal to 1% of the suggested retail list price ('SRLP') thereof for such Soundtrack Album Sales . . ., and
>
> (B) Artist/Producer Royalty: a base phonorecord royalty equal to 13% of SRLP . . . . Said royalty to be pro rated by the number of "tracks" on which Artist renders services.

---

[3] This part of BP's breach of contract claim related to the soundtrack royalties for Alvin is addressed in Section V below.

     (b)    <u>Other Royalty-Bearing Sales</u>: Soundtrack Royalties shall be reduced, computed, paid, and defined (including for all other phonorecords, including  singles, and all international Soundtrack Album Sales) in accordance with the distribution agreement between Fox and the Soundtrack Album distributor ('Record Company').

(Agreement, ¶ 10(a) and (b).)[4]

Fox claims that Paragraph 10(a) provides the base royalty rates applicable for "top line albums" sold in the United States and Canada, and Paragraph 10(b) provides that the Soundtrack Royalties will be "reduced, computed, calculated, paid and defined" in accordance with Fox's contract with the record company handling distribution of the soundtrack.  By contrast, BP argues that only Paragraph 10(a) applies and does not permit deductions.  It claims that Fox improperly relies on Paragraph 10(b) which applies only to "Other Royalty-Bearing Sales" – i.e. sales other than top-line album sales in the U.S. and Canada, which are the sales described in the preceding Paragraph 10(a).

The Referee agrees with Fox's application of both Paragraph 10(a) and Paragraph 10(b) to permit the deductions at issue.  "Soundtrack Royalty" in Paragraph 10 is a defined term, and Paragraph 10(b) addresses the same defined term, "Soundtrack Royalties," not any limitation of that term to non-top-line sales and/or those outside the U.S. or Canada.  Soundtrack Royalties in Paragraph 10(b) by definition includes the royalties detailed in Paragraph 10(a).  In addition, the terms "net sales" and "base phonorecord royalty"[5] in Paragraph 10(a) signal that adjustments are to be made, and Paragraph 10(b) sets forth where to look to find those adjustments – "in accordance with the distribution agreement between Fox and

---

[4] The parties agreed to use an "Artist/Royalty" of 9.75%, for a total of 10.75% when combined with the 1% "Right Royalty."

[5] "Net sales" means all sales exclusive of any albums returned or given away (i.e. "free goods," typically for promotional purposes).  (Cavanaugh Decl., ¶ 7.)  "Base" means the starting point before any deductions or adjustments are taken.  (<u>Id.</u>)

- 13 -

1   the Soundtrack Album distributor." Moreover, Paragraph 10(b) notes that it

2   addresses Soundtrack Royalties "including for all other phonorecords." Contrary to

3   BP's assertion, the word "including" means the royalties specified under Paragraph

4   10(a), and the word "other" refers to royalties other than those specified in Paragraph

5   10(a). Under BP's construction, these words would be superfluous.

6          BP asserts that the heading of Paragraph 10(b), "Other Royalty-Bearing

7   Sales," means sales other than top-line album sales in the U.S. and Canada. The

8   Referee agrees that this heading may appear to be misleading.[6] However, the

9   paragraph explaining this heading uses the term "Soundtrack Royalties," which, as

10  explained above, includes the royalties described in Paragraph 10(a), and further

11  addresses Soundtrack Royalties "*including* for all other phonorecords." BP's

12  proposed construction would strictly interpret the heading of the paragraph while

13  ignoring certain phrases of the paragraph defining that heading. The Referee must

14  interpret the Agreement "to effectuate every provision and not in a way that renders

15  some clauses nugatory, inoperative or meaningless." United Artists Corp. v. Strand

16  Productions, Inc., 216 F.2d 305, 310 (9th Cir. 1954).

17         BP additionally argues that even if Paragraph 10(b) would be applied to

18  top-line album sales in the U.S. and Canada, any deductions taken under Paragraph

19  10(b) would be limited by Paragraph 10(c), which provides that BP's soundtrack

20  royalty "shall be subject to the same Record Company policies and practices as are

21  applicable to Fox." BP asserts that Fox is not subject to the same policies and

22  practices because Fox has "joint venture" deals with the Record Companies and is

23  not subject to any of the "standard deductions" by which Fox seeks to reduce BP's

24  _____

    [6] The Referee disagrees with Fox that this heading can be ignored pursuant to Section
25  VIII(H) of Exhibit A which provides that "captions of paragraphs hereof are inserted for
    reference only and in no way define, limit or describe the scope or intent of any provision
26  hereof . . . ." (Agreement, Exhibit A, Section VIII(H).) This provision applies only to
    language found in Exhibit A "Definition of Net Proceeds." There is no similar provision in
27  the Agreement itself. While BP previously relied on Section VIII(H) and argued that
    headings could not be relied upon, BP did so in the context of contingent compensation.
28

                                    - 14 -

1  royalty.  However, application of Paragraph 10(c) in the manner suggested by BP

2  would ignore the specific provisions of Paragraph 10(a) and (b) that specify the

3  Soundtrack Royalties payable to BP.  As Fox asserts, the "policies and practices"

4  referred to in Paragraph 10(c) make more sense when interpreted as accounting

5  practices.  Indeed, Paragraph 10(c) is entitled "Computation" and is a general

6  provision that cannot override the detailed provisions addressing Soundtrack

7  Royalties.

8         In sum, the Referee finds that application of the plain language of the

9  Agreement permits the challenged deductions to the Soundtrack Royalties for Alvin

10  in accordance with Fox's contract with R&T.

11              **(b)     Extrinsic evidence**

12         Fox further contends that the extrinsic evidence confirms BP's

13  understanding that deductions would be taken.  It contends that BP received the

14  soundtrack agreement between Fox and R&T, exclusive of the exhibits attached

15  thereto, in January 2008, which referenced that third-party royalties would be

16  computed on SRLP of the album "with customary reductions," and understood by at

17  least April 2008 that free goods and packaging deductions were being taken when it

18  received two soundtrack royalty statements (through the March 2008 period) that

19  detailed these deductions.

20         BP contends that when Bagdasarian discussed the deductions taken

21  under the R&T deal with Fox, he was not aware that BP was subject to any

22  deductions to which Fox was not also subject.  It claims that it was not until much

23  later when Bagdasarian learned that BP and Fox were not being paid in the same

24  manner, and as a result, Bagdasarian's conduct in 2009 cannot be taken to represent

25  BP's approval of Fox's practice of exempting itself from "standard deductions"

26  while subjecting BP to them.

27

28

- 15 -

1    It is undisputed that BP received the main body of the R&T Contract in

2  January 2008.  (Fox's MSJ, UF 37.)  Paragraph 5 of this contract provides that

3  royalty participants would receive their royalties "with customary reductions (e.g.,

4  25% packaging deduction, automatic 20% free goods deduction, ¾ reduction for

5  mid-priced records, etc.)."  (Id.)  Paragraph 6 provides that "all Net Profits for the

6  Soundtrack Album and Masters distributed by [R&T] pursuant to this Agreement

7  will be split 50/50 between RT and [Fox]."  (Id.)  BP does not dispute receiving the

8  R&T contract but instead argues that it was unaware that Fox wasn't receiving the

9  same deductions as it was.  The Referee finds, however, that this cannot support BP's

10  breach of contract claim which alleges that the deductions, by themselves, constitute

11  a breach.

12    In April 2008, Bagdasarian complained that the deductions being taken

13  were "very high."  (1st Cavanaugh Decl., ¶ 19, Ex. 3.)  In a subsequent conversation

14  to address Bagdasarian's concerns, Cavanaugh clarified to Bagdasarian the nature of

15  the soundtrack deal in terms of Fox's and BP's respective payment streams and the

16  application of deductions to all royalty participants.  (Id. at ¶ 20.)  In addressing this

17  conversation, Bagdasarian states that when he approached Fox in April 2008 about

18  the R&T deal, he was not aware that BP was subject to any deductions to which Fox

19  was not.  (Plaintiffs' Opp. to Fox MSJ, Ex. F at 175:17-177:19, 186:22-23.)

20  However, again, this shows that Bagdasarian's complaint was not that the deductions

21  were improper but that, as Bagdasarian asserts, he believed "the deal [with R&T]

22  was bad for both of them in the same manner."  Further, Minks of BP also had a

23  discussion with Cavanaugh relating to the fact that BP "felt too many deductions

24  were being taken off of [BP's] share."  (Ruga Decl., Ex. 23, Minks Depo. at 220:11-

25  221:14.)  This extrinsic evidence of course of conduct before a dispute was raised is

26  among the most reliable in determining the parties' real intent.  Crestview

27  Cemetery Ass'n v. Dieden, 54 Cal. 2d 744, 752 (1960) ("The acts of the parties under

28

1   the contract afford one of the most reliable means of arriving at their intention");

2   Oceanside 84, Ltd. v. Fid. Fed. Bank, 56 Cal. App. 4th 1441, 1449 (1997) ("the

3   conduct of the parties after the execution of the contract, and before any controversy

4   arose, may be considered in order to attempt to ascertain the parties' intention").[7]

5       **2.   With respect to The Squeakquel, the deductions taken were**

6           **proper under the Agreement**

7           **(a)   Plain language of the Agreement**

8           With respect to the Squeakquel, BP contends that calculating BP's

9   royalties based upon the wholesale price or PPD (Purchase Price to Dealer) rather

10  than the SRLP breached the Agreement.  It contends that it was entitled to a royalty

11  based on SRLP (e.g. $18.98/album) not PPD (e.g., $12.05/album).  BP claims that

12  Fox underpaid royalties on top-line album sales of The Squeakquel soundtrack in the

13  U.S. and Canada through June 30, 2012, by at least $527,944.  Fox, by contrast,

14  contends that the PPD calculations under its record company contract with Rhino

15  Entertainment Company ("Rhino") are the dollars-and-cents equivalent of payments

16  based on SRLP with deductions.  It claims that Rhino would not have agreed to pay

17  third-party royalties keyed to SRLP unless it applied standard deductions, and it paid

18  on a PPD basis with the intent of affording BP the equivalent of SRLP with

19  deductions.

20          In applying the language of the Agreement to The Squeakquel royalty

21  payments, the parties rely on the same arguments as discussed above with respect to

22  Alvin.  For the reasons explained above, the Referee finds that the plain language of

23

---

24  [7] Furthermore, the Referee also agrees with Fox that BP's own auditor's testimony is consistent with the plain language of the Agreement and supports the interpretation

25  determined herein.  BP hired Gelfand, Rennert & Feldman to conduct a financial audit in connection with Alvin. (Fox MSJ, UF 27.)  George Cavelli testified on behalf of the audit

26  firm that except for his contentions in this case, he had never audited an SRLP-based record royalty deal that did not allow for deductions, that it would be "unusual" for an SRLP

27  royalty deal to not be subject to deductions, and that packaging deductions for physical goods and territorial reductions are common in the music industry. (Id.)

28

1   the Agreement permitted the challenged deductions to the Soundtrack Royalties for
2   The Squeakquel in accordance with Fox's contract with Rhino.

                    (b)      **Extrinsic evidence**

4                BP does not dispute that prior to executing the soundtrack contract with
5   Rhino, Fox provided BP with a copy of Exhibit A to the Rhino contract which
6   indicated that certain deductions or reductions would be taken in calculating third-
7   party royalties and that Rhino would be computing the royalties based on the PPD
8   method. (Fox MSJ, UF 32.)  Under Exhibit A, the royalty rate for net sales of
9   records sold for distribution in Canada is 85% of the applicable U.S. rate. (Id. at UF
10  33.) Further, it is undisputed that BP never asserted that the Agreement did not
11  permit deductions in calculating third-party royalties or that PPD would be
12  inconsistent with the Agreement at any time before Fox executed the Rhino Contract
13  in July 2009. (Id. at UF 34.)  Finally, it is undisputed that when BP sued Fox in
14  April 2010, it did not claim Fox breached the Agreement by taking deductions in
15  calculating royalties or by using PPD in the Rhino contract. (Id.)  In response to the
16  above, BP argues that such evidence is irrelevant as Fox is obliged to pay BP a
17  Soundtrack Royalty pursuant to the terms of the Agreement, not the terms of the
18  Rhino contract.  However, contrary to BP's assertion, its conduct demonstrates its
19  pre-dispute understanding that the Agreement permitted deductions in calculation of
20  it royalties.

21          **3.      Summary judgment in favor of Fox is warranted with respect
22                  to the breach of contract claims based on the Soundtrack
23                  Royalties**

24                The Referee finds that BP's soundtrack claims fail as a matter of law
25  because the Agreement as supported by the extrinsic evidence provides that BP's
26  Soundtrack Royalties are subject to all deductions applicable under Fox's contract
27
28

- 18 -

1   with the Record Company.[8]  Fox is therefore entitled to summary judgment with

2   respect to the breach of contract claims based on the soundtrack royalties.[9]

3       **4.  BP is not entitled to summary judgment with respect to its**

4          **breach of contract claim based on the record company deals**

5       BP contends that Fox's deals with R&T and Rhino were a

6   discriminatory exercise of Fox's business judgment in violation of Section

7   VIII(BB)(1) of Exhibit A to the ST&C, which provides, "The exercise by Fox of its

8   sole business judgment hereunder shall be on a reasonable and non-discriminatory

9   basis."  Specifically, BP argues that Fox entered into record deals that saddle BP's

10  royalty with onerous deductions in an effort to increase the profit pool that Fox

11  shares with record companies.  It seeks summary judgment with respect to this clam.

12  Fox responds that there is no evidence that it discriminated against BP in any respect

13  as Fox treated BP the same as all similarly situated persons.

14      The Referee finds that BP fails to make a sufficient showing in support

15  of this claim.  First, the evidence shows that there were other third-party royalty

16  participants to the two soundtracks, and they were also subject to the record

17  company's standard deductions and reductions.  (1st Cavanaugh Decl., ¶¶ 18, 31-35;

18  2nd Cavanaugh Decl., ¶ 4.)  BP argues that these other royalty participants were not

19  parties to the Agreement and therefore, treating them and BP the same doesn't mean

20  that Fox has not violated Section VIII(BB)(1).  However, as BP sets forth,

21  "discrimination" is defined as "differential treatment; esp., a failure to treat all

22  persons equally when no reasonable distinction can be found between those favored

---

[8] Based on the determinations herein, the Referee need not address Fox's additional argument that BP's Alvin soundtrack claim is time-barred.  Similarly, the Referee need not address Fox's additional argument that Paragraph 10(e) of the Agreement, which provides that "if the Record Company agrees in writing to Owner to so account, Fox shall be relieved of such obligations and Owner shall look solely to Record Company for such record royalties," precludes The Squeakquel soundtrack claim.

[9] Denial of BP's summary judgment motion is correspondingly warranted, with the exception of its claim based on Fox's failure to report any royalties on sales of over 300,000 Alvin soundtrack albums which is addressed in Section V.

- 19 -

1   and those not favored." Black's Law Dictionary (9[th] ed. 2009).  Here, all royalty

2   participants were treated equally.  With respect to Fox, Fox and BP are not similarly

3   situated as Fox is a profit participant and BP is a royalty participant.  As Fox asserts,

4   nothing in the Agreement precludes this arrangement.  As such, BP is not entitled to

5   summary judgment with respect to this claim.

6        **D.**   **Breach of Contract Claim Based on the Licensing to HBO**

7        BP asserts a breach of contract claim for the underpayment of

8   contingent compensation on the pay-television licenses to HBO for Alvin and The

9   Squeakquel.   It contends that in exchange for co-financing payments for these films

10  from New Regency, Fox relinquished control of the lucrative pay-TV licenses for the

11  films to New Regency ("Regency").  According to BP, Fox was willing to accept

12  reduced HBO payments for the pay-TV licenses for Alvin and The Squeakquel,

13  because by co-financing the films, Fox received more significant benefits by

14  mitigating its risk on the films.  BP claims that it received no benefit from Fox's

15  decision to seek co-financing monies from Regency, and as a result, BP received

16  $261,720 less in contingent compensation than it otherwise would have.  It argues

17  that Fox's decision to co-finance with Regency was a "discriminatory" business

18  decision in violation of Section VIII(BB)(1) of the Agreement.  Both parties seek

19  summary judgment with respect to BP's claim.

20       Fox contends that the assertion it was "discriminatory" is impossible

21  because BP was treated the same as all others:  all profit participants for the two

22  films had diminished revenue from HBO as a result of the co-financing of the

23  pictures with Regency, including Fox.

24       Section VIII of the Agreement requires Fox to exercise its business

25  judgment in exploiting films "on a reasonable and non-discriminatory basis."  The

26  Referee agrees with Fox that its decision to co-finance the films with Regency, or as

27  BP puts it "exploiting [the deals] in a manner that uniquely benefits Fox when BP

28  would otherwise have a right to a portion of the assets' full value," does not violate

1   this provision.  First, Fox's Chairman during the relevant time period testified that he

2   decided to co-finance the two films because financial analysis showed that Fox could

3   lose $19-$20 million even if the first Alvin film garnered a respectable domestic box

4   office performance of $50 million.  (Ruga Decl., Ex. 1, Rothman Depo., 59:14-63:7,

5   70:13-76:7, 151:8-152:1.)  He testified that the co-financing decision was the

6   difference between making the movie and not making the movie.  (Id. at 75:20-76:7.)

7   BP benefited from Fox's decision to co-finance because it would have received

8   nothing by way of contingent compensation had it been decided that the risk of the

9   films was too great.  Moreover, it is undisputed that all profit participants were

10  treated exactly the same as BP; in other words, all profit participants for the two

11  films had diminished revenue from HBO as a result of the co-financing of the

12  pictures with Regency, including Fox.

13          In sum, under both parties' undisputed definition of "discrimination"

14  (see Bagdasarian and Karman Opposition to Fox's Motion for Summary Judgment,

15  p. 21 n. 9), the Referee determines that Fox and BP are not similarly situated as only

16  Fox faced the risk of $60 million in losses if Alvin did not produce substantial box

17  office proceeds.  The co-financing decision resulted in diminished HBO revenue that

18  impacted both BP and Fox and contrary to BP's hypothetical situation, did not result

19  in Fox achieving any benefits on any other projects.  Fox is therefore entitled to

20  summary judgment on this claim as a matter of law.

21  **IV.    Motions for Summary Judgment Re Breach of Implied Contract Claims**

22          In the SAC, Karman asserts breach of implied contract claims alleging

23  that at Fox's request, Karman supplied screenwriting and graphic design services for

24  The Squeakquel, and that Karman was never compensated for these services.  Both

25  Karman and Fox seek summary judgment with respect to these claims.

26          Under California Civil Code § 1621, an implied contract "is one, the

27  existence and terms of which are manifested by conduct."  Such a contract exists

28  "where the circumstances preceding and attending [the offeror's performance],

- 21 -

60

1   together with the conduct of the offeree acting with knowledge of the circumstances,

2   show a promise [to pay] of the type usually referred to as implied or implied in fact."

3   Grosso v. Miramax Film Corp., 383 F.3d 965, 967 (9th Cir. 2004) (quoting Desny v.

4   Wilder, 46 Cal. 2d 715, 738 (1956)).  The Desny rule that an implied contract will be

5   enforced to compensate an individual who provides an idea to another "is justified on

6   the theory that the bargain is not for the idea itself, but for the services of conveying

7   that idea."  Grosso, 383 F.3d at 967.  To avoid preemption by the Copyright Act, the

8   claim must allege an "extra element," which for an implied contract claim is the

9   implied promise to pay.  Id.

10          Contrary to Karman's reliance on Spinelli v. Tallcot, 272 Cal. App.

11  2d589, 595 (1969), an implied contract will not be formed as long as services are

12  provided and accepted.  See Desny, 46 Cal. 2d at 739 ("The law will not imply a

13  promise to pay for an idea from the mere facts that the idea has been conveyed, is

14  valuable, and has been used for profit."); Faris v. Enberg, 97 Cal. App. 3d 309, 319

15  (1979) ("an obligation to pay could not be inferred from the mere fact of submission

16  on a theory that everyone knows that the idea man expects to be paid").  Rather, the

17  parties' conduct must demonstrate a bilateral intent to compensate for the services.

18  See Grosso, 383 F.3d at 968 (noting that the "extra element" that makes an implied

19  contract claim avoid copyright preemption has been referred to as "the bilateral

20  expectation of compensation"); Montz v. Pilgrim Films & Television, Inc., 649 F.3d

21  975, 976 (9th Cir. 2011) ("the contractual claim requires that there be an expectation

22  on both sides that use of the idea requires compensation").

23      **A.    Genuine Issues of Material Fact Exist With Respect to Karman's**

24              **Breach of Implied Contract Claim Based on Her Writing Services**

25          The following facts are found to be undisputed[10]:

26  _____

27  [10] In finding that these facts are undisputed, the Referee reviewed Fox's Evidentiary
    Objections to Karman's Separate Statement and Karman's Responses to Fox's Evidentiary

28  Objections, in addition to the Separate Statement, Statement of Genuine Disputes, and

                                    - 22 -

1         On March 31, 2008, Karman provided Fox with a detailed treatment,

2  including specific scenes and dialog, for The Squeakquel.  (Karman's PSJ, UF 1.)

3  Jon Vitti prepared the first draft of The Squeakquel screenplay, which he submitted

4  to Fox in mid-October.  (Id. at UF 2.)  Elizabeth Gabler, Karen Rosenfelt, Erin

5  Siminoff, Bagdasarian and Karman agreed that Vitti's mid-October 2008 draft of the

6  The Squeakquel screenplay was unacceptable.  (Id. at UF 3.)  At a meeting on

7  October 21, 2008, involving at least Gabler, Rosenfelt, Bagdasarian and Karman to

8  discuss the development of The Squeakquel screenplay, it was decided that Karman

9  would write the next draft of the screenplay.  (Id. at UF 4.)  Karman provided Fox

10  with the first 29 pages of her screenplay for The Squeakquel on October 22, 2008,

11  and provided Fox with a complete draft of her screenplay on November 10, 2008.

12  (Id. at UF 5.)

13         Elizabeth Gabler of Fox testified that she agreed to offer Karman a

14  writer's agreement to enable Karman to become a member of the Writer's Guild.

15  (Karasik Decl., Ex. X, Gabler Depo., pp. 108:12-109:5.)  On October 21, 2008,

16  Gabler instructed Karen Rosenfelt and Erin Siminoff to contact Fox Business Affairs

17  to implement this decision.  Steven Plum in Fox Business Affairs was advised to

18  make an offer of a writer's agreement including the minimum (i.e., "scale")

19  compensation compliant with the Writers Guild Basic Agreement.  (UF 8; Karasik

20  Decl., ¶ 33, Ex. X, Gabler Depo. at 106:4-109:12; Plum Decl., ¶¶ 17-22, Exs. 6-7.)

21  On October 22, 2008, Fox (through Plum) offered Karman (through Waterman)

22  additional compensation of $29,250 for writing a screenplay, an offer that was based

23  on the Writers Guild of America's ("WGA") guidelines for compensation for non-

24  WGA writers with no precedent.  (UF 9; Plum Decl., ¶¶ 20-21, Ex. 7; Karasik Decl.,

25  ¶ 35, Ex. E, Bagdasarian Depo. 304:5-23.)  On October 24, 2008, after Karman had

26

27  Reply to Statement of Genuine Disputes.  Rulings on the objections shall be deemed
    consistent with the findings of fact when applicable.

28

1  submitted the first 29 pages of her re-write, Fox revised its initial offer and offered

2  Karman $100,000 in additional compensation for any writing services Karman might

3  render in connection with The Squeakquel, with a bonus of $50,000 if Karman

4  received sole writing credit from the WGA and $25,000 bonus if she received share

5  credit from the WGA.  (Plum Decl., ¶¶ 22-24, Exs. 7-8; Karasik Decl., ¶ 35, Ex. E,

6  Bagdasarian Depo., 304:24-305:9.)  Between October 21, 2008 and December 10,

7  2008, Karman was the person actively writing on The Squeakquel screenplay.  (Id. at

8  UF 10.)  In early 2009, Karman rejected Fox's offer.  Fox has refused to pay Karman

9  additional compensation for the writing she submitted on The Squeakquel.  (Id. at UF

10  16.)

11             At the outset, the Referee notes that the time period at issue is from

12  October 21 through December 10.  (See Karman Reply, p. 2 n. 1 ("In this motion,

13  however, we have focused on the services Karman provided from October 21

14  through December 10 because it cannot be disputed that Fox requested these

15  services.").)[11]  This is the time period when Vitti's draft of The Squeakquel

16  screenplay was deemed unacceptable, and it was decided that Karman would write

17  the next draft of the screenplay.  (Karman PSJ, UF 4.)  In support of her claim,

18  Karman contends that an implied contract was formed between Fox and Karman

19  whereby Karman agreed to, and did in fact, provide writing services on The

20  Squeakquel at Fox's request and that Karman expected to be paid, and Fox agreed to

21  pay, for those services.  She concludes that Fox is liable to Karman for the

22  reasonable value of those services, despite the fact that the parties never executed a

23  written agreement.  Fox, on the other hand, asserts that the undisputed facts show

24  that Karman lacked an expectation of additional compensation for any supposed

25

26  [11] At the hearing, Plaintiffs clarified that they focused on this time period in support of their Motion for Partial Summary Judgment, and that with respect to Fox's Motion for Summary

27  Judgment, if they successfully establish their claim during this time period or raise a triable issue, then Fox's motion for summary judgment on this claim cannot be granted.

28

1  writing services, and that it had no expectation to compensate Karman.

2  The Referee finds that genuine issues of material fact exist precluding

3  summary judgment in favor of either party. At issue is the bilateral expectation of

4  compensation. Based on the undisputed facts that Fox offered Karman a writer's

5  agreement, which included compensation, and that the parties negotiated the amount

6  of compensation, reasonable inferences can be drawn in favor of both parties whether

7  Fox expected to compensate Karman, and whether Karman expected compensation.

8  While Fox claims that it never expected to compensate Karman and that it only

9  offered her money "in appreciation for Karman's contributions" and to allow her to

10 become a member of the WGA, a trier of fact could find otherwise. Steve Plum

11 testified with respect to what Fox contemplated prior to its initial offer:

12        I think in the initial conversation I had with Erin Siminoff and Karen
          Rosenfelt, I asked them if they had a point of view about whether
13        [Karman] was going to get paid, and they did have a point of view. So
          prior to my first conversation with Janice's representative, I had an
14        understanding that our side was contemplating paying her on that.
15                                    * * *

16        What I would say is they expected that she would have a writer's
          agreement which would have compensation involved in the writer's
17        agreement, yes.
18
19 (Dixon Decl., Ex. 22, Plum Depo., 52:25-54:1.) With respect to the ensuing

20 negotiations, Fox's initial offer to Karman was rejected as too low by Steve

21 Waterman, Karman's representative. (Dixon Decl., Ex. 6 at p. 10.) Following this,

22 Fox then offered Karman "$100,000 for an 'all writing' deal that would extend to

23 any further screenplay materials she might prepare in connection with The

24 Squeakquel." (Id.) In addition, while Fox claims that Karman began writing the

25 screenplay prior to any offers of compensation, a trier of fact could reasonably infer

26 that Karman expected to be compensated and that Fox expected to compensate her

27 because it is undisputed that Karman was the only writer on the project during the

28 timeframe of October 21 and December 10, 2008. It was during this timeframe that

- 25 -

64

1   Karman wrote the next draft of The Squeakquel screenplay, because the screenplay

2   by Vitti, who was hired by Fox, was deemed unacceptable.  Furthermore, the other

3   writers on The Squeakquel received compensation for their similar work on the

4   screenplay.  Fox paid the writing teams of Aibel & Berger and McRobb & Viscardi a

5   total of $800,000 for their work on The Squeakquel screenplay. [12]  (See Dixon Decl.,

6   Ex. 41 at BP00021934-BP00021935.)  Thus, these facts, when viewed in the light

7   most favorable to the nonmoving party, demonstrate disputed issues of material fact.

8          Fox argues that under Paragraph 21(c) of the ST&C's of the Agreement,

9   there cannot be an implied agreement because additional payment for Karman's

10  writing services would necessarily require a written agreement.  The Referee

11  disagrees.  Paragraph 21(c) provides:  "This Agreement may be amended or modified

12  only by the written agreement of Owner and Fox."  However, the Agreement does

13  not encompass the writing services at issue here.  Instead, it addresses Fox's

14  purchase of the underlying rights to the Chipmunk characters and covers only the

15  producer services of Karman and Bagdasarian.  (See Agreement, ¶ 5 (engaging

16  Karman and Bagdasarian to perform services "customarily rendered by producers in

17  the motion picture industry, including supervision of the screenplay materials

18  required by Fox").)  As such, the cases relied on by Fox for the proposition that an

19  implied contract cannot exist where an express contract exists concerning the same

20  subject matter are inapposite.  Because Karman's writing services at issue here are

21  outside the scope of the Agreement, it cannot be found that the Agreement already

22  covered the same subject matter.  Furthermore, the fact that Fox offered Karman an

23  "all writing" writer's agreement belies Fox's assertion that Karman's writing

24  services were part of her obligations pursuant to the Agreement.  And, as noted

25  ─────────────────────

26  [12] Similarly, although Fox argues that Karman had previously provided written materials
    without any expectation of compensation, Karman is correct that the instances showing that
    she voluntarily submitted her writings do not necessarily preclude a finding in her favor

27  regarding the October rewrite of the Vitti screenplay which was of a different nature than
    her prior work.

28

- 26 -

1 | above, Karman's rewrite of the screenplay was similar to the work for which Fox
2 | compensated other writers, thereby supporting the determination that Karman's
3 | writing services at issue were outside the scope of the Agreement and therefore not
4 | requiring a written agreement as a matter of law.

5 |       In sum, an implied contract claim requires a showing of a bilateral
6 | expectation of compensation.  Because reasonable inferences can be drawn in favor
7 | of both parties regarding the existence or absence of the bilateral expectations of
8 | compensation, genuine issues of material fact exist.  Summary judgment is therefore
9 | not warranted in favor of either party on the implied contract claim for Karman's
10 | writing services.

11 |     **B.**    <u>**Karman Fails to Establish an Implied Contract With Respect to**</u>
12 |         <u>**Her Graphic Design Services**</u>

13 |       Karman claims that in or around March 2008, Fox asked Karman to
14 | design Brittany, Jeanette, and Eleanor (the Chipettes) for The Squeakquel.  (Karman
15 | PSJ, Ex. 18 at 150:6-14; Ex. 8 at 255:19256:11.)  She claims that at Fox's request,
16 | she created pencil sketches re-imagining Brittany, Jeanette, and Eleanor so that they
17 | could be turned into CGI (computer-generated imagery) characters for The
18 | Squeakquel.  (Id. at Ex. 18 at 150:6-14, 166:23-167:2; Ex. 8 at 255:19-256:11; Ex.
19 | 47.)  She claims that she presented her pencil sketches to Fox in or around June
20 | 2008, and Fox loved them.  (Id. at Ex. 8 at 255:19-256:11; Ex. 47.)  On July 1, 2008,
21 | Karman provided her pencil sketches to Rhythm & Hues, which Fox had hired to
22 | create 2D CGO images of the Chipettes for The Squeakquel.  (Id. at Exs. 48, 49, 47,
23 | 51.)  Karman claims that Rhythm & Hues, with her assistance, turned Karman's
24 | pencil sketches into 2D CGO characters for The Squeakquel.  (Id. at Ex. 47, 55.)

25 |       Based on the above and in seeking summary judgment, Karman
26 | contends that an implied contract was formed between Fox and Karman whereby
27 | Karman agreed to, and did in fact, provide graphic design services on The
28 |

- 27 -

1   Squeakquel at Fox's request, and that Karman expected to be paid for those services,

2   which are of the type of services that Fox usually pays for.  Karman concludes that

3   Fox is therefore liable to Karman for the reasonable value of those services.

4        Fox argues that during the period of time that Karman claims to have

5   provided services, it was never aware of the pencil sketches that Karman now claims

6   she created and which are basis for her motion.  Fox claims that no one from Fox

7   ever asked Karman to prepare any pencil sketches or other drawings of the Chipette

8   characters for use in connection with The Squeakquel.  (Garberson Decl., ¶ 14;

9   Gabler Decl., ¶ 4; Ruga Decl., Ex. 20, Garberson Depo. at 67:25-69:4.)  It claims that

10  it was not even informed that Karman was providing or had provided any 2D artwork

11  of the Chipettes to R&H until after the 2D design process was complete.  (Garberson

12  Decl., ¶¶ 11-14, Ex. D; Karasik Decl., ¶ 40, Ex. BB.)  Fox claims that it never

13  offered to compensate Karman for any graphic design services and at no time had

14  any expectation that it was obligated to pay Karman for providing graphic design

15  services directed to any characters, including the Chipettes, for The Squeakquel.

16  (Plum Decl., ¶ 28; Karasik Decl., Ex. E, Bagdasarian Depo. at 256:19-257:19, Ex.

17  BB; Garberson Decl., ¶¶ 12-14.)

18       The Referee finds that Karman's implied contract claim based on her

19  graphic design services fails as a matter of law.  First, it is questionable whether

20  Karman has shown that Fox knew about her design services at the time.  The only

21  undisputed evidence that Karman relies on is her testimony that she believed that

22  Karen Rosenfelt, the independent third-part producer on the films, knew that she was

23  going to design the Chipettes.  (Karman PSJ, Ex. 18, Karman Depo. at 150:6-21.)

24  The evidence is undisputed that no one at Fox knew Karman had provided any 2D

25  artwork for the Chipettes to R&H until August 2008 when the 2D design process was

26  complete.  (Fox's Response to Plaintiffs' Statement of Genuine Issues, UF 83.)

27  While Karman argues that Rosenfelt was "acting on behalf of Fox," this argument of

28

- 28 -

67

1    course raises the issue and requisite proof of agency.

2            Nonetheless, the issue is whether Karman has shown a bilateral intent to

3    compensate, and she has not.  First, it is undisputed that during the development of

4    Alvin (the first film), Karman provided Fox with certain two-dimensional drawings

5    of the Chipmunk characters that had been prepared by a third-party.  Fox never

6    requested these materials, and Karman had no expectation of compensation with

7    respect to this submission.  (Karasik Decl., ¶ 38, Ex. P, Karman Depo., 129:1-130:2,

8    132:18-134:17; Gaberson Decl., ¶¶ 7-8, Ex. C.)  As Fox states, based on Karman

9    providing Fox with graphic design materials on the first film with no expectation or

10   demand for compensation, Fox at no time believed it had any obligation to pay

11   Karman additional compensation for any graphic design activity.  Indeed, "[i]f at the

12   time the services were originally rendered they were intended to be gratuitous or as

13   an accommodation, motivated by friendship, kindness, or some other significant

14   relationship existing between the parties, and were tendered without any expectation

15   of remuneration, they cannot afterwards be converted into an obligation to pay their

16   reasonable value under the theory of an implied contract."  Payne v. Bank of Am.

17   Nat'l Trust & Sav. Ass'n, 128 Cal. App. 2d 295, 304 (1954).

18           Karman seeks to show that Fox intended to compensate her by relying

19   on evidence that Fox paid another individual for the same service on Alvin, the first

20   picture.  However, this cannot establish that Fox intended to compensate Karman for

21   her services on The Squeakquel.  First, Fox did pay for this service on The

22   Squeakquel.  It hired R&H, a professional motion picture graphic design firm, to

23   design the Chipettes, ultimately paying it $55,000 for nine weeks of design services

24   relating to the preparation of those materials.  (Garberson Decl., ¶¶ 10-11, 14; Ruga

25   Decl., Ex. 20, Garberson Depo. at 67:25-69:4.)  Moreover, that Karman may have

26   expected compensation because she knew that Fox had paid for such services on

27   Alvin cannot establish her claim.  "The assumption, intention or expectation of either

28

- 29 -

1  party alone, not made known to the other, can give rise to no inference of an implied

2  contract." Travelers Fire Ins. Co. v. Brock & Co., 47 Cal. App. 2d 387, 392 (1941);

3  see also City of Pasadena v. Los Angeles Cnty., 118 Cal. App. 2d 497, 500 (1953)

4  (finding no implied contract because although services were performed that

5  benefitted defendant, they were never requested by defendant).   Furthermore, it is

6  undisputed that neither Karman nor anyone on her behalf requested or expressed an

7  expectation of additional compensation for Karman's services designing the

8  Chipettes until after the work had been completed.  (Fox's Response to Plaintiffs'

9  Statement of Genuine Disputes, UF 82, 86.)  "It is the expectation of the parties

10  existing at the time the services were rendered or the benefits conferred that

11  controls." Payne, 128 Cal. App. 2d at 304.

12        Thus, because Karman cannot establish a breach of implied contract

13  claim based on her graphic design services, summary judgment in favor of Fox is

14  warranted.

15  **V.    Fox's Application Pursuant to FRCP 56(d)**

16        In its Motion for Partial Summary Judgment on Certain Breach of

17  Contract Claims, BP contends that Fox breached Paragraph 10(a) of the Agreement

18  by failing to report any royalties on sales of over 300,000 Alvin soundtrack albums.

19  Specifically, BP contends that Fox underreported the number of units sold to BP

20  through December 31, 2012, by 307,984 units, resulting in the underpayment of BP's

21  soundtrack royalty by $581,430.  It also contends that Fox does not appear to have

22  accounted to BP for revenue from Digital Streams, resulting in the underpayment of

23  royalties of at least $11,536.  In making these contentions, BP relies on the expert

24  Declaration of Christian Tregillis, a forensic accountant.

25        In response, Fox argues that this "underreporting" claim rests entirely

26  on a comparison between "units shipped" (less reserves and returns, as reported on

27  Fox's profit-sharing statement) and royalty-bearing units (as reported in the

28

- 30 -

69

1   statements to BP), but Fox and BP are accounted to on different bases, and reported

2   unit counts are accordingly different.  It claims that BP's asserted difference in unit

3   counts is attributable in substantial part to "free goods," which are records that are

4   given away as incentives to retailers, not sold.  Fox states that it has not had an

5   opportunity to present its evidence or depose Mr. Tregillis about his analysis because

6   expert discovery has not yet commenced.[13]  It asserts Evidentiary Objections to the

7   Tregillis Declaration, and it brings an Application Pursuant to Rule 56(d) to depose

8   Tregillis and to present its own expert's conclusions in a timely manner.[14]

9           Fed. R. Civ. Pro. 56(d) provides relief where "the party opposing

10   summary judgment makes (a) a timely application which (b) specifically identifies

11   (c) relevant information, (d) where there is some basis for believing that the

12   information sought actually exists."  VISA Int'l Serv. Ass'n v. Bankcard Holders of

13   Am., 784 F.2d, 1472, 1475 (9th Cir. 1986); accord Burlington N. Santa Fe. R.R. Co.

14   v. Assinboine & Sioux Tribes of the FortPeck Reservation, 323 F.3d 767, 774-75

15   (9th Cir. 2003).  Once "a nonmovant shows by affidavit or declaration that, for

16   specified reasons, it cannot present facts essential to justify its opposition" the Court

17   may defer considering the motion, deny it, allow time for the nonmoving party to

18   obtain declarations or conduct discovery, or issue any other appropriate order.  Fed.

19   R. Civ. P. 56(d).

20           Fox states that Plaintiffs gave it no notice during the parties' meet and

21   confer over the motions for summary judgment that they intended to rely on expert

22   declarations.  (Ruga Dec., ¶4.)  It claims that it learned of these expert declarations

23   ---

[13] According to the Referee's July 23, 2013 Scheduling Order, Initial Expert Disclosures are not due until February 10, 2014, Rebuttal Expert Disclosures are not due until February 24, 2014, and the Expert Discovery deadline is March 30, 2014.

[14] In its Application, Fox also seeks to depose another expert relied on by BP, Frederic Bernstein.  However, the issue related to that testimony (the implied contract claim) has been resolved herein, and Fox's request related and objections to this expert are therefore moot.

1   when they were received along with Plaintiffs' moving papers only on November 8.

2   (Id.) Fox states that it intends to offer evidence through cross-examination of

3   Tregillis that establishes the flaws and mistaken assumptions of his analysis. (Ruga

4   Decl., ¶¶ 7-10.) Fox will demonstrate that Tregillis's conclusions relating to the

5   alleged underreporting of units and royalties are simply incorrect. (Id.) Fox has

6   retained accounting and industry experts who will provide testimony demonstrating

7   that units were not underreported and that Tregillis's conclusions are flawed and

8   based on his improper comparison of statements reported to two different types of

9   participants – profit share participants and royalty participants. (Ruga Dec., ¶9.)

10          Based on Fox's showing in its Application, and having read BP's

11  Opposition, and Fox's Reply, the Referee finds that Fox has met its burden under

12  Rule 56(d), and that granting its application is warranted. As such, the Referee

13  grants Fox's Application Pursuant to Federal Rule of Civil Procedure 56(d) to allow

14  Fox to depose Mr. Tregillis and conduct expert discovery with respect to the

15  remaining issue identified herein.  {**Insert Timing and restrictions**}  Ruling on

16  this remaining issue in Bagdasarian's Motion for Partial Summary Judgment on

17  Certain Breach of Contract Claims is deferred, and the Declaration of Tregillis is

18  stricken as premature.

19  **VI.    Conclusion**

20          Accordingly, the Referee:

21          (1) Grants in Part and Denies in Part Defendant Twentieth Century Fox Film

22  Corporation's Motion for Summary Judgment;

23          (2) Denies Plaintiff Bagdasarian Productions, LLC's Motion for Partial

24  Summary Judgment on Certain Breach of Contract Claims, with the exception of one

25  claim, the determination of which is deferred;

26          (3) Denies Plaintiff Janice Karman's Motion of Partial Summary Judgment on

27  Implied Contract Claims; and

28

1        (4) Grants Fox's Application Pursuant to FRCP 56(d) as set forth herein.

2

3   DATED:  February  11 , 2014

4                                                    Carl J. West
                                                     Judge of the Superior Court (Ret.)
5                                                    Referee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 33 -

## PROOF OF SERVICE BY U.S. MAIL

Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation
Reference No. 1220044628

I, Kathryn Cisneros, not a party to the within action, hereby declare that on  February 11, 2014 I served

the attached ORDER DATED FEBRUARY 11, 2014 on the parties in the within action by depositing true

copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los

Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067
   Parties Represented:
   Bagdasarian Productions, LLC
   Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird LLP
333 S. Hope St.
16th Floor
Los Angeles, CA  90071
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA  90012-4793

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660
    Parties Represented:
    Bagdasarian Productions, LLC
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA  90213-0900
   Parties Represented:
   Twentieth Century Fox Film Corp.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA, on February 11, 2014.

_Kathryn Cisneros_
Kathryn Cisneros

73

# EXHIBIT 6

```
                                          FILED
                           CLERK, U.S. DISTRICT COURT

                                   APR 1 4 2014

                           CENTRAL DISTRICT OF CALIFORNIA
                           BY                      DEPUTY
```

1   HON. CARL J. WEST RET.
    JAMS
2   707 Wilshire Blvd.
    46th Floor
3   Los Angeles, CA 90017
    Tel: 213-620-1133
4   Fax: 213-620-010

5   Referee

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10  BAGDASARIAN PRODUCTIONS, LLC, a        Case No.:  CV102991MWF (JCGx)
11  California limited liability company, and
    JANICE KARMAN, an individual,          Referred under Cal. Code Civ. Proc.
12                                          Section 638 to:
              Plaintiffs,
13                                          Hon. Carl J. West (Ret.)
         v.
14                                          JAMS Reference No. 1220044628
    TWENTIETH CENTURY FOX FILM
15  CORPORATION, a Delaware corporation,

16            Defendant.                    [~~PROPOSED~~] ORDER RE:
                                            STIPULATION TO UNDISPUTED
17                                          FACTS AND REQUEST FOR
                                            FURTHER ORDER ON CROSS-
18                                          MOTIONS FOR SUMMARY
                                            JUDGMENT (SUPPLEMENTING
19                                          PRIOR ORDER DATED FEBRUARY
                                            11, 2014)
20
                                            [Stipulation To Undisputed Facts and
21                                          Request For Further Order On Cross-
                                            Motions For Summary Judgment
22                                          (Supplementing Prior Order Dated
                                            February 11, 2014) filed concurrently
23                                          herewith]

24

25

26

27

28

                            [~~PROPOSED~~] ORDER

## ORDER

2   This Court, having read and considered the Stipulation To Undisputed Facts
3   and Request For Further Order On Cross-Motions For Summary Judgment
4   (Supplementing Prior Order Dated February 11, 2014) ("Stipulation") of plaintiffs
5   Bagdasarian Productions, LLC ("Bagdasarian") and Janice Karman's ("Karman")
6   (collectively "Plaintiffs") and defendant Twentieth Century Fox Film Corporation's
7   ("Fox"), and having considered the evidence and pleadings in the record, and good
8   cause appearing,

9   **IT IS HEREBY ORDERED, ADJUDGED AND DECREED,** as follows:

10   1.   Summary judgment is granted to Fox on Bagdasarian's breach of contract
11   claim for underreporting of units on the *Alvin and the Chipmunks* ("*Alvin*") soundtrack
12   album for the reasons set forth in the Stipulation;

13   2.   Summary judgment is granted to Fox on Karman's claim for breach of
14   implied contract for her alleged writing services for *Alvin and the Chipmunks: The*
15   *Squeakquel* for the reasons set forth in the Stipulation;

16   3.   Except as set forth above, the Referee's Order on the parties' cross-
17   motions for summary judgment dated February 11, 2014 remains unchanged; and

18   4.   The adjudications provided for herein shall be included in the Referee's
19   Statement of Decision.

21   IT IS SO ORDERED:

23   DATED: 4/14/14 _____          _____
                                             Honorable Carl J. West

1

~~[PROPOSED]~~ ORDER

## PROOF OF SERVICE BY U.S. MAIL

Re: Bagdasarian Productions LLC et al. vs. Twentieth Century Fox Film Corporation
Reference No. 1220044628

I, Kathryn Cisneros, not a party to the within action, hereby declare that on  July 16, 2014 I served the attached STATEMENT OF DECISION on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Steven A. Marenberg Esq.
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA   90067
    Parties Represented:
    Bagdasarian Productions, LLC
    Janice Karman

Rachel M. Capoccia Esq.
Louis Karasik Esq.
Casondra K. Ruga Esq.
Alston & Bird, LLP
333 S. Hope St.
16th Fl.
Los Angeles, CA   90071-1410
    Parties Represented:
    Twentieth Century Fox Film Corp.

Hon. Michael W. Fitzgerald
U.S. District Court
312 N. Spring St.
#G-8
Los Angeles, CA   90012-4793

Douglas J. Dixon Esq.
Melissa R. McCormick Esq.
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA   92660
    Parties Represented:
    Bagdasarian Productions, LLC
    Janice Karman

Jonathan Gottlieb Esq.
Fox Group Legal
P.O. Box 900
Beverly Hills, CA   90213-0900
    Parties Represented:
    Twentieth Century Fox Film Corp.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on July 16, 2014.

Kathryn Cisneros